**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ASYLUMWORKS
2121 Decatur Pl., Northwest, Ste. 4
Washington, DC 2008

TAHIRIH JUSTICE CENTER
6400 Arlington Blvd # 400
Falls Church, VA 22042

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO
1861 Bay Rd.
East Palo Alto, CA 94303

D.M.C.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

K.N.E.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

N.E.F.* and her minor son, C.A.* (by and through
his mother)
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

U.O.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

L.G.M. and her minor daughter, L.M.M.G. (by and
through her mother)*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

Case No.: 1:20-cv-03815-BAH

**COMPLAINT**

C.H.A.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

R.P.P.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

L.E.J.J.* and M.C.J.J.*, through their next friend
W.C.J.A.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

J.H.C.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

H.M.R.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

M.L.V., through his next friend M.V.M.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

M.C.R.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

G.S.M.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

V.M.B.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

M.A.S.*
c/o National Immigrant Justice Center
224 S. Michigan Ave., Suite 600
Chicago, IL 60604;

                    Plaintiffs,

        v.

ALEJANDRO MAYORKAS, *in his official capacity*
*as the Secretary of Homeland Security*,
c/o Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528–0485;

JOSEPH B. MAHER, *in his official capacity as the*
*Acting General Counsel for the Department of*
*Homeland Security*,
Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528–0485; *and*

U.S. DEPARTMENT OF HOMELAND SECURITY
c/o Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528–0485;

                    Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(Violation of Refugee Act, Immigration and Nationality Act, Administrative Procedure Act, The
Federal Vacancies Reform Act, the Homeland Security Act, and the Appointments Clause)

\* Plaintiffs proceeding under pseudonym are indicated with an asterisk.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

JURISDICTION AND VENUE ................................................................................................. 3

THE PARTIES............................................................................................................................ 3

  Organizational Plaintiffs ......................................................................................................... 3

  Individual Plaintiffs ................................................................................................................ 5

  Defendants .............................................................................................................................. 15

FACTUAL ALLEGATIONS ................................................................................................... 16

I.     Access to Work Authorization Is Contemplated by Law and Vital to the Survival of
       Asylum Seekers ........................................................................................................... 16

II.    The Rules Fundamentally Impair Access to Work ..................................................... 19

III.   The Rules Violate the APA.......................................................................................... 25

      A.   Portions of the Rules Are Inconsistent With the INA. ....................................... 27

          The Port-of-Entry Requirement ........................................................................ 27

          The One-Year Filing Bar ................................................................................... 29

          The 365-Day Waiting Period ............................................................................. 30

          Automatic Termination During Appeals ........................................................... 31

          The Criminal Bar ............................................................................................... 31

      B.   The Rules Are Arbitrary and Capricious Because DHS Failed to Adequately Justify
          Each Provision.................................................................................................... 33

          The Port-of-Entry Requirement ........................................................................ 38

          The One-Year Filing Bar ................................................................................... 39

          The 365-Day Waiting Period ............................................................................. 42

          Automatic Termination During Appeals ........................................................... 43

          The Criminal Bar ............................................................................................... 46

          The Timeline Repeal Rule ................................................................................. 47

          Applicant-Caused Delays................................................................................... 48

          Elimination of the Deemed Complete Provision .............................................. 49

          Discretionary Denials......................................................................................... 50

          Elimination of Recommended Approvals .......................................................... 51

          Maximum Validity ............................................................................................. 52

          Parole Limitation ............................................................................................... 52

          Biometrics Requirement ..................................................................................... 53

      C.   The Rules Are Arbitrary and Capricious Because DHS Did Not Adequately
          Consider the Effect of Contemporaneous and Related Rules ................................... 54

D. The Rules Are Invalid Because DHS Deprived the Public of a Meaningful Opportunity To Comment on Their Interrelated Impact by Segregating Its Rulemakings ........................................................................................ 57

E. The Rules are Arbitrary and Capricious Because DHS Failed to Consider the Harm to Asylum Seekers That the Rules Cause and the Humanitarian Purpose of the Refugee Act ............................................................................................ 58

IV. The Changes in the EAD Rules Harm Both Individual and Organizational Plaintiffs ..... 61

A. Harm to Individual Plaintiffs ......................................................................... 62

Denial of Work Authorization ............................................................................ 62

Delays and Costs Related to Work Authorization ............................................. 65

Harm Caused by the Inability To Gain Work Authorization ............................. 65

B. Harm to Organizational Plaintiffs .................................................................. 69

V. Mr. Wolf and Mr. Mizelle Invalidly Served as DHS Secretary and DHS General Counsel Respectively, so They Lacked Authority To Make or Ratify the Rules .......................... 73

A. The Appointments Clause, FVRA, and HSA .................................................. 74

B. McAleenan and Wolf's Service as Acting DHS Secretary Violated the HSA ........ 76

C. Wolf Unlawfully Assumed Office as Acting DHS Secretary ......................... 78

D. Mr. Wolf's Service as Acting DHS Secretary Also Violated the FVRA ........ 79

E. Mr. Mizelle's Service as Acting DHS General Counsel Violated the FVRA ......... 80

F. Mr. Wolf's Issuance of the Rules Was Unlawful, so the Rules Must Be Set Aside . 80

G. The Purported Fall 2020 Ratification of the Unlawfully Promulgated Rules Is Invalid 83

H. Gaynor's Memos Did Not Cure Wolf's Unlawful Succession ....................... 86

I. Wolf's Fall 2020 Ratifications of the Rules Were Invalid .............................. 88

J. Mr. Wolf's January 2021 Purported Ratification Of The Unlawfully Promulgated Rules Was Invalid ............................................................................................ 90

CLAIMS FOR RELIEF ................................................................................................. 92

PRAYER FOR RELIEF ................................................................................................ 103

## INTRODUCTION

1.      This complaint challenges two related rules (the "Rules") issued by the Department of Homeland Security (the "Department" or "DHS") in June 2020 related to employment authorization documents ("EADs") for asylum seekers. Chad F. Wolf issued the Rules while purportedly serving as Acting Secretary of DHS, and Chad Mizelle signed the Rules while purportedly serving as Acting General Counsel of the DHS.  EADs enable asylum seekers to earn income to survive while their asylum application is being adjudicated and are often an applicant's only way of obtaining government identification. The Rules drastically curtail access to an EAD.

2.      Congress established a statutory right to apply for asylum, but the U.S. government does not offer economic, social, or legal support to asylum seekers during that process. EADs are thus essential for asylum applicants to earn income to secure housing, food, medical care, legal counsel, and other basic needs as they pursue a safe and permanent life in this country.

3.      The Rules eviscerate the system that asylum applicants rely on to obtain work authorization by complicating and delaying access to EADs. For example, one portion of the Rules requires asylum applicants to wait, at minimum, a full year before being granted an EAD, while other provisions impose outright denial of work authorization for the duration of an applicant's asylum case, which is often years.

4.      The asylum applicants harmed by these rules are vulnerable to homelessness, hunger, inadequate healthcare, and exploitation. They are less likely to be able to afford an attorney to assist with their asylum process, even though legal representation significantly increases their chance of obtaining asylum. Some may have no choice but to abandon their asylum claims and return home to danger even when they would have ultimately won asylum.

5.      The merit of the Individual Plaintiffs' asylum claims is beyond reasonable dispute. Four are transgender women, two of whom have won remand from a circuit court. Another applicant fears harm related to political activism. Some fled gender-based violence and others fled serious harm from gangs or cartels. Two are gay men from Nigeria and Cuba respectively and another is a lesbian from Uganda. Nigeria and Uganda are countries where it is illegal to have such an identity; in Cuba the legal regime is less stark but abuse of LGBT people remains extreme. Theirs are not the sorts of "frivolous, fraudulent, or otherwise non-meritorious asylum applications" that the Rules purportedly seek to curtail. 85 Fed. Reg. 38,532, 38,533. Yet the harm they face is real and immediate.

6.      Mr. Wolf and Mr. Mizelle's indifference to that harm is summed up by their chilling suggestion that "[a]sylum seekers who are concerned about homelessness during the pendency of their employment authorization waiting period should become familiar with the homelessness resources provided by the state where they intend to reside." *Id.* at 38,591.

7.      Mr. Wolf and Mr. Mizelle's meager justifications for the Rules betray their true purpose: not to deter skeletal or bad-faith asylum applications, but instead to deter *all* asylum applications—even if those applications would ultimately prevail. Indeed, the Rules are one part of the Trump Administration's campaign to dismantle the United States' commitment to provide asylum to migrants fleeing persecution. The administration's explicit strategy has been to "present[] aliens with multiple *unsolvable* dilemmas to impact their calculus for choosing to make the arduous journey to begin with."[1] The Rules do just that by undercutting asylum seekers' ability to support themselves and thus their ability to survive, while their asylum application are pending.

---

[1]  *See* Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Migrant Asylum Claims*, NBC News (Jul. 29, 2019), https://nbcnews.to/3mq1Ic5 (quoting a National Security Council official) (emphasis added).

And the Department's supposed reasons for adopting these changes cannot bear even minimal scrutiny.

8.      Plaintiffs ask this Court to vacate the Rules because they are arbitrary and capricious and contrary to the Immigration and Nationality Act ("INA") in violation of the Administrative Procedure Act ("APA"), and because the Department's purported rationales were woefully inadequate. Vacatur is also necessary for the independent reason that Chad Wolf was not validly serving as Acting DHS Secretary under the Homeland Security Act ("HSA"), Federal Vacancies Reform Act ("FVRA"), and the Appointments Clause of the Constitution when he signed the Rules. He, therefore, lacked the authority to issue the Rules or to delegate that authority to Chad Mizelle. Moreover, under the FVRA, Mr. Mizelle was no longer validly serving as Acting DHS General Counsel when he signed the Rules. All *post hoc* attempts to ratify Mr. Wolf's installment as Acting Secretary, and all efforts made in attempt to ratify Wolf's various actions have likewise been ineffective, so the Rules remain invalid.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701 *et seq*.

10.     Venue is proper in this district under 28 U.S.C. § 1391(e) and in this division because Defendants are agencies and officers of the United States, the action does not involve real property, and Defendants reside in this district.

## THE PARTIES

### Organizational Plaintiffs

11.     Organizational Plaintiffs are legal and social service organizations that serve asylum seekers. Plaintiff AsylumWorks is based in Washington, D.C. and is dedicated to serving

the non-legal needs of asylum seekers in the region. Its mission is to empower asylum seekers to rebuild their lives with dignity and purpose through the provision of direct services, education, and community support. Participants in AsylumWorks programming receive social services, assistance connecting to legal services, assistance with entry into the workforce, and community building services. Through its Employment Program, AsylumWorks helps asylum seekers find employment by connecting them to legal services to apply for EADs, conducting resume writing and job interviewing workshops, and by providing training to ensure that asylum seekers are ready to enter the workforce in the United States.

12.     Plaintiff Tahirih Justice Center ("Tahirih") is a nonprofit and non-partisan organization that provides free legal immigration services to survivors of gender-based violence. Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law. Tahirih offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings. Tahirih also assists its clients with applications that relate to their request for asylum, including applications for EADs. Tahirih operates from five offices, in Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

13.     Plaintiff Community Legal Services in East Palo Alto ("CLSEPA") is a nonprofit organization that provides legal and social services to low-income families in and around East Palo Alto, California. The mission of its immigration program is to provide transformative immigration legal services that enable low-income immigrants to achieve a secure and thriving future. It seeks transformative change by providing high-quality services and assisting as many people as possible who are eligible for immigration relief to apply for and obtain that relief, including asylum and

related protection, as well as work authorization. In addition to providing legal representation to asylum seekers, CLSEPA conducts *pro se* clinics to help those without counsel apply for immigration-related relief; CLSEPA offers pro se clinics for asylum seekers to assist with their applications on the merits and has also held such clinics to assist with applications for EADs.

**Individual Plaintiffs**

14.     The Individual Plaintiffs are noncitizens who came to the United States to seek asylum. Each of them has an urgent need for work authorization, and each of their applications is subject to delay or denial because of the Rules.

15.     D.M.C. is a Honduran woman who is seeking asylum because her family has been targeted by drug cartels. They threatened to kill D.M.C. and kidnap her son, and other members of her family have gone into hiding or otherwise fled for their lives out of fear. D.M.C. lives in Illinois and applied for asylum on October 1, 2020. D.M.C. applied for asylum more than a year after she entered the United States due to confusion about the asylum application process and after mistakenly believing she had taken the necessary steps to seek asylum when she had a credible fear interview at the border. Because D.M.C. did not formally apply for asylum until after August 25, 2020, the Rules preclude her from obtaining work authorization for the duration of her immigration proceedings, unless an immigration judge ("IJ") finds that she qualifies for an exception to the asylum statute's one-year filing deadline. She will not have an opportunity to make such an argument until her next Master Calendar hearing on April 1, 2022. D.M.C. sought to mitigate this harm by joining the Asylum Seeker Advocacy Project ("ASAP").[2] Now that her I-

---

[2]  Where possible, Individual Plaintiffs have sought to mitigate the Rules' harm by joining ASAP, an organization whose members are currently able to benefit from a partial preliminary injunction issued in *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 973-74 (D. Md. 2020). Both parties have appealed in that case. *See Casa de Maryland v. Wolf*, Nos. 20-2217, 20-2263

589 has been pending for 150 days, she plans to apply for an EAD as soon as she is able to acquire the identity documents.

16.     K.N.E. is a lesbian from Uganda who fled the horrendous violence LGBTQ+ people in her country face. K.N.E. lives in Indiana, and she applied for asylum on June 23, 2020. Because K.N.E.'s application for asylum had not been pending for 150 days when the Rules took effect, she was not yet eligible to apply for an EAD. Under the Rules, K.N.E.'s wait to apply for a work permit grew from 150 to 365 days, and she was required to pay an $85 fee even though her application previously would have been free. In addition, K.N.E. entered the United States without inspection after falling ill and being hospitalized in Mexico. She was convicted of illegal entry under 8 U.S.C. § 1325. She entered prior to August 2020, so she is not subject to the provision in the Rules that bars work authorization for entry without inspection, but she nonetheless fears that her entry and the subsequent conviction could result in the discretionary denial of her application for an EAD. K.N.E. sought to mitigate these harms by joining ASAP and filing her application for work authorization on November 25, 2020.. K.N.E. did not receive a receipt notice until February 22, 2021. Though the USCIS online system listed the receipt date as February 13, 2021, the paper receipt was dated as November 25, 2020. K.N.E. has not received work authorization.

17.     N.E.F. is an asylum seeker who fled gender-based violence in her native Morocco with her son, C.A. They live in Illinois, and they applied for asylum on April 27, 2020. Because N.E.F.'s application for asylum had not been pending for more than 150 days when the Rules took effect, she was not yet eligible to apply for work authorization. Under the Rules, N.E.F.'s wait to apply for a work permit grew from 150 to 365 days, and she was required to pay an $85 fee even

(4th Cir.). As such, it is uncertain if and for how long these individuals will be able to benefit from ASAP membership. And in any event, that injunction does not provide permanent relief and is not available to all Individual Plaintiffs.

though her application previously would have been free. N.E.F. tried to mitigate these harms by joining ASAP and filing for a work permit, but in November 2020, Defendants denied her application based on a provision of the Rules not covered by that limited injunction. According to Defendants, N.E.F. caused a "delay" in the adjudication of her asylum case because she apparently missed a fingerprinting appointment, even though the notice for the appointment did not arrive until after its scheduled date. Under the Rules, this "delay" rendered N.E.F. ineligible for an EAD.

18.     C.A. is the minor child of N.E.F. He is a derivative applicant on his mother's asylum claim. Because his mother's application for asylum had not been pending for more than 150 days when the Rules took effect, he was not yet eligible to apply for an EAD. Under the Rules, C.A.'s wait to apply grew from 150 to 365 days, and he was required to pay an $85 fee even though his application previously would have been free. C.A. joined his mother's ASAP registration, but he was denied an EAD anyway based on the provision regarding applicant-caused delays. Due to their urgent need for work authorization, N.E.F. and C.A. applied again for EADs on March 9, 2021, but have not yet received receipts for those applications.

19.     U.O. is a gay man from Nigeria who fled following serious violence directed at him because of his sexual orientation in his country. U.O. applied for asylum in September 2017, and he lives in New York. Because U.O. had been detained at the border, he was required to file his asylum application defensively, in an immigration court. He waited several months for his case to be calendared, but it never was, so he filed affirmatively with DHS. U.O. applied for an EAD after his asylum application was pending for 150 days and received it in April 2018. In June 2019, after his asylum application had been pending with DHS for nearly two years, he received notice that his case would be calendared with the immigration court and that he would have to re-file his asylum application. U.O.'s case was not calendared with the immigration court until October 2020,

so U.O. was unable to re-file his asylum application until early December 2020. Because U.O.'s asylum application was not considered filed until December 2, 2020, the Rules preclude him from renewing his work authorization *at all*, until an IJ finds that his application for asylum was timely. And even if an IJ finds that U.O. meets an exception to the filing deadline, he will still have to wait until December 2021 to renew his EAD because DHS will not treat the September 2017 filing date as operative. He will also have to pay an additional $85 biometrics fee under the Rules, even though his biometrics have already been collected.

20.     L.G.M. is an asylum seeker from Nicaragua who fled to the United States because of political persecution in her country. She fled with her daughter, L.M.M.G., and they now live in Wisconsin. L.G.M. and her daughter applied for asylum on June 5, 2020. Because L.G.M. and her daughter had been detained at the border, they were required to file their asylum application defensively, in an immigration court. They waited almost a year for their case to be calendared with the immigration court, but it never was, so they filed affirmatively with DHS to avoid missing the one-year filing deadline. Defendants later transferred L.G.M.'s case to the immigration court. Because of the delay, L.G.M.'s application for asylum had not been pending for more than 150 days when the Rules took effect, so she was not yet eligible to apply for work authorization and the amount of time her application was pending with DHS will not count for the purposes of her EAD application. L.G.M. re-filed her asylum application with the court in December 2020, after her one-year filing deadline. Because of this timing, the Rules preclude her from receiving work authorization at all, until an IJ finds her prior application was timely. Even if an IJ finds that she meets an exception to the filing deadline, she will still have to wait nearly a year to apply for an EAD because DHS will not treat the earlier filing date as operative. L.G.M. will also have to pay

an additional $85 biometrics fee under the Rules, even though her application previously would have been free.

21.     L.M.M.G. is the minor child of Plaintiff L.G.M. She is both a derivative applicant on her mother's asylum claim and has her own independent asylum application. Because her and her mother's application for asylum had not been pending for more than 150 days when the Rules took effect, L.M.M.G. was not yet eligible to apply for work authorization. Under the Rules, L.M.M.G. is vulnerable to delay or denial of her work permit for the same reasons as her mother: the operative application was filed after the one year filing deadline; if she overcomes that provision, the wait to apply for a work permit grows from 150 to 365 days and the application is subject to an $85 fee. And, because L.M.M.G. missed a fingerprinting appointment related to her asylum application before DHS (an application that DHS has not allowed her to benefit from in any event), she is vulnerable to the provision of the Rules that calls for denials of work authorization based on applicant-caused delays.

22.     C.H.A. is a transgender woman from Cuba. She fled Cuba because of physical violence, sexual abuse, and arbitrary police detention stemming from her gender identity. In December 2020, C.H.A. walked across the southern United States border into Texas, where she was apprehended by border patrol within minutes. She was released with an ankle monitor, and is pursuing asylum while living in Pennsylvania. C.H.A. applied for asylum on January 8, 2021. Because C.H.A. entered the United States without inspection after August 25, 2020, she is barred from seeking work authorization, and the limited exception to this provision does not apply. Even if C.H.A. could demonstrate that she qualified for the exception to the bar despite her manner of entry, she would still have to wait one year to seek work authorization, would be vulnerable to a discretionary denial, and would still have to pay the $85 filing fee. And although she could mitigate

these latter harms by joining ASAP, doing so will not help her overcome the bar based on her manner of entry because the injunction in *Casa de Maryland* did not include individuals who are impacted by that provision.

23.     R.P.P. is a gay man from Cuba who fled harm related to his LGBTQ activism. He attempted to enter the United States near Tijuana around August 2020 but was turned away at the border. On approximately December 8, 2020, R.P.P. entered the United States near Presidio, Texas without presenting himself at a port of entry. Border patrol subsequently apprehended him and detained him in El Paso. He applied for asylum on January 7, 2021 and was released from detention in February 2021. He currently lives with sponsors in California. Because R.P.P. entered the United States without inspection after August 25, 2020, he is barred from seeking work authorization, and the limited exception to this provision does not apply. Even if R.P.P. could demonstrate that he qualified for the exception to the bar despite his manner of entry, he would still have to wait one year to seek work authorization, be vulnerable to a discretionary denial, and still have to pay the $85 filing fee. And although he could mitigate these latter harms by joining ASAP, doing so will not help him overcome the bar based on his manner of entry because  the injunction in *Casa de Maryland* did not include individuals who are impacted by that provision.

24.     L.E.J.J. is an unaccompanied immigrant child from El Salvador who fled to the United States with his minor sister, M.C.J.J. They fled El Salvador around September 2020 because their lives were threatened after their father, a gang leader, was arrested and agreed to testify against other gang members. L.E.J.J. and M.C.J.J. were released from immigration custody in October 2020 to live with their mother in California, who herself fled to the United States over ten years ago due to violence she faced in El Salvador. L.E.J.J. and M.C.J.J. filed asylum applications to USCIS on January 4, 2021. Both are charged with having entered the United States

without inspection after the Rules' effective date of August 25, 2020, and thus the Rules prevent

them from seeking employment authorization documents during the pendency of their proceedings.

Neither L.E.J.J. nor M.C.J.J. can seek to mitigate all of the harm caused by the Rules by joining

ASAP, because *Casa de Maryland* did not enjoin the Rules' entry-without-inspection provision.

Even if they could get around the manner-of-entry bar, L.E.J.J. and M.C.J.J. would still have to

wait one year to seek work authorization, would be vulnerable to a discretionary denial, and would

still have to pay the $85 filing fee.

25.     M.C.J.J. is an unaccompanied immigrant child from El Salvador and the minor

sibling of L.E.J.J. She is impacted by the Rule in the same manner as her brother, as described in

the previous paragraph.

26.     J.H.C. is an unaccompanied immigrant child who came to the United States from

Honduras to seek asylum because of gang-related violence. He lives in Indiana, and he applied for

asylum on May 7, 2020. Because J.H.C.'s application for asylum had not been pending for more

than 150 days when the Rules took effect, he was not yet eligible to apply for work authorization.

Under the Rules, J.H.C.'s wait to apply grew from 150 to 365 days, and he must now pay an $85

fee even though his application previously would have been free. Initially, J.H.C. could seek to

mitigate the harm caused by the Rules by joining ASAP because he is 15, and ASAP did not accept

members who were under the age of 18. ASAP recently lowered the age threshold to 14, so J.H.C.

will register for membership.

27.     H.M.R. is an unaccompanied immigrant child who came to the United States from

Honduras to seek asylum because of child abuse he faced in his home country. He lives in

Wisconsin, and he applied for asylum on August 14, 2020. Because H.M.R.'s application for

asylum had not been pending for more than 150 days when the Rules took effect, he was not yet

eligible to apply for an EAD. Under the Rules, H.M.R.'s wait grew from 150 to 365 days, and he must now pay an $85 fee even though his application previously would have been free. H.M.R. cannot seek to mitigate the harm caused by the Rules by joining ASAP because he is 13, and ASAP does not accept members who are under 14.

28.     M.L.V. is eight years old and from Guatemala. Early in life he suffered kidney damage and near-total hearing loss. He now lives in California with his grandmother, who is his legal guardian. His guardian fears for his safety if he were forced to return to Guatemala, where he was targeted based on his disability. M.L.V. applied for asylum in March 2020. Under the Rule, M.L.V.'s wait to apply for an EAD grew from 150 to 365 days, and he must now pay an $85 fee even though his application previously would have been free. Although M.L.V. does not need a work authorization card to work, he has been living in a homeless shelter and other temporary housing with his grandmother, and he needs an EAD to access stable housing through publicly administrated programs. M.L.V. cannot himself seek to mitigate the harm caused by the Rules by joining ASAP because he is 8, and ASAP does not accept members who are under 14. His grandmother is attempting to mitigate this harm by joining ASAP. Relying on his grandmother's ASAP membership, M.L.V. applied for work authorization around March 5, 2021 but has not yet received a receipt for that application.

29.     M.C.R. is a transgender woman from Honduras who is seeking asylum in the United States following years of abuse and physical and sexual violence based on her gender identity and sexual orientation. She currently lives in New York, but she applied for and was denied asylum while detained in California. She appealed her case to the Ninth Circuit, and that court remanded her case in March 2020. M.C.R. was detained until August 2020, so she did not apply for an EAD until September 2020. Because her application was subject to the new Rules, she

included the newly required $85 fee. Before her application for work authorization was adjudicated, the immigration court denied her asylum application again, on October 21, 2020. M.C.R. is appealing for a second time. DHS subsequently denied her application for a work permit on November 4, 2020. The notice of denial cited the fact that, notwithstanding M.C.R.'s subsequent successful appeal of the decision, the immigration court had denied her asylum on March 25, 2019, which was within 365 days from when she applied for asylum and before the adjudication of her initial request for employment authorization.

30.      G.S.M. is a transgender woman from Mexico who fled to the United States after enduring violence based on her sexuality. She applied for asylum in September 2013 and lives in California. Her case is currently on remand from the Ninth Circuit. G.S.M. recently registered for ASAP membership and applied to renew her EAD, which officially expired in January 2021 but was subject a brief extension of the expiry date based on delays in EAD processing. DHS has not yet adjudicated that application. G.S.M. anticipates that her application could be barred by the provision in the Rules that allows for discretionary denials. First, she is seeking her fifth year of working status, which runs contrary to the Rules' intention to curtail so-called "limitless" renewals. In addition, G.S.M. likely faces a discretionary denial because of the Rules' focus on individuals who entered the United States without inspection, filed for asylum more than a year after entry, and who have certain criminal convictions. Though these provisions of the Rules apply only to new asylum seekers and thus not to G.S.M. directly, she fears that Defendants will nonetheless rely on these factors to deny her work permit renewal in the exercise of discretion.

31.      V.M.B. is a transgender woman from Mexico. She faced harm in her country where she was perceived of as a gay man, and worries that she will face a worse fate if she returns now that she is open about her gender identity. V.M.B. lives in Indiana, and she filed her application

for asylum on November 13, 2020. V.M.B applied for asylum more than a year after she entered the United States, but her delay relates partially to her process of coming to terms with her identity and openly identifying as a transgender woman. Because V.M.B. applied for asylum after August 25, 2020, the Rules preclude her from obtaining work authorization for the duration of her immigration proceedings, unless an IJ finds that she qualifies for an exception to the asylum statute's one-year filing deadline. In addition, V.M.B. faces a discretionary denial of her EAD application because of the Rules' focus on individuals who entered the United States without inspection and who have certain criminal convictions. Though these provisions of the Rules should not apply directly to V.M.B., she fears that Defendants will nonetheless rely on the existence of these new bars to deny her work permit in the exercise of discretion.

32.     M.A.S. is a Honduran woman who has survived severe gender-based violence. She suffered decades of beatings, sexual abuse, and murder threats from the man she married as a teenager. Fearing for her life, she fled to the United States in 2013. M.A.S. was detained in Texas but released after she was found to have a credible fear of return to Honduras. M.A.S. then moved to Virginia, where she continues to pursue her asylum case. An IJ denied relief in May 2018, and the Board of Immigration Appeals ("BIA") dismissed her appeal in late August 2020. She is currently appealing her case to the Fourth Circuit Court of Appeals. In 2019, M.A.S. received employment authorization that stated it was valid from May 2019 through May 2021. However, the Rules took effect before the dismissal of M.A.S.'s BIA appeal, and under the Rules, a dismissal at the BIA automatically terminates work authorization. In addition to terminating M.A.S.'s prior work authorization, the Rules also prevent M.A.S. from renewing or reapplying for work authorization while her case is pending before the Fourth Circuit. M.A.S. cannot seek to mitigate

14

these harms through ASAP membership because the injunction in *Casa de Maryland* did not extend to these provisions of the Rule.

**Defendants**

33.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet agency of the United States Government. DHS is the agency that proposed and issued both of the Rules and is charged with implementing them. Within DHS, U.S. Citizenship and Immigration Services ("USCIS") is responsible for adjudicating asylum applications and EADs for asylum applicants.

34.     Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security. He is sued in his official capacity. Defendant Mayorkas succeeds Chad F. Wolf who purportedly held the title of Acting Secretary of the U.S. Department of Homeland Security beginning on November 13, 2019, and who issued both of the Rules at issue in this case under that purported authority. Defendant Mayorkas has current capacity to redress violations described below relating to actions taken by Mr. Wolf in excess of his authority.

35.     Defendant Joseph B. Maher is the Acting General Counsel of the U.S. Department of Homeland Security. He is sued in his official capacity. Defendant Maher succeeds Chad Mizelle, who purported to assume the title of Acting General Counsel of the U.S. Department of Homeland Security on February 12, 2020. Mr. Mizelle subsequently purported to assume the title of "Senior Official Performing the Duties of the General Counsel for DHS" and purported to continue to exercise the powers of the office of DHS General Counsel. Mr. Wolf allegedly delegated authority to Mr. Mizelle to sign both of the Rules at issue in this case. Mr. Mizelle signed both Rules under that purported authority. Defendant Maher has current capacity to redress violations described below relating to actions taken by Mr. Mizelle in excess of his authority.

**FACTUAL ALLEGATIONS**

**I.      ACCESS TO WORK AUTHORIZATION IS CONTEMPLATED BY LAW AND VITAL TO THE SURVIVAL OF ASYLUM SEEKERS**

36.     The United States' asylum system was codified in the Refugee Act of 1980, which declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including, where appropriate, humanitarian assistance for their care and maintenance in asylum areas . . . and transitional assistance to refugees in the United States." Pub. L. No. 96–212, 94 Stat. 102.

37.     The Refugee Act sought "to bring United States refugee law into conformance" with the United States' international obligations under the 1967 United Nations Protocol Relating to the Status of Refugees ("UN 1967 Protocol") and the 1951 United Nations Convention Relating to the Status of Refugees ("Refugee Convention"). *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987). The Convention and Protocol provide that contracting states "shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment." Refugee Convention, art. 17(1), July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 137 (entered into force Apr. 22, 1954); UN 1967 Protocol, 19 U.S.T. 6223, TIAS No. 6577, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967).

38.     Asylum can be sought by any person who is not a citizen or national of the United States "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status." 8 U.S.C. § 1158(a)(1). Noncitizens are eligible to receive asylum if they meet the definition of a "refugee" and are not subject to specific statutory bars outlined in Section 1158 of the INA.

39.     Though the right to seek asylum is clearly protected, the process is complicated, difficult, resource intensive, and it often takes years.[3] It generally involves a written application and a long wait for an interview or hearing, and it may include appeals in the immigration and federal court systems. During this process, work authorization is critical to ensuring that asylum seekers are able to support themselves and pursue relief.

40.     Restricting access to an EAD for asylum seekers deprives them of access to critical supports for their survival. An EAD is usually an asylum seeker's first government-issued identification as well as the predicate for obtaining a Social Security Number ("SSN"). Because a government-issued photo ID and an SSN are often prerequisites for accessing public services that are essential to asylum seekers' ability to support themselves, an EAD is critical to enable asylum seekers to rebuild their lives as they pursue a permanent protection in the United States.

41.     For example, in addition to barring access to legal work, lack of an EAD can preclude asylum seekers from obtaining a state identity card or driver's license,[4] opening a bank

---

[3] The average processing time for a defensive immigration case (one filed in immigration court) is more than 930 days. *See* American Immigration Council, *Asylum in the United States* (June 11, 2020), https://bit.ly/38iNB3z; *see also* TRAC Immigration, *Immigration Court Processing Time by Outcome*, https://bit.ly/3nxwBwF.

[4] States have adopted differing approaches to the federal REAL ID Act, which DHS implements, *see* 6 C.F.R. Part 37, including whether an EAD or SSN is required to obtain a state identity card or driver's license. *Compare, e.g.*, Md. MVA, Online Document Guide, https://bit.ly/3fm8bkQ (no SSN required), *with* Ind. BMV, Proving Your Social Security Number Current, https://bit.ly/30lgrNE (SSN required).

account,[5] accessing vocational training programs,[6] and accessing scholarships or in-state tuition.[7] In addition, lack of access to these documents can make it difficult or impossible to obtain housing.

42.     Lack of access to work authorization also restricts asylum seekers' access to health care. Asylum seekers who do not have an EAD cannot access employer-sponsored health care; yet asylum seekers are also ineligible for federally-funded Medicaid, *see* 8 U.S.C. § 1641(b), and they often cannot qualify for state-funded health insurance plans.

43.     The federal government does not provide any financial or legal support to asylum seekers during the application process, so there is no federal substitute that would provide access to these basic necessities of daily life. Nor is non-state funded support available in many states, including  Wisconsin and Indiana, where some Individual Plaintiffs live.

44.     Without an EAD, asylum seekers will be unable to obtain gainful employment in the United States and support themselves as they pursue the pathway to lawful permanent resident status, and, ultimately, U.S. citizenship.

45.     Requiring asylum applicants to wait one year before applying for an EAD unreasonably deprives them of the opportunity to work and provide for themselves and their families. Because many asylum seekers are forced to flee their country without time to prepare or save, many come to this country with limited resources. Depriving them of the opportunity to sustain themselves can be tantamount to depriving them of their ability to seek asylum outright.

---

[5]  Opening an account with an IRS–issued taxpayer identification number is possible, but it adds a substantial burden that DHS should have taken into account, particularly for child applicants. *See* Consumer Financial Protection Bureau, *Can I get a checking account without a social security number*, https://bit.ly/3fhx29u.

[6]  *E.g.*, YouthCare, YouthBuild, https://bit.ly/31elYEW.

[7]  *See, e.g.*, Univ. System of Georgia, Board of Regents Policy Manual § 4.3.2, https://bit.ly/30mUXA6.

46.     Lack of work authorization makes asylum applicants more vulnerable to domestic violence and other crimes. Asylum seekers without an EAD typically must rely on the goodwill of others—such as family, friends, or charities—to obtain basic necessities like housing, food, and clothing. As a report by Human Rights Watch points out, "[f]orcing asylum seekers to rely on others for subsistence permits, and even encourages, abusive and exploitive relationships."[8] For example, Plaintiff G.S.M., who faces the risk of denial of her application for a renewed EAD under the Rule, was sexually abused by a man who had offered her a place to stay in the time period before she had obtained her initial work permit.

47.     Asylum seekers who resort to unauthorized work find themselves particularly vulnerable to unpaid wages and substandard working conditions. Fearing retaliation, they are often afraid to lodge complaints or report violations, making it more difficult for other workers to improve their wages and working conditions.

## II.     THE RULES FUNDAMENTALLY IMPAIR ACCESS TO WORK

48.     During the week of June 22, 2020, DHS introduced two rules that change the existing EAD system to the detriment of asylum applicants.

49.     On June 22, 2020, DHS published the "Timeline Repeal Rule," which, in pertinent part, eliminates the then-existing regulation providing for a thirty-day timeframe for USCIS to process initial EAD applications. *See* Final Rule, Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants, 85 Fed. Reg. 37,502, *et seq*. The Timeline Repeal Rule became effective on August 21, 2020.

---

[8]     *See* Human Rights Watch, *At Least Let Them Work*, (Nov. 12, 2013), https://bit.ly/38uZ0NQ.

50.     On June 26, 2020, USCIS published additional regulations imposing a number of additional barriers to asylum applicants' access to work authorization (the "EAD Bar Rule"). *See* Final Rule, Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38,532, *et seq*. The EAD Bar Rule became effective on August 25, 2020.

51.     The EAD Bar Rule and the Timeline Repeal Rule (collectively the "Rules") will devastate the ability of asylum seekers to gain the work authorization necessary to support themselves in this country as they await a decision on their asylum cases.

52.     The Rules detailed below substantially change the EAD application process and enact significant barriers to obtain pre-asylum work authorization.

53.     *First*, under the Timeline Repeal Rule, USCIS may leave an asylum seeker to wait on a decision on his or her application indefinitely. Previously, USCIS was required to rule on an EAD application within thirty days of its filing. *See* 8 C.F.R. § 208.7(a)(1) (effective until Aug. 21, 2020); *Gonzalez Rosario v. USCIS*, 365 F. Supp. 3d 1156, 1163 (W.D. Wash. 2018). The Timeline Repeal Rule has "eliminate[d] any deadlines previously imposed on the agency to process EAD applications." *Casa de Maryland*, 486 F. Supp. 3d at 938 (citing 85 Fed. Reg. at 37,505).

54.     *Second*, the EAD Bar Rule extends the waiting period before an applicant may apply for an EAD from 150 to 365 days (the "365-Day Waiting Period"). *See* 8 C.F.R. § 208.7(a)(1)(ii) (Aug. 25, 2020) ("An applicant for asylum cannot apply for initial employment authorization earlier than 365 calendar days after the date USCIS or the immigration court receives the asylum application."); *id.* § 208.3(c)(3) (Aug. 25, 2020) ("Receipt of a properly filed asylum application will commence the 365-day period after which the applicant may file an application for employment authorization."); *id.* § 274a.12(c)(8) (Aug. 25, 2020) (discussing eligibility of an

alien "who is eligible to apply for employment authorization under 8 C.F.R. § 208.7 because the 365-day period set forth in that section has expired"). Relatedly, an applicant who is denied asylum within 365-days of the application date cannot seek work authorization for the duration of an administrative appeal to the BIA.

55.     *Third*, the EAD Bar Rule eliminates the "Deemed Complete" provision of the EAD Rules. Previously, if USCIS did not return an incomplete asylum application within 30 days, it was deemed complete and the 150-day waiting period to apply for EAD began. *See id.* § 208.3(c)(3) (effective until August 25, 2020). Now, an asylum applicant must wait for an indefinite waiting period to receive notice from USCIS that his or her asylum application is complete before the EAD waiting period will begin. *See id.* § 208.3(c)(3) (Aug. 25, 2020) ("Receipt of a properly filed asylum application will commence the 365-day period after which the applicant may file an application for employment authorization.").

56.     *Fourth*, asylum-seekers' EAD applications may now be denied at the discretion of USCIS (the "Discretionary Denials" provision). *See id.* § 274a.13(a)(1) (Aug. 25, 2020). Previously, EAD applications were subject to automatic authorization if the asylum applicant met preexisting criteria. *See id.* § 274a.13(a)(1) (effective until August 25, 2020) ("The approval of applications filed under 8 C.F.R. 274a.12(c), except for 8 C.F.R. 274a.12(c)(8) [those who have filed a complete application for asylum or withholding of deportation or removal who have not yet received a decision], are within the discretion of USCIS.").

57.     *Fifth*, the EAD Bar Rule imposes greater restrictions with respect to applicant-caused delays in the asylum application process and introduces new types of delays that will result in an EAD denial. Any delay requested or caused by the applicant that is still outstanding or has

not been remedied when the EAD application is filed will result in a denial of the application (the "Applicant-Caused Delay" provision). *Id.* § 208.7(a)(1)(iv) (Aug. 25, 2020).

58.     Previously, any applicant-caused delay was not a basis on which USCIS could deny an EAD application. Instead, applicant-caused delays were relevant only for purposes of calculating whether an asylum application had been pending for the 150 days required to apply for an EAD or the 180 days required to approve an EAD. Once an applicant completed the 180-waiting period, an otherwise approvable EAD application could be granted regardless of a subsequent delay. *See id.* §§ 208.4(c) and 208.9(e) (effective until August 25, 2020). Additionally, previously, applicants could rectify a delay and resume accruing time toward EAD eligibility, a process that has been curtailed under this provision.

59.     The EAD Bar Rule also imposes new "applicant-caused delays," including a failure to appear for an asylum interview or a biometric services appointment. *Compare id.* § 208.10(a)(1)(iv) ("The failure to appear for an interview or biometric services appointment may result in . . . [d]enial of employment authorization."), *with Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532, 38,598–99 (June 26, 2020) (explaining no such penalties in the prior rule).

60.     Under the EAD Bar Rule, applicant-caused delays now encompass, as set forth in 8 C.F.R. § 208.7(a)(iv): (a) a request to amend or supplement an asylum application that causes a delay, (b) failure to appear to receive and acknowledge a decision, (c) certain extension requests for purposes of evidentiary submissions, (d) most failures to appear at interviews or biometrics appointments, (e) requests to reschedule asylum interviews, (f) requests to transfer the case to a new asylum office, (g) failure to provide an interpreter at an interview, (h) a request to provide

additional evidence for an interview, and (i) "[f]ailure to comply with any other request needed to determine asylum eligibility."

61.     *Sixth*, the EAD Bar Rule eliminates USCIS's process whereby an applicant who received a "notice of recommended approval" could apply for an EAD before the waiting period expired (the "Elimination of Recommended Approvals"). *Compare id.* § 208.7(a)(1) (effective until August 25, 2020) ("In the case of an applicant whose asylum application has been recommended for approval, the applicant may apply for employment authorization when he or she receives notice of the recommended approval.") *and id.* § 274a.12(c)(8)(ii) (effective until August 25, 2020) (allowing EAD applications based on recommended approval for asylum) *with id.* § 208.7(a)(1) (Aug. 25, 2020) (omitting reference to notice of recommended approval) *and id.* § 274a.12(c)(8) (Aug. 25, 2020) (same and imposing 365-day wait period).

62.     *Seventh*, even though the INA provides that asylum seekers can receive asylum despite missing the one-year statutory filing deadline if they demonstrate changed or extraordinary circumstances, *see* 8 U.S.C. § 1158(a)(2)(D), the EAD Bar Rule requires denial of an EAD for failing to file the asylum application within one year of entering the United States (the "One-Year Filing Bar"), unless and until an asylum officer or IJ determines that the applicant meets a statutory exception. *See* 8 C.F.R. § 208.7(a)(1)(iii)(F) (Aug. 25, 2020).

63.     *Eighth*, although U.S. asylum law expressly permits asylum applications by people who entered the U.S. without inspection, *see* 8 U.S.C. § 1158(a)(1), the EAD Bar Rule renders these asylum seekers ineligible for EAD authorization, unless they meet a limited exception (the "Port-of-Entry Requirement"). *See id.* § 208.7(A)(1)(iii)(G) (Aug. 25, 2020).

64.     *Ninth*, the EAD Bar Rule creates a new EAD eligibility bar against applicants who have been convicted of a "particularly serious crime," or if there are "serious reasons for believing

that the applicant . . . has committed a serious non-political crime outside the United States" (the "Criminal Bar"). *Id.* § 208.7(a)(1)(iii)(B)–(C) (Aug. 25, 2020). This new bar does not provide any definition of "particularly serious crime" or "serious non-political crime" and gives USCIS unlimited discretion as to its application, despite ample case law defining both terms. *See, e.g.*, *Matter of N-A-M-*, 24 I. & N. Dec. 336 (BIA 2007) (addressing the particularly serious crime bar); *Matter of E-A-*, 26 I. & N. Dec. 1 (BIA 2012) (addressing the serious nonpolitical crime bar).

65.     *Tenth*, the EAD Bar Rule provides that an EAD will automatically terminate on the date that an asylum officer denies the asylum application, thirty days after an IJ denies the asylum application unless timely appealed to the BIA, or the BIA affirms or upholds a denial (the "Automatic Termination" provision). 8 C.F.R. § 208.7(b)(2) (Aug. 25, 2020). Previously, if an asylum applicant received an EAD based on a pending asylum application, that EAD would remain valid throughout the review process, including federal court review, subject only to its expiration date. The EAD Bar Rule prohibits access to a work permit during a federal court appeal process. *See id.* §§ 208.7(a)(1)(i), (b)(1). Such an applicant can reapply for an EAD only after a federal court remand. *See id.*

66.     *Eleventh*, under the EAD Bar Rule, an EAD may be granted for a maximum term of two years the ("Maximum Validity" provision). *See id.* § 208.7(b)(1) (Aug. 25, 2020) ("USCIS may renew employment authorization under 8 C.F.R. § 274a.12(c)(8) in increments determined by USCIS in its discretion, but not to exceed increments of two years."). Previously, no such restriction existed.

67.     *Twelfth*, the EAD Bar Rule eliminates USCIS's prior discretion to adjudicate parole-based employment authorization on a case-by-case basis.[9] Now, applicants who have been paroled into the United States may not apply for an EAD, unless their asylum application has been pending for more than 365 days and they meet the other eligibility requirements (the "Parole Limitation" provision). *See id.* § 274a.12(c)(11) (Aug. 25, 2020).

68.     *Thirteenth*, the EAD Bar Rule imposes a new and redundant biometrics requirement and an accompanying new fee. *See id.* § 208.7(a)(1)(i) (Aug. 25, 2020) (the "Biometrics Requirement"). Previously, asylum applicants were required to submit to fingerprinting and other biometrics collection in connection with their asylum application, but there was no fee for the collection and asylum applicants were not required to resubmit the same information separately to support their EAD application. The EAD Bar Rule requires asylum applicants to attend another biometric appointment, to pay a fee, and to re-submit to the same biometric collection that was required for their asylum application to have their EAD application processed.

69.     These rule changes will significantly impair the ability of asylum seekers to fully exercise their right to asylum in the United States.[10]

## III.     THE RULES VIOLATE THE APA

70.     The Rules are final agency actions because they represent the consummation of the agency's decisionmaking processes and because they have direct consequences for hundreds of

---

[9]   *See* USCIS Policy Manual, Volume 10: Employment Authorization, Part B, Specific Categories, Chapter 2, Parolees [10 USCIS-PM B.2], https://bit.ly/3msYkx7.

[10]   Some of these changes apply only to initial EAD applications; others apply to both initial and renewal requests. The changes that apply only to initial applications are: the Timeline Repeal Rule, the 180-day waiting period, the elimination of the "Deemed Complete" rule, the elimination of recommended approvals, and the applicability of applicant-caused delays as a basis for denial of the application. All other challenged provisions apply to both initial and renewal applications.

thousands of asylum applicants and for the plaintiff organizations and other organizations that serve asylum applicants.

71.     DHS knew or should have known during the rulemaking process and from the comments it received that the Rules are unlawful, yet it did not cure the relevant defects.

72.     The Rules were part of a larger push by the Trump Administration to punish and deter asylum seekers, leaving the asylum system virtually "unrecognizable." *See* Nicole Narea, *The Demise of America's Asylum System Under Trump, Explained*, Vox (Nov. 5, 2019), https://bit.ly/34nx8tp. "The administration has built up, layer by layer, a series of impediments . . . that have made obtaining asylum nearly impossible." *Id.*

73.     For example, the government adopted a policy of prosecuting all asylum seekers and separating those who enter with children from those children. It required some asylum seekers to wait in Mexico for their cases to be heard, and forced others to seek asylum in unsafe third countries. It barred asylum to individuals who enter outside of a port of entry, who fail to seek asylum in a country through which they transit, and who have even minor exposure to portions of the criminal justice system.[11] These changes reflect a calculated and systematic attempt by Mr. Wolf and Mr. Mizelle to punish asylum seekers and make it more difficult for migrants to apply for asylum.

74.     This context helps illustrate that DHS's purpose in promulgating the Rules was to deter migrants from seeking asylum without regard to their reasons for doing so. In other words, in promulgating the Rules to diminish asylum applicants' access to work authorization, DHS sought to deter asylum seekers from seeking asylum in the first place. Such punitive measures to

---

[11]     *See* National Immigrant Justice Center, *A Timeline of the Trump Administration's Efforts to End Asylum* (Nov. 2020), https://bit.ly/3narjH6 (describing these and other policies).

deter lawful access to asylum are unlawful. *See generally Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. 2018) (agency cannot consider deterrence in evaluating parole requests); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) (agency cannot deny bond to deter others).

75.     The Rules, with these other changes, seek to inflict suffering on some asylum seekers to send a message to future asylum seekers that they should not attempt to make the journey in the first place. Indeed, the administration's mantra has been to "present[] aliens with multiple unsolvable dilemmas to impact their calculus for choosing to make the arduous journey to begin with." *See* Ainsley, *supra* n.1.

76.     DHS's callousness is encapsulated in its response to comments recognizing that the Final Rule will have an adverse impact on asylum seekers' ability to obtain housing. DHS glibly responded that applicants should "become familiar with the homelessness resources provided by the state where they intend to reside." 85 Fed. Reg. at 38,591.

77.     As described below, the Rules violate the APA because they are contrary to the INA and inconsistent with DHS's stated justifications for its action. One court has already issued a preliminary injunction enjoining the Timeline Repeal Rule in full and every portion of the EAD Bar Rule that it reached on the basis that the plaintiffs in that case were likely to succeed in showing that these actions were arbitrary and capricious. *See Casa de Maryland*, 486 F. Supp. 3d at 967.

### A.     Portions of the Rules Are Inconsistent With the INA.

78.     Numerous provisions in the Rules run afoul of the INA.

### The Port-of-Entry Requirement

79.     The INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival[)] . . . may apply for asylum." 8 U.S.C. § 1158(a)(1). As the Ninth Circuit has explained, "[t]his provision reflects

our understanding of our treaty obligation to not 'impose penalties [on refugees] on account of their illegal entry or presence.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 772 (9th Cir. 2018) (quoting Convention, art. XXXI, § 1, 189 U.N.T.S. at 174).

80.    But under the EAD Bar Rule, asylum seekers like Plaintiffs C.H.A., R.P.P., L.E.J.J. and M.C.J.J., who are alleged to have entered the United States other than through a port of entry, are penalized because they are rendered ineligible for EAD authorization unless they meet an extremely limited exception. *See* 8 C.F.R. § 208.7(a)(1)(iii)(G) (Aug. 25, 2020).

81.    Indeed, DHS admits that penalizing asylum seekers is the point, when it emphasizes that this requirement "will *incentivize* aliens to comply with the law." Notice of Proposed Rulemaking, *Asylum Application, Interview, and Employment Authorization for Applications*, 84 Fed. Reg. at 62,374, 62,392 (emphasis added). DHS also stated its "belie[f] that the good cause exception [to this bar] is consistent with U.S. obligations under the 1967 Protocol because it exempts aliens from the bar to eligibility for employment authorization if they establish good cause for entering or attempting to enter the United States at a place and time other than lawfully through a U.S. port of entry." 85 Fed. Reg. at 38,553.

82.    That does not cure the problem, however, because the EAD Bar Rule defines "good cause" far more narrowly than is required by our international treaties. The EAD Bar Rule provides that "good cause does not include the evasion of U.S. immigration officers, convenience, or for the purpose of circumvention of the orderly processing of asylum seekers at a U.S. port of entry." *Id.* at 38,626. Nor does the Rule account for the fact that, for years now, Defendants have made it more and more difficult to enter the United States at a port of entry. *See e.g. Al Otro Lado, Inc. v. Wolf*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.) (challenging the "metering" of asylum seekers in Mexico). For example, Plaintiff K.N.E. tried to wait her turn to enter the United States but entered

without inspection after waiting several months in Mexico and falling ill while there. K.N.E.'s entry predates the EAD Bar Rule, but her circumstances would not be covered by the limited exception that the Rule contemplates. Similarly, Plaintiff R.P.P., who entered without inspection after being beaten and robbed at gunpoint in Mexico, is subject to this bar and would be unable to satisfy the limited exception to the Rule even after what he endured in Mexico.

83. The EAD Bar Rule's narrow definition of good cause is inconsistent with the United States' treaty obligations. *See E. Bay Sanctuary Covenant*, 932 F.3d at 771–72 (enjoining the Trump administration's ban on asylum for any applicant who had not entered through a port of entry as contrary to the INA). As such, the Port-of-Entry Requirement is irreconcilable with the INA.

**The One-Year Filing Bar**

84. The INA exempts asylum seekers from the statutory one-year filing deadline if they can demonstrate either "changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay." 8 U.S.C. § 1158(a)(2)(D).

85. Yet under the EAD Bar Rule, an EAD application will be denied for an asylum applicant who fails to file the asylum application within one year of entering the United States, unless and until an asylum officer or IJ determines that the applicant meets a statutory exception to the one-year filing bar. *See* 8 C.F.R. § 208.7(a)(1)(iii)(F). Plaintiffs D.M.C. and V.M.B. are both harmed by this provision, for which there are no exceptions. Plaintiffs U.O, L.G.M., and L.M.M.G. also stand to be harmed by this rule because, though they applied for asylum on time in an affirmative posture, USCIS refuses to recognize those applications.

86. By permanently barring access to work authorization to asylum seekers even when they have a clear changed or exceptional circumstance to justify the delay in their application

process and thus remain statutorily eligible to pursue asylum, the EAD Rule's One-Year Filing

Bar enacts a penalty against asylum seekers that cannot be reconciled with the INA.

**The 365-Day Waiting Period**

87.     The INA provides that an "applicant who is not otherwise eligible for employment

authorization shall not be granted such authorization prior to *180 days* after the date of filing of

the application for asylum." 8 U.S.C. § 1158(d)(2) (emphasis added). DHS effectively amends the

statute to more than double this mandatory waiting period. Although the statute expressly

proscribes granting work authorization "prior to" 180 days, to construe the provision exclusively

as a floor would disregard the context of its enactment and history.

88.     In adopting the 180-day bar, Congress largely codified the approach taken by the

Immigration and Naturalization Service ("INS")—DHS's predecessor agency—in 1994, which

had concluded that "all applicants could have work authorization after 180 days" unless their

claims were denied. *Rules and Procedures for Adjudication of Applications for Asylum or

Withholding of Deportation and for Employment Authorization*, 59 Fed. Reg. 14,779, 14,780 (Mar.

30, 1994). In codifying a 180-day wait, Congress adopted the balance that the INS struck between

"discourag[ing] applicants from filing meritless claims solely as a means to obtain employment

authorization" and "provid[ing] legitimate refugees with lawful employment authorization." *Id.*

89.     The 365-Day Waiting Period upends this balance and is contrary to congressional

intent. The same Congress that enacted the 180-day bar also declared it to be "national policy" that

"[s]elf-sufficiency has been a basic principle of United States immigration law since this country's

earliest immigration statutes;" that immigrants "rely on their own capabilities and the resources of

their families, their sponsors, and private organizations;" and that "[i]t is a compelling government

interest to enact new rules for eligibility . . . in order to assure that aliens be self-reliant." 8 U.S.C. § 1601(1), (2), (5).

90.     It is implausible that this Congress meant to confer roving administrative discretion to DHS to unilaterally subvert this "compelling interest" by drastically increasing the mandatory waiting period for an asylum seeker to obtain the EAD upon which the principle of self-sufficiency depends. Indeed, in seeking to double the 180-day period, Defendants appear to eschew any limiting principle and could, on its untenable theory, set a decades-long waiting period. That is inconsistent with the text of the INA.

**Automatic Termination During Appeals**

91.     The INA expressly affords asylum seekers the right to seek federal court appellate review. *See id.* § 1252(a)(2)(B)(ii). In that provision, Congress eliminates judicial review over discretionary determinations "other than the granting of relief under [the Refugee Act]." *Id.*

92.     The process of seeking appellate review routinely takes a year or more. By denying access to an EAD during the appeal process, the Rule deprives many asylum seekers, like Plaintiff M.A.S., of their right to pursue appellate review simply because they will be unable to survive during the appellate process. As such, the elimination of work authorization upon federal-court appeal is contrary to the INA.

**The Criminal Bar**

93.     The INA specifies two crime-related bars to asylum: (i) the particularly serious crime ("PSC") bar, and (ii) the serious nonpolitical crime bar. *Id.* § 1158(b)(2)(A)(ii), (iii). Both have specific definitions and scopes of application.

94.     The INA's PSC bar closely mirrors the language of the Refugee Convention. The Refugee Convention's bar was designed narrowly to avoid barring access to asylum for minor

criminal offenses. The United Nations High Commissioner for Refugees ("UNHCR") has noted

that, to be considered a serious crime, an offense must generally be a "capital crime or a very grave

punishable act," such as murder, arson, rape, or armed robbery. UNHCR, Handbook on Procedures

and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol

relating to the Status of Refugees, U.N. Doc. HCR/4/IP/Eng/REV. ¶¶ 154–55 (1979, reissued 2019)

("UNHCR Handbook").

95.     The serious nonpolitical crime bar requires a showing that "there are serious

reasons for believing that the alien has committed a serious nonpolitical crime outside the United

States prior to the arrival of the alien in the United States." 8 U.S.C. § 1158(b)(2)(A)(iii). This

provision also corresponds to a clause in the 1951 Refugee Convention barring protection when

there are "serious reasons for considering that . . . [the applicant] has committed a serious non-

political crime outside the country of refuge." Refugee Convention, art. 1F(b).

96.     In other rulemaking, Defendants have dramatically broadened the scope of these

bars to include, for example convictions where there is "reason to believe" the conduct was in

furtherance of gang activity, any felony conviction under state law, any conviction for certain

misdemeanors including simple possession of any drug other than a small amount of marijuana,

and any *accusation* of domestic battery, even when there has been no adjudication of guilt. *See*

Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67,202 (Oct. 21, 2020). This

rulemaking was enjoined for violating the APA. *See Pangea Legal Servs. v. DHS*, No. 20-cv-

07721 (SI), 2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) (issuing TRO); *see also* Dkt. 74

(converting TRO to preliminary injunction).

97.     The EAD Bar Rule incorporates by reference the regulatory provision where these

changes are codified, 8 C.F.R. § 208.13(c). Under the EAD Bar Rule, an EAD is not available

where "[t]he applicant fails to establish that he or she is not subject to a mandatory denial of asylum due to any regulatory criminal grounds under 8 CFR 208.13(c)." 85 Fed. Reg. 38,626 (codified at 8 CFR 208.7(a)(iii)(D)).

98.     These criminal bars are themselves contrary to the text of Section 1158 because they sweep in offenses that are not serious, let alone particularly serious, and that do not suggest a danger to others or the community. Some of them are triggered by mere "reason to believe" that domestic criminal conduct has occurred. That is inconsistent with the statutory scheme in Section 1158, which outlines the criminal bars to asylum and provides that any addition must be "consistent with" that section. *See* 8 U.S.C. § 1158(b)(2)(C).

99.     The EAD Bar Rule's incorporation of these changes to deny work authorization based on criminal conduct that cannot lawfully render a person ineligible for asylum is contrary to the INA and constitutes unlawful agency action.

100.     The categorical bars also conflict with Section 1158 because the Refugee Convention, which is incorporated into the INA, requires an individualized analysis of whether a particular crime disqualifies an asylum applicant and eschews any categorical bars. The EAD Bar Rule's incorporation of the unlawful categorical bars in 8 C.F.R. § 208.13(c) conflict with the INA and the treaty obligations it effectuates.

## B.     The Rules Are Arbitrary and Capricious Because DHS Failed to Adequately Justify Each Provision

101.     DHS's purported rationales for promulgating the EAD Bar Rule were to "(1) reduc[e] incentives for aliens to file frivolous, fraudulent, or otherwise non-meritorious asylum applications intended primarily to obtain employment authorization, or other forms of non-asylum based relief, and remain for years in the United States due to the backlog of asylum cases, and (2) disincentiviz[e] illegal entry into the United States." 85 Fed. Reg. at 38,543.

102.    DHS's purported rationales for the Timeline Repeal Rule were to "(1) ensure USCIS has sufficient time to receive, screen, and process applications for an initial grant of employment authorization based on a pending asylum application, and to also (2) reduce opportunities for fraud and protect the security-related processes undertaken for each EAD application." *Id.* at 37,503.

103.    Deterring people from seeking protection in the United States—a right enshrined in the INA and international law—is not a valid justification for a rule that effectively blocks only indigent applicants from the asylum process. 8 U.S.C. § 1158(a); *see also R.I.L-R*, 80 F. Supp. 3d at 188–90 (granting preliminary injunction against policy of detaining asylum seekers to send "a message of deterrence to other Central American individuals who may be considering immigration" and finding deterrence is not a valid reason to force someone to be civilly committed); *Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 1166–67 (S.D. Cal. 2018) (denying motion to dismiss substantive due process claim, holding that alleged "government practice. . . to separate parents from their minor children in an effort to deter others from coming to the United States . . . is emblematic of the exercise of power without any reasonable justification").

104.    In addition, there is no indication that the people who are most harmed by the Rules—the indigent—have disproportionately unmeritorious claims. To the contrary, asylum applicants often leave everything behind to embark on a costly, dangerous journey to seek protection. Their indigency upon arrival is frequently interrelated with the circumstances in their home countries that ultimately caused them to flee in pursuit of protection in this country.

105.    And the Rules are unreasonable because the already existing regulatory scheme is effective in discouraging abuse of the asylum system.

106.     DHS's self-contradictory reasoning in its regulatory changes illustrates that these proposals are intended to dismantle the asylum system Congress created, rather than improve it.

107.     There is also a clear disconnect between the agency's stated purpose to simplify the adjudication process and increase its efficiency and the effects of the Rules because several of the changes will make processing EAD applications *more* complicated and time-consuming.

108.     For example, the Biometrics Requirement will contribute to the "backlog" in asylum applications DHS says it is trying to solve. This requirement applies to initial and renewal applications and will take additional time to schedule and administer.

109.     As another example, consider the application of the Criminal Bar following a biometrics check, which will further complicate the EAD adjudication process. Every time biometrics results return criminal history information, USCIS must assess (or re-assess) whether the convictions are for "particularly serious crimes" or "serious nonpolitical crimes" and render the applicant categorically ineligible for an EAD. The USCIS adjudicators are untrained in how to conduct this complex, context-specific assessment. Assessing the applicability of these bars, moreover, usually requires testimony about the nature and circumstances of an underlying event. But the EAD application process is in writing, with no interview mechanism. Creating an interview to accurately perform that assessment would grind the EAD issuance process to a halt.

110.     There is also a clear disconnect between the agency's purported concerns about the need to reduce fraud and protect U.S. workers, on the one hand, and the foreseeable consequences of the Rules, on the other hand. Specifically, narrowing eligibility for work authorization and increasing processing times for employment authorization may create incentives for asylum seekers to participate in the underground market, thereby increasing fraud (by employers) and

prejudicing U.S. workers (by increasing the pool of desperate foreign workers willing to accept less than minimum wage and to work in unsafe conditions).

111.   Notably, while the EAD Bar Rule repeatedly references reducing fraud as a primary goal, the agency failed to define fraud or to explain how the Rule would deter it. Defendants identify only one type of fraud—meritless asylum applications that are filed for the sole purpose of obtaining employment authorization—based on research that was conducted more than twenty-five years ago. *See* 85 Fed. Reg. at 38,544 n.32. Despite recognition that the asylum context has changed substantially since that time, DHS failed to explain how the kind of fraud discussed in these outdated studies requires a substantial change in regulation now. *See* 84 Fed. Reg. at 62,383. Indeed, the only recent instance of "fraud" identified in the EAD Bar Rule is of asylum-seekers using "skeletal" affirmative asylum applications to trigger removal proceedings through which they can apply for cancellation of removal, *see* 85 Fed. Reg. at 38,550, but there is no explanation for how the Final Rule would have any impact on this alleged trend.

112.   In fact, Defendants' focus on the use of asylum applications to pursue cancellation of removal illustrates the ways in which the agency failed to consider reasonable alternatives to achieve its purported goals. Cancellation of removal is a defense to deportation that is available to long-term residents of the United States, but it can only be requested in defensive removal proceedings. *See* 8 U.S.C. § 1229b. If Defendants truly wished to curtail the relatively rare occurrence of long term residents applying for asylum in order to be placed into removal proceedings, it could have drafted a single, short regulation enabling USCIS to consider cancellation applications or creating a mechanism for these applicants to see an IJ.

113.   Given the Rule's stated purposes and in particular its focus on deterring both unauthorized entry into the United States and "frivolous, fraudulent, or otherwise non-meritorious

asylum applications," the agency also failed to justify restricting EAD renewal for asylum seekers who already have pending asylum cases and who have been working in the United States with employment authorization for years, like Individual Plaintiffs G.S.M, and U.O. Similarly, the agency failed to justify restricting EAD renewal for asylum seekers who obtained EADs, lost them upon denial of their asylum application, and are presently pursuing a petition for review, like Individual Plaintiff M.A.S.

114.    As to simplifying the adjudication process and increasing its efficiency, the agency failed to consider the reasonable alternative that USCIS recommended in 2019: hiring more staff to enable more production hours to be devoted to EAD processing.[12] The Final Rule states that USCIS "considered alternatives" to the Final Rule as promulgated, including hiring more staff. 85 Fed. Reg. at 38,584. This *ipse dixit* does not qualify as a reasoned response that would pass muster under the APA, because DHS did not adequately explain why it chose not to pursue this alternative.

115.    DHS also could have eliminated the regulatory requirement that asylum seekers must wait 150 days to submit their work authorization applications, instead relying on the statutory 180-day wait for work authorization. This change would increase the efficiency of adjudication because it would enable the agency to better predict the number of work authorization applications in the pipeline at different times and to work through its present backlog.

116.    DHS mentioned this alternative in the Final Rule, but its explanation for why it elected not to pursue it was inadequate. DHS first reasoned that the change would "contravene the intent of this rule as well as the prior regulations, which were specifically designed to ensure there is a waiting period for applying for an EAD that follows the filing of asylum application and have mechanisms for addressing periods where applicants delay the adjudication of their asylum

---

[12]    *See* USCIS Ombudsman, *Annual Report 2019* at 84 (July 2019), https://bit.ly/3tq7QVC.

applications." *Id.* at 38584. This explanation is illogical. Permitting concurrent filing would have no affect at all on the statutory waiting period required before DHS could grant an EAD, but it would allow DHS to better track applications and streamline the process.

117.    DHS also reasoned that adopting this suggestion would "create[] a different operational burden." *Id.* That was "[b]ecause the statutory scheme mandates that employment authorization cannot be granted until the asylum application has been pending for a minimum of 180 days," "USCIS would need to implement new tracking and records mechanisms to ensure applications would not be adjudicated too early." *Id.* This would allegedly "impede the agency's ability to nimbly move workloads between centers and officers." *Id.* This explanation is unreasonable. USCIS already tracks the 180-day statutory deadline, and the incremental "operational burden" associated with concurrent filing is likely to be *de minimis*.

118.    Alternatively, DHS could have recognized that, through no fault of the applicant, adjudicating asylum cases takes considerable periods of time, and lengthen the validity of an EAD, thereby reducing the need to process frequent renewal applications.

119.    Similarly, the agency could simplify the application EAD renewals, reducing the resources necessary to process them. Defendants did the opposite.

120.    As to the agency's goal to reduce incentives to file "frivolous, fraudulent, or otherwise non-meritorious asylum claims," there are countless other strategies Defendants could employ to achieve this goal.

121.    The poor fit between the Rules and DHS's purported justifications suggests that DHS's justifications were arbitrary and capricious.

**The Port-of-Entry Requirement**

122.    DHS's justification for the Port-of-Entry Requirement was inadequate. DHS said: "Asylum is a discretionary benefit reserved for those who establish that they are genuinely in need of the protection of the United States. It follows that employment authorization associated with a pending asylum application should be similarly reserved." 85 Fed. Reg. at 38,553.

123.    Even accepting DHS's explanation that employment authorization requirements should mirror those for obtaining asylum, the Port-of-Entry Requirement does not, in fact, mirror the asylum laws. To the contrary, DHS must "accept asylum applications from aliens, irrespective of whether or not they arrived lawfully through a port of entry," *E. Bay Sanctuary*, 932 F.3d at 772. Adding a port-of-entry restriction on employment was unnecessary if, as DHS explained, its purpose was simply to mirror the restrictions on asylum. 85 Fed. Reg. at 38,553.[13]

**The One-Year Filing Bar**

124.    DHS also failed to adequately justify why it was enacting the One-Year Filing Bar. The asylum statute permits untimely applications based on changed or extraordinary circumstances, 8 U.S.C.§ 1158(a)(2)(B), (D), and the asylum regulations describe circumstances that can constitute meet that standard, 8 C.F.R. § 208.4(a)(4), (a)(5). Those include, among others, illness, mental or physical disability, legal disability, prior ineffective assistance of counsel, and prior lawful status.

125.    Together, the asylum statute and regulations provide a safe harbor for asylum seekers whose circumstances inhibit applying within a year. They also reflect a strong interest in avoiding premature applications for asylum if there are viable alternative paths to permanent

---

[13]    Another rule barring access to asylum for those who enter outside a port of entry has been enjoined and vacated for violating the APA. *See O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating the rule); *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242 (9th Cir. 2020) (affirming grant of preliminary injunction).

lawful status or safety. *See* Asylum Procedures, 65 Fed. Reg. 76,121, 76,123 (Dec. 6, 2000) ("The Department does not wish to force a premature application for asylum.").

126.    Notwithstanding these long-standing considerations, DHS has now asserted that applying the One-Year Filing Bar to EAD applications is necessary to deter individuals from filing "skeletal or fraudulent asylum applications to trigger removal proceedings before the immigration court where they can apply for cancellation of removal." 85 Fed. Reg. at 38,550.

127.    This explanation does not make sense. As discussed above, *supra* ¶ 108, cancellation of removal is a path to immigration available to some long-term residents. Imposing a one-year filing deadline for a collateral benefit would not logically deter members of this group, whose goal is to get their case in front of an IJ. *See* 8 U.S.C. § 1229b. And deterring those applications falls outside the stated justification for the Rules, which is to reduce "fraudulent" applications for the purpose of obtaining an EAD, not for the purpose of triggering removal proceedings. *See* 85 Fed. Reg. at 38,533.

128.    DHS has also claimed that the one-year filing restriction is necessary to "incentivize bona fide asylum applicants to file sooner, and to reduce the asylum backlog." 85 Fed. Reg. at 38,550. DHS did not explain, however, how more people filing asylum applications sooner is rationally related to the stated goal of reducing the asylum backlog.

129.    In addition, the types of circumstances that underlie most late-filed asylum applications—such as serious illness, legal disability, and trauma—are unlikely to yield to "incentives." The same is true for the changed circumstances exception to the one-year deadline. Applicants cannot be "incentivized" to apply for asylum before the changes that give rise to their extenuating reasons for filing untimely actually arise.

130.    The One-Year Filing Bar thus threatens to harm the most vulnerable of asylum seekers—those who have been so traumatized by their experiences that they are unable to timely file an application for asylum. Prior asylum regulations account for this reality, but the EAD Bar Rule does not. *See* 8 C.F.R. § 208.4(a)(5).

131.    The One-Year Filing Bar also harms a smaller but significant number of applicants, like L.G.M., L.M.M.G. and U.O., who were required to file their applications defensively because they were detained upon entry into the United States, yet were unable to do so until after the one-year filing deadline because DHS failed to initiate defensive removal cases for them.

132.    This disparity between the statutory provisions and protections relating to the one-year filing deadline for asylum applications and the EAD Bar Rule indicates that the Rule's One-Year Filing Bar was designed, not to deter skeletal or bad-faith asylum applications, but instead to deter *all* asylum applications—even if those applications would ultimately be meritorious.

133.    In the EAD Bar Rule, DHS conceded that "there are legitimate reasons that an alien may be delayed from seeking asylum within the one-year filing deadline, which is why the current regulations at 8 CFR 208.4(a)(4) and (5) allow for an alien to establish either that there are changed circumstances that materially affect the alien's eligibility for asylum or that there are extraordinary circumstances related to the delay in filing." 85 Fed. Reg. at 38,570.

134.    This is a non-sequitur. DHS highlighted provisions creating exceptions to the one-year deadline for the underlying asylum application, but the agency failed to acknowledge that the new rules for EAD applications contain no corresponding exceptions and instead require the applicant to get an adjudication on this question from the judge or officer hearing the underlying asylum case, a step that may itself be years down the road.

135.    DHS did not even try to explain why those who have good reasons for filing for asylum late should nevertheless be barred from EADs while their applications are pending.

136.    In imposing the One-Year Filing Bar, moreover, DHS failed to justify its departure from its previous decision to separate EAD adjudication from asylum eligibility because of the administrative burdens of attempting to duplicate the asylum adjudication process within the EAD adjudication process.

137.    And in finalizing this bar, DHS failed to justify its departure from its previous decision to not impose a One-Year Filing Bar for EADs in part because it did not want to encourage people in lawful status during their first year in the United States to prematurely seek asylum.

**The 365-Day Waiting Period**

138.    In imposing the 365-Day Waiting Period, DHS also failed to justify its rejection of the alternative of imposing a shorter waiting period. Instead, DHS said that it was rejecting this alternative to avoid creating an incentive to file a "non-meritorious" asylum application. 85 Fed. Reg. at 38,564. But DHS failed to justify why a shorter waiting period would create that incentive when asylum applicants would not be guaranteed work authorization within any particular time frame under the Timeline Repeal Rule.

139.    DHS also said that it was rejecting a shorter waiting period because it would necessitate the creation of a new system to ensure that EADs would not be issued prior to 180 days as provided by statute. *See id.* at 38,565. But this explanation does not address why a 180-day waiting period would not be a reasonable alternative when commenters suggested shorter alternative timelines to the 365-Day Waiting Period. *See id.* at 38,564–65(discussing comments).

140.    In issuing the Rules, DHS failed to consider reasonable alternatives to mitigate the alleged problem of "frivolous, fraudulent, or otherwise non-meritorious asylum applications" filed

for the purpose of obtaining EADs, such as ensuring prompt processing of asylum claims so that they are adjudicated within the statutorily mandated 180 days.

141.    DHS also failed to justify its departure from existing policy with respect to the 180-day waiting period. For decades, work authorization was broadly available to asylum applicants whose applications had been pending for 180 days, with the narrow exception of individuals who had been convicted of an aggravated felony. DHS failed to offer a reasoned explanation for its extraordinary departure from this approach, which balanced flexibility and accountability.

142.    DHS relied instead solely on a decades-old body of work that discussed problems in the early 1990s, which the current work authorization system was created to address, not problems with the current system. *See id.* at 38,544 n.30; *id.* at 38,546 & n.58; *id.* at 38,555 & n.93 (citing David A. Martin, *Making Asylum Policy: The 1994 Reforms*, 70 Wash. L. Rev. 725 (July 1995) & David A. Martin, *The 1995 Asylum Reforms*, Ctr. for Immigration Studies (May 1, 2000)). That analysis contradicts the agency's position that the current work authorization system requires and warrants further restriction.

143.    In imposing the 365-Day Waiting Period, DHS also pointed to the fact that asylum cases take longer to adjudicate. This is a reason to be more, not less, generous in the issuance of work authorization. The law continues to require the government to adjudicate affirmative asylum applications within 180 days. The failure to meet this timeline and the delay in asylum adjudication often have nothing whatsoever to do with the applicant's actions. Penalizing applicants for a delay that is out of their control is irrational.

**Automatic Termination During Appeals**

144.    DHS did not adequately justify the need for the Automatic Termination provision. This provision precludes extension of an EAD to cover the time that a petition for review is pending in federal court, until the case is remanded back to EOIR for further proceedings.

145.    The agency's stated reason for this change is that EADs should not "be granted or remain valid for those who have been denied asylum through multiple levels of administrative review." 85 Fed. Reg. at 38,581. This is an insufficient reason to preclude individuals from any ability to make a showing that theirs is a bona fide pursuit of meaningful review. Moreover, the Automatic Termination provision applies to those applicants who have *not* been "denied asylum through multiple levels of administrative review" as the Rule requires termination of an EAD even when an applicant has been granted asylum by an IJ, but denied it by the BIA, a not infrequent occurrence. *See, e.g.*, *Guerra v. Barr*, 974 F. 3d 909 (9th Cir. 2020) (vacating the BIA's reversal of an IJ's decision because the BIA failed to follow clear-error review); *Baez Sanchez v. Barr*, 947 F. 3d 1033, 1035 (7th Cir. 2020) (finding that the BIA's repeated reversals of an IJ's grant of relief in the face of Circuit Court precedent "beggars belief").

146.    The Automatic Termination provision also impedes asylum seekers' statutory right to seek review of an adverse determination. *See* 8 U.S.C. § 1252. Termination would have the effect of denying continued employment to asylum seekers who eventually succeed in obtaining relief, which undercuts DHS's assertion that the purpose of the rule is to reduce incentives for asylum seekers to file frivolous, fraudulent, or non-meritorious asylum applications.

147.    It is unreasonable to revoke a valid employment authorization, like Plaintiff M.A.S.'s EAD, which would not have expired until May 2021 but for the rule change, without allowing the asylum seeker to complete the statutorily-mandated asylum application process,

which includes pursuing a petition for review, and it is contrary to DHS's stated goal of restricting employment authorization to those asylum seekers whose applications are granted.

148.    Moreover, immediate termination prevents asylum seekers from adequately preparing to end their employment. The EAD Bar Rule thus harms both the employee and the employer, as it allows no time for an asylum seeker to adequately plan for termination or the employer to plan to fill the position.

149.    Focused on escaping threats and persecution in their countries of origins, few asylum seekers have the opportunity to prepare adequately for their economic support in the United States prior to their departure. And in the United States, many asylum seekers lack the familial and community support that could otherwise enable them to survive without work.

150.    For these reasons, the automatic termination of employment will lead to a cascade of collateral consequences on the asylum seeker's ability to provide housing, health, and basic necessities for themselves and their children.

151.    The Automatic Termination provision also requires an asylum seeker to renew an EAD while the IJ adjudication process is ongoing. This additional burden undermines DHS's claim that one reason for the rule change is to ameliorate backlogs at USCIS. It will in fact add to them.

152.    In response to comments noting the consequences of the Automatic Termination provision, DHS asserted that "[a]liens are afforded multiple levels of administrative review within DHS as well as before the immigration courts and BIA." 85 Fed. Reg. at 38,351.

153.    This focus on the multiple levels of review misses the point. The INA guarantees asylum seekers the opportunity to appeal an adverse determination in federal court—and the Automatic Termination provision substantially burdens and effectively nullifies that right. As such, the Automatic Termination provision is arbitrary and capricious.

**The Criminal Bar**

154.    The Criminal Bar creates substantial eligibility barriers to work authorization based on an asylum seeker's past criminal history. Indeed, it effectively bars asylum-seekers with nearly any conviction—some who have been accused but not convicted—from receiving an EAD, even where the conviction is not an aggravated felony and is extremely unlikely to be deemed a particularly serious crime that would render the person ineligible for asylum. And, as discussed above (¶ 96), separate rulemaking has dramatically increased the criminal bars to asylum, which are incorporated by reference in this bar.

155.    In other words, many asylum seekers who will ultimately win their asylum cases will be categorically ineligible for work authorization while their asylum applications are pending due to minor infractions, contrary to congressional intent.

156.    DHS wrote that this bar would "bar any alien who has been convicted of *or charged* with a *serious* crime from eligibility for a discretionary EAD." 85 Fed. Reg. at 85,608–09 (emphasis added). This language sweeps *far broader* than the asylum statute's bar to asylum on the basis of a *conviction* for a "*particularly serious*" crime. 8 U.S.C. § 1158(b)(2)(ii) (emphasis added).

157.    Thus, applying the Criminal Bar undermines the overarching statutory scheme governing asylum by discouraging meritorious asylum claims based on minor criminal convictions. This is because asylum seekers may have perfectly valid claims, but be unable to support themselves, hire counsel, or otherwise provide for necessities without access to work authorization.

158.    By expanding the criminal conduct that bars access to work authorization and thus the ability to survive in the United States throughout the lengthy asylum application process, the EAD Criminal Bar creates additional de facto bars to asylum that undermine the existing

regulatory and statutory scheme. DHS reasoned that its proposed categorical exclusions based on criminal convictions are necessary to limit work authorization to only those asylum seekers with potentially meritorious claims. Yet DHS failed to explain why it categorically eliminated work authorization for many asylum seekers whose convictions are unlikely to have any impact on their asylum claims.

159.    The Criminal Bar also places complex, fact-intensive questions into an administrative process with no capacity to account for the legally recognized exceptions to the application of those bars to on-the-merits asylum cases. This issue is especially prevalent when and EAD adjudicator is asked to decide, on a written record alone, if there is reason to believe a person committed a serious nonpolitical crime in his or her home country.

160.    This mismatch between the Criminal Bar and the criminal bars for on-the-merits asylum adjudications shows DHS's true purpose: to deter asylum applications even if those applications are meritorious. Because that is not a legally valid purpose and because DHS did not purport to rely on it, the EAD Criminal Bar is arbitrary and capricious.

**The Timeline Repeal Rule**

161.    In issuing the Timeline Repeal Rule, DHS failed to reasonably explain why it rejected alternative time periods for adjudicating an EAD application.

162.    In responding to comments suggesting that DHS should adopt a longer timeline instead of repealing the timeline entirely, the agency steadfastly maintained that it "cannot predict" the processing times for future applications. 85 Fed. Reg. at 37,519–21. But this response contradicts DHS's own statements. In the EAD Bar Rule, DHS wrote that it "expect[ed]" to be able to process 78% of asylum applications within 60 days and 92% of asylum applications within 90 days, based on its historical rate of processing. *Id.* at 37,503, 37,513.

163.    Moreover, DHS argued that it was rejecting an alternative 90-day timeline for adjudicating EAD applications because of the need for "flexibility." DHS failed to explain why this dramatic change to afford more "flexibility" is necessary now, however, when the agency had faced backlogs and fluctuations in application volumes in the past, including at the time of the prior rulemaking. *See Casa de Maryland*, 486 F. Supp. 3d at 963.

164.    The desire to avoid accountability is not a reasonable explanation under the APA, particularly when even prior to this rulemaking, USCIS has been enjoined from failing to adhere to the 30-day deadline. *See Gonzalez Rosario*, 365 F. Supp. 3d at 1163. The Timeline Repeal Rule is an attempt to skirt this injunction, which DHS did not adequately justify. DHS's failure to consider a longer timeline suggests that its purported need for increased "flexibility" was not its true justification for the Timeline Repeal Rule, and that the entirely foreseeable consequence of diminished accountability is the more likely justification.

**<u>Applicant-Caused Delays</u>**

165.    DHS claimed that the EAD Bar Rule expanded the definition of an "applicant-caused delay" to "improve administrative efficiency and aid in the meaningful examination and exploration of evidence in preparation for and during the interview" as well as to "generate disincentives to applicants to cause any delays in the adjudication of their asylum application." 85 Fed. Reg. at 38,621. But DHS did not explain its view of how these disincentives will play out or acknowledge that the changes will result in economic hardship to asylum seekers.

166.    In particular, DHS failed to explain why an applicant-caused delay should justify *outright denial* of work authorization when in the past it merely caused an applicant to stop accruing time toward work-authorization eligibility. Such a permanent denial of an EAD whenever there is any applicant-caused delay, no matter how trivial, is a disproportionate sanction,

particularly when many of the "delays" are an inevitable part of the application process. For instance, a change of venue request from an asylum seeker who relocated after being released from detention would result in an EAD denial. So too would a request to reschedule an asylum interview with USCIS because the applicant was critically ill. In the case of Plaintiff N.E.F. and her son C.A., the "delay" that caused their denial was that they missed a biometrics appointment for their work permit, even though the notice of the appointment arrived *after the date of the appointment.*

167.    Permanently denying an EAD to asylum applicants who avail themselves of routine, yet essential, remedies and processes is an irrationally harsh sanction. Indeed, the harshness of the sanction suggests that the purpose of the Applicant-Caused Delay provision is to enable the use of any applicant-caused delay as a justification to deny an EAD application.

168.    Furthermore, DHS completely ignores that many asylum seekers and their counsel will seek to provide more evidence to help immigration authorities by corroborating their substantive asylum claims. Prior regulations imposed no deadline for asylum seekers to submit evidence to support their claims. The EAD Bar Rule requires evidence to be submitted 14 days in advance of a hearing—and requesting to submit evidence after this time is treated as an applicant-caused delay. Thus, the Applicant-Caused Delay provision has the effect of punishing asylum seekers for adhering to their evidentiary burden and being diligent in seeking to meet it, which is completely at odds with DHS's purported justification for the EAD Bar Rule.

**Elimination of the Deemed Complete Provision**

169.    Because DHS has eliminated the Deemed Complete provision, an applicant must first wait an unspecified amount of time for the asylum application itself to be accepted or rejected before the waiting period to seek a work permit can even begin.

170.     Asylum seekers are particularly vulnerable and face many barriers to presenting successful claims, and changes in the adjudication of asylum applications have dramatically increased the rejection of asylum applications for errors as small as failing to write "N/A" in a box on the asylum application that does not apply the applicant. *See Vangala v. USCIS*, No. 4:20-cv-08143-HSG (N.D. Cal Nov. 19, 2020) (class action challenging policy of rejecting asylum and other applications based on blank spaces on the filing). Such a disproportionate sanction suggests that DHS's purpose in repealing the Deemed Complete provision was to enable the agency to avoid accountability for promptly reviewing applications and to permit DHS to simply reject EAD applications for trifling and irrelevant technical errors.

**Discretionary Denials**

171.     Under prior regulations, employment authorizations for asylum applicants were not discretionary. *See* former 8 C.F.R. § 274a.13(a)(1) (effective until Aug. 25, 2020) ("The approval of applications filed under 8 C.F.R. § 274a.12(c), *except for 8 C.F.R. § 274a.12(c)(8)*, are within the discretion of USCIS.") (emphasis added). This carve out was the sole exception from the discretion otherwise conferred for other categories of employment authorization, reflecting a deliberate policy choice. DHS has abandoned this deliberate choice without justification.

172.     In situations where an asylum applicant has met all the criteria necessary to be granted an EAD, it injects unpredictability—and hence, inefficiency—into the process to grant DHS the discretion to deny EADs. DHS did not explain what benefits would offset these costs, nor did it justify departing from its prior precedents.

173.     Instead, the agency generally bemoaned "the crisis at our southern border and in our asylum system" without explaining how granting itself discretion to deny EADs to asylum seekers would help resolve this "crisis." 85 Fed. Reg. at 38,577.

174.    DHS also explained that it "cannot continue to provide EADs with virtually no eligibility criteria." *Id.* This explanation is bizarre. DHS had promulgated numerous "eligibility criteria" for EADs, and the EAD Bar Rule has imposed even more. Indeed, DHS has undermined its own eligibility criteria by granting itself discretion to deny EADs even when an applicant has satisfied those criteria.

**Elimination of Recommended Approvals**

175.    The Elimination of Recommended Approvals provision will decrease the efficiency of the approval process for EADs and leave asylum applicants without EADs for far longer than necessary. It therefore cannot serve the stated efficiency rationale.

176.    Ending the availability of access to EADs based on a recommended approval makes no sense even based on the agency's self-professed rationale of deterring fraudulent or meritless applications: these asylum seekers have already been found to have winning asylum claims, and must merely comply with the requisite background checks, which can take months or even years to complete.

177.    DHS explained its decision to eliminate the EAD Bar Rule by stating its conclusion that issuing EADs based on a notice of recommended approval "is inconsistent with Congressional mandate." 85 Fed. Reg. at 38,578. In support, DHS cited a 2019 statute stating ''[n]one of the funds made available in this Act may be used by [USCIS] to grant an immigration benefit unless the results of background checks required by law . . . have been received . . . and the results do not preclude the granting of the benefit." *See id.* at 38,550 n.86 (quoting *Consolidated Appropriations Act*, 2019, Public Law 116–6, 113 Stat. 33, Div. A, tit. IV, sec. 402 (2019)); *id.* at 38,578 n.137.

178.    DHS cited a 1997 statute in support of its apparent belief that this provision applies to EADs. *See id.* at 38,578 n.86 (citing *Departments of Commerce, Justice, and State, the Judiciary,*

*and Related Agencies Appropriations Act of 1998*, Public Law 105–119, 111 Stat. 2440, 2447–48 (1997)). Of course, DHS (and its predecessor, INS) have granted EADs based on Notices of Recommended Approval for decades after Congress passed the 1997 statute. Thus, DHS effectively conceded in the EAD Bar Rule that it was altering its prior legal interpretation of the 1997 statute, but it never explained why its legal interpretation changed or even acknowledged that it *had* changed.

**Maximum Validity**

179.    The Maximum Validity provision, which limits the validity period for an EAD to two years, runs counter to the EAD Bar Rule's stated goal of reducing backlogs and promoting efficiency in EAD processing. Indeed, the EAD period for asylum seekers was expanded from one to two years in response to litigation, to reduce USCIS workload and in recognition of processing delays of applications for employment authorization and asylum.

180.    Capping the validity period for an EAD will lead to more EAD renewals, which will increase the administrative burden that the EAD Bar Rule is supposed to reduce. And DHS did not account for the effect that this change would have on asylum seekers, especially when it is considered in conjunction with another rule promulgated by DHS that increases the fees applicants must pay to receive asylum. *See* USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 85 Fed. Reg. 46,788–01 (Aug. 3, 2020) (the "Fee Rule").

181.    DHS did not consider these harms, so this provision is arbitrary and capricious.

**Parole Limitation**

182.    Previously, DHS had a separate work authorization provision for individuals paroled into the United States. DHS eliminated that provision, claiming to believe that "[a]ll

asylum seekers should be subject to the same rules, including the rules governing eligibility for employment authorization." 85 Fed. Reg. at 38,582.

183.    Aside from the fact that DHS did not explain why it believed that all asylum seekers should be subject to the same rules, DHS cannot sincerely believe that all asylum seekers should be subject to the same rules for employment authorization because they are not all similarly situated. Many asylum seekers apply for such permanent protection while present in the United States on a visa that authorizes work. Under the prior regulations, parolees were eligible for an EAD under former 8 C.F.R. § 274a.12(c)(11) because of their manner of entry, just like these other visa holders. DHS failed to recognize this point and failed to otherwise justify eliminating the previous allowance for parolees.

## Biometrics Requirement

184.    DHS conceded that it "collects biometrics when an alien first files for asylum." 85 Fed. Reg. at 38,576. But, according to DHS, the requirement that asylum seekers resubmit biometrics with their EAD application was not "duplicative or wasteful" because "[t]he results of criminal history check generally only last 15 months." *Id.* DHS also wrote that "when [it] collects biometrics, the collection is tied to the form and is not person centric." *Id.* In other words, "[b]iometrics collected for the asylum application remain with the asylum application" while "[b]iometrics collected for employment authorization remain with the EAD application." *Id.*

185.    These inscrutable explanations are inadequate. When DHS collects biometric data, it takes an applicant's fingerprints, which do not change from one visit to the next. DHS said, "USCIS is not able to refresh or reuse biometrics that were collected for one benefit type for another benefit type." *Id.* But it did not explain *why* this would be true or *why* it could not simply re-run a biometrics check using previously collected data at the time of a new application. Indeed,

DHS appears not to have considered a process that would permit information-sharing within USCIS, or re-running these checks with existing data. Such a process would almost certainly be more efficient than requiring asylum applicants to resubmit their biometrics.

186.    Even taking DHS's explanation at face value, however, it does not hold up to scrutiny because DHS went on to explain that "[c]ollecting biometrics for asylum EAD applicants enables DHS to know with greater certainty the identity of aliens seeking employment authorization by *comparing* EAD biometrics with those collected from the asylum applicant." *Id.* (emphasis added). Thus, DHS admitted that it can, and in fact plans to, reuse and share the biometrics that it collected with the initial asylum application for reasons that have no legitimate connection to the statutory intent behind allowing asylum applicants to work pending adjudication of their applications.

187.    DHS also failed to consider the burden of the costs associated with the Biometrics Requirement, which DHS estimated would be at least $30 but no more than $85 without accounting for costs to asylum seekers of travel and lodging for the biometrics appointment itself. *See id.* When considered in light of other rules DHS has promulgated, such as the Fee Rule, this requirement adds to the already heavy burden on asylum seekers.

188.    For those reasons, DHS's explanation of its decision to add the Biometrics Requirement was inadequate, and the requirement is arbitrary and capricious.

### C.    The Rules Are Arbitrary and Capricious Because DHS Did Not Adequately Consider the Effect of Contemporaneous and Related Rules

189.    In promulgating the Rules, DHS failed to consider the cumulative impact of the Rules and the Fee Rule.  The Fee Rule was first noticed in 2019 on the same day as the EAD Bar Rule and will charge asylum applicants $50 to file an asylum application and $550 to file an EAD application, with virtually no waivers available. 85 Fed. Reg. 46,788–01. Much like the Rules at

issue here, DHS justified the Fee Rule as a means to "safeguard[]" the integrity of the nation's immigration benefits system. *Id.* at 46,789.

190.    Multiple comments on the EAD Bar Rule "noted that DHS was already increasing fees for applications for employment authorization and imposing a new fee for filing of asylum applications." 85 Fed. Reg. at 38,575. There is every reason to believe that the Fee Rule would drastically reduce the number of asylum applications DHS will be required to process, irrespective of any incidence of fraud. Thus, DHS should have considered the substantive and fee-based deterrence measures in tandem. DHS failed to do so and did not respond to concerns about the interactions between these Rules. *See id.* at 38,576.

191.    The Fee Rule has been preliminarily enjoined under the APA in part because DHS "fail[ed] to consider the combined impact" of the Rules and the Fee Rule. *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *14 (N.D. Cal. Sept. 29, 2020); *see also Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, 2020 WL 5995206, at *1 (D.D.C. Oct. 8, 2020). The Rules are invalid by the same logic.

192.    DHS similarly failed to consider the impact of other rules it has proposed. For example, in finalizing the Criminal Bar, DHS abandoned its initial proposal to add certain specific criminal bars to EADs and decided instead to align the EAD criminal bars to criminal grounds of ineligibility for asylum, which were dramatically amended in another rule that has been separately enjoined. *See Pangea Legal Servs.* No. 20-cv-07721 (SI), Dkt. 74; *see also supra* ¶ 96.

193.    This approach deprived the public of a meaningful opportunity to comment on the new proposal, including whether the new asylum ineligibility grounds that may be adopted as a result of the Asylum Criminal Bars Notice are also appropriate grounds for denying EADs.

194.    DHS also refused to consider the cumulative impact of other policies that the Trump Administration has adopted and discussed above, *supra* ¶ 72[14] The cumulative impact of these policies has been to dramatically decrease the number of individuals eligible for asylum in the United States, such that those policies were effective in addressing much of the influx that the EAD Rules purported to address.

195.    Moreover, the Rule's repeated reference to a "crisis" at the southern border was no longer applicable when the EAD Rules entered into force. On March 20, 2020, the Trump Administration invoked 42 U.S.C. § 265 to effectively suspend the operation of the asylum laws altogether at United States land borders. Since the issuance of that March order and similar subsequent orders invoking the same authority under Title 42, DHS has expelled the vast majority of asylum seekers without affording them any process to seek asylum, much less work in the United States. In the six-month period from April 2020 through September 2020, 189,962 individuals were expelled from the United States in accordance with the Administration's Title 42 order, meaning that the "crisis" at the border that the agency had invoked in July 2020 when it finalized these Rules had already been eliminated by another action.

196.    The failure to consider the interaction of the Rules with the other changes to asylum promulgated by the Trump Administration was arbitrary and capricious.

---

[14] Since December 10, 2020, DHS and the Executive Office for Immigration Review have issued an additional five separate final rules. Each impacts asylum seekers, and three of them dramatically change the asylum system. *See* DHS & EOIR, Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274 (effective Jan. 11, 2021); EOIR, Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81,698 (effective Jan. 16, 2021); Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (effective Jan. 19, 2021). Through this bifurcated rulemaking, the Agencies have failed to consider, and have deprived the public of a chance to comment on, the interplay between the relevant rules and whether these restrictions on EAD access for asylum seekers are necessary when the other Rules have the effect of dramatically curtailing asylum eligibility.

**D.** **The Rules Are Invalid Because DHS Deprived the Public of a Meaningful Opportunity To Comment on Their Interrelated Impact by Segregating Its Rulemakings**

197.    Just as it failed to consider the interaction of the challenged Rules with other rulemaking, DHS failed to address the interrelated impact of the Timeline Repeal Rule and the EAD Bar Rule by issuing them separately, in an artificially segregated process.

198.    DHS only considered the impact of each rule on its own and considered comments regarding each against the backdrop of the existing asylum landscape, instead of considering their aggregate impact. In conducting the cost-benefit analysis on the EAD Bar Rule, as well as in analyzing each rule change, DHS also refused to consider the cumulative impact of the rule changes within the EAD Bar Rule or of the interrelated impact of the Timeline Repeal Rule.

199.    Thus, commenters could not meaningfully comment on the interaction between the EAD Bar Rule and the Timeline Repeal Rule because of DHS's staggered rulemaking process. In issuing the Timeline Repeal Rule, DHS categorized comments related to the EAD Bar Rule as "out of scope" and refused to consider comments on the interaction of the two notices. 85 Fed. Reg. at 37,530. In responding to comments stating that it is "essentially impossible" to meaningfully comment on the Timeline Repeal Notice without analyzing how the repeal would interact with the Broader EAD Notice (which had not yet been issued at the time that the comment period for the Timeline Repeal Notice closed), DHS recognized that the two Rules interact and stated that "to the extent that there is interaction or overlap, DHS will address such concerns if it finalizes the broader rule." *Id.*

200.    DHS broke that promise when it issued the EAD Bar Rule and refused to consider comments that pointed to the problems with segregated and staggered rulemaking and the interaction of the two rules.

201.    In the EAD Bar Rule, the agency acknowledged the "potential interaction" of the rules, but concluded that "incorporating such interactions in the impact assessments for this rule would be speculative as it assumes the Timeline Repeal Rule will be finalized, and without change." *Id.* at 38,590. But the Timeline Repeal Rule *had already been finalized without change* when the agency promulgated the EAD Bar Rule. *See Casa de Maryland*, 486 F. Supp. 3d at 964.

202.    Thus, the agency did not meaningfully consider the Rules' interaction, and that is unlawful under the APA.

**E.    The Rules are Arbitrary and Capricious Because DHS Failed to Consider the Harm to Asylum Seekers That the Rules Cause and the Humanitarian Purpose of the Refugee Act**

203.    In issuing the Rules, DHS failed to consider the interests of asylum applicants and the humanitarian purposes of the Refugee Act, which are important aspects of the EAD system for asylum applicants.

204.    In accordance with our international treaty obligations, Congress for almost 40 years has clearly supported the right to claim asylum anywhere on the U.S. border or at a land, sea or air port of entry. As discussed above, Congress has expressly affirmed the eligibility for asylum of "any" foreign national "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival)." 8 U.S.C. § 1158(a)(1).

205.    This inclusive provision reflected Congress's ongoing intent to comply with international law, as well as its recognition that allowing an applicant for refugee status to assert a claim for asylum at any point along a land border is a necessary component of essential refugee protections because asylum seekers often flee for their lives and cannot pick and choose where they will ask for protection.

206.    Likewise, the asylum statute is carefully crafted to comport with other aspects of U.S. treaty obligations. For example, the criminal bars to asylum in the INA align with the Refugee Convention. *Compare id.* § 1158(b)(2)(A)(ii), (iv), and (v) *with* Refugee Convention, Art. 33(2). The same is true for the other bars, like the persecutor bar and the bar for those who committed serious nonpolitical crimes. *Compare* 8 U.S.C. § 1158(b)(2)(A)(i), (iii) *with* Refugee Convention, Art. 1(F)(c), (b). Indeed, the U.S. Supreme Court has recognized the humanitarian purpose of the INA and that the Refugee Act was passed to bring the United States into conformity with our international treaty obligations. *See Cardoza-Fonseca*, 480 U.S. at 429.

207.    The Rules undermine this humanitarian purpose by making it exceptionally difficult for migrants to survive while awaiting the outcome of their asylum application. The *Casa de Maryland* court noted this common-sense point: Without access to work, "asylum applicants lack the resources to pursue their claims." 486 F. Supp. 3d at 966.

208.    DHS noted in the Final Rule that it did not "*intend* to cause hardship to bona fide asylum seekers." 85 Fed. Reg. at 38,570 (emphasis added). But regardless of DHS's intent, the *effect* of the rule is to harm asylum seekers who may have meritorious asylum claims.

209.    When faced with comments about the procedural and financial barriers that make it nearly impossible for asylum seekers to receive pre-asylum work authorization imposed by the Rule, *id.* at 38,558, DHS responded with a series of non-sequiturs and generalized "understandings" of the commenters' positions that do not qualify as reasoned responses under the APA.

210.    DHS noted that the new rules inflict a certain "degree of economic hardship" but declared the rule changes are necessary to "maintain integrity in the asylum process" and that "it is not unreasonable to impose additional time and security requirements on asylum seekers before they may apply for an EAD." *Id.* at 38,549. That *ipse dixit* is inadequate under the APA.

211.    Similarly, the agency failed to consider the impact of the Rules on international treaty obligations. The Refugee Convention requires the United States to provide refugees and asylum seekers a means to assimilate into this society. *See* Refugee Convention, Art. 17 (requiring that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment"). That right has previously been implemented via the carefully crafted Refugee Act of 1980, along with the related rules for work authorization and application for permanent legal status. The Rules eviscerate this principle.

212.    Defendants' failure to consider the impact on asylum applicants is made more indefensible when considering that one of the agency's stated rationales for the Rules was to reduce the asylum backlog for the long-term benefit of asylum seekers with meritorious claims. Taking DHS at its word, it was irrational for it not to consider whether the same rules visit substantial hardship on the very asylum seekers the agency claimed to want to protect.

213.    DHS also failed to consider important uses of EADs beyond employment. For example, the EAD card is the only form of government-issued photo identification many asylum seekers can obtain, and it is a predicate for obtaining an SSN.

214.    For adults and children alike, there are many important, non-employment uses of an EAD or SSN that the agency likewise failed to consider, including obtaining a state identity card or driver's license; opening a bank account; accessing vocational training programs; and accessing scholarships or in-state tuition. Despite receiving comments on this subject, DHS failed to grapple with any non-employment EAD uses, beyond its unconscionable suggestion that asylum seekers familiarize themselves with homeless shelters. *See* 85 Fed. Reg. at 38,591–92.

215.    DHS's one substantive response to the issue of EADs for children actually cuts in the opposite direction of the conclusion it reached: the agency admitted that it did not factor into its burden calculation the fact that some EADs go to children too young to work. *See id.* at 38,587–88. Yet it made no changes in response, despite this recognition.

216.    DHS's additional suggestion that harms arising from asylum seekers' inability to get state identification "are outside USCIS's purview," *id.* at 37,528, is incorrect. The connection between work authorization, SSNs, and government IDs arises in part from federal law that DHS implements. *See* 6 C.F.R. § 37 *et seq*. It was therefore arbitrary and capricious for DHS to rely on that specious reasoning as its sole basis for ignoring the substantial, and in many cases quantifiable, costs that the Rules will impose on asylum seekers.

217.    In sum, DHS's justifications for the Rules were grossly inadequate and suggest that DHS's true purpose in promulgating those rules was to deter even meritorious asylum applications, and DHS failed to consider the harm that the Rules visit on asylum applicants. For those reasons and the others stated above, the Rules are unlawful under the APA.

## IV.    THE CHANGES IN THE EAD RULES HARM BOTH INDIVIDUAL AND ORGANIZATIONAL PLAINTIFFS

218.    Absent declaratory and injunctive relief, Plaintiffs face severe, irreparable harm.

219.    Some Individual Plaintiffs are subject to outright denial of their applications for a work permit while others face significant and potentially indeterminate delays. Most are first-time applicants for work authorization, meaning that they have not yet been able to pursue self-sufficiency during their pending immigration cases. Others face the inability to renew their work applications and the associated loss of stability. Several Individual Plaintiffs are children who need work authorization, not to work, but to access other critical benefits.

220.    Organizational Plaintiffs AsylumWorks, Tahirih, and CLSEPA will also suffer irreparable harm. The Rules frustrate their respective missions, force them to divert resources, jeopardize ongoing programs, and put their funding at risk.

### A.    Harm to Individual Plaintiffs

221.    Individual Plaintiffs are asylum seekers from nine countries. V.M.B., G.S.M., M.C.R., and C.H.A. are transgender women who fear persecution in the form of violent death or severe physical and sexual violence in Latin American. L.G.M. was politically active in Nicaragua and faces violence stemming from that activism. N.E.F. and her son C.A. fled gender and family based violence in Morocco; M.A.S. suffered gender-based violence at the hands of her partner in Honduras. K.N.E. is a lesbian woman who fled violence and abuse by the authorities in Uganda, one of the most dangerous countries in the world for LGBT people. U.O. and R.P.P. are gay men who fled violence and abuse due to their sexual orientation in Nigeria and Cuba, respectively. D.M.C. fled cartel violence in Honduras. M.L.V. is a disabled child at risk of persecution in Central America. And J.H.C., L.E.J.J.,  M.C.J.J., and H.M.R. are children who fear gang and domestic violence in Central America.

### Denial of Work Authorization

222.    Plaintiffs C.H.A., R.P.P., L.E.J.J., and M.C.J.J. are charged with having entered the United States without inspection after the effective date of the Rules and are therefore likely unable to receive employment authorization for the duration of their immigration cases because of the Rules' Port-of-Entry Requirement. C.H.A., a transgender woman, and R.P.P., a gay man, both faced discrimination and threats in Cuba because of their gender identity and sexuality. L.E.J.J. and M.C.J.J. fled El Salvador as unaccompanied children. It is unclear that the limited exception to the Port-of-Entry Requirement would apply to C.H.A., R.P.P., L.E.J.J., or M.C.J.J.

223.   Plaintiffs D.M.C. and V.M.B. applied for asylum more than one year after their respective entries into the United States. Under the Rules, they are likely unable to receive employment authorization *at all* for the duration of their immigration case unless or until a judge finds that they qualify for an exception to the asylum statute's one-year filing deadline. Both have a qualifying exception. V.M.B. is a transgender woman who has only recently come to terms with her gender identity and pursued her transition, and D.M.C. understood that she had in fact timely requested asylum through her interactions with immigration officials while she was detained at the border. Neither will have an opportunity to make these arguments for quite some time; their first chance could be years from now when their cases will be set for individual hearings.

224.   Plaintiffs U.O., L.G.M., and L.M.M.G. face a similar problem. They *did* apply for asylum within one year of their respective entries, but because DHS failed to calendar their cases with an immigration court, they had to file their applications with USCIS even though their cases were in a defensive posture. DHS has since calendared their cases and required them to refile for asylum with the court. They have done so, but those refiled applications were received more than a year after their respective entries. As is evident from U.O.'s failed attempt to renew his EAD, DHS will not credit the original filing date for purposes of work authorization. As such, these individuals, like D.M.C. and V.M.B., cannot receive work authorization until an IJ makes a finding that their applications for asylum were timely. Such a finding is likely, but it is months or years away.

225.   Plaintiff M.A.S. had an EAD that was valid until May 2021. But under the Rules, her EAD automatically terminated in August 2020, when the BIA dismissed the appeal of her asylum case. Though M.A.S. is currently appealing her asylum case to the Fourth Circuit Court of

Appeals, the Rules prevent her from renewing or reapplying for work authorization while her case remains before the Court of Appeals, which will likely take a year or more.

226.    All Individual Plaintiffs are vulnerable to being denied work authorization in the exercise of discretion, but this is particularly true for G.S.M., K.N.E., and V.M.B. G.S.M. has two prior convictions for driving under the influence, and V.M.B. is facing a misdemeanor charge for driving while intoxicated. K.N.E. was convicted of illegal entry into the United States. The conduct of G.S.M. and K.N.E. predates the Rules, so the Criminal Bars do not apply. V.M.B. is spared from these provisions because, though her offense postdates the Rules, it is a single DUI. But even though these individuals have escaped the Rules' Criminal Bars, they are uniquely vulnerable to a discretionary denial of their work authorization based on these same incidents.

227.    Plaintiffs N.E.F., C.A., and L.M.M.G. face denial of an EAD under the Applicant-Caused Delay provision. N.E.F. and C.A. missed a biometrics appointment even though the notice arrived *after* the date of the appointment, and their EAD applications were denied on this basis in November 2020. Similarly, L.M.M.G. missed a biometrics appointment because she did not get her notices. Previously, an applicant's time-clock for accruing time toward work authorization could be *paused* on the basis of such an issue, but the applicant had the ability to restart that clock and eventually seek an EAD. The new Rules eliminate that flexibility and authorize the permanent denial of an EAD for minor, subsequently rectified delays.

228.    Plaintiff M.C.R. has been denied work authorization under the provision that bars work authorization during the appeal process where the applicant had not reached eligibility prior to appeal. M.C.R. applied for asylum in February 2019 and was denied a month later. She appealed and won remand, and because the Rules allow for work authorization on remand from federal court, she sought a work permit in August 2020. The judge denied asylum in October 2020, and DHS

denied her work permit a month later, refusing to credit her for the more than a year of time that has passed since her original application because her case is again pending on appeal.

**Delays and Costs Related to Work Authorization**

229.    In addition to the specific harms identified above, the Rules impact all Individual Plaintiffs in various ways.

230.    First, the Rules now require all Individual Plaintiffs who are eligible to receive an EAD to wait more than double the time previously required to apply—a full 365 days instead of the original 150 days. This provision in the Rules directly impacts K.N.E., N.E.F., C.A., J.H.C., and H.M.R. Individual Plaintiffs who face a complete bar to work authorization bar based on the Rules' one year provision (D.M.C., V.M.B., U.O., L.G.M., and L.M.M.G.) will also face this delay even if a judge finds an exception to the one year provision in less than a year.  The same is true for those who face a complete bar to work authorization due to their alleged manner of entry, C.H.A., R.P.P., L.E.J.J., and M.C.J.J. Even if they are able to meet the limited exception to that provision, they will still have to wait more than twice as long to seek work authorization.

231.    In addition, the Rules eliminate the requirement that the government rule on an EAD application within 30 days, meaning all Individual Plaintiffs do not know when—if ever—they will receive work authorization.

232.    Finally, for all Individual Plaintiffs, the Rules impose an $85 biometric services fee that did not previously exist. For first-time applicants this is an increase from a previously free application. For those seeking renewal, this change increases an already-expensive application fee from $410 to $495. Individual Plaintiffs must pay both the renewal fee and the biometric services fee each time they renew their applications.

**Harm Caused by the Inability To Gain Work Authorization**

233.    Without work authorization, Individual Plaintiffs will have no other lawful means by which to generate an income while they await the adjudication of their claims for protection. The Rules also deprive them and those similarly situated of the collateral benefits of an EAD, including the ability to retain counsel, receive medical care, apply for identity documents, secure housing, or provide support to dependent family members. For Individual Plaintiffs, these harms are real and present, and they face ongoing harm because of them.

234.    First, in many states, work permits are the only avenue that Individual Plaintiffs have to valid identity documents. Many states do not allow noncitizens to get a driver's license or state ID without work authorization and a corresponding social security number. Plaintiffs J.H.C., K.N.E, and V.M.B live in Indiana, a state with such rules. The same is true for L.G.M., L.M.M.G., and H.M.R., who live in Wisconsin. Without this documentation, these plaintiffs will struggle to rent apartments, open bank accounts, and access state-services for which they may qualify.

235.    From the inability to get identification and the inability to work, comes an inability to provide for the necessities of daily living like food, housing, utilities, and clothing. For example:

a.    N.E.F. is a single mother. She needs work authorization to provide for herself and her minor child, C.A., who is also a plaintiff in this case.

b.    M.L.V., an eight-year-old deaf child, spent several months in a homeless shelter with his grandmother last year, and has struggled to find more stable housing without a government-issued photo identification and a social security number.

c.    L.G.M. tried to apply for rental assistance and housing assistance for herself and her daughter, L.M.M.G. The organization that provides those services told them they did not qualify for rental assistance without an SSN, which they cannot get without an EAD.

    d.  M.C.R., a transgender woman, is vulnerable because she does not have the support of family. In particular, M.C.R. is unable to afford the medical care or feminine clothing and cosmetics that are critical to her identity and psychological wellbeing.

236.    Access to work authorization is also critical for access to medical care, both as a financial matter and because some medical services require participants to have a government-issued identification card or a social security number. For example:

    a.  M.L.V. is a chronically ill eight-year-old boy; he is deaf and he has limited kidney function and will require a transplant. M.L.V. may face obstacles in pursuing medical care because he does not have government identification.

    b.  V.M.B., M.C.R., G.S.M, and C.H.A. are all transgender women who seek gender-affirming medical care. V.M.B., M.C.R., and C.H.A. lack access to this care without a government-issued ID or a way to pay for it. G.S.M. has been able to receive this care because she has had an EAD for the last four years, but if her renewal request is denied based on the Rules, she faces loss of these services. C.H.A. is also HIV positive and faces significant barriers without an EAD or the ability to pay for care.

    c.  C.A. was diagnosed with a stage-four cancerous germinoma brain tumor in 2016 and with leukemia lymphoma in 2019. He requires expensive treatment, and even with insurance, he and his mother are unable to cover his expenses.

237.    For the children who are plaintiffs in this case—C.A., L.M.M.G., J.H.C., H.M.R., M.L.V., L.E.J.J., and M.C.J.J.—work authorization is important for reasons unrelated to work. For example, C.A. is approaching college age, and he will not qualify for some financial aid or be

eligible for certain scholarships. M.L.V. lives in California, where he cannot access certain publicly-funded resources without an EAD. And L.E.J.J. and M.C.J.J. face the prospect of recurring delays or obstacles to accessing healthcare or educational services due to a lack of government-issued identification. Many of these children are in or approaching their teen years, where having identification is important for an increased number of routine activities, including internships, health services, and even access to certain buildings.

238.    In addition, many Individual Plaintiffs, including D.M.C., V.M.B., L.G.M, K.N.E., and R.P.P. have family members in their home countries who depend on them for financial support that they cannot provide. In multiple cases, these family members are young children who were left behind because the journey to the United States was too dangerous or expensive.

239.    For the plaintiffs who have received work authorization in the past—G.S.M., M.A.S., and U.O.—the loss of an EAD threatens to upend the limited stability they have achieved. G.S.M and U.O. have both been able to find meaningful work contributing to the LGBTQ+ community in their new cities, but their ability to stay in these jobs is threatened by the loss of an EAD. M.A.S., who fled her abusive partner in Honduras, found work at a cleaning company in the United States and has no one else to support her here. Having access to work authorization has enabled these individuals to gain independence, pursue work that they are passionate about, and in the case of G.S.M., escape an abusive situation.

240.    Where possible and useful, individual plaintiffs have tried to mitigate the harm they face by registering as members of ASAP, one of the membership organizations that is a plaintiff in *Casa de Maryland*. But because not all of the injuries that Individual Plaintiffs face are covered by the preliminary injunction entered in that case, and because there is no final judgment or permanent injunction, it does not protect them from ongoing injury.

### B.    Harm to Organizational Plaintiffs

241.    Plaintiff AsylumWorks is a nonprofit and nonpartisan organization dedicated to serving the needs of the estimated 50,000 asylum seekers living in the Washington, D.C. region. AsylumWorks' mission is to strengthen communities by empowering asylum seekers to rebuild their lives with dignity and purpose through the provision of direct services, education, and community support.

242.    AsylumWorks' three core service areas are employment, social services, and community building. In the past year, AsylumWorks assisted approximately 300 asylum seekers. There are approximately 65 asylum seekers enrolled in AsylumWorks' employment programs, which focus on preparing participants for entry-level employment and career re-entry. Specifically, AsylumWorks connects participants with counsel to apply for work authorization, conducts trainings focused on resume-writing, interviewing, and building job skills, and facilitates informational interviews with potential employers for program participants.

243.    This entire program, AsylumWorks' Employment Program, will be derailed due to the changes in the Rules. AsylumWorks typically enrolls clients in its Employment Programs before they receive work authorization, to prepare them to seek employment as soon as possible. AsylumWorks' job re-entry training, resume building workshops, informational interview programming, and on-the-job simulations are all dependent on the notion that their clients will be able to get work permits. Under the Rules, they will have no way to know if or when clients will receive permission to work, which frustrates this aspect of AsylumWorks' programming.

244.    The new Rules will also increase the burden on AsylumWorks' social services programming. The new Rules pose significant degrees of uncertainty, which will likely lead to

increased anxiety and uncertainty for its clients. Such stress will in turn increase demand for AsylumWorks staff to provide emotional support and referrals to mental health services.

245.    Relatedly, AsylumWorks observes that the ability to work is a key contributor to improved mental health outcomes. When asylum seekers arrive to AsylumWorks, many are in crisis and experience thoughts of suicide because they do not know how they will survive in the United States. AsylumWorks consistently sees a marked improvement in clients' mental health once they have begun to work. Without the promise of the ability to work on the horizon, the Rules will leave clients in crisis for longer, taxing AsylumWorks' social services to a significantly greater degree than they already are.

246.    The Rules will further harm AsylumWorks by increasing the amount of time that its clients will require the most labor-intensive part of its services. AsylumWorks' programming is designed to provide more intensive assistance during the first six months and then to taper off as clients gain independence. Because the Rules delay or deny asylum seekers' ability to work, they force AsylumWorks to expend resources for food, housing, and medical care for clients who could have obtained an EAD under the prior regulations.

247.    Plaintiff CLSEPA is a nonprofit and nonpartisan organization providing legal and social services to low-income families in and around East Palo Alto, California. CLSEPA's mission is to provide transformative legal services that enable diverse communities in East Palo Alto and beyond to achieve a secure and thriving future. CLSEPA provides free and low cost legal services to low-income community members in the areas of economic advancement, housing, and immigration. Immigration is the largest of CLSEPA's programs, with the organization currently providing full representation to more than 100 asylum seekers. For the last two years, CLSEPA has also assisted more than 140 asylum seekers per year to fill out their asylum applications at *pro*

*se* clinics. In addition, CLSEPA currently provides mentorship on more than 200 cases placed with *pro bono* counsel, which includes *pro bono* representation of more than 100 asylum seekers.

248.     The Rules frustrate CLSEPA's mission by limiting individuals' ability to work legally, in turn reducing their likelihood of success in their substantive cases while simultaneously increasing displacement, decreasing stability and family unity, increasing poverty and stress, and worsening health and educational outcomes. The Rules impose an increased burden on CLSEPA's social workers as clients increasingly face labor exploitation, housing insecurity, and abusive relationships which they do not have the means to escape.

249.     CLSEPA has been forced to cancel plans for *pro se* clinics for work authorization preparation because the complexity of the Rules makes them impracticable. Instead, CLSEPA must now dedicate significantly more time and resources to training staff and *pro bono* partners, researching and filing Freedom of Information Act requests for EAD applications, compiling and seeking review of EAD applications from managing attorneys. The difficulties posed by the Rules have decreased the number of clients CLSEPA can serve. As a significant part of CLSEPA's funding is tied to the number of clients served, the devastating impacts of the Rules threaten the organization's revenue. Decreased funding will in turn decrease the number of clients CLSEPA can serve, further frustrating its mission.

250.     Plaintiff Tahirih Justice Center is a nonprofit and nonpartisan organization that provides free legal immigration services, including asylum services, to survivors of gender-based violence. Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law. Tahirih

offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings.

251.    The Rules frustrate Tahirih's mission, require them to expend significant resources they otherwise would spend in other ways to address the consequences of the policy, and jeopardize their funding streams. The Rules will also force Tahirih to provide social services to a smaller percentage of its clients. Many of Tahirih's clients require extensive social-services support: Survivors of gender-based violence are significantly more vulnerable to negative short- and long-term health outcomes, including injury, chronic health problems, depression, post-traumatic stress, exposure to sexually transmitted infections, and gynecological problems. Survivors also require mental health services to deal with the often severe aftereffects of trauma, and of the secondary effects of trauma on their children. Asylum clients with EADs are able to work and earn money to support themselves and their families. Such financial self-sufficiency allows many of Tahirih's clients to address their trauma and other psychological issues, thereby requiring less support from social services at Tahirih. Asylum clients who are denied an EAD, or are still awaiting adjudication of an EAD application, cannot earn money and are less able and less likely to address their underlying psychosocial needs, requiring more prolonged and involved assistance from Tahirih.

252.    Tahirih's legal work will also be adversely affected by the Rules. In particular, the Applicant-Caused Delay provision deprives legal staff of the ability to present new evidence—including evidence newly received from an asylum applicant's home country—in order to supplement an application or in advance of an asylum interview. The client's best interest, and thus the rules of legal ethics, as well as the interests of justice, generally compel lawyers to present new, favorable evidence no matter when it arrives. If legal staff do so, however, they will further

delay the client's ability to become self-supporting by triggering a rejection of the client's EAD application. As such, the Rules put attorneys at Tahirih in an untenable position of having to advise clients about the need to balance doing what is best for the long-term success of an asylum claim in the face of an immediate, urgent, need for work and the associated financial stability.

253.    The Rules frustrate Tahirih's legal work in other ways, too. The provision concerning circumstances providing "serious reasons to believe" an asylum seeker engaged in a non-political crime and forcing asylum seekers to disprove any potential crime bars to asylum as a prerequisite to an EAD will require legal staff to gather all evidence related to clients' past actions, and present full-fledged arguments concerning those actions, well in advance of a merits hearing or asylum interview. And no matter the disposition of those issues at the EAD stage, the same issues will then have to be re-litigated when the asylum case is heard on its merits.

## V.    MR. WOLF AND MR. MIZELLE INVALIDLY SERVED AS DHS SECRETARY AND DHS GENERAL COUNSEL RESPECTIVELY, SO THEY LACKED AUTHORITY TO MAKE OR RATIFY THE RULES

254.    On June 22 and 26, 2020, Mr. Wolf—while purporting to serve as the Acting DHS Secretary—purported to issue and delegate sign-off authority to Mr. Mizelle for the two Rules at issue in this case: the Timeline Repeal Rule and the EAD Bar Rule. On September 17, 2020, Mr. Wolf issued a memo that purported to ratify all of his prior actions, including the purported issuance of the Rules. On October 7 and November 16, 2020, Mr. Wolf issued additional memos purporting to ratify the Notices of Proposed Rulemaking for each Rule purportedly issued by his predecessor, Mr. McAleenan.

255.    Mr. Wolf was never lawfully designated the Acting DHS Secretary and thus never had the authority to issue or ratify the Rules. Even if he validly became Acting DHS Secretary after purportedly issuing the Rules, his subsequent attempts to ratify them were still unlawful. Thus, the Rules are nullities and must be set aside.

A.     **The Appointments Clause, FVRA, and HSA**

256.     Under the Appointments Clause of the Constitution, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const., Art. II, § 2, Cl. 2.

257.     The Appointments Clause is fundamental to the checks and balances between the branches of government that the Framers intended. Consistent with this intention, and like other executive departments, the principal positions within the Department of Homeland Security must be appointed by the President, by and with the advice and consent of the Senate. 6 U.S.C. §§ 112(a)(1) & § 113(a)(1) (commonly referred to as a "PAS," or "Presidential Appointment and Senate confirmation," Position or Office).

258.     Because "[t]he constitutional process of Presidential appointment and Senate confirmation . . . can take time," *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017), Congress has exercised its authority by enacting various vacancy statutes through which another official may be temporarily designated in an acting capacity to fulfill the duties of an office.

259.     Congress enacted the current iteration of this statute in 1998: the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345-3349d. The FVRA was designed to protect the Senate's authority under the Appointments Clause, preventing the Executive from undermining the separation of powers through the manipulation of official appointments. S. Rep. No. 105-250, at 4–5 (1998) ("[T]he Senate's confirmation power is being undermined as never before.").

260.     The FVRA accomplishes this purpose by specifying the categories of individuals who may serve in an acting capacity when a Senate-confirmed position, such as DHS Secretary or DHS General Counsel, is vacant. 5 U.S.C. § 3345. Specifically, the FVRA provides that the default

successor will be designated as the "first assistant" to the relevant position or office—subject to, among other limitations, the time limits under section 3346. *See id.* § 3345(a)(1).

261.    An acting officer may serve for a maximum of 210 days from when the vacancy occurred. *See id.* § 3346(a)(1). This 210 day maximum service provision applies unless and until the President submits "a first or second nomination for the office . . . to the Senate." *Id.* § 3346(a)(2). If this occurs, an acting officer may serve "from the date of such nomination for the period that the nomination is pending in the Senate." *Id.*

262.    Actions taken by officers acting in violation of the FVRA "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d); *see infra* Part V.D. and V.F.

263.    The FVRA is the "exclusive means" for authorizing an acting official, unless an alternative statutory provision "expressly" authorizes another mechanism. 5 U.S.C. § 3347(a). The Homeland Security Act ("HSA") is such an alternative statutory provision.

264.    The HSA outlines an order of succession for vacancies arising in the position of Secretary of Homeland Security that differs from the order provided in the FVRA in two major ways. 6 U.S.C. § 113(g).

265.    *First*, the HSA provides that the Deputy DHS Secretary is the first in line to serve as Acting DHS Secretary if the DHS Secretary resigns. *See id.* § 113(a)(1)(A). The HSA also provides that the Under Secretary of Management is next in line after the Deputy DHS Secretary. *See id.* §§ 113(a)(1)(F) & (g)(1).

266.    *Second*, the HSA authorizes "the Secretary" to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2).

267.    The HSA distinguishes between the roles of the "Secretary" and an "Acting Secretary." An individual may establish or modify the "further order of succession" under

§ 113(g)(2) only if that individual was nominated by the President for the office of Secretary and confirmed by the Senate. An Acting Secretary cannot change the order of succession.

### B.   McAleenan and Wolf's Service as Acting DHS Secretary Violated the HSA

268.   On December 5, 2017, the Senate confirmed Kirstjen Nielsen as DHS Secretary. She was the last person to exercise the functions of DHS Secretary who was appointed with the advice and consent of the Senate.

269.   On April 7, 2019, President Trump announced Secretary Nielsen's departure from office by tweet. Secretary Nielsen announced her resignation later in the day and publicly submitted her resignation letter. At the time, the next two potential successor roles were vacant.

270.   When Secretary Nielsen resigned, the top two "first assistant" positions were vacant, thus triggering DHS's "further order of succession." 6 U.S.C. § 113(g)(2).

271.   DHS's further succession orders are contained in "DHS Delegation No. 106." *See* DHS Delegation No. 106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authority* (Apr. 10, 2019). On April 10, 2019, and at all points since then, this Delegation contained two separate lines of succession: one line "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," *id.* § II.A (resignation line), and another line "in the event [of] a disaster or catastrophic emergency," *id.* § II.B (emergency line). Executive Order 13,753 governed the "resignation line," and Annex A to DHS Delegation No. 106 governed the "emergency line." *See* Exec. Order No. 13,753 (Dec. 9, 2016), 81 Fed. Reg. 90,667 (Dec. 14, 2016). The FVRA is incorporated by reference into E.O. 13,753's order of succession.

272.   On April 9, 2019, former Secretary Nielsen amended DHS Delegation No. 106 to elevate the CBP Commissioner's position in Annex A's emergency line ("April Delegation"). This amendment did not change Annex A's title or its function in DHS Delegation No. 106. It simply

changed the order of officials within Annex A. As explained, Annex A provides the "order for delegation of authority" in case of disasters and emergencies only. *Id.* (capitalization altered).

273.    Secretary Nielsen vacated her role as Secretary via resignation and not as the result of a disaster or catastrophic emergency. Thus, E.O. 13,753 governed and Christopher Krebs, who served as the Senate-confirmed Under Secretary for National Protection and Programs, became the Acting DHS Secretary.[15] On April 11, 2019, McAleenan purported to assume the office of Acting DHS Secretary in violation of the HSA. *See* U.S. Gov't Accountability Off., No. B-331650, *Decision: Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security* ("GAO Decision") (Aug. 14, 2020), https://bit.ly/3vBYacB.

274.    McAleenan was not next in the line of succession in the resignation line. Secretary Nielsen vacated her role as Secretary via resignation and not as the result of a disaster or catastrophic emergency. Thus, the resignation line—not the emergency line—applied. Since Nielsen did not amend the resignation line, the order of succession set out in E.O. 13,753 remained in force. Under that order, as mentioned above, Krebs became the Acting DHS Secretary.

275.    McAleenan purported to issue Notices of Proposed Rulemaking for both Rules at issue in this case while he was unlawfully serving in office. *See* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, Notice of Proposed Rulemaking, 84 Fed. Reg. 47,148 (Sept. 9, 2019); Asylum Application, Interview, and Employment Authorization for Applicants, Notice of Proposed Rulemaking, 84 Fed. Reg. 62,374 (Nov. 14, 2019).

---

[15]    Krebs was the next in line in the order of succession because the office of Deputy Secretary was vacant, the Under Secretary of Management had resigned on April 9, 2019, and there was an acting FEMA administrator. President Trump terminated Krebs via Tweet on November 17, 2020.

### C.   Wolf Unlawfully Assumed Office as Acting DHS Secretary

276.   On November 8, 2019, the 212th day since Secretary Nielsen left office,  McAleenan purported to amend DHS Delegation No. 106 ("November Delegation"). *See* DHS Delegation No. 106, Revision No. 8.6, *DHS Orders of Succession and Delegations of Authority* (Nov. 8, 2019).

277.   The November Delegation purported to (1) establish that Annex A would also govern vacancies when the Secretary resigns and (2) change the order of succession outlined in Annex A to DHS Delegation No. 106. As a result, both vacancy tracks—the resignation line and the emergency line—would thereafter follow the order of succession outlined in the amended Annex A to the November Delegation. DHS Delegation No. 106, Revision No. 8.6.

278.   Under the November Delegation's universal order of succession for Acting DHS Secretary, the order of succession became: "(1) Deputy Secretary; (2) Under Secretary for Management; (3) CBP Commissioner; (4) Under Secretary for Strategy, Policy, and Plans." November Delegation, Annex A.

279.   On November 13, 2019, Mr. Wolf purported to assume the role of Acting DHS Secretary upon McAleenan's resignation. He purported to assume office pursuant to McAleenan's November Delegation to DHS Delegation No. 106. But for the November Delegation, Mr. Wolf would not have been next in the line of succession under DHS Delegation No. 106.

280.   Mr. Wolf unlawfully assumed office as Acting DHS Secretary because the November Delegation was invalid for at least two reasons.

281.   *First*, as outlined above, *see* V.B.2, McAleenan had unlawfully assumed office as Acting DHS Secretary. As such, he had no authority to issue the November Delegation.

282.     *Second*, even assuming Mr. McAleenan had lawfully assumed office as Acting DHS Secretary—to be clear, he did not—he nonetheless had no authority to issue the November Delegation because he was only Acting Secretary. Section 113(g)(2) of the HSA provides that only the *Presidentially nominated and Senate confirmed DHS Secretary* can amend the order of succession, not the *Acting Secretary*.

### D.     Mr. Wolf's Service as Acting DHS Secretary Also Violated the FVRA

283.     Mr. Wolf's service as Acting DHS Secretary was unlawful under the FVRA.

284.     The FVRA provides that an acting officer may serve in a vacancy that requires Senate confirmation "for no longer than 210 days beginning on the date the vacancy occurs," with limited exceptions that are inapplicable here. 5 U.S.C. § 3346(a)(1). After 210 days without a Senate-confirmed officer, the FVRA requires an office to remain vacant until the President submits a new nominee for Senate confirmation. *See id.* § 3348(b)(1).

285.     This 210-day limitation is not supplanted by the HSA. The HSA does empower the DHS Secretary to modify the order of succession "[n]otwithstanding" the FVRA. 6 U.S.C. § 113(g)(2). But nothing in the HSA removes the 210-day limitation or authorizes the DHS Secretary to establish a different time limitation. Instead, the HSA expressly incorporates the FVRA by providing that the HSA's modifications to the line of succession for the positions of Deputy Secretary of Homeland Security and Under Secretary for Management apply "for purposes of subchapter III of chapter 33 of Title 5," namely the FVRA. *See* 6 U.S.C. §§ 113(a)(1)(A), (F). Thus, the 210-day limitation controls regardless of whether the HSA or FVRA governs the succession for Acting DHS Secretary.

286.     Secretary Nielsen resigned on April 10, 2019, at the latest. By November 6, 2019, the FVRA's 210-day limitation expired. Mr. Wolf purported to issue the Rules challenged here in

June 2020. Under the FVRA, no official could have lawfully served as Acting DHS Secretary at this time—so the Rules are unlawful under the FVRA.

### E. Mr. Mizelle's Service as Acting DHS General Counsel Violated the FVRA

287.    The DHS General Counsel must be appointed by the President, by and with the advice and consent of the Senate. 6 U.S.C. § 113(a)(1)(J).

288.    On February 15, 2018, the Senate confirmed John Mitnick as DHS General Counsel. He was the last person to exercise the functions of DHS General Counsel who was appointed with the advice and consent of the Senate. On or about September 17, 2019, Mitnick was terminated.

289.    On or about February 12, 2020, Mr. Mizelle purported to assume the office of Acting DHS General Counsel and assumed the title of "Acting DHS General Counsel." He subsequently assumed the title of "Senior Official Performing the Duties of the General Counsel for DHS." As of December 22, 2020, President Trump had not nominated Mr. Mizelle as DHS General Counsel.

290.    As explained in section V.D, the FVRA imposes a 210-day limitation on an acting officer's service in a vacancy that requires Senate confirmation, and this limitation is not supplanted by any provision of the HSA.

291.    Mitnick was terminated as DHS General Counsel on September 17, 2019. By April 14, 2020, the FVRA's 210-day limitation expired. Mr. Mizelle purported to sign the Rules challenged here in June 2020. He was not empowered to do so under the FVRA.

### F. Mr. Wolf's Issuance of the Rules Was Unlawful, so the Rules Must Be Set Aside

292.    On June 22 and 26, 2020, respectively, Mr. Wolf purported to issue the Timeline Repeal Rule and the EAD Bar Rule. He purported to "review[] and approve[]" both Rules. He then purported to "delegat[e] the authority to electronically sign" them to Mr. Mizelle in his capacity

as "the Senior Official Performing the Duties of the General Counsel for DHS." Timeline Repeal Rule, 85 Fed. Reg. at 37,545 (Timeline Repeal Rule); 85 Fed. Reg. at 38,626 (EAR Bar Rule). Mr. Mizelle in turn signed both Rules on behalf of Mr. Wolf.

293.    Both Rules were nullities that must be set aside because Mr. Wolf was serving unlawfully under both the HSA and the FVRA at all relevant times, including at the time he purported to issue the Rules. The Rules must also be set aside because (1) Mr. Mizelle was unlawfully in office under the FVRA at the time he purported to sign the Rules; and (2) the Rules are based on Notices of Proposed Rulemaking that were invalidly issued by McAleenan.

294.    The Rules must be set aside under the HSA because Mr. Wolf unlawfully assumed office and was unlawfully in office at the time he issued the Rules. Indeed, on August 14, 2020, the Government Accountability Office concluded that neither McAleenan nor Mr. Wolf had lawfully been performing the functions of Acting DHS Secretary. Per the GAO, DHS's internal succession orders at the time assigned the role to a different official, precluding McAleenan from serving as Acting Secretary. As such, the GAO concluded that McAleenan had not validly served as Acting Secretary and that his designation of Wolf as his successor was also invalid. *See* U.S. Gov't Accountability Off., No. B-331650, *Decision: Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security* (Aug. 14, 2020), https://bit.ly/3vBYacB.

295.    Because the Rules are final agency action taken by an official not lawfully performing the functions of Acting Secretary under the HSA, they must be set aside as "not in accordance with law" and "in excess of . . . authority" under the APA. 5 U.S.C. §§ 706(2)(A), (C).

296.    The Rules were nullities under the FVRA because no official was lawfully serving as Acting DHS Secretary in June 2020, as explained in section V.C. Mr. Wolf purported to issue

the Rules well after the 210-day statutory period running from Secretary Nielsen's April 2019 resignation had expired.

297.    The FVRA's enforcement mechanism establishes the remedy for "an action taken by any person" who is not validly serving in a relevant position. 5. U.S.C. § 3348(d)(1). Any "action" taken by the unlawfully acting official in the "performance of any function or duty" of the vacant office "shall have no force or effect." *Id.*

298.    In issuing the Rules, Mr. Wolf took an "action" in the performance of a "function or duty" of the vacant office of DHS Secretary. First, the FVRA defines "action" as "any agency action as defined under [5 U.S.C. §] 551(13)." *Id.* § 3348(a)(1). The Rules satisfy this definition because section 551(13) defines "agency action" to include rule-making. Second, the FVRA defines "function or duty" as "any function or duty of the applicable office that—is established by statute; and is required by statute to be performed by the applicable officer (and only that officer)." *Id.* § 3348(a)(2)(A)(i)–(ii). Both elements of this definition are met here, as the EAD Bar Rule and the Timeline Repeal Rule expressly invoked rule-making powers established by statute that Congress vested in the DHS Secretary under the INA and the HSA. *See* 85 Fed. Reg. at 38,546 (EAD Bar Rule); 85 Fed. Reg. at 37,503 (Timeline Repeal Rule). Accordingly, section 3348(d)(1) of the FVRA renders the Rules "of no force or effect."

299.    Because the Rules are final agency actions taken by an official not lawfully performing the functions of Acting Secretary, they must also be set aside as "not in accordance with law" and "in excess of . . . authority" under the APA. 5 U.S.C. §§ 706(2)(A), (C).

300.    The Rules must also be set aside as because they were signed by an official who was not lawfully performing the functions of DHS General Counsel. Mr. Mizelle purported to sign the Rules in the capacity of "Senior Official Performing the Duties of the [DHS] General Counsel"

well after the FVRA's 210-day statutory period running from the September 2019 termination of Mr. Mitnick as DHS General Counsel had expired.

301.    Even if Mr. Mizelle were lawfully performing the duties of Acting DHS General Counsel in June 2020—he was not—the Rules must still be set aside because Mr. Wolf unlawfully approved them and then unlawfully delegated the authority to sign them to Mr. Mizelle. Because Mr. Wolf was unlawfully in office, Mr. Mizelle's purported exercise of delegated authority from Mr. Wolf to sign the Rules is similarly invalid.

302.    Furthermore, the Rules must be set aside because they were based on Notices of Proposed Rulemaking that were invalidly issued by McAleenan. The EAD Bar Rule states that it "implements the proposed rule" issued by McAleenan. 85 Fed. Reg. at 38,532. Similarly, the Timeline Repeal Rule states that it "adopt[s] [the] proposed regulation [issued by McAleenan] in all material respects, and incorporates by reference the reasoning, and data in the proposed rule." 85 Fed. Reg. at 37,502. But McAleenan was not validly serving as Acting Secretary when he purported to issue the Notices of Proposed Rulemaking for both Rules. Because the Notices of Proposed Rulemaking were both nullities, any Rules based on them are necessarily also nullities.

### G.    The Purported Fall 2020 Ratification of the Unlawfully Promulgated Rules Is Invalid

303.    On September 10, 2020, President Trump nominated Mr. Wolf to serve as the Secretary of Homeland Security and submitted his nomination for Senate confirmation. *See* White House, Two Nominations Sent to the Senate (Sept. 10, 2020), https://bit.ly/3s3hopn. As of December 22, 2020, the Senate had not confirmed Wolf as DHS Secretary.

304.    Under the FVRA, the submission of Wolf's nomination triggered an alternative basis for an official to exercise the functions of the office as Acting DHS Secretary. The FVRA provides an official may serve in an acting capacity "once a . . . nomination for the office is

submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(2).

305.     Thus, under the April Delegation and E.O. 13,753, Peter Gaynor, the FEMA Administrator, became Acting DHS Secretary on September 10, 2020 by operation of law, as the first Presidentially-appointed and Senate-confirmed officer in the line of succession provided by E.O. 13,753.[16]

306.     That same day—but apparently before Wolf's nomination was submitted to the Senate—purported Acting Secretary Gaynor issued a memo entitled "Order Designating the Order of Succession for Secretary of Homeland Security" ("Original Gaynor Memo"). *See* Letter by DHS, *Batalla Vidal v. Wolf*, No. 16-cv-4756 (NGG) (VMS), Dkt. 341 (E.D.N.Y. Nov. 13, 2020) (addressing sequence of events). In that memo, he purported to exercise authority under 6 U.S.C. § 113(g)(2) to ratify or otherwise adopt the same November Delegation that McAleenan had unlawfully issued.

307.     On November 14, 2020, Mr. Gaynor reissued the same memo. *See* Peter T. Gaynor, *Order Designating the Order of Succession for the Secretary of Homeland Security* (Nov. 14, 2020). He again purported to exercise "any authority vested in [him] as Acting Secretary" pursuant to the order of succession in place when Secretary Nielsen resigned in April 2019 and to use that authority to re-assign the Acting Secretary role to Mr. Wolf. *Id.*

308.     Under both iterations of the Gaynor Memo, Mr. Wolf purportedly became Acting DHS Secretary immediately. But DHS never submitted any notice to Congress that Administrator Gaynor was serving as Acting Secretary, as is required by the FVRA, 5 U.S.C. § 3349(a)(2).

---

[16]   At the time, the offices of Deputy Secretary of Homeland Security and Under Secretary for Management were vacant.

Mr. Gaynor also neither resigned from the office that he purported to cede to Mr. Wolf nor otherwise created a new vacancy in the role of Acting Secretary.

309.    On September 17, 2020, Mr. Wolf issued a legal memorandum purporting to ratify his unlawful promulgation of the Timeline Repeal Rule and the EAD Bar Rule. This memo was subsequently published in the Federal Register. *See* Ratification of Department Actions, 85 Fed. Reg. 59,651 (Sept. 23, 2020) ("First Ratification Memo").

310.    On October 7, 2020 Mr. Wolf issued a second ratification memo that purported to ratify Mr. McAleenan's Notices of Proposed Rulemaking for the Rules, which was also subsequently published in the Federal Register. 85 Fed. Reg. 65,653 (Oct. 16, 2020) ("Second Ratification Memo").

311.    On November 16, 2020, Mr. Wolf reissued the Second Ratification Memo, again purporting to ratify McAleenan's Notices of Proposed Rulemaking for the Rules. This memo was subsequently published in the Federal Register. *See* Ratification of Department Actions, 85 Fed. Reg. 75,223 (Nov. 25, 2020) ("Third Ratification Memo" and together with the First and Second Ratification Memos, the "Ratification Memos").

312.    The Ratification Memos do not address either rule—indeed, the First Ratification Memo does not even mention the Rules. In purporting to ratify the Rules and the Notices of Proposed Rulemaking, Mr. Wolf did not take into account or even reference any relevant changes in circumstances in the time since the promulgation of the Rules. Mr. Wolf's Ratification Memos are without legal effect for at least two reasons.

313.    *First*, Mr. Wolf's nomination and the Gaynor Memos did not cure Mr. Wolf's unlawful succession, so Mr. Wolf had no authority to issue the Ratification Memos.

314.    *Second*, even had Mr. Wolf validly assumed office, his Ratification Memos were still invalid because they cannot be ratified. *See* 5 U.S.C. § 3348(d)(2) ("An action that has no force or effect . . . may not be ratified."); S. Rep. No. 105-250, at 19 (1998) ("A lawfully serving acting officer cannot ratify the actions of a temporary officer whose service does not comply with the Vacancies Reform Act.").

### H.    Gaynor's Memos Did Not Cure Wolf's Unlawful Succession

315.    The Gaynor Memos did not cure Mr. Wolf's unlawful succession for at least five independent and additional reasons.

316.    *First*, the Gaynor Memos did not cure Mr. Wolf's unlawful succession because, as Acting DHS Secretary, Mr. Gaynor had no authority to amend the line of succession. Plaintiffs repeat and incorporate by reference their pleading in section V.B.2 that only the Presidentially-nominated and Senate-confirmed DHS Secretary—not the Acting DHS Secretary—can amend the order of succession under 6 U.S.C. § 113(g)(2). Mr. Wolf's Ratification Memos were nullities because he never validly assumed office as Acting DHS Secretary.

317.    *Second*, section 3348(d)(2) of the FVRA prohibits Gaynor from ratifying McAleenan's unlawful November Delegation. The Gaynor Memos are in substance a ratification of the November Delegation. Plaintiffs repeat and incorporate by reference their pleading that McAleenan was not lawfully performing the functions and duties of Acting DHS Secretary when he issued the November Delegation. The authority to change the order of succession for Acting DHS Secretary also falls squarely within a "function or duty" under the FVRA because 6 U.S.C. § 113(g)(2) exclusively authorizes the office of the DHS Secretary to establish the further order of succession. *See* 5 U.S.C. § 3348(a)(2) (defining "function or duty" as "established by statute . . .

to be performed by the applicable officer (and only that officer)"). Thus, the FVRA's enforcement provision prohibited Mr. Gaynor from ratifying the November Delegation.

318.     *Third*, the Gaynor Memos did not cure Mr. Wolf's unlawful succession because DHS never provided notice to Congress that Gaynor is currently serving as Acting DHS Secretary. DHS's failure to provide notice violated the FVRA, which requires "[t]he head of each Executive agency" to notify Congress of "the name of any person serving in an acting capacity and the date such service began *immediately* upon the designation." *Id.* § 3349(a)(2) (emphasis added). Indeed, the only purpose for which DHS appears to have recognized Gaynor's authority is "for the sham purpose of abdicating his authority to DHS's preferred choice," namely Mr. Wolf. *Batalla Vidal v. Wolf*, 2020 WL 6695076, at *9 (E.D.N.Y. Nov. 14, 2020). Indeed, following the Gaynor Memos, DHS publicly represented to a federal court that "Gaynor 'never' was the Acting Secretary of Homeland Security." *Pangea Legal Services v. U.S. Department of Homeland Security*, 2021 WL 75756, at *5 (N.D. Cal. Jan. 8, 2021). Because DHS failed to provide the required notice to Congress, Gaynor was not validly serving as Acting DHS Secretary when he issued the Gaynor Memos, and the Gaynor Memos are of no "force or effect." 5 U.S.C. § 3348(d)(1).

319.     *Fourth*, Gaynor had no authority to issue the memos because he issued the Original Gaynor Memo before the President submitted Mr. Wolf's nomination to the Senate. The Original Gaynor Memo was thus a nullity because Gaynor could only validly serve in an acting capacity "once a . . . nomination for the office is submitted to the Senate"—not before. 5 U.S.C. § 3346(a)(2). While Gaynor did purport to reissue the Original Gaynor Memo following Mr. Wolf's nomination, it is in substance a ratification of the original memo. Because Gaynor was not validly serving when he issued the original memo, the FVRA's enforcement provision prohibited him from ratifying that memo. 5 U.S.C. § 3348(d)(2).

320. *Fifth*, Congress and DHS, via the FVRA and HSA, have provided detailed contingency plans to ensure that somebody is accountable for the Department's mission. That purpose would be significantly undermined if DHS allowed two different people—Mr. Wolf and Administrator Gaynor—to simultaneously exercise the Secretary's power.

**I.      Wolf's Fall 2020 Ratifications of the Rules Were Invalid**

321. Even assuming that Mr. Wolf's nomination as DHS Secretary and the Gaynor Memos could cure Mr. Wolf's unlawful succession—and they cannot—Mr. Wolf's purported ratifications of the Rules and Notices of Proposed Rulemaking through the Ratification Memos were nonetheless invalid for at least four independent and additional reasons.

322. *First*, Mr. Wolf's ratifications were invalid because they contravened the FVRA's prohibition of ratification of actions taken by an official unlawfully in office. Section 3348(d)(2) of the FVRA provides that "[a]n action that has no force or effect under [section 3348(d)(1)] may not be ratified." 5 U.S.C. § 3348(d)(2). Plaintiffs repeat and incorporate by reference their pleadings in section V.F that the Rules are "of no force and effect" under section 3348(d)(1) of the FVRA because Mr. Wolf was both unlawfully in office and exercising a "function or duty" of the vacant office of DHS Secretary when he purported to issue them. Thus, section 3348(d)(2) renders Mr. Wolf's purported ratifications of the Rules invalid.

323. *Second*, even if Gaynor's reissuance of the Original Gaynor Memo on November 14, 2020 was valid, Mr. Wolf's ratification of the Rules is invalid because it predated the reissuance of the Original Gaynor Memo. Mr. Wolf purported to ratify the Rules on September 17, 2020—nearly two months before Gaynor reissued the Original Gaynor Memo. Mr. Wolf never purported to reratify the Rules following the reissuance of the Original Gaynor Memo on November 14, 2020.

324. *Third*, Mr. Wolf's ratifications of the Notices of Proposed Rulemaking and the Rules are incapable of rendering the errors in the initial promulgation of the Notices of Proposed Rulemaking and the Rules harmless. The Appointments Clause is a "significant structural safeguard[] of the constitutional scheme" explicitly designed "to promote a judicious choice of persons" for filling important positions. *Edmond v. United States*, 520 U.S. 651, 659 (1997). Congress enacted the FVRA to "recla[i]m[]" its "Appointments Clause power." *Sw. Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017). Since the very purpose of the Appointments Clause (and, by extension, the FVRA) is to ensure that only appropriate persons are exercising the powers of Officers of the United States, the Court cannot assume that the Notices of Proposed Rulemaking and Rules would have come out the same way if they had been promulgated by a properly-serving official.

325. *Fourth*, Mr. Wolf's ratifications of the Rules and Notices of Proposed Rulemaking should be set aside as arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A). He did not even mention the Rules in the First Ratification Memo and did no more than list off the Notices of Proposed Rulemaking in the Second and Third Ratification Memos. He also did not even purport to re-familiarize himself with the rulemaking record or reevaluate those materials. Nor did he purport to consider any evidence about the effects of the operation of the Rules that may have emerged in the months since he originally purported to promulgate them. Mr. Wolf thus failed to provide any reasoned explanation for why the Department's original justifications for the Rules would remain valid. His purported ratifications failed to follow a rational process, grapple with the evidence, and consider the advantages and disadvantages of the Rules. They must be set aside.

**J.      Mr. Wolf's January 2021 Purported Ratification Of The Unlawfully Promulgated Rules Was Invalid**

326.      On January 11, 2021, Mr. Wolf issued a new order of succession for the Secretary of Homeland Security that designated Mr. Gaynor as the most senior eligible successor. Chad F. Wolf, *Ratification*, at 2 (Jan. 13, 2020), https://bit.ly/3luL0JP  ("Fourth Ratification Memo"). Mr. Wolf resigned on that same date and purported to return to his duties as the Under Secretary for Strategy, Policy, and Plans.  *Id.*; Chad F. Wolf, *A Message from Acting Secretary Chad F. Wolf* (Jan. 11, 2021), https://bit.ly/3eZWe89.

327.      On January 12, 2021, purported Acting Secretary Gaynor issued a memo entitled "Delegation to the Under Secretary for Strategy, Policy, and Plans to Act on Final Rules, Regulations, and Other Matters." DHS Delegation No. 23028, *Delegation to the Under Secretary for Strategy, Policy, and Plans to Act on Final Rules, Regulations, and Other Matters* (Jan. 12, 2021), https://bit.ly/3c0wBSM. In that memo, he purported to delegate to Mr. Wolf the power of the Secretary to make rules and "to ratify any prior regulatory actions of the Department of Homeland Security." *Id.* § II(A).

328.      On January 13, 2021, in reliance on the authority that Mr. Gaynor had purportedly delegated to him, Mr. Wolf purported to "ratify any and all prior regulatory actions involving delegable duties that I have taken from November 13, 2019, through January 11, 2021." Fourth Ratification Memo, at 2. Mr. Wolf also purported to ratify Mr. McAleenan's issuance of the Notices of Proposed Rulemaking for the Rules. *Id.* at 3.

329.      The Fourth Ratification Memo does not even mention the Rules. In purporting to ratify the Rules, Mr. Wolf expressly relied on his "full and complete knowledge of the contents and purpose" of his prior actions. *Id.* at 2. Tellingly, Mr. Wolf only purported to make a "detached and considered affirmation and ratification" of certain prior actions by Mr. McAleenan—not of

his own actions.  *Id.* at 3-4.  Mr. Wolf's Fourth Ratification Memo is without legal effect for at least four reasons.

330.   *First,* Mr. Wolf was not lawfully serving as Acting Secretary on January 11, 2021, and therefore could not exercise the Secretary's powers under 6 U.S.C. § 113(g)(2) to designate a new order of succession that placed Gaynor in the highest occupied position.

331.   *Second*, section 3348(d)(2) of the FVRA prohibits Mr. Wolf from ratifying his actions.  Plaintiffs repeat and incorporate by reference their pleadings in section V.F that the Rules are "of no force and effect" under section 3348(d)(1) of the FVRA.  Thus, section 3348(d)(2) renders Mr. Wolf's purported ratification of the Rules invalid because "[a]n action that has no force or effect under [section 3348(d)(1)] may not be ratified." 5 U.S.C. § 3348(d)(2).

332.   *Third*, Mr. Gaynor's delegation of ratification power to Mr. Wolf irreparably tainted the ratifications because Mr. Wolf is the very wrongdoer who unlawfully promulgated the Rules. Mr. Gaynor could have tried to remove the taint of Mr. Wolf's unlawful issuance of the Rules by independently exercising ratification power himself or delegating that power to another validly serving official who conducted a fresh review. He did neither and instead chose to task Mr. Wolf with the power to ratify his own prior unlawful actions. That choice extends the taint from Mr. Wolf's promulgation of the Rules in violation of the FVRA and the HSA to his January 13, 2021 ratification of the Rules.

333.   *Fourth*, Mr. Gaynor's delegation of ratification power to Mr. Wolf violated the FVRA and HSA because it functionally kept Mr. Wolf in the role of Acting Secretary. Mr. Gaynor's "delegation" in fact permitted Mr. Wolf to continue to exercise all the ratification and rule-making powers that Mr. Wolf purported to exercise when he claimed to be Acting Secretary. "DHS cannot recognize [Mr. Gaynor's] authority only for the sham purpose of

abdicating his authority to DHS's preferred choice," namely Mr. Wolf. *Batalla Vidal*, 2020 WL 6695076, at *9. Nor can the government use the wordplay of "delegation" to keep Mr. Wolf's authority unchanged despite the unanimous decisions of half a dozen courts and the GAO finding that Mr. Wolf's tenure was illegal.

334.     *Fifth*, Mr. Wolf's ratifications are invalid because he failed to independently evaluate the merits of the Rules. Mr. Wolf never purported to conduct a fresh and independent review of the rulemaking record, never mentioned the details of the ratification process, and never even mentioned the Rules. Instead, he made a blanket ratification of "each of [his] delegable prior actions as Acting Secretary" in reliance on his "knowledge of the contents and purpose" of his prior actions. Fourth Ratification Memo, at 2. Tellingly, Mr. Wolf only purported to make a "detached and considered affirmation and ratification" of certain prior actions by Mr. McAleenan, but not of his own prior actions. *Id.* at 3-4.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the APA, 5 U.S.C. § 706(2)(A))

335.     Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth within.

336.     The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). The Rules are not in accordance with the asylum statute, 8 U.S.C. § 1158. In addition to violating the requirement that regulatory changes impacting asylum be "consistent with" Section 1158, *see* Section 1158(b)(2)(C):

> a.  The provision creating a 365-day wait for seeking working authorization
>     violates Section 1158(d)(2);

b. The provision barring work permits for those who enter without inspection violates Section 1158(a)(1);

c. The provision barring work permits for those who apply for asylum more than a year after their entry violates Section 1158(a)(2)(B) and (D); and

d. The provision barring work permits based on certain criminal convictions and even unconvicted conduct violates Section 1158(b)(2)(A)(ii) and (iii).

337. The section barring work authorization during the pendency of a federal appeal violates 8 U.S.C. § 1252(a)(2)(B)(ii), the provision allowing for judicial review of asylum claims.

338. The Rules are contrary to law, so they are unlawful under the APA.

**SECOND CLAIM FOR RELIEF**
**(Violation of the APA, 5 U.S.C.§ 706(2)(A))**

339. Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth within.

340. The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). DHS failed to adequately justify the Rules.

341. The Rules purportedly seek to discourage fraudulent applications without any indication that fraudulent asylum applications pose a significant problem, without considering alternative, less restrictive methods to address this purported problem, and without considering whether other, existing provisions would curtail this purported problem.

342. The Rules also purport to seek to improve operational efficiency when the Rules will actually make the EAD application system less efficient by imposing a duplicative biometrics requirement, by requiring more frequent renewals, by denying EADs to individuals who have been

recommended for a grant of asylum, and by making of the merits-based determinations of asylum cases part of the EAD adjudication process.

343.   DHS failed to consider the effect of closely related and contemporaneous proposed rules and deprived the public of an opportunity to comment on the interrelated impact of the Rules, each an independent APA violation that requires vacatur of the Rules.

344.   Finally, DHS failed to adequately consider the devastating impact of the EAD Bar Rule on asylum seekers. Without access to an EAD, many asylum seekers will be forced to forego their claims because they will be unable to support themselves while they are seeking asylum. Even for those who are able to pursue their claims, the Rules will impose untold suffering. Yet DHS hardly accounted for the effect of the Rules on asylum seekers themselves.

345.   Indeed, when considered in the context of other DHS rulemaking addressing asylum, the agency's true motive becomes clear: To deter migrants from seeking asylum by any means necessary. That explains the mismatch between the ends the Rules are purportedly designed to serve and the means Defendants chose to pursue those ends. But that same disconnect between means and ends renders the Rules arbitrary and capricious.

346.   Every provision of the Rules, both individually and in the aggregate, is arbitrary and capricious.

347.   Because the Rules are arbitrary and capricious, they are unlawful under the APA.

## THIRD CLAIM FOR RELIEF
**(Violation of the HSA, 6 U.S.C. § 113(g)(2), the FVRA, 5 U.S.C. § 3347(a), and the APA, 5 U.S.C. § 706(2)(A) & (C))**

348.   Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth within.

349.   The Secretary of Homeland Security must be appointed by the President with the advice and consent of the Senate. 6 U.S.C. § 112(a)(1).

350.    The FVRA is the "exclusive means" for authorizing an acting official, unless an alternative statutory provision "expressly" authorizes certain other mechanisms to fill positions in an acting capacity temporarily. 5 U.S.C. § 3347(a).

351.    The HSA authorizes that "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2).

352.    The HSA distinguishes between the roles of the "Secretary" and an "Acting Secretary." Only an individual nominated by the President for the office of Secretary and confirmed by the Senate is authorized under § 113(g)(2) to establish or modify the further order of succession to serve as acting Secretary. 6 U.S.C. § 112(a)(1).

353.    Secretary Nielsen's April Delegation did not place Mr. McAleenan next in line for succession upon her resignation because the April Delegation only impacted vacancies occurring in the case of an emergency. Mr. McAleenan and subsequently Mr. Wolf both improperly assumed the position of Acting Secretary in violation of the order of succession as it existed following Nielsen's resignation. Neither Mr. McAleenan nor Mr. Wolf had legal authority to perform the functions of Acting DHS Secretary. Accordingly, Mr. McAleenan's purported promulgation of Notices of Proposed Rulemaking for the Rules were nullities.

354.    Additionally, even if Mr. McAleenan did validly assume the office of Acting DHS Secretary, he did not have authority under the HSA, 6 U.S.C. § 113(g)(2), to issue the November Delegation because the HSA reserves the authority to change the succession order to Secretaries and not to Acting Secretaries. Accordingly, the November Delegation under which Mr. Wolf purportedly assumed the role of Acting Secretary was invalid. For this additional and independent reason, Mr. Wolf did not have legal authority to perform the functions of Acting DHS Secretary.

355.    Accordingly, Mr. Wolf's purported issuance of the Rules and delegation of authority to Mr. Mizelle to sign the Rules on June 22 and 26, 2020, were unlawful and must be set aside as "not in accordance with law" and "in excess of … authority" under the APA. 5 U.S.C. § 706(2)(A) & (C).

### FOURTH CLAIM FOR RELIEF
### (Violation of the FVRA and the APA, 5 U.S.C. § 706(2)(A) & (C))

356.    Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth within.

357.    The Secretary of Homeland Security and the DHS General Counsel must be appointed by the President with the advice and consent of the Senate. 6 U.S.C. §§ 112(a)(1) & 113(a)(1)(J).

358.    Congress enacted the FVRA to "reclaim[]" its "Appointments Clause power" and reassert its authority over temporary appointments. *See Sw. Gen.*, 796 F.3d at 70. Under the FVRA, an office can only be filled by an official in an acting capacity for a maximum of 210 days from the date the vacancy occurs. 5 U.S.C. § 3346(a)(1).

359.    The FVRA creates a default rule that a vacancy shall be filled by the "first assistant" to the office. 5 U.S.C. § 3345(a)(1).

360.    The FVRA is the "exclusive means" for authorizing an acting official, unless an alternative statutory provision "expressly" authorizes certain other mechanisms to fill positions in an acting capacity temporarily. 5 U.S.C. § 3347(a).

361.    The HSA determines who shall serve as the "first assistant" performing the functions and duties of the office of DHS Secretary in the event of a vacancy, but otherwise adheres to and does not displace the FVRA requirements, including the 210-day limit on interim service. 6 U.S.C. §§ 113(a), (g).

362.     Under the HSA, the Deputy Secretary and the Under Secretary for Management are first and second in line to temporarily fill a vacancy in the office of the DHS Secretary. 6 U.S.C. §§ 113(a)(1)(A) & (F), (g)(1). The HSA designates both officers as "first assistant" for purposes of incorporating the FVRA and its 210-day rule and other limitations into the HSA succession scheme. Given the absence of any other time restrictions within the HSA as well as the HSA's express references to the FVRA, both officers are subject to the FVRA's maximum, aggregate limit of 210-days for an acting DHS Secretary. *See* 6 U.S.C. §§ 113(a)(1)(A) & (F); 5 U.S.C. §§ 3345(a)(1), 3346(a)(1).

363.     The HSA further authorizes the Secretary to designate a "further order of succession" to follow after the Deputy Secretary and the Under Secretary for Management. 6 U.S.C. § 113(g)(2). The textual reference to a "further order" of succession and the context and purpose of the HSA and FVRA indicate that any "further" Acting Secretary would serve under the same constraints as any preceding Acting Secretary.

364.     The office of DHS Secretary became vacant upon Secretary Nielsen's resignation on April 10, 2019 at the latest. Pursuant to the April Delegation and E.O. 13753, as to which the FVRA is incorporated by reference, an Acting Secretary could serve only for the maximum 210 days permitted by the FVRA (*i.e.*, until November 6, 2019). From that date onwards, no person could validly serve as Acting DHS Secretary until the President submitted a nomination for the office of DHS Secretary to the Senate. *See* 5 U.S.C. § 3346(a)(2).

365.     President Trump did not nominate Mr. Wolf to serve as DHS Secretary until September 10, 2020. Thus no person could have validly served as Acting Secretary between the expiration of the 210-day period on November 6, 2019 and the nomination of Mr. Wolf on September 10, 2020.

97

366.     Similarly, the office of DHS General Counsel became vacant on September 17, 2019, when Mr. Mitnick was terminated. An Acting General Counsel could serve only for the maximum 210 days permitted by the FVRA (*i.e.* until April 14, 2020). From that date onward, no person could validly serve as Acting DHS General counsel until the President submitted a nomination for the office of DHS General Counsel to the Senate. *See* 5 U.S.C. § 3346(a)(2). President Trump did not nominate Mr. Mizelle or anyone else to serve as DHS General Counsel. Thus, no person could have validly served as Acting DHS General Counsel from the expiration of the 210-day period on April 14, 2020 onward.

367.     Mr. Wolf was exercising functions that Congress had assigned to the DHS Secretary under the INA and the HSA when he issued the Rules.

368.     Because Mr. McAleenan's November Delegation was issued on November 9, 2019—after the 210 days permitted by the FVRA—it had no "force or effect" and could not be "ratified" to elevate Mr. Wolf to acting Secretary either in November 2019, when Mr. McAleenan tried to do so, or in September and November 2020, when Mr. Gaynor tried to do so. 5 U.S.C. § 3348(d)(1), (2).

369.     Accordingly, Mr. Wolf's purported promulgation of the Rules in June 2020 and subsequent ratification of those Rules on September 17, 2020, were unlawful and must be set aside as "not in accordance with law" and "in excess of … authority" under the APA. 5 U.S.C. §§ 706(2)(A), (C).

370.     Mr. Wolf's purported promulgation of the Rules in June 2020 was a nullity. Mr. Wolf promulgated those Rules long after the 210-day period expired and nearly three months before the President nominated him to serve as DHS Secretary. The FVRA prohibited him from exercising authority as Acting DHS Secretary during this period.

371.     Similarly, Mr. Mizelle's purported signature of the Rules in June 2020 was a nullity. Mr. Mizelle purported to sign the Rules in the capacity of Acting DHS General Counsel long after the 210-day period expired. The FVRA prohibited him from exercising authority as Acting DHS General Counsel during this period.

372.     The Rules must therefore be declared "of no force or effect" under the FVRA, § 3348(1)(d), and set aside as "not in accordance with law" and "in excess of . . . authority" under the APA. 5 U.S.C. § 706(2)(A), (C).

**FIFTH CLAIM FOR RELIEF**
**(Violation of the HSA, 6 U.S.C. § 113(g)(2), FVRA, 5 U.S.C. § 3348(d)(2) and the APA, 5 U.S.C. § 706(2)(A) & (C))**

373.     Plaintiffs repeat and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth within.

374.     On September 10, 2020, President Trump nominated Mr. Wolf to serve as DHS Secretary. On that same date, Acting DHS Secretary Peter Gaynor issued a memo purporting to amend DHS Delegation No. 106 so that Mr. Wolf would assume the office of Acting DHS Secretary effective immediately.

375.     On November 14, 2020, Mr. Gaynor reissued that same memo.

376.     On September 17, 2020, Mr. Wolf published a legal memorandum in the Federal Register, which purported to make a blanket ratification of "any and all actions taken by me since November 13, 2019." 85 Fed. Reg. 59,651. On October 7, 2020, Mr. Wolf issued a second ratification memo that purported to ratify Mr. McAleenan's Notices of Proposed Rulemaking for the Rules. 85 Fed. Reg. 65,653. On November 16, 2020, Mr. Wolf issued a third ratification memo that reissued the second ratification memo.

377.     Mr. Wolf's purported ratifications are final agency actions.

378.     Mr. Wolf's purported ratifications of the Notices of Proposed Rulemaking and the Rules were invalid because Mr. Wolf never validly assumed office as Acting Secretary. Plaintiffs repeat their allegations in Counts 3 and 4 that Mr. Wolf never validly assumed office under the HSA or the FVRA. The Gaynor Memos did not and could not cure Mr. Wolf's unlawful succession because, as Acting Secretary, Mr. Gaynor had no authority to amend the order of succession under the HSA. 6 U.S.C. § 113(g)(2). Only a Presidentially nominated and Senate confirmed DHS "Secretary" is capable of exercising this power. *Id.* Furthermore, Section 3348(d)(2) of the FVRA prohibits Mr. Gaynor from ratifying Mr. McAleenan's unlawful November Delegation. Additionally, Mr. Gaynor had no authority to issue his original memo because it preceded Mr. Wolf's nomination, and Section 3348(d)(2) of the FVRA prohibits him from ratifying it by reissuing it. The Gaynor Memos were thus nullities and did not remedy the situation of illegality that prevailed prior to their issuance.

379.     Accordingly, Mr. Wolf's September 17, 2020 purported ratification of his unlawful promulgation of the Rules and his subsequent additional ratification memos were also unlawful and must be set aside as "not in accordance with law" and "in excess of . . . authority" under the APA. 5 U.S.C. § 706(2)(A) & (C).  Even if Mr. Gaynor's reissuance of the Original Gaynor Memo on November 14, 2020 was valid, Mr. Wolf's purported ratification of the Rules remained unlawful because it predated Mr. Gaynor's reissuance of the Original Gaynor Memo.

380.     Additionally, Mr. Wolf's purported ratifications were invalid because they contravened the prohibition on ratification of actions taken by an official unlawfully in office under § 3348(d)(2) of the FVRA. Plaintiffs repeat their pleading that the Notices of Proposed Rulemaking and Rules are "of no force and effect" under § 3348(d)(1) of the FVRA because Mr. McAleenan and Mr. Wolf were both unlawfully in office and exercising a "function or duty" of

the vacant office of DHS Secretary when they purported to issue them. Accordingly, § 3348(d)(2) of the FVRA provides that the Rules "may not be ratified." Mr. Wolf's purported ratifications contravene this prohibition on ratification and are thus a nullity.

381.    Moreover, Mr. Wolf's ratifications of the Notices of Proposed Rulemaking and the Rules were incapable of rendering the errors in the initial promulgation of the Notices of Proposed Rulemaking and Rules harmless. Plaintiffs repeat their pleading that the very purpose of the Appointments Clause and the FVRA is to ensure that only appropriate persons are exercising the powers of Officers of the United States. Accordingly, it cannot be assumed that the Notices of Proposed Rulemaking and Rules would have come out the same way if they had been promulgated by a properly-serving official instead of by an official who unlawfully assumed office.

382.    Finally, Mr. Wolf's purported ratifications of the Notices of Proposed Rulemaking and the Rules were arbitrary, capricious, and an abuse of discretion. The Ratification Memos are blanket statements. The First Ratification Memo does not mention the Rules that it purports to ratify, and none of the Ratification Memos provide any reasoned explanation for why the Department's original justifications for the proposed rulemakings would remain valid. Nor do the memos indicate whether Mr. Wolf refamiliarized himself with the rulemaking record or considered any new evidence about the effects of the Rules. Accordingly, Mr. Wolf's purported ratification of the Rules must be set aside under the APA. 5 U.S.C. § 706(2)(A).

### SIXTH CLAIM FOR RELIEF
### (Violation of the Appointments Clause, U.S. Const. art. II, § 2, cl.2)

383.    In the alternative, if the FVRA does not impose a 210-day limitation where an Acting Secretary is designated under the HSA's "further order of succession," such indefinite service of an Acting DHS Secretary would violate the Appointments Clause of the United States Constitution, and the Acting DHS Secretary's actions must be set aside as contrary to law.

384.     The Appointments Clause provides that principal officers of the United States, including heads of executive departments, must be appointed by the President "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2.

385.     The Supreme Court has held that an acting officer—who is carrying out the functions of a principal officer—is an inferior officer and thus may only serve in that capacity "for a limited time and under special and temporary conditions." *United States v. Eaton*, 169 U.S. 331, 343 (1898).

386.     By purporting to exercise the functions and duties of the office of the Secretary of Homeland Security free from any time limitation, Mr. McAleenan, Mr. Wolf, and Mr. Gaynor sought to serve as principal officers. Because the power to appoint a principal officer must be vested in the President, all three appointments, which were effectuated by a DHS Secretary (acting or otherwise), violated the Appointments Clause.

387.     Similarly, by purporting to exercise the functions and duties of the office of DHS General Counsel free from any time limitation, Mr. Mizelle sought to serve as a principal officer. Because the power to appoint a principal officer must be vested in the President and is subject to Senate confirmation, Mr. Mizelle's appointment as Acting DHS General Counsel violated the Appointments Clause.

388.     On June 22 and 26, 2020, when Mr. Wolf purported to promulgate the Rules and Mr. Mizelle purported to sign them, the offices of the Secretary of Homeland Security and DHS General Counsel had been vacant without a permanent appointee for more than 210 days. Mr. Wolf and Mr. Mizelle purported to serve as Acting DHS Secretary and Acting DHS General Counsel, respectively, for an additional six months. As of December 22, 2020, the functions and duties of

the DHS Secretary and DHS General Counsel have been purported to be fulfilled by an acting official for 622 days and 463 days and counting, respectively.

389.    Thus, even if Mr. Wolf and Mr. Mizelle's purported service as Acting Secretary of Homeland Security and Acting DHS General Counsel, respectively, were consistent with the HSA and FVRA, their tenure became indistinguishable from that of a Senate-confirmed DHS Secretary and Senate-confirmed DHS General Counsel and violated the Appointments Clause. Because Mr. Wolf's purported service as Acting DHS Secretary and Mr. Mizelle's purported service as Acting DHS General Counsel violated the Appointments Clause, Mr. Wolf lacked authority to issue the Rules and Mr. Mizelle lacked authority to sign them.

390.    For the reasons previously stated, Mr. Wolf's attempts to ratify the Rules were ineffective, and the Rules are therefore invalid and must be vacated.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.  A declaration pursuant to 28 U.S.C. § 2201 that the Rules are contrary to law, arbitrary and capricious, and/or unconstitutional, in violation of the APA;

b.  A declaration pursuant to 28 U.S.C. § 2201 that Mr. Wolf was not lawfully serving as Acting DHS Secretary when the Rules were issued and was also not lawfully serving as Acting DHS Secretary when he ratified the Rules such that the Rules are unlawful and must be set aside as not in accordance with law and in excess of his authority;

c.  A declaration pursuant to 28 U.S.C. § 2201 that Mr. Mizelle was not lawfully serving as Acting DHS General Counsel when the Rules were issued such that the Rules are unlawful and must be set aside as not in accordance with law and in excess of his authority;

d.  Vacatur of the Rules;

e.   An injunction prohibiting Defendants, their officials, agents, employees, assigns, and all

     persons acting in concert or participating with them from implementing or enforcing the

     Rules;

f.   For any Individual Plaintiffs who have been denied an EAD prior to the Court's Order, an

     order mandating that Defendants promptly adjudicate their applications under the

     previously-existing rules;

g.   An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses

     pursuant to any applicable law;

h.   Such other and further relief as the Court deems equitable, just, and proper.

Dated:  March 22, 2021

Respectfully submitted,

By:   */s/ Keren Zwick*

Tyler Whitmer (D.C. Bar No. 1618676)
Deepa Acharya (D.C. Bar No. 996412)
Carl Spilly (D.C. Bar No. 230830)
Brian McGrail (D.C. Bar No. 1672349)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005
202-538-8000
tylerwhitmer@quinnemanuel.com
deepaacharya@quinnemanuel.com
carlspilly@quinnemanuel.com
brianmcgrail@quinnemanuel.com

Nicholas A. S. Hoy
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
212-849-7000
nicholashoy@quinnemanuel.com

Julie Carpenter (D.C. Bar No. 418768)***
Richard Caldarone***
TAHIRIH JUSTICE CENTER
6400 Arlington Blvd., Suite 400
Falls Church, VA 22042
571-282-6161
richardc@tahirih.org
juliec@tahirih.org

*Certification to practice pursuant to
LCvR 83.2(g) to be submitted*

** *Counsel for Individual Plaintiffs only*

*** *Counsel for Tahirih Justice Center
only*

Keren Zwick (D.D.C. Bar. No. IL0055)
Mark Fleming*
Gianna Borroto*
Drew Heckman
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
kzwick@heartlandalliance.org
mfleming@heartlandalliance.org
gborroto@heartlandalliance.org
dheckman@heartlandalliance.org

Jamie Crook (D.C. Bar No. 1002504)
Annie Daher
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
415-565-4877
crookjamie@uchastings.edu
daherannie@uchastings.edu

Scott Shuchart (D.C. Bar No. 1531377)**
KIDS IN NEED OF DEFENSE
1201 L St., NW, Floor 2
Washington, DC 20005
202-318-0595
sshuchart@supportkind.org

Wendy Wylegala**
KIDS IN NEED OF DEFENSE
252 West 37th Street, Floor 15
New York, NY 10018
646-970-2913
wwylegala@supportkind.org

*Counsel for Plaintiffs*