**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASYLUMWORKS, *et al.*, | |
| Plaintiffs, | |
| v. | No. 2020-cv-03815-BAH |
| ALEJANDRO N. MAYORKAS, in his official capacity as the Secretary of Homeland Security, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................5

I.     UNLAWFUL DESIGNATIONS AT THE DEPARTMENT OF HOMELAND
       SECURITY .....................................................................................................5

       A.     Mr. McAleenan's And Mr. Wolf's Service As Acting DHS Secretary In
              Violation Of The HSA ...............................................................................5

       B.     Mr. Wolf's Unlawful Assumption Of Office As Acting DHS Secretary ...............7

       C.     Mr. Mizelle's Service As Acting DHS General Counsel ..........................................8

       D.     Mr. McAleenan, Mr. Wolf, And Mr. Mizelle Purport To Issue And Sign
              The Notices Of Proposed Rulemaking And The Rules ..........................................8

       E.     Mr. Wolf's Purported Ratification Of The Rules And Secretary Mayorkas'
              Purported Ratification Of The Timeline Repeal Rule ...........................................8

II.    THE RULES FUNDAMENTALLY IMPAIR ACCESS TO WORK AND HARM
       THE INDIVIDUAL AND ORGANIZATIONAL PLAINTIFFS ......................................10

       A.     The Rules Harm Individual Plaintiffs And Other Asylum Seekers......................10

       B.     The Rules Harm Organizational Plaintiffs...........................................................13

LEGAL STANDARD.........................................................................................................13

ARGUMENT ...................................................................................................................14

I.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE RULES ............................14

       A.     The Individual Plaintiffs Have Standing To Challenge The Rules.......................14

       B.     The Organizational Plaintiffs Have Standing To Challenge the Rules And
              Fall Within The Zone Of Interests Protected By The INA ..................................15

              1.     Article III Standing ...............................................................................15

              2.     Zone of Interests .................................................................................18

II.    THE RULES ARE VOID *AB INITIO* UNDER THE HSA, THE FVRA, AND
       THE APPOINTMENTS CLAUSE.................................................................................19

       A.     The 210-Day Time Limit Under The FVRA Applies To Acting Officers
              Designated Under The HSA ................................................................................20

              1.     The FVRA Sets Unambiguous Limits On Executive Appointments.........20

              2.     The HSA Implements The FVRA But Does Not Supplant It...................21

       B.     McAleenan's Unlawful Designation As Acting Secretary Rendered Mr.
              Wolf's Service And Issuance Of The Rules Unlawful ..........................................23

1.     McAleenan Never Validly Succeeded Secretary Nielsen..........................23

2.     Mr. McAleenan's Amendments To The Line of Succession Thus Have No Force And Effect And Cannot Be Ratified................................24

C.     The Rules Are Void *Ab Initio* Because Mr. Wolf Issued Them And Mr. Mizelle Signed Them In Violation Of The FVRA's 210-Day Limit....................26

1.     Mr. Wolf Unlawfully Assumed Office Because Mr. McAleenan's Service As Acting Secretary Exceeded The FVRA's 210-Day Limit......................................................................................................26

2.     Mr. Mizelle Signed The Rules In Violation Of The 210-Day Limit .........27

D.     The Prolonged And Indefinite Acting Appointment Of Mr. Wolf Violates The Appointments Clause......................................................................................28

III.    DHS'S REPEATED ATTEMPTS TO RATIFY THE UNLAWFULLY PROMULGATED RULES ARE THEMSELVES UNLAWFUL AND INEFFECTIVE .................................................................................................31

A.     Mr. Wolf's Fall 2020 Attempts To Ratify The Rules Fail......................................33

B.     The January 2021 Ratification Attempt Is Similarly Unlawful .............................37

1.     The January 2021 Ratification Is A Nullity Because Mr. Gaynor Never Validly Assumed Office As Acting Secretary And Mr. Wolf Could Not Ratify His Own Prior Actions .............................................38

2.     Mr. Gaynor's Delegation Violates The FVRA And HSA Because It Functionally Kept Mr. Wolf In The Acting Secretary Role.................38

3.     Mr. Gaynor And Mr. Wolf Failed To Independently Evaluate The Merits Of The Rules....................................................................................40

4.     Gaynor's Delegation Of Ratification Power To Wolf Tainted The Ratifications ................................................................................................42

C.     Secretary Mayorkas' Ratification Of The Timeline Repeal Rule Is Similarly Unlawful.......................................................................................................42

IV.     THIS COURT SHOULD VACATE THE RULES IN THEIR ENTIRETY....................43

CONCLUSION...................................................................................................................45

## TABLE OF AUTHORITIES

**Page**

### Cases

*Advanced Disposal Servs. E., Inc. v. Nat'l Labor Relations Bd.*,
   820 F.3d 592, 603 (3d Cir. 2016)............................................................ 41, 43

*Arpaio v. Obama*,
   27 F. Supp. 3d 185 (D.D.C. 2014) ...................................................... 37

*Ashwander v. Tennessee Valley Authority*,
   297 U.S. 288 (1936).......................................................................... 31

*Batalla Vidal v. Wolf*,
   No. 16-cv-4756, 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020) ...................................... passim

*Batalla Vidal v. Wolf*,
   No. 16-cv-4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020)............................ 45

*Bullock v United States*,
   489 F. Supp. 3d 1112 (D. Mont. 2020)................................................ 28, 29, 30, 39

*Capital Area Immigrants' Rights Coal. v. Trump*,
   471 F. Supp. 3d 25 (D.D.C. 2020), *appeal filed*, No. 20-5273 (D.C. Cir.) ............... 19

*Carpenters Indus. Council v. Zinke*,
   854 F.3d 1 (D.C. Cir. 2017)................................................................ 14

*Casa de Maryland v. Wolf*,
   486 F. Supp. 3d 928 (D. Md. 2020),
   *appeal dismissed*, No. 20-2217, Dkt. 23 (4th Cir. Mar. 23, 2021) .................................... passim

*CLINIC v. EOIR*,
   No. 20-cv-03812, 2021 WL 184359 (D.D.C. Jan. 18, 2021)................................... 19

*Comm. on the Judiciary of the United States H.R. v. McGahn*,
   968 F.3d 755 (D.C. Cir. 2020)................................................................ 14

*Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*,
   139 F.3d 203 (D.C. Cir. 1998)............................................................ 41, 43

*Edmond v. United States*,
   520 U.S. 651 (1997)........................................................................... 5, 29

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ............................................................ 15

*English v. Trump*,
    279 F. Supp. 3d 307 (D.D.C. 2018) ....................................................................... 22

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................................. 22

*\*Freytag v. Comm'r*,
    501 U.S. 868 (1991) ......................................................................................... 4, 28

*\*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) .............. 40, 41, 42

*Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
    356 F. Supp. 3d 109 (D.D.C.),
    *aff'd*, 920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) .............. 5, 29

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................. 15

*Immigrant Legal Res. Ctr. v. Wolf*,
    491 F. Supp. 3d 520 (N.D. Cal. 2020) ........................................................ 3, 25, 45

*\*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    796 F.3d 111 (D.C. Cir. 2015) ......................................................................... 40, 42

*J.E.M. Ag. Supply, Inc., v. Pioneer Hi-Bred Int'l, Inc.*,
    534 U.S. 124 (2001) ............................................................................................. 22

*\*L.M.-M. v. Cuccinelli*,
    442 F. Supp. 3d 1 (D.D.C. 2020) ............................................................. 35, 39, 44

*La Clinica De La Raza v. Trump*,
    No. 19-cv-4980, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020) ......................... 3, 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ............................................................................................. 19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ............................................................................................. 19

*Mohamed v. Palestinian Auth.*,
    566 U.S. 449 (2012) ............................................................................................. 35

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................................. 29

*N.M. Health Connections v. HHS*,
    340 F. Supp. 3d 1112 (D.N.M. 2018) ................................................................... 25

*Nat. Res. Def. Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ................................................................... 45

*Niz-Chavez v. Garland*,
   141 S. Ct. 1474 (2021) ................................................................... 4, 32

*\*NLRB v. SW Gen, Inc.*,
   137 S. Ct. 929 (2017) ................................................................... passim

*\*Nw. Imm. Rights. Proj. (NWIRP) v. USCIS*,
   496 F. Supp. 3d 31, 55 (D.D.C. 2020),
   *appeal dismissed*, No. 20-5369, Dkt. 7 (D.C. Cir. Jan. 12, 2021) .................................... passim

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019), *appeal filed*, No. 19-5272 (D.C. Cir.) ........................... 19

*\*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
   No. 20-cv-9253, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021) ............................................ passim

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ................................................................... 25

*Steele v. Schafer*,
   535 F.3d 689 (D.C. Cir. 2008) ................................................................... 13

*\*SW Gen., Inc. v. NLRB*,
   796 F.3d 67 (D.C. Cir. 2017), *aff'd* 137 S. Ct. 929 (2017) ........................................ 20, 35, 44

*United States v. Cano-Flores*,
   796 F.3d 83 (D.C. Cir. 2015) ................................................................... 31

*\*United States v. Eaton*,
   169 U.S. 331 (1898) ................................................................... 29

*United States v. Hilario*,
   218 F.3d 19 (1st Cir. 2000) ................................................................... 29

*United States v. Smith*,
   962 F.3d 755 (4th Cir. 2020) ................................................................... 29

*United States v. Valencia*,
   No. 17-cr-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018) .......................................... 30, 31

*Wellness Int'l Network, Ltd. v. Sharif*,
   575 U.S. 665 (2015) ................................................................... 5

*\*Wilkes-Barre Hosp. Co., LLC v. Nat'l Labor Relations Bd.*,
   857 F.3d 364 (D.C. Cir. 2017) ................................................................... 40

**Statutes**

5 U.S.C. § 101 ................................................................................................... 29

5 U.S.C. § 3345(a) ............................................................................................. 20

5 U.S.C. § 3345(a)(2) .................................................................................... 5, 20

5 U.S.C. § 3345(b) ............................................................................................. 20

5 U.S.C. § 3346(a) ....................................................................................... 20, 28

5 U.S.C. § 3346(a)(1) ................................................................................... 25, 26

5 U.S.C. § 3347(a) ....................................................................................... 21, 35

5 U.S.C. § 3347(a)(1) ......................................................................................... 34

5 U.S.C. § 3347(a)(2) ......................................................................................... 21

5 U.S.C. § 3348(a)(2)(A)(i)-(ii) ......................................................................... 36

5 U.S.C. § 3348(b) ............................................................................................. 21

5 U.S.C. § 3348(b)(1) ................................................................................... 20, 26

5 U.S.C. § 3348(d)(1) .................................................................... 21, 26, 28, 36

5 U.S.C. § 3348(d)(2) ................................................................................. passim

5 U.S.C. § 3349 ................................................................................................. 25

5 U.S.C. § 3349(a)(2) .................................................................................. 10, 33

5 U.S.C. § 706(2) ............................................................................................... 44

5 U.S.C. §§ 3347(a)(1)(A)-(B) ..................................................................... 21, 22

5 U.S.C. §§ 706(2)(A), (C) ................................................................................ 26

5 U.S.C. 3346(a)(1) ........................................................................................... 20

5 U.S.C. 3348(b)(1) ........................................................................................... 20

6 U.S.C. § 112(e) ............................................................................................... 37

6 U.S.C. § 113(a)(1)(A) ..................................................................................... 21

6 U.S.C. § 113(g)(1) ..................................................................................... 21, 34

6 U.S.C. § 113(g)(2) ........................................................................................... passim

6 U.S.C. §§ 113(a)(1)(A), (F) ...................................................................................... 22

8 U.S.C. § 1103(a)(3) ................................................................................................... 37

## **Regulations**

6 C.F.R. § 37 ............................................................................................................... 13

8 C.F.R. § 208.3(c)(3) ................................................................................................. 11

8 C.F.R. § 208.7(a)(1)(i) ............................................................................................. 11

8 C.F.R. § 208.7(a)(1)(ii) ....................................................................................... 11, 12

8 C.F.R. § 208.7(a)(1)(iii)(F) ...................................................................................... 10

8 C.F.R. § 208.7(a)(1)(iii)(G) ..................................................................................... 10

8 C.F.R. § 208.7(a)(1)(iv) ........................................................................................... 10

8 C.F.R. § 208.7(a)(i) .................................................................................................. 11

8 C.F.R. § 208.7(b)(2) ................................................................................................. 11

8 C.F.R. § 274a.12(c)(11) ........................................................................................... 11

8 C.F.R. § 274a.12(c)(8) ............................................................................................. 11

8 C.F.R. § 274a.13(a)(1) ......................................................................................... 11, 12

8 C.F.R. §§ 208.7(a)(1)(iii)(B)-(C) ............................................................................ 10

EAD Bar Rule, 85 Fed. Reg. 38,532 (June 26, 2020) ........................................... 13, 37

Timeline Repeal Rule, 85 Fed. Reg. 37,502 (June 22, 2020) ................................ 13, 37

## **Rules**

Fed. R. Civ. P. 56(c) ................................................................................................... 13

## **Constitutional Provisions**

U.S. Const., Art. II, § 2, cl. 2 ................................................................................. 29, 35

## **Other Authorities**

Executive Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016) ............................... 5

S. Rep. No. 105-250 (1998) .................................................................................... 20, 34

Plaintiffs submit this Memorandum of Law in support of their Motion for Partial Summary Judgment on their third, fourth, fifth, and sixth claims for relief for violations of the Homeland Security Act ("HSA"), the Federal Vacancies Reform Act ("FVRA"), the Appointments Clause, and the Administrative Procedure Act ("APA"), pursuant to Federal Rule of Civil Procedure 56.

## PRELIMINARY STATEMENT

In June 2020, while purporting to serve as Acting Secretary of the Department of Homeland Security ("DHS"), Chad F. Wolf issued two related rules (the "Rules")—the EAD Bar Rule and the Timeline Repeal Rule[1]—concerning Employment Authorization Documents ("EADs") for asylum seekers. The Rules eviscerate the system that allows asylum applicants access to both lawful work and government-issued identification by complicating and delaying access to the EADs that asylum seekers need to survive while their asylum applications are being adjudicated. The Individual Plaintiffs are asylum seekers from nine countries who have faced homophobic and transphobic violence, gender-based and domestic violence, cartel and gang violence, and political persecution in their home countries. *See* Statement of Undisputed Facts ("SUF") ¶¶ 11-147. Many of them are children. *Id.* ¶¶ 29-39, 50-66, 85-112. Like other asylum applicants harmed by these Rules, Individual Plaintiffs are vulnerable to homelessness, hunger, inadequate healthcare, and exploitation. Without an EAD, some may have no choice but to abandon their asylum claims and return to danger in their home countries, even if they would ultimately be found eligible for asylum. The Rules impair their overriding economic and psychological survival interest in obtaining an EAD by making it vastly more difficult to do so.

As the District Court for the District of Maryland concluded, organizations serving asylum seekers, members of those organizations, and other asylum applicants "have suffered and will

---

[1]  Defined terms have the same meaning as in Plaintiffs' amended complaint, Dkt. 12.

continue to suffer a concrete harm" because "every additional day [asylum applicants] wait [to obtain an EAD] will visit[] on them crippling dependence on the charity and good will of others." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020), *appeal dismissed*, No. 20-2217, Dkt. 23 (4th Cir. Mar. 23, 2021).[2] And, in some cases, asylum seekers will have to navigate the complexity of the EAD application process without assistance from the Organizational Plaintiffs, because the Rules' increased complexity has reduced the number of clients that Organizational Plaintiffs are able to serve. *See* SUF ¶¶ 157, 166, 177.

Plaintiffs should never have had to suffer these deprivations because Mr. Wolf's purported service violated statutory and constitutional requirements, and so he had no authority to issue the Rules, rendering them void *ab initio*. Mr. Wolf's service and issuance of the Rules were unlawful in at least three ways because the government failed to comply with the plain text of the government's own orders of succession and the statutory and constitutional requirements set out in the HSA, the FVRA, and the Appointments Clause.

*First*, Mr. Wolf should never have assumed the position of Acting Secretary because he took office pursuant to an unlawful modification to the order of succession issued by his predecessor, Kevin McAleenan, who was himself unlawfully in office and had no power to modify the order of succession. Even if Mr. McAleenan had validly assumed office, both the FVRA and HSA precluded his attempt to amend the order of succession so that Mr. Wolf could succeed him.

*Second*, Mr. Wolf was serving in violation of the FVRA's 210-day limit on the service of acting officials when he issued the Rules more than a year after the Office of the Secretary of Homeland Security became vacant. The acting official to whom Mr. Wolf delegated the power to

---

[2]   Unless otherwise noted, internal citations, quotation marks, and alterations are omitted from citations in this memorandum of law.

sign the Rules, Chad Mizelle, was himself serving as Acting DHS General Counsel in violation of the same 210-day limit, compounding the statutory violation. Mr. Wolf's and Mr. Mizelle's violations of the 210-day limit necessarily render the Rules of no force or effect.

*Third*, Mr. Wolf's purported acting tenure as the longest-serving DHS Secretary under the Trump administration while filling a cabinet vacancy that lasted for 665 days necessarily violates the Appointments Clause's prohibition on indefinite acting appointments. As six courts have already ruled and the Government Accountability Office ("GAO") concluded, Mr. Wolf was not validly serving as Acting Secretary.[3] The Rules he purported to issue are thus nullities.

As federal courts (and the GAO) issued decision after decision voiding Mr. Wolf's actions, the government began to engage in an increasingly tortured and convoluted game of catch-me-if-you-can to evade those decisions and attempt to legitimate Mr. Wolf's service by "ratifying" his unlawful actions. On three occasions, the Administrator of the Federal Emergency Management Agency ("FEMA"), Peter Gaynor, purported to assume the office of Acting Secretary only to immediately abdicate authority in favor of Mr. Wolf, who in turn purported to ratify the Rules at issue here and many others. But as courts quickly identified, this was a transparent and unlawful "sham" designed to preserve Mr. Wolf's authority, *Batalla Vidal*, 2020 WL 6695076, at *9, and

---

[3] *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-9253, 2021 WL 75756, at *3-6 (N.D. Cal. Jan. 8, 2021); *Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 6695076, at *1 (E.D.N.Y. Nov. 14, 2020); *Nw. Imm. Rights. Proj. (NWIRP) v. USCIS*, 496 F. Supp. 3d 31, 55 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, Dkt. 7 (D.C. Cir. Jan. 12, 2021); *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529-36 (N.D. Cal. 2020); *Casa de Maryland*, 486 F. Supp. 3d at 954-60; *La Clinica De La Raza v. Trump*, No. 19-cv-4980, 2020 WL 7053313, at *7-9 (N.D. Cal. Nov. 25, 2020); Ex. 5, U.S. Gov't Accountability Off., No. B-331650, *Decision: Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security* (Aug. 14, 2020). Unless otherwise noted, all Exhibits cited herein are attached to the Declaration of Brian McGrail, dated June 8, 2021, submitted with this Motion.

by January 2021 even the government "abandoned" the theory that Mr. Gaynor ever served as Acting Secretary, *Pangea Legal Servs.*, 2021 WL 75756, at \*5.

The attempted ratifications were a contrived effort to evade the combined effect of the decisions of six courts and the GAO because Mr. Wolf objected to decisions questioning the "validity of [his] authority." Ex. 35, Chad F. Wolf, *A Message from Acting Secretary Chad F. Wolf* (Jan. 11, 2021) ("Wolf Resignation Message") at 1.  The attempted ratifications also fail for two additional reasons: The FVRA prohibits any officer from ratifying Mr. Wolf's prior actions, and neither Mr. Gaynor nor Mr. Wolf had any authority to amend the line of succession.

The government made yet another attempt to ratify Mr. Wolf's actions in January 2021. This attempted ratification fails for the reasons given above and for the additional reasons that Mr. Wolf did not independently evaluate the merits of the Rules and that Mr. Gaynor's delegation of ratification power to Mr. Wolf—the very wrongdoer who unlawfully promulgated the Rules— irreparably tainted the ratifications. The government tried again to ratify the Timeline Repeal Rule in May 2021. But this purported ratification similarly fails because it violates the FVRA's prohibition on ratification of Mr. Wolf's unlawful actions and DHS Secretary Alejandro Mayorkas did not make a considered judgment to ratify that Rule.[4]

Given the Rules' harsh impact on Plaintiffs, "it cannot be too much to expect the government to turn square corners when it deals with [Plaintiffs]" by complying with fundamental statutory and constitutional requirements designed to ensure executive accountability. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021). "The principle of separation of powers is embedded in the Appointments Clause," *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991), and its adjuncts, the

---

[4]  Secretary Mayorkas' purported ratification did not address the EAD Bar Rule at issue in this case; Defendants have no new defense to that rule that has not already been considered and rejected by the six courts and the GAO.

FVRA and HSA. These "structural safeguards" protect the separation of powers, *Edmond v. United States*, 520 U.S. 651, 659 (1997), which in turn "promotes both liberty and accountability." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 695 (2015) (Roberts, C.J., dissenting). They also contribute to the democratic protection of vulnerable members of our society by "promot[ing] a judicious choice of persons" for important positions. *Edmond*, 520 U.S. at 659. And because these statutory and constitutional requirements are "no mere formality, . . . [this Court] can and must play a role in policing [Mr. Wolf's] 'acting' appointment[] that [became] effectively permanent." *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 153 (D.D.C.), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020). This Court should reaffirm that presidential appointments are subject to the rule of law, declare that Mr. Wolf had no legal authority to issue or ratify the Rules, and vacate the Rules in their entirety.

## BACKGROUND

### I.    UNLAWFUL DESIGNATIONS AT THE DEPARTMENT OF HOMELAND SECURITY

#### A.    Mr. McAleenan's And Mr. Wolf's Service As Acting DHS Secretary In Violation Of The HSA

On December 9, 2016, President Obama exercised his authority under Section 3345(a)(2) of the FVRA to set a line of succession for the DHS Secretary by issuing Executive Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016) (Ex. 1, "E.O. 13,753"). SUF ¶ 184; 5 U.S.C. § 3345(a)(2). E.O. 13,753 set out the order in which DHS officials would serve as Acting Secretary "during any period in which the [DHS] Secretary has died, resigned, or otherwise become unable to perform the functions" of the Office. Ex. 1, 81 Fed. Reg. at 90,667. Officials may only serve under E.O. 13,753 "if they are eligible to act as Secretary under the provisions of the [FVRA]." *Id.*

On December 15, 2016, then-DHS Secretary Jeh Johnson implemented E.O. 13,753 by issuing an updated version of "Delegation Order 00106," a "succession order for named positions

and a delegation of authority for the continuity of official functions of officials at [DHS]." DHS Delegation No. 00106, Rev. 8 (Dec. 15, 2016), § 1 ("Johnson Delegation"); SUF ¶ 185. The Johnson Delegation stipulates two separate tracks detailing the order of succession to the office of Acting DHS Secretary. "In case of the Secretary's death, resignation, or inability to perform the functions of the Office," the Johnson Delegation affirms that the order of succession continues to be governed by E.O. 13,753, which incorporates the FVRA by reference. Ex. 2 § II.A (resignation line). Where the vacancy is due to "a disaster or catastrophic emergency," Annex A defines a separate order of succession. *Id*. § II.B (emergency line).

On December 5, 2017, the Senate confirmed Kirstjen Nielsen as DHS Secretary—the last person to exercise the functions of this position with the advice and consent of the Senate until February 2, 2021, when the Senate confirmed Alejandro Mayorkas as DHS Secretary. SUF ¶¶ 189, 196, 252. On May 21, 2018, October 23, 2018, and February 15, 2019, then-Secretary Nielsen exercised her authority under the HSA to issue revised versions of Delegation Order 00106 that amended the order of acting officers to fill DHS senior positions. *See* 6 U.S.C. § 113(g)(2); Ex. 4, DHS Delegation No. 00106, Rev. 8.4 (Feb. 15, 2019) ("February 2019 Delegation"); SUF ¶¶ 190-91. On each of these occasions, then-Secretary Nielsen maintained and affirmed the lines of succession for the Office of the Secretary set out in the Johnson Delegation. SUF ¶ 192.

Secretary Nielsen resigned on April 10, 2019. SUF ¶ 196. At that time, the next two potential successor roles—the "first assistant positions"—were vacant, thus triggering DHS's order of succession contained in Delegation Order 00106. *Id*. ¶¶ 205-06. Before leaving office, however, Secretary Nielsen again amended Delegation Order 00106, this time to elevate the Customs and Border Protection ("CBP") Commissioner's position in Annex A's emergency line. *Id*. ¶¶ 197-201. She first signed an order on April 9, 2019 that declared that "Annex A of …

Delegation No. 00106 is hereby amended" by substituting a new list of offices, but made no other amendments to Delegation Order 00106. SUF ¶ 197-99; Ex. 9, Designation of an Order of Succession for the Secretary (Apr. 9, 2019) ("April 2019 Order"). Then, on April 10, 2019, Secretary Nielsen issued a revised version of Delegation Order 00106 that implemented the April 2019 Order by updating Annex A with the new list of offices, but made no further amendments. SUF ¶¶ 197, 200-01; Ex. 10, DHS Delegation No. 00106, Rev. 8.5 (Apr. 10, 2019) (the "April 2019 Delegation"). Neither the April 2019 Order nor the April 2019 Delegation changed Annex A's title or function—rather, they simply changed the order of officials within Annex A. SUF ¶¶ 198-201. After Nielsen's departure, Kevin McAleenan, the CBP Commissioner, purported to assume the position of Acting Secretary on April 11, 2019. *Id.* ¶ 209.

Mr. McAleenan's purported accession was improper because Secretary Nielsen vacated her role as Secretary via resignation and not as the result of a disaster or catastrophic emergency, and therefore E.O. 13,753 (the resignation line) governed succession, not the emergency line in amended Annex A. Under the resignation line, Christopher Krebs, the Director of Cyber Security and Infrastructure, should have become the Acting Secretary because the first three offices in the order of succession were vacant or filled with acting officials. SUF ¶¶ 203-08, 210.

### B.    Mr. Wolf's Unlawful Assumption Of Office As Acting DHS Secretary

On November 8, 2019, the 212th day since Secretary Nielsen left office, Mr. McAleenan purported to amend Delegation Order 00106 ("November 2019 Delegation"). SUF ¶ 211. The November 2019 Delegation purported to: (1) establish that Annex A would also govern vacancies when the Secretary resigns and (2) change the order of succession in Annex A to place the Under Secretary for Strategy, Policy, and Plans fourth in the line. *Id.* At the time of Mr. McAleenan's resignation, all positions higher than the Under Secretary for Strategy, Policy, and Plans in the orders of succession were unoccupied. *Id.* ¶ 213.

On November 13, 2019, the Senate confirmed Mr. Wolf as the Under Secretary for Strategy, Policy, and Plans; Mr. McAleenan resigned from his purported role as Acting Secretary of DHS; and Mr. Wolf purported to assume the role of Acting Secretary pursuant to the November 2019 Delegation. SUF ¶¶ 212, 214. Mr. Wolf was not the next in the line of succession under Delegation Order 00106 before Mr. McAleenan's unlawful November 2019 Delegation. *Id*. ¶ 215.

### C.    Mr. Mizelle's Service As Acting DHS General Counsel

On or about February 12, 2020, Chad Mizelle purported to assume the office of Acting General Counsel of DHS. SUF ¶ 219. He initially titled himself Acting General Counsel but subsequently styled himself the "Senior Official Performing the Duties of the General Counsel" for DHS. *Id.* ¶ 220. Mr. Mizelle succeeded John Mitnick, who was the last Senate-confirmed DHS General Counsel but was terminated on or about September 17, 2019. *Id.* ¶¶ 217-18.

### D.    Mr. McAleenan, Mr. Wolf, And Mr. Mizelle Purport To Issue And Sign The Notices Of Proposed Rulemaking And The Rules

DHS issued and Mr. McAleenan signed Notices of Proposed Rulemaking ("NPRMs") for the Rules on September 9, 2019 and November 14, 2019, respectively. SUF ¶¶ 1, 6. On June 22 and 26, 2020, Mr. Wolf purported to issue the Timeline Repeal Rule and EAD Bar Rule, respectively. *See id*. ¶¶ 2-3, 7-8. Mr. Wolf purported to "delegat[e] the authority to electronically sign" the Rules to Mr. Mizelle in his capacity as "the Senior Official Performing the Duties of the General Counsel for DHS," and Mr. Mizelle signed both Rules on behalf of Mr. Wolf. *Id*. ¶¶ 4, 9.

### E.    Mr. Wolf's Purported Ratification Of The Rules And Secretary Mayorkas' Purported Ratification Of The Timeline Repeal Rule

On September 10, 2020, President Trump nominated Mr. Wolf to serve as DHS Secretary and submitted the nomination to the Senate. SUF ¶ 234. Mr. Wolf was never confirmed. *Id*. While Mr. Wolf continued to purport to serve as Acting Secretary, the government turned to Peter Gaynor, the FEMA Administrator, to legitimate Mr. Wolf's service. On the government's theory, if the

November 2019 Delegation was void, then Mr. Gaynor would have been next in line to become Acting Secretary under E.O. 13,753. *See Batalla Vidal*, 2020 WL 6695076, at *4. On September 10, 2020—before Mr. Wolf's nomination was submitted to the Senate—Mr. Gaynor issued a memorandum entitled "Order Designating the Order of Succession for Secretary of Homeland Security" (Ex. 27, "First Gaynor Memo"). SUF ¶ 235. Mr. Gaynor "rel[ied] on any authority I may have been granted" as Acting Secretary to ratify or otherwise adopt the same November 2019 Delegation that Mr. McAleenan had unlawfully issued, thus re-assigning the Acting Secretary role to Mr. Wolf. Ex. 27, First Gaynor Memo at 1. Although Mr. Gaynor never resigned, Mr. Wolf purportedly became Acting Secretary immediately because Mr. Gaynor assumed that his "authority . . . will [automatically] terminate" upon the issuance of the memo. *Id*. Mr. Wolf then purported to ratify the Rules and their respective NPRMs. *See* SUF ¶¶ 242-43.

On November 14, 2020, after *Batalla Vidal* held that Mr. Wolf was not lawfully serving as Acting Secretary, Mr. Gaynor reissued the same memo, again purporting to re-assign the Acting Secretary role to Mr. Wolf. *See* Ex. 29, Peter T. Gaynor, *Order Designating the Order of Succession for the Secretary of Homeland Security* (Nov. 14, 2020) ("Second Gaynor Memo," collectively with the First Gaynor Memo, "Gaynor Memos"); SUF ¶ 236. Mr. Wolf again purported to ratify the Rules and the NPRMs. *Id.* ¶ 244.

In neither case did Mr. Gaynor actually assume the office of Acting Secretary. He accepted Mr. Wolf's claim to the role of Acting Secretary throughout because he "believe[d] that the GAO's opinion [that the November 2019 Delegation was unlawful] . . . [was] incorrect." Ex. 27, First Gaynor Memo at 1; Ex. 29, Second Gaynor Memo at 1. Mr. Gaynor was never sworn in as Acting Secretary, performed no actions as Acting Secretary besides issuing the memorandum, and never

resigned from his post as FEMA Administrator. Nor did DHS notify Congress that Mr. Gaynor was serving as Acting Secretary, as the FVRA requires. *See* 5 U.S.C. § 3349(a)(2); SUF ¶ 241.

On January 11, 2021, after *Pangea* held that Mr. Wolf was *still* not lawfully serving as Acting Secretary, Mr. Wolf purported to designate a new order of succession under the HSA that made Mr. Gaynor the most senior eligible successor. SUF ¶ 246. Mr. Wolf resigned on that same day and purported to return to his duties as the Under Secretary for Strategy, Policy, and Plans. *Id*.

On January 12, 2021, Mr. Gaynor, purporting to exercise the authority of DHS Acting Secretary, attempted to delegate to Mr. Wolf the power of the Secretary to make rules, "ratify any prior regulatory actions," and "issue written documents . . . furthering policy goals." *Id*. ¶ 247. On January 14, 2021, Mr. Wolf purported to ratify both "any and all prior regulatory actions involving delegable duties that I have taken," including the Rules, and the NPRMs. *Id*. ¶¶ 248, 250.

On May 4, 2021, Secretary Mayorkas purported to ratify the Timeline Repeal Rule but not the EAD Bar Rule. *Id*. ¶¶ 253-54.

## II.    THE RULES FUNDAMENTALLY IMPAIR ACCESS TO WORK AND HARM THE INDIVIDUAL AND ORGANIZATIONAL PLAINTIFFS

### A.    The Rules Harm Individual Plaintiffs And Other Asylum Seekers

The Rules construct multiple layers of barriers to deter asylum seekers from seeking protection. The Rules multiply the bases to deny asylum seekers' EAD applications by mandating denial of an EAD application for applicant-caused delay ("Applicant-Caused Delay") (8 C.F.R. § 208.7(a)(1)(iv)), failure to file an asylum application within one year of entering the United States ("One-Year Filing Bar") (*id*. § 208.7(a)(1)(iii)(F)), entering the United States without inspection ("Port-of-Entry Requirement") (*id*. § 208.7(a)(1)(iii)(G)), conviction for a "particularly serious crime" or the existence of "serious reasons for believing that the applicant . . . has committed a serious non-political crime" (*id*. §§ 208.7(a)(1)(iii)(B)-(C)), the denial of an asylum

application despite a pending appeal (*id*. § 208.7(b)(2)), or if an applicant has been paroled into the United States (*id*. § 274a.12(c)(11)). Even where none of these new bases is present, the Rules also give USCIS discretion to deny asylum-seekers' EAD applications. *Id*. § 274a.13(a)(1).

The Rules also create intersecting delays and barriers to EADs. The Rules create an indefinite waiting period to receive notice from USCIS that an asylum application is complete before the EAD waiting period will begin (*id*. § 208.3(c)(3)), extend the EAD waiting period before an applicant may apply for an EAD from 150 to 365 days (*id*. § 208.7(a)(1)(ii)), require applicants to attend and pay for another biometric appointment to support their EAD application (*id*. § 208.7(a)(1)(i)), "eliminate[] any deadlines previously imposed on the agency to process EAD applications" (*Casa de Maryland*, 486 F. Supp. 3d at 938), and eliminate the ability of applicants who received a "notice of recommended approval" to apply for an EAD before the waiting period expired (8 C.F.R. §§ 208.7(a)(i), 274a.12(c)(8)). And by providing that an EAD may be granted for at most two years, *id*. § 208.7(b)(1), the EAD Bar Rule forces even many successful applicants to apply again if they wish to retain work authorization, as DHS's asylum adjudication time often exceeds two or even three years.

The Rules harm Individual Plaintiffs and other asylum seekers by denying their ability to obtain work authorization, causing increased delays and costs related to work authorization, and depriving them of the important collateral benefits of an EAD. For some, the Rules likely pose an outright bar to an EAD. For instance, Plaintiffs C.H.A., R.P.P., L.E.J.J., and M.C.J.J. are likely barred from obtaining an EAD by the Port-of-Entry Requirement. SUF ¶¶ 71, 81, 89. Plaintiffs D.M.C. and V.M.B. are likely unable to obtain an EAD for the duration of their immigration case due to the One-Year Filing Bar; Plaintiffs U.O., L.G.M., and L.M.M.G. are also impacted by the One-Year Filing Bar; and Plaintiff L.M.M.G. faces denial under the Applicant-Caused Delay

provision. *Id*. ¶¶ 14, 34, 38, 47, 58, 64-65, 131. And because the Rules made EADs for asylum seekers discretionary, all Individual Plaintiffs were vulnerable to being denied work authorization in the exercise of discretion. *See* 8 C.F.R. § 274a.13(a)(1).

The Rules also impose long delays and financial barriers. The Rules imposed a 365-day wait instead of the original 150 days to apply for an EAD (8 C.F.R. § 208.7(a)(1)(ii)), required all applicants to pay an additional $85 biometric services fee, and deprived applicants of any concrete timeline for adjudication. *Casa de Maryland*, 486 F. Supp. 3d at 938. Numerous Individual Plaintiffs, including for example H.M.R., J.H.C., M.L.V., and U.O., were subject to these provisions. SUF ¶¶ 22, 32, 38, 49, 60, 64, 72, 82, 90, 94, 101, 108, 117. By barring or delaying Individual Plaintiffs from obtaining an EAD, the Rules prevent them from earning lawful income while they await the adjudication of their claims for protection.

The Rules are causing ongoing harm to Individual Plaintiffs by denying them the collateral benefits of an EAD, including the ability to receive medical care, apply for identity documents, secure housing, or support dependent family members. In many states, work permits are the only way that Individual Plaintiffs can obtain valid identity documents. Consequently, Plaintiffs M.L.V., L.G.M., and L.M.M.G. have struggled to find stable housing without a Social Security Number ("SSN") and/or a government-issued photo identification. SUF ¶¶ 62, 109. Similarly, Plaintiffs V.M.B., M.C.R., and C.H.A., all transgender women, all struggle to obtain gender-affirming medical care without EADs. *Id*. ¶¶ 74, 121, 134. And by preventing the lawful generation of income, the Rules delayed or completely prevented Individual Plaintiffs such as D.M.C., V.M.B., L.G.M., K.N.E., and R.P.P. from financially supporting family members in their home countries. *Id*. ¶¶ 18, 28, 61, 84, 135.

The Rules evince a chilling indifference to these harms. In response to comments recognizing that the EAD Bar Rule will have an adverse impact on asylum seekers' ability to obtain housing, DHS responded that applicants should "become familiar with the homelessness resources provided by the state where they intend to reside." EAD Bar Rule, 85 Fed. Reg. 38,532, 38,591 (June 26, 2020). Similarly, DHS dismissed the harms arising from asylum seekers' inability to get state identification as "outside USCIS's purview," Timeline Repeal Rule, 85 Fed. Reg. 37,502, 37,528 (June 22, 2020), a demonstrably false suggestion because the connection between work authorization, SSNs, and government IDs arises in part from federal law that DHS implements. *See* 6 C.F.R. § 37 *et seq*.

## B.    <u>The Rules Harm Organizational Plaintiffs</u>

As explained in detail *infra* (Argument, Section I.B), the challenged Rules harm Organizational Plaintiffs AsylumWorks, Community Legal Services in East Palo Alto ("CLSEPA"), and Tahirih Justice Center ("Tahirih"). By increasing the complexity of the EAD application process and causing uncertainty for clients, the Rules have caused these Plaintiffs to divert scarce resources to support clients pursuing EADs and train staff and pro bono volunteers. SUF ¶¶ 152-54, 158-59, 162, 164, 167, 173, 179-180. The Rules also frustrate the Organizational Plaintiffs' missions by decreasing the number of clients they can serve. *Id*. ¶¶ 157, 165-66, 181.

## <u>LEGAL STANDARD</u>

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008).

Plaintiffs' third, fourth, fifth, and sixth claims turn on the "plain meaning" of the DHS order of succession, *Casa de Maryland*, 486 F. Supp. 3d at 960, and on the interpretation of the FVRA, the HSA, and the Appointments Clause. These are issues of law, so they are amenable to summary disposition.[5] Six courts have "correctly identified and analyzed the salient points vitiating Wolf's claim of rulemaking authority" and resolved these issues before trial because the relevant facts are uncontested. *See Pangea Legal Servs.*, 2021 WL 75756, at *5 (collecting cases); *see also Batalla Vidal*, 2020 WL 6695076, at *1, *9 (granting summary judgment).

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE RULES

Both the Individual and Organizational Plaintiffs have standing to challenge the Rules. "[T]he irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Comm. on the Judiciary of the United States H.R. v. McGahn*, 968 F.3d 755, 763 (D.C. Cir. 2020). "If constitutional standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs to raise that claim." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017). Plaintiffs satisfy the three requirements for standing.

### A.    The Individual Plaintiffs Have Standing To Challenge The Rules

The Rules cause grave harm to the Individual Plaintiffs by making it more difficult, and in some cases impossible, for them to obtain EADs. SUF ¶¶ 11-147. These injuries are caused by the

---

[5] Plaintiffs are equally entitled to summary judgment on their first and second claims that the Rules are contrary to law and arbitrary and capricious, and thus unlawful under the APA. While Plaintiffs reserve the right to seek summary judgment on their first and second claims at a later time, Plaintiffs are pursuing a motion for partial summary judgment on their third, fourth, fifth, and sixth claims because these claims are dispositive and the issues they present are well-trodden.

Rules, and vacatur of the rules would redress Plaintiffs' injuries by removing the barriers to EADs that the Rules have erected. The Individual Plaintiffs thus meet all three requirements for standing.

**B.** **The Organizational Plaintiffs Have Standing To Challenge the Rules And Fall Within The Zone Of Interests Protected By The INA**

**1.** **Article III Standing**

"Under [the Supreme Court's decision in] *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), an organization may establish Article III standing if it can show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). Organizational Plaintiffs meet that standard because they can show (1) "that the defendant's action or omission to act injured the organization's interest" and (2) "it used its resources to counteract that harm." *Id.*

Plaintiff AsylumWorks is a nonprofit organization providing services to asylum seekers living in the Washington, D.C. region. SUF ¶ 148. AsylumWorks' three core service areas are employment, social services, and community building. *Id.* ¶ 149.

The Rules have impaired AsylumWorks' job re-entry, resume building, informational interview, and on-the-job simulation programming because all these programs depend on clients' ultimate ability to obtain work permits. SUF ¶¶ 150-51. The Rules frustrate the mission behind this programming by making it more difficult for clients to obtain EADs.

The Rules also increase the burden on AsylumWorks' social services. The Rules create uncertainty and anxiety for AsylumWorks clients, which increases demand for AsylumWorks staff to provide emotional support and mental health service referrals. SUF ¶¶ 152-53. Relatedly, AsylumWorks consistently sees a marked improvement in clients' mental health once they begin to work. *Id.* ¶ 154. Without the promise of the ability to work on the horizon, the Rules have left

AsylumWorks clients in crisis for longer, requiring AsylumWorks to spend more on mental health and other social services. *Id*.

The Rules further tax AsylumWorks' resources by increasing demand for the most labor-intensive part of its services among its clients. AsylumWorks' programming is designed to provide more intensive assistance during the first six months and then to taper off as clients gain independence. SUF ¶ 156. Because the Rules delay or deny asylum seekers' ability to work, they force AsylumWorks to expend resources for food, housing, and medical care for clients who could have obtained an EAD under the prior regulations. *Id.* ¶ 158. By increasing demand for labor-intensive services, the Rules reduce AsylumWorks' ability to accept new clients. This in turn jeopardizes AsylumWorks' ongoing funding, which depends, in part, on the number of clients it is able to serve. *Id.* ¶ 157.

Plaintiff CLSEPA is a nonprofit organization providing legal and social services to low-income families in and around East Palo Alto, California. SUF ¶ 160. CLSEPA provides free and low-cost legal services to low-income community members in the areas of economic advancement, housing, and immigration. *Id.* ¶ 161.

The Rules frustrate CLSEPA's mission by limiting its clients' opportunity to work legally, increasingly subjecting them to labor exploitation, housing insecurity, and abusive relationships which they do not have the means to escape. SUF ¶ 162. As the Rules have resulted in significant delays in EAD adjudication and increased denial rates, CLSEPA has had to invest increased resources in its clients' cases to mitigate for the harmful consequences of being unable to work. *Id.* ¶ 167.

The Rules also require CLSEPA staff to devote more time to counseling asylum seekers regarding EAD eligibility and preparing the actual applications. SUF ¶ 165. The Rules have forced

CLSEPA to cancel plans for *pro se* clinics for work authorization preparation because the Rules' complexity makes them impracticable. *Id.* ¶ 163. Instead, CLSEPA must now dedicate significantly more time and resources to training staff and pro bono partners, researching and filing Freedom of Information Act requests for EAD applications, and compiling and seeking review of EAD applications from managing attorneys. *Id.* ¶ 164. The Rules have thus decreased the number of clients CLSEPA can serve and required a diversion of resources to a more labor-intensive practice model. *Id.* ¶¶ 164–66.

Because a significant part of CLSEPA's funding is tied to the number of clients served, the Rules threaten the organization's revenue. SUF ¶ 157. Decreased funding will in turn decrease the number of clients CLSEPA can serve, further frustrating its mission. *Id.*

Plaintiff Tahirih Justice Center is a nonprofit organization that provides free legal immigration services, including asylum services, as well as social services to survivors of gender-based violence. SUF ¶ 170.

Many of Tahirih's clients require extensive social-services support, but the Rules diminish Tahirih's capacity to provide this service to as many of its clients as possible. Survivors of gender-based violence are vulnerable to negative short- and long-term health outcomes, including injury, chronic health problems, depression, post-traumatic stress, exposure to sexually transmitted infections, and gynecological problems. SUF ¶ 171. Survivors also often require mental health services to deal with the often-severe aftereffects of trauma, and of the secondary effects of trauma on their children. *Id.* ¶ 172. Asylum clients with EADs are able to work and earn money to support themselves and their families. Financial self-sufficiency allows Tahirih's clients to address their trauma and other psychological issues themselves, so they require less social-services support from Tahirih. *Id.* ¶ 173. Asylum clients who are denied or awaiting an EAD cannot earn money and are

17

less able and less likely to address underlying psychosocial needs. The Rules thus force Tahirih to divert resources into providing more prolonged and involved assistance to asylum clients and harm Tahirih's mission by reducing the number of asylum clients it can serve. *Id*. ¶ 177, 181.

The Rules also adversely affect Tahirih's legal work. For example, the Applicant-Caused Delay provision impairs legal staff's ability to present new evidence, including evidence newly received from an asylum applicant's home country, to supplement an application or in advance of an asylum interview. SUF ¶ 178. The client's best interest—and thus the rules of legal ethics and the interests of justice—generally compel lawyers to present new, favorable evidence no matter when it arrives. *Id*. If legal staff do so, however, they will further delay the client's ability to become self-supporting by triggering a rejection of the client's EAD application. *Id*. The Rules thus force Tahirih attorneys to choose between presenting new evidence to maximize the probability of success to support an asylum claim or prioritizing an immediate, urgent need for work authorization. *Id*.

The Rules frustrate Tahirih's legal work in other ways, too. The provision concerning circumstances providing "serious reasons to believe" an asylum seeker engaged in a non-political crime and forcing asylum seekers to disprove any potential crime bars to asylum as a prerequisite to an EAD will require legal staff to gather all evidence related to clients' past actions and present full-fledged arguments concerning those actions, well in advance of a merits hearing or asylum interview. SUF ¶ 179. And no matter the disposition of those issues at the EAD stage, the same issues will then have to be re-litigated when the asylum case is heard on its merits. *Id*.

### 2.    Zone of Interests

Organizational Plaintiffs also fall within the zone of interests of the Immigration and Nationality Act ("INA"). This test "is not especially demanding," and the "benefit of any doubt goes to the plaintiff," foreclosing only those suits wherein "a plaintiff's interests are so marginally

related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). As long as a plaintiff is "arguably within the zone of interests to be protected or regulated by the statute," the test is satisfied. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Numerous courts in this district have found that organizations, including Tahirih, have standing to challenge immigration-related regulations and fall within the zone of interests of the INA on similar, if not identical, facts. *See, e.g.*, *CLINIC v. EOIR*, No. 20-cv-03812, 2021 WL 184359, at \*9-10 (D.D.C. Jan. 18, 2021); *NWIRP*, 496 F. Supp. 3d at 50-52; *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 38-39, 43-44 (D.D.C. 2020), *appeal filed*, No. 20-5273 (D.C. Cir.); *O.A. v. Trump*, 404 F. Supp. 3d 109, 142-45 (D.D.C. 2019), *appeal filed*, No. 19-5272 (D.C. Cir.). The same result is warranted here.

## II.    THE RULES ARE VOID *AB INITIO* UNDER THE HSA, THE FVRA, AND THE APPOINTMENTS CLAUSE

Plaintiffs are entitled to summary judgment on their third, fourth, fifth and sixth claims that the Rules were unlawfully promulgated for three independent reasons. *First*, Mr. Wolf never assumed the position of Acting Secretary because he took office pursuant to an unlawful modification to the order of succession issued by his predecessor, Mr. McAleenan. Mr. McAleenan did not have authority to modify the order of succession because he too never lawfully became Acting DHS Secretary based on the plain text of DHS's order of succession. And even if he had validly assumed office, both the FVRA and HSA voided his modification to the order of succession. *Second*, Mr. Wolf issued the Rules, and Mr. Mizelle signed them, after the FVRA's 210-day limit on service in their respective roles had expired. *Finally*, the prolonged and indefinite appointment of Mr. Wolf violates the Appointments Clause.

19

### A.    The 210-Day Time Limit Under The FVRA Applies To Acting Officers Designated Under The HSA

#### 1.    The FVRA Sets Unambiguous Limits On Executive Appointments

Congress enacted the FVRA to prevent the Executive from undermining the separation of powers through the manipulation of official appointments. Like its predecessor statutes, the FVRA redresses the practical problem that occurs when "a vacancy arises and the President and Senate cannot promptly agree on a replacement" by "authorizing the President to direct certain officials to *temporarily* carry out the duties of a vacant [ ] office." *NLRB v. SW Gen, Inc.*, 137 S. Ct. 929, 934 (2017) (emphasis added); *see* 5 U.S.C. §§ 3345(a)(2), 3346(a)(1), 3348(b)(1). But the FVRA does not grant the President a blank check; it tightly circumscribes the President's power to designate acting officials to prevent the Executive from abusing this power to avoid congressional scrutiny of appointments. Congress enacted the FVRA to reclaim its Appointments Clause power in the face of widespread Presidential use of acting appointments and weaknesses in the enforcement provisions of the predecessor Vacancies Act. *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2017) (citing S. Rep. No. 105-250, at 5 (1998)), *aff'd* 137 S. Ct. 929 (2017).

Consistent with this purpose, the FVRA establishes at least three unambiguous limits on the use of acting officers and sanctions for violations of those limits. *First*, the FVRA circumscribes the President's powers by specifying who may be designated as acting officers, thus setting out a general framework for filling vacancies. *See* 5 U.S.C. § 3345(a). *Second*, the FVRA prohibits certain individuals from serving as acting officers. *Id*. § 3345(b). And *third*, the FVRA ensures that acting officers may only serve on a temporary basis by prohibiting any person from serving as an acting officer "for longer than 210 days beginning on the date the vacancy occurs." *Id*. § 3346(a). To give teeth to the 210-day limit, Congress coupled it with a clawback provision, *id*. § 3348(b)(1). Under the clawback, if an acting officer serves past the 210-day limit, then the

office must "remain vacant," no additional acting officers may be designated, and the President must submit a nomination to the Senate to fill the office. *Id*. § 3348(b). And to ensure that Executive non-compliance would carry consequences, Congress provided that actions by officers acting in violation of the FVRA "shall have no force or effect," *id*. § 3348(d)(1), and "may not be ratified." *Id*. § 3348(d)(2). These provisions establish a "rule that actions taken in violation of the FVRA are void *ab initio*." *SW Gen., Inc.*, 137 S. Ct. at 938 n.2.

### 2. The HSA Implements The FVRA But Does Not Supplant It

Sections 3345 and 3346 of the FVRA are the "exclusive means for temporarily authorizing an acting official to perform the function and duties of any [Presidentially-appointed and Senate-confirmed] office," subject to limited exceptions. 5 U.S.C. § 3347(a). One exception, Section 3347(a)(1), permits an alternative designation process for agency-specific statutes that "expressly" implement some other succession scheme, thus allowing agency-specific statutes to "temporarily" designate some other official to serve in an acting capacity.[6] *Id*. §§ 3347(a)(1)(A)-(B).

The HSA implements Section 3347(a)(1) of the FVRA by providing for an alternative designation process. Under the HSA, (1) the Deputy DHS Secretary shall assume the role of Acting DHS Secretary when a vacancy occurs, 6 U.S.C. § 113(a)(1)(A), (2) the Under Secretary for Management shall serve as Acting DHS Secretary if neither the Secretary nor the Deputy Secretary is available, *id*. § 113(g)(1), and (3) "[n]otwithstanding [the FVRA], the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary," *id*. § 113(g)(2).

The 210-day limit applies to acting officers designated by the Secretary under Section 113(g)(2) because the FVRA and the HSA are interlocking and co-existing statutes, and the latter

---

[6] The other exception, regarding recess appointments, is inapplicable here. 5 U.S.C. § 3347(a)(2).

supplements but does not displace the former. As Section 3347(a)(1) makes clear, the FVRA "was generally intended to apply alongside agency-specific statutes, rather than be displaced by them." *English v. Trump*, 279 F. Supp. 3d 307, 319 (D.D.C. 2018). The HSA thus supplements the FVRA by authorizing the Secretary to designate a "further order of succession." 6 U.S.C. § 113(g)(2). But nothing in the HSA addresses time limits for the Acting Secretary or purports to displace the time limits set out in the FVRA. Instead, the HSA contemplates the continued operation of the FVRA by expressly providing that the Deputy Secretary and Under Secretary for Management shall each be a "first assistant for purposes of [the FVRA]" and are therefore subject to the FVRA's time limits. *Id*. §§ 113(a)(1)(A), (F). It would be absurd for the HSA to impose the FVRA's time limits on the Deputy Secretary and Under Secretary for Management but not on lower ranked officials who assume the Acting Secretary role. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (Courts "must interpret [a] statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole.").

Accordingly, the "notwithstanding" clause in Section 113(g)(2) does not oust the application of the 210-day time limit in Section 3346(a)(1) of the FVRA. *See S.W. Gen., Inc.*, 137 S. Ct. at 939 (explaining that "notwithstanding" clauses are relevant only "in the event of a clash" between two provisions). And because the HSA and the FVRA "are capable of coexistence" and there is no "clearly expressed congressional intention to the contrary," "it is the duty of the courts . . . to regard each as effective." *J.E.M. Ag. Supply, Inc., v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001). The Court should avoid construing the HSA's silence to displace the FVRA's time limits because this interpretation would place the HSA in conflict with the FVRA's requirement that an acting agency head who assumes office pursuant to a housekeeping statute can only serve on a "temporar[]y" basis. *See* 5 U.S.C. §§ 3347(a)(1)(A)-(B).

22

**B.    McAleenan's Unlawful Designation As Acting Secretary Rendered Mr. Wolf's Service And Issuance Of The Rules Unlawful**

**1.    McAleenan Never Validly Succeeded Secretary Nielsen**

Mr. McAleenan never validly took office as Acting Secretary under the HSA and the FVRA, and he thus lacked authority to amend the order of succession so that Mr. Wolf could succeed him. Mr. McAleenan purportedly assumed office pursuant to Secretary Nielsen's April 2019 amendments to the order of succession. The government's contrary position hinges on the argument that Mr. McAleenan, Mr. Wolf's predecessor, lawfully became Acting Secretary in April 2019 and then lawfully amended the order of succession pursuant to 6 U.S.C. § 113(g)(2) in November 2019 so that Mr. Wolf could succeed him.

That argument fails because Secretary Nielsen did not amend the applicable order of succession. *Batalla Vidal*, 2020 WL 6695076, at *8. As explained above, the version of Delegation Order 00106 in effect at the time of the April 2019 amendments established two separate lines of succession: (1) the resignation line (governed by E.O. 13,753), and (2) the emergency line (governed by Annex A). SUF ¶ 199. On April 9 and 10, 2019, Secretary Nielsen amended the emergency line set out in Annex A to elevate the CBP Commissioner's position. *See* SUF ¶¶ 197-98, 200; Exs. 9-10. But as the *Pangea* court explained, Secretary Nielsen left unchanged the order of succession applicable "in the event of resignations or other vacancies, which continued to be governed by Executive Order (EO) 13753." *Pangea Legal Servs.*, 2021 WL 75756, at *4. While Secretary Nielsen had authority under Section 113(g)(2) of the HSA to amend the resignation line as well as the emergency line, the plain text of both the April 2019 Order and the April 2019 Delegation demonstrates that she only amended the emergency line set out in Annex A. *See Casa de Maryland*, 486 F. Supp. 3d at 959-60; *Batalla Vidal*, 2020 WL 6695076, at *9. Because E.O. 13,753 governed, "the operation of [E.O. 13,753] should have resulted in Christopher Krebs, the

23

Director of Cyber Security and Infrastructure Security, assuming head DHS authority." *Pangea Legal Servs.*, 2021 WL 75756, at *4; *see* SUF ¶ 210. Accordingly, Mr. McAleenan's designation as Acting Secretary was unlawful because he was seventh in the E.O. 13,753 line of succession. SUF ¶ 203. While Mr. McAleenan "purported to be Acting Secretary," he "possessed no statutory authority to do so." *Batalla Vidal*, 2020 WL 6695076, at *8.

### 2. Mr. McAleenan's Amendments To The Line of Succession Thus Have No Force And Effect And Cannot Be Ratified

Although Mr. McAleenan possessed no statutory authority to serve as Acting Secretary, he nonetheless purported to amend the line of succession on November 8, 2019, to pave the way for Mr. Wolf. SUF ¶ 211. Mr. McAleenan's November 2019 Delegation provided that Annex A would also govern vacancies when the Secretary resigned and placed the Under Secretary for Strategy, Policy, and Plans fourth in the line of succession. *Id*. On November 13, 2019, the Senate confirmed Mr. Wolf as Under Secretary, Mr. McAleenan resigned, and Mr. Wolf assumed the role of Acting Secretary because all positions higher than the Under Secretary were unoccupied. *Id.* ¶¶ 211-14.

But the November 2019 Delegation was void under both the HSA and the FVRA, so Mr. Wolf's assumption of office was unlawful. As outlined above, Mr. McAleenan unlawfully assumed office as Acting Secretary under the April 2019 Order and April 2019 Delegation. And "[b]ecause the passing of the torch from Nielsen to McAleenan was ineffective, the attempt by McAleenan to pass it in turn to Wolf had no legal effect whatsoever." *Pangea Legal Servs.*, 2021 WL 75756, at *5; *see also Batalla Vidal*, 2020 WL 6695076, at *9 (same). Even if Mr. McAleenan had lawfully assumed office, he had no authority to amend the line of succession because, as explained in greater detail *infra* (Argument, Section III.A), "an Acting Secretary may not amend the Department's order of succession under § 113(g)(2) [of the HSA]." *NWIRP*, 496 F. Supp. 3d at 70. Moreover, even if Mr. McAleenan had been lawfully designated as Acting Secretary, he

24

issued the November 2019 Delegation on his 212th day in office—past the 210-day limit on acting

officers stipulated by the FVRA. *See* 5 U.S.C. § 3346(a)(1).

The invalidity of Mr. McAleenan's designation as Acting Secretary and his subsequent

amendment to the order of succession pursuant to which Mr. Wolf assumed office are questions

of law that this Court can resolve on an undisputed factual record. Plaintiffs ask this Court to "plow

the same ground about Wolf's authority *vel non* to change the immigration regulations," *Pangea*

*Legal Servs.*, 2021 WL 75756, at *4, as six other courts have already done. *See Casa de Maryland*,

486 F. Supp. 3d at 960; *NWIRP*, 496 F. Supp. 3d at 70; *Batalla Vidal*, 2020 WL 6695076, at *9;

*Immigrant Legal Res. Ctr.*, 491 F. Supp. 3d at 535; *La Clinica De La Raza*, 2020 WL 7053313,

at *7; *Pangea Legal Servs.*, 2021 WL 75756, at *5. These prior decisions "conducted a painstaking

analysis" of the undisputed facts and correctly determined that Mr. McAleenan had no authority

to serve as Acting Secretary or amend the line of succession, rendering Mr. Wolf's service as

Acting Secretary unlawful. *Pangea Legal Servs.*, 2021 WL 75756, at *4.

The GAO has also confirmed that Mr. McAleenan's designation as Acting Secretary was

unlawful and that Mr. Wolf was thus serving unlawfully. On August 14, 2019, the GAO fulfilled

its mandate to oversee FVRA compliance, *see* 5 U.S.C. § 3349, by issuing a report concluding that

Mr. McAleenan took office as Acting Secretary in violation of "the express terms of the existing

designation," so his "subsequent amendments to the order of succession . . . were invalid." Ex. 5,

at 1, 11; SUF ¶ 226. Therefore, the GAO concluded, Mr. Wolf was "named by reference to an

invalid order of succession." Ex. 5 at 1. This Court should adopt that conclusion. *See N.M. Health*

*Connections v. HHS*, 340 F. Supp. 3d 1112, 1173 (D.N.M. 2018) (GAO reports entitled to "respect

as a body of experience and informed judgment to which courts and litigants may properly resort

for guidance") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Because both the HSA and the FVRA voided Mr. McAleenan's designation of Mr. Wolf as his successor, Mr. Wolf was not lawfully serving as Acting Secretary. Thus, Mr. Wolf lacked lawful authority to issue the Rules, and pursuant to the FVRA, the Rules have "no force or effect," 5 U.S.C. § 3348(d)(1), and "may not be ratified," *id*. § 3348(d)(2). The Rules are equally "not in accordance with law" and "in excess of . . . authority" under the APA. *Id*. §§ 706(2)(A), (C).

### C.    The Rules Are Void *Ab Initio* Because Mr. Wolf Issued Them And Mr. Mizelle Signed Them In Violation Of The FVRA's 210-Day Limit

Additionally, the Rules are nullities because Mr. Wolf issued them and Mr. Mizelle signed them after the expiration of the FVRA's 210-day limit on the service of an acting official. This rendered the Rules without force or effect and ineligible for ratification under the FVRA. Granting summary judgment on this basis is appropriate because the only material facts—the dates on which the Offices of the Secretary of Homeland Security and the DHS General Counsel became vacant, and the length of purported acting service by Mr. Wolf and Mr. Mizelle—are uncontested.

### 1.    Mr. Wolf Unlawfully Assumed Office Because Mr. McAleenan's Service As Acting Secretary Exceeded The FVRA's 210-Day Limit

The FVRA's 210-day limit prohibited Mr. Wolf from ever assuming office as Acting Secretary. Because Mr. McAleenan purported to serve for 218 days, his service triggered the FVRA's clawback provision. Under this provision, if an Acting Secretary performs the functions or duties of the office in excess of the 210-day limit provided in Section 3346(a)(1), "the office shall remain vacant." *Id*. § 3348(b)(1). The office of Secretary of Homeland Security became "vacant" when Secretary Nielsen, the last officer confirmed by the Senate, resigned on April 10, 2019, at the latest. SUF ¶ 196. The office remained vacant for the duration of Mr. McAleenan's purported designation. *Id*. The FVRA's 210-day limitation expired by November 6, 2019, and Mr. McAleenan had thus exceeded that limit by the time he resigned on November 13, 2019. *See id.* ¶ 212. Therefore, by the time Mr. McAleenan left office, the office of Acting Secretary was

required to remain vacant, meaning neither Mr. Wolf nor any other person could fill it in an acting capacity, and the Rules that Mr. Wolf issued while purporting to do so necessarily have "no force or effect" and "may not be ratified." *Id.* §§ 3348(d)(1)-(2).

Even if the 210-day limit did not apply to officers designated under Section 113(g)(2) of the HSA—it does—the 210-day limit still prohibits Mr. Wolf's service because he was not properly designated under the HSA. E.O. 13,753 continued to govern the line of succession when Mr. Wolf purportedly assumed office because Secretary Nielsen's April 2019 Order and April 2019 Delegation did not amend the resignation line. Not only did that "Executive Order designate[] its order of succession pursuant to the FVRA," *NWIRP*, 496 F. Supp. 3d at 57, it also made "eligib[i]l[ity] to act as Secretary under the provisions of the [FVRA]" a condition precedent to service. Ex. 1, 81 Fed. Reg. at 90,667. Accordingly, Mr. McAleenan, Mr. Wolf, and any other official purporting to serve as Acting Secretary remained subject to the FVRA's 210-day limit and sanctions provisions. Mr. McAleenan and Mr. Wolf cannot use the HSA to deflect the FVRA's application because neither individual was lawfully designated under the HSA and the E.O. 13,753 order of succession that President Obama designated under the FVRA governed at all times.

### 2. Mr. Mizelle Signed The Rules In Violation Of The 210-Day Limit

The Rules must also be set aside because Mr. Wolf delegated the power to sign them to Mr. Mizelle, an acting official who was also serving in violation of the FVRA's 210-day limit at the time he signed the Rules. Because Mr. Mitnick, the last Senate-confirmed DHS General Counsel, was terminated on September 17, 2019, SUF ¶¶ 217-18, the FVRA's 210-day limit on Mr. Mizelle's service as Acting DHS General Counsel expired on April 14, 2020. Mr. Mizelle purported to sign the Rules in the capacity of "Senior Official Performing the Duties of the [DHS] General Counsel" more than two months later—well after the 210-day statutory period had

expired.[7] SUF ¶¶ 223, 225. Accordingly, Mr. Mizelle's signature provides an additional basis to conclude that the rules violated the FVRA's limit on acting appointments, 5 U.S.C. § 3346(a), have "no force or effect," *id*. § 3348(d)(1), and cannot be ratified, *id*. § 3348(d)(2).

### D.     The Prolonged And Indefinite Acting Appointment Of Mr. Wolf Violates The Appointments Clause

Mr. Wolf's prolonged service as Acting Secretary also violated the Appointments Clause, an independent constitutional basis to set the Rules aside as unlawful. The Appointments Clause forbids indefinite acting appointments. President Trump disregarded this prohibition by leaving the Office of DHS Secretary vacant for 665 days, instead choosing to rely on a series of acting officers, including Mr. McAleenan and Mr. Wolf. SUF ¶ 196. Mr. Wolf alone purported to serve for more than a year—426 days—without Senate confirmation. *Id*. ¶¶ 214, 246. Mr. Wolf's purported designation as Acting Secretary preserved an indefinite vacancy, infringing the Senate's advice and consent power. *See SW Gen., Inc.*, 137 S. Ct. at 935-37. Here too, summary judgment on the Appointments Clause claim is appropriate because the only material facts—the date at which the Office of the Secretary of Homeland Security became vacant, and the length of Mr. Wolf's purported acting service—are uncontested.

Recognizing that the "manipulation of official appointments" by the President could be an "insidious and powerful weapon," the Framers drafted the Appointments Clause to ensure "that those who wielded [the appointment power] were accountable to political force and the will of the people." *Freytag*, 501 U.S. at 883-84. The Appointments Clause limits the Presidential power by

---

[7]  It does not matter that Mr. Mizelle styled himself as "Senior Official Performing the Duties of the [DHS] General Counsel" instead of "Acting General Counsel." *See Bullock v United States*, 489 F. Supp. 3d 1112, 1127 (D. Mont. 2020) ("The Interior Secretary carefully crafted the Secretarial Order to avoid designation of Pendley as 'Acting BLM Director,' but the Executive Branch cannot use wordplay to avoid constitutional and statutory requirements.").

requiring that the President appoint "Officers of the United States," such as the Secretary of Homeland Security, with "the Advice and Consent of the Senate." U.S. Const., Art. II, § 2, cl. 2; 5 U.S.C. § 101. The Appointments Clause enshrines a critical "structural safeguard [] of the constitutional scheme" that "curb[s] Executive abuses of the appointment power." *Edmond*, 520 U.S. at 659. The Appointments Clause protects the system of checks and balances and "promote[s] a judicious choice of persons" for important positions. *Id*.

The Appointments Clause effects its purpose by prohibiting indefinite acting appointments. As the Supreme Court has long insisted, a "subordinate officer" may only be "charged with the performance of the duty of the superior for a *limited time*, and under special and *temporary* conditions." *United States v. Eaton*, 169 U.S. 331, 343 (1898) (emphases added); *see also Morrison v. Olson*, 487 U.S. 654, 672 (1988) (same). Courts have thus recognized that "an acting tenure" may become "so lengthy that it . . . amounts . . . to a circumvention of the Appointments Clause." *United States v. Smith*, 962 F.3d 755, 764 n.3 (4th Cir. 2020); *see also United States v. Hilario*, 218 F.3d 19, 29 (1st Cir. 2000) (noting that "continued service" of an inferior officer could "require[] nomination by the President and confirmation by the Senate" if the inferior officer "remain[ed] so long in office that "he became indistinguishable" from a principal officer). And because "the 'special and temporary' conditions that *Eaton* requires are no mere formality, . . . courts can and must play a role in policing 'acting' appointments that are effectively permanent." *Guedes*, 356 F. Supp. 3d at 153; *see also Bullock*, 489 F. Supp. 3d at 1128 (same).

Accordingly, it is appropriate for this Court "to say where th[e] . . . constitutional boundaries lie," and set the Rules aside as unlawful on the basis that Mr. Wolf's service is an "unlawful attempt[] to avoid the constitutional requirements of the Appointments Clause." *Bullock*, 489 F. Supp. 3d at 1128-29. This case does not pose a close call about the application of the

"special and temporary" exception. President Trump allowed the DHS Secretary vacancy to go unfilled for 665 days and waited 520 days before even nominating Mr. Wolf. SUF ¶¶ 196, 234. Mr. Wolf himself served for 426 days, and purported to issue the Timeline Repeal Rule and EAD Bar Rule on the 440th and 444th days, respectively, since the vacancy began. *Id*. ¶¶ 214, 222, 224, 246. President Trump thus failed to nominate a permanent replacement within the FVRA's 210-day timeframe, which is itself sufficient to show an Appointments Clause violation. *See United States v. Valencia*, No. 17-cr-882, 2018 WL 6182755, at *7 (W.D. Tex. Nov. 27, 2018) (Appointments Clause violation when the President "fail[s] to nominate a permanent replacement within the timeframe designated by statute"); *Bullock*, 489 F. Supp. 3d at 1129 (acting official's service "beyond the 210-day maximum allowed by the FVRA" necessarily "violates the Appointments Clause"). Accordingly, the Appointments Clause prohibited Mr. Wolf from serving as Acting Secretary, and the Rules are unlawful because Mr. Wolf lacked authority to issue them.

Even leaving the 210-day FVRA time frame aside, Mr. Wolf's service violates the Appointments Clause because it cannot be described as temporary under any reasonable definition. Mr. Wolf was President Trump's longest-serving DHS Secretary, acting or otherwise. Mr. Wolf, who is only one of the acting officers to purport to serve as Acting Secretary, purported to serve for 426 days, well in excess of the 337 days of service by an acting official that Chief Judge Morris found violated the Appointments Clause in *Bullock. See Bullock*, 489 F. Supp. 3d at 1119, 1129; SUF ¶¶ 212, 246. Indeed, in *Batalla Vidal*, Judge Garaufis found that the then "nearly 600 days since the Department of Homeland Security was led by a Senate-confirmed Secretary" "raise[d] serious constitutional concerns" about "allowing acting officers to serve without time limitations," thus "avoid[ing] constitutionally required Senate approval." *Batalla Vidal*, 2020 WL 6695076, at *7 n.9. Whatever the precise "parameters of the [special and temporary] exception" may be,

*Valencia*, 2018 WL 6182755, at *7, acting service for almost two full years—nearly three times as long as the FVRA allows—surely transgresses those boundaries.

At the very least, Plaintiffs have raised significant constitutional concerns that favor granting Plaintiffs' statutory claims by adopting a construction of the HSA that does not oust the 210-day limit in the FVRA. "[T]he canon of constitutional avoidance requires that if one of two linguistically permissible interpretations raises serious constitutional problems and the other does not, [the court is] to choose the second unless it is plainly contrary to the intent of Congress." *United States v. Cano-Flores*, 796 F.3d 83, 94 (D.C. Cir. 2015); *see Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring). Interpreting the HSA to oust the 210-day limit poses "serious constitutional concerns" because "[w]ithout the time limitations of the FVRA, it could be possible to install a series of acting officers in order to avoid constitutionally required Senate approval." *Batalla Vidal*, 2020 WL 6695076, at *7 n.9. In contrast, holding that the HSA does not override the FVRA's 210-day limit squares the HSA with the Appointments Clause by ensuring that acting officials serve only temporarily. Thus, if there is any ambiguity, the court should adopt Plaintiffs' interpretation of the HSA and the FVRA to "avoid[] a serious, unaddressed constitutional problem." *NWIRP*, 496 F. Supp. 3d at 69.

## III.   DHS'S REPEATED ATTEMPTS TO RATIFY THE UNLAWFULLY PROMULGATED RULES ARE THEMSELVES UNLAWFUL AND INEFFECTIVE

In a vain effort to salvage Mr. Wolf's unlawful assumption of office, the government has "resorted to the [FVRA] as a back-up theory after the HSA argument was turned aside by the court decisions" outlined above. *Pangea Legal Servs.*, 2021 WL 75756, at *4. Specifically, the government has previously argued that Peter Gaynor, then the FEMA Administrator, "was properly in office as DHS Acting Secretary under the FVRA and EO13753," and "was thereby authorized to change the order of succession in Wolf's favor," thus permitting Mr. Wolf to

31

"retroactively ratify" the Rules and NPRMs in fall 2020. *Id.*; *see* SUF ¶¶ 233-245. In January 2021, Mr. Wolf tried again, this time designating Mr. Gaynor as his successor only for Mr. Gaynor to "delegate" to Mr. Wolf all of the Secretary's rule-making, ratification, and policy-making powers—powers which Mr. Wolf promptly used to purport to ratify the Rules and NPRMs yet again. SUF ¶¶ 246-251. Finally, Secretary Mayorkas purported to ratify the Timeline Repeal Rule—but not the EAD Bar Rule—on May 4, 2021. *Id*. ¶¶ 253-54. Instead of "turn[ing] square corners," *Niz-Chavez*, 141 S. Ct. at 1486, the previous administration created a "self-made thicket" in its attempts to legitimate Mr. Wolf's service, *Batalla Vidal*, 2020 WL 6695076, at *9 n.11, which left even the government confused about who was exercising the Acting Secretary's authority. *See Pangea Legal Servs.*, 2021 WL 75757, at *5 (government initially argued that "[Mr.] Gaynor was properly in office as DHS Acting Secretary," only to later "abandon[] this theory" and represent to the court "that Gaynor 'never' was the Acting Secretary of Homeland Security").

Every court to consider DHS's purported "ratifications" has concluded that they have no effect. *See Batalla Vidal*, 2020 WL 6695076, at *9; *Pangea Legal Servs.*, 2021 WL 75757, at *5. This Court should do the same for at least four reasons. *First*, the FVRA prohibits Mr. Wolf from ratifying his own prior actions. *Second*, Mr. Wolf's fall 2020 attempts to ratify the Rules and NPRMs based on purported amendments to the line of succession by Mr. Gaynor are nullities because Mr. Gaynor never assumed the Office of Acting Secretary and had no authority to amend the line of succession even if he had assumed that office. *Third*, Mr. Wolf's January 2021 ratification attempt fails because Mr. Gaynor never validly assumed office as Acting Secretary and Mr. Gaynor's delegation violated the FVRA and HSA by functionally keeping Mr. Wolf in the Acting Secretary role. Further compounding the unlawfulness of the January 2021 ratification, neither Mr. Gaynor nor Mr. Wolf independently evaluated the merits of the Rules, and Mr.

Gaynor's delegation of ratification power to Mr. Wolf irreparably tainted the ratification. *Fourth*, Secretary Mayorkas failed to make a considered judgment to ratify the Timeline Repeal Rule and the FVRA prohibits him from ratifying Mr. Wolf's actions.

### A.    Mr. Wolf's Fall 2020 Attempts To Ratify The Rules Fail

Mr. Wolf's fall 2020 ratification attempts were invalid because Mr. Gaynor never assumed the Office of Acting Secretary at any point in fall 2020. Mr. Wolf purported to serve as Acting Secretary throughout, and the Gaynor Memos asserted that Mr. Wolf was the Acting Secretary and disclaimed Mr. Gaynor's status as such. *See* Ex. 27, First Gaynor Memo at 1; Ex. 29, Second Gaynor Memo at 1 (stating that, "without casting doubt on the continued validity" of Mr. Wolf's status, "I am relying on any authority I may have been granted by the FVRA"). There is no evidence that Mr. Gaynor either performed any actions in the role of Acting Secretary besides issuing the Gaynor Memos or left his post as FEMA Administrator, and DHS never notified Congress that Mr. Gaynor was serving as Acting Secretary, as the FVRA requires. *See Batalla Vidal*, 2020 WL 6695076, at \*9; 5 U.S.C. § 3349(a)(2); SUF ¶ 231. In short, as courts determined upon assessing these undisputed facts, Mr. Gaynor's "service" as Acting Secretary was a "sham" designed to "abdicat[e] his authority to" Mr. Wolf. *Batalla Vidal*, 2020 WL 6695076, at \*9. As Judge Garaufis concluded in *Batalla Vidal*, "[t]here is no indication that Administrator Gaynor has ever been empowered by the agency to exercise the powers of the Acting Secretary, and there is every indication to the contrary." *Id*.

By January 2021, even the government had recognized that the jig was up. In *Pangea*, the latest case to adjudicate the lawfulness of Mr. Wolf's service, the government "abandoned" its FVRA argument and represented to the court that "Gaynor 'never' was the Acting Secretary of Homeland Security." 2021 WL 75756, at \*5. And "[b]ecause Gaynor was never the Acting Secretary, he did not have authority under the FVRA or EO 13753 to change the order of

succession" by designating Mr. Wolf as Acting Secretary, meaning that "Wolf's effort to ratify [his own] June 2020 actions as Acting Secretary is of no moment legally." *Id.*

While the government's admission that Mr. Gaynor never served as Acting Secretary is dispositive, Judge Moss's decision in *NWIRP* provides an additional basis to void the Gaynor Memos—that as "an Acting Secretary [Mr. Gaynor] may not amend the Department's order of succession under § 113(g)(2) [of the HSA]." *NWIRP*, 496 F. Supp. 3d at 70. "[T]he text, structure, and purpose of the statute" all compel interpreting "§ 113(g)(2) as vesting in only the PAS [presidentially appointed and Senate-confirmed] Secretary the authority" to amend the line of succession. *Id.* at 69. The text of Section 113(g)(2) provides that "the Secretary"—not the Acting Secretary—"may designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). Indeed, Section 113(g) repeatedly distinguishes the role of "Secretary" from that of "Acting Secretary." For example, Section 113(g) states that the "Under Secretary for Management shall serve as the *Acting* Secretary" when "neither the *Secretary* nor Deputy Secretary is available," 6 U.S.C. § 113(g)(1) (emphasis added); it also says that "the *Secretary* may designate such other officers . . . to serve as *Acting Secretary*," *id.* § 113(g)(2) (emphasis added). The FVRA confirms that § 113(g)(2) does not empower the Acting Secretary to amend the order of succession because "[t]he exception to the exclusive-means provision of the FVRA applies only if a 'statutory provision *expressly* . . . authorizes . . . the head of an Executive department'" to temporarily designate an acting officer. *NWIRP*, 496 F. Supp. 3d at 63 (quoting 5 U.S.C. § 3347(a)(1)) (emphasis in original). Section 113(g)(2) "can[not] be understood to expressly—or explicitly—authorize an 'Acting Secretary'" to designate an order of succession as the FVRA requires. *Id.* at 64. The Court should thus "respect Congress's decision to

use different terms to describe different categories of people" in this context. *Mohamed v. Palestinian Auth.*, 566 U.S. 449, 456 (2012).

The structure and purpose of the HSA and the FVRA confirm this interpretation. The Secretary's power under § 113(g)(2) to amend the line of succession is an exception to the rule that "Sections 3345 and 3346 [of the FVRA] are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS] office." 5 U.S.C. § 3347(a). If "Secretary" in Section 113(g)(2) encompassed the Acting Secretary, then "'[t]he President would be relieved of responsibility and accountability for selecting acting officials,'" and that power could pass . . . to lower-level 'officers' whom the President did not appoint." *NWIRP*, 496 F. Supp. 3d at 63 (quoting *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28 (D.D.C. 2020)). This in turn would "undermine the structure and purpose of the FVRA," *id.*, because it would frustrate the FVRA's purpose of "recla[i]m[ing] [] Congress's Appointments clause power," *SW Gen., Inc.*, 796 F.3d at 70 (quoting S. Rep. No. 105-250, at 5 (1998)), by permitting the Acting Secretary "to assign the duties of PAS offices to officers and employees, with little or no check from Congress." *NWIRP*, 496 F. Supp. 3d at 63 (quoting *L.M.-M.*, 442 F. Supp. 3d at 28).

Constitutional concerns further buttress this conclusion. As Judge Moss reasoned in *NWIRP*, interpreting Section 113(g)(2) as authorizing an Acting Secretary to amend the line of succession "would arguably expand [that provision] beyond constitutional limits" by permitting inferior officers to appoint other inferior officers. *Id.* at 68. The Appointments Clause allows Congress to permit only the President, a court, or "Heads of Department" to designate inferior officers as acting officers without the advice and consent of the Senate. U.S. Const., Art. II, § 2, cl. 2; *NWIRP*, 496 F. Supp. 3d at 64. To propose that an Acting Secretary may designate future orders of succession thus assumes that "Heads of Department . . . can include inferior officers."

*NWIRP*, 496 F. Supp. 3d at 65. This assumption is both "improbable" and "discordant," because it would permit an inferior officer to evade the constitutional prohibition on appointing other inferior officers by "alter[ing] the order of succession in a manner that, in effect, chooses [who] will become the Acting Secretary." *Id*. Recognizing that this posed a "difficult constitutional question," *NWIRP* applied the canon of constitutional avoidance to both "confirm[] the Court's reading of the statutory text" and "avoid[] a serious, unaddressed constitutional problem." *NWIRP*, 496 F. Supp. 3d at 69; *see also Batalla Vidal*, 2020 WL 6695076, at *7 n.9 (referring to *NWIRP*'s interpretation of Section 113(g)(2) as "a possible solution" to "serious constitutional concerns"). This Court should similarly hold that Section 113(g)(2) does not authorize an Acting Secretary to amend the line of succession to avoid these constitutional concerns.

Accordingly, "because Gaynor could not amend the order of succession to put Wolf next in line, Wolf acted without authority . . . when he attempted to ratify" the Rules. *NWIRP*, 496 F. Supp. 3d at 69. Summary judgment is appropriate because it is undisputed that Mr. Gaynor only purported to serve as Acting Secretary and the interpretation of the HSA is a question of law.

Even assuming that Mr. Gaynor assumed the office of Acting Secretary and could amend the line of succession, the FVRA still prohibited Mr. Wolf from ratifying his prior actions. The FVRA plainly states that any action that constitutes a "function or duty" of the office within the meaning of the FVRA, taken by a person improperly serving in violation of the FVRA, shall have "no force or effect," 5 U.S.C. § 3348(d)(1), and "may not be ratified," *id*. § 3348(d)(2). The FVRA defines "function or duty" as a duty that is (1) "established by statute" and (2) "is required by statute to be performed by the applicable officer (and only that officer)." *Id*. §§ 3348(a)(2)(A)(i)-(ii). Both elements of this definition are met here, as the Rules expressly invoked rulemaking powers established by statute that Congress vested in the DHS Secretary under the INA and the

HSA. EAD Bar Rule, 85 Fed. Reg. at 38,546; Timeline Repeal Rule, 85 Fed. Reg. at 37,503; *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 192 (D.D.C. 2014) (noting that 8 U.S.C. § 1103(a)(3) grants the DHS Secretary authority to establish regulations).[8] Thus, Section 3348(d)(2) prohibited Mr. Wolf from ratifying the Rules and summary judgment is warranted.

### B.    The January 2021 Ratification Attempt Is Similarly Unlawful

While courts have not yet considered Mr. Wolf's last ratification, it fares no better. On January 11, 2021—three days after *Pangea*—Mr. Wolf purportedly modified the order of succession to make Mr. Gaynor the most senior eligible successor. SUF ¶ 246. According to Mr. Wolf, his "authority as the Acting Secretary [then] terminated," Mr. Gaynor "began serving as the Acting Secretary," and Mr. Wolf "returned to [his] duties as the Under Secretary." Ex. 34, Chad F. Wolf, *Ratification* (Jan. 14, 2021) ("January 2021 Ratification"), at 2; *see* SUF ¶ 246. The next day, Mr. Gaynor purportedly delegated to Mr. Wolf the Secretary's power "to ratify *any* prior regulatory actions," SUF ¶ 247 (emphasis added), and Mr. Wolf promptly purported to ratify the Rules. January 2021 Ratification at 2. This attempt is a nullity like its predecessors: Mr. Gaynor never validly assumed office as Acting Secretary, and the FVRA prohibits Mr. Wolf from ratifying the Rules. The January 2021 Ratification is a nullity for three additional reasons: (1) there was no valid delegation of rulemaking authority, (2) Mr. Gaynor and Mr. Wolf failed to independently evaluate the merits of the Rules, and (3) Mr. Wolf's prior unlawful service tainted the ratifications.

---

[8]  Specifically, both rules rely on 6 U.S.C. § 112(e) of the HSA and 8 U.S.C. § 1103(a)(3) of the INA. EAD Bar Rule, 85 Fed. Reg. at 38,546; Timeline Repeal Rule, 85 Fed. Reg. at 37,503. The latter provision provides that "[t]he *Secretary of Homeland Security* . . . shall establish such regulations . . . as he deems necessary for carrying out his authority" to enforce the immigration and nationalization laws. 8 U.S.C. § 1103(a)(3) (emphasis added).

1.      **The January 2021 Ratification Is A Nullity Because Mr. Gaynor Never Validly Assumed Office As Acting Secretary And Mr. Wolf Could Not Ratify His Own Prior Actions**

The January 2021 Ratification stumbles out of the gate because Mr. Wolf had no authority to amend the line of succession so that Mr. Gaynor could succeed him. As Mr. Wolf admitted, Mr. Gaynor "began serving as the Acting Secretary" pursuant to Mr. Wolf's own January Designation. January 2021 Ratification at 2. But Mr. Wolf had no authority to amend the line of succession, and Mr. Gaynor's purported service in reliance on Mr. Wolf's January Designation was thus also a nullity. The HSA, the FVRA, and the Appointments Clause each rendered Mr. Wolf's service as Acting Secretary of Homeland Security unlawful. Mr. Wolf thus had no authority to exercise the Secretary's powers under 6 U.S.C. § 113(g)(2) to designate a new order of succession that placed Mr. Gaynor in the highest occupied position. Additionally, even a valid "Acting Secretary may not amend the Department's order of succession under § 113(g)(2)," *NWIRP*, 496 F. Supp. 3d at 70, and Mr. Wolf's January Designation had no effect for this independent reason.  These are all questions of law whose resolution does not require consideration of disputed facts.

Even if Mr. Gaynor validly assumed office as Acting Secretary, the FVRA's anti-ratification penalty still prohibited Mr. Wolf or anyone else from ratifying the Rules because, as explained above (Argument, Section I.B), Mr. Wolf was both serving unlawfully under the FVRA and the HSA and was performing a "function or duty" of the Secretary's office within the meaning of the FVRA's anti-ratification provision when he purported to issue the Rules.

2.      **Mr. Gaynor's Delegation Violates The FVRA And HSA Because It Functionally Kept Mr. Wolf In The Acting Secretary Role**

Mr. Gaynor's delegation also violates the FVRA and the HSA because it functionally kept Mr. Wolf in the role of Acting Secretary. While styled as a "delegation," in substance the January Gaynor Memo simply repeats the same game of musical chairs that occurred in September and

November 2020: Mr. Gaynor purportedly assumed the Acting Secretary's authority, only to immediately abdicate all authority to Mr. Wolf. The "delegation" in fact permitted Mr. Wolf to "review, approve or disapprove, and sign *any regulatory action*, . . . and *to ratify any prior regulatory actions* of [DHS]," as well as "[t]o establish and issue written documents . . . furthering policy goals" for the duration of his service as Under Secretary. SUF ¶ 247 (emphasis added). The January Gaynor Memo thus kept rulemaking, ratification, and policy-making authority with Mr. Wolf. This was a brazen attempt to do what the federal courts have already held that "DHS cannot," namely to "recognize [Mr. Gaynor's] authority only for the sham purpose of abdicating his authority to" Mr. Wolf. *Batalla Vidal*, 2020 WL 6695076, at *9. Indeed, Mr. Gaynor's "delegation" is precisely the type of blanket delegation to evade the Appointments Clause that motivated the FVRA's enactment. *See L.M.-M.*, 442 F. Supp. 3d at 29 (noting the use of "delegation statutes to assign the duties of PAS offices to officers and employees[] with little or no check from Congress").

At bottom, "delegation" cannot save the government's attempt to keep Mr. Wolf's authority unchanged despite the unanimous decisions of half a dozen courts and the GAO finding Mr. Wolf's tenure illegal. "[T]he Executive Branch cannot use wordplay to avoid constitutional and statutory requirements" set out in the FVRA, HSA, and Appointments Clause by permitting Mr. Wolf to "actually exercise[] powers reserved to the [Acting Secretary]" under a different title. *Bullock*, 489 F. Supp. 3d at 1127-28. The courts have recognized documents containing such "boilerplate limitation[s]" for what they are—"unlawful attempts to avoid the constitutional requirements of the Appointments Clause and the statutory requirements of the FVRA," and the HSA. *Id.* at 1126-27 (holding that a secretarial order "improperly empowered [an acting official]

as the "Acting [] Director" notwithstanding the fact that "[t]he Interior Secretary carefully crafted the Secretarial Order to avoid designation of [the acting official] as 'Acting [] Director.'").

### 3. Mr. Gaynor And Mr. Wolf Failed To Independently Evaluate The Merits Of The Rules

The January 2021 Ratification is also a nullity because neither Mr. Gaynor nor Mr. Wolf "made a detached and considered judgment" to ratify the Rules. *Wilkes-Barre Hosp. Co., LLC v. Nat'l Labor Relations Bd.*, 857 F.3d 364, 371 (D.C. Cir. 2017). Ratification requires that "a properly appointed official has the power to conduct an independent evaluation of the merits and does so." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015). Thus, even if Mr. Gaynor had been lawfully serving as Acting Secretary, he could ratify the Rules only if he independently evaluated the merits of the Rules and determined that ratification was warranted. *Cf. Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 12 (D.C. Cir. 2019) (Plaintiff conceded that valid ratification occurred when "Attorney General Barr independently familiarized [him]self with the rulemaking record [and] reevaluated those materials without any deference to [the unlawfully serving official's] earlier decision."), *cert. denied*, 140 S. Ct. 789 (2020). Instead, Mr. Gaynor specifically disavowed any role in reviewing the merits of Mr. Wolf's actions, and simply passed these responsibilities back to Mr. Wolf wholesale, without engaging in *any* review (independent or otherwise). *See* SUF ¶ 247.

As for Mr. Wolf, he never purported to "make a detached and considered judgment," *Wilkes-Barre Hosp. Co.*, 857 F.3d at 371, even assuming he were somehow capable of "reevaluating [the rulemaking record] without any deference to [his own] earlier decision." *Guedes*, 920 F.3d at 12. Rather than "independently familiariz[ing] [him]self with the rulemaking record" and any subsequent developments, *id.*, Mr. Wolf instead expressly relied on his "full and complete knowledge of the contents and purpose" of his prior actions and his belief that they were "legally

authorized and entirely proper" to ratify them. January 2021 Ratification at 2. Mr. Wolf did not explain why his knowledge of his prior actions could still ground a reasoned conclusion to ratify the Rules notwithstanding the *Casa de Maryland* court's intervening ruling that the Rules "are [likely] not the product of reasoned decisionmaking." *Casa de Maryland*, 486 F. Supp. at 967; *see also id.* at 961 ("[I]n both rulemakings, the agency either failed to respond to significant concerns raised or to consider an important aspect of the problem."). Tellingly, Mr. Wolf only purported to make a "detached and considered affirmation and ratification" of certain prior actions by Mr. McAleenan (January 2021 Ratification at 3-4)—not of his own prior actions.

Mr. Wolf's tacit admission that he did not independently review or re-familiarize himself with the rulemaking record is dispositive because "simply writing a letter or memorandum adopting" the prior action without any substantive review does not suffice. *Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203, 213 (D.C. Cir. 1998). The detached and considered judgment standard instead requires the ratifier to act "in the normal course of agency" practice and reach a "reasoned conclusion." *Id.* But instead of reevaluating the rulemaking record without deference to his own prior decision, *Guedes*, 920 F.3d at 12, Mr. Wolf merely made "a barebones blanket affirmation, without any specific mention of [the Rules] or the details of any ratification process." *Advanced Disposal Servs. E., Inc. v. Nat'l Labor Relations Bd.*, 820 F.3d 592, 603 (3d Cir. 2016). Indeed, the January 2021 Ratification does not specifically refer to the Rules or consider their merits. To the contrary, Mr. Wolf "affirm[ed] and ratif[ied] *any and all prior regulatory actions* involving delegable duties that I have taken" on a blanket basis. January 2021 Ratification at 2 (emphasis added). And that, without more, is insufficient, because a ratifier may "not simply rubberstamp the earlier action." *Advanced Disposal Servs.*, 820 F.3d at 603, 605 (blanket affirmation was sufficient only because it was coupled with an act of implied affirmation).

41

### 4.    Gaynor's Delegation Of Ratification Power To Wolf Tainted The Ratifications

Finally, the January 2021 Ratification was a nullity because Mr. Gaynor's delegation of ratification power to Mr. Wolf irreparably tainted the January 2021 Ratification. Mr. Wolf is the very wrongdoer who unlawfully promulgated the Rules. A "new, proper appointment" is only effective to remedy a violation of the Appointments Clause—and, by extension, the FVRA and the HSA—if there is no "continuing taint arising from" the initial violation. *Intercollegiate Broad. Sys.*, 796 F.3d at 117. As explained above, Mr. Gaynor could have attempted to remove the taint flowing from Mr. Wolf's unlawful service by "reevaluat[ing] [the rulemaking] materials without any deference to [Mr. Wolf's] earlier decision," *Guedes*, 920 F.3d at 12, but he did not do so. Instead, he put the fox in charge of the henhouse by tasking Mr. Wolf with the power to ratify his own prior unlawful actions. That choice extended the taint from Mr. Wolf's unlawful promulgation of the Rules to the January 2021 Ratification. Indeed, it is apparent that Mr. Wolf resigned in order to wield the Secretary's power as Under Secretary and thereby circumvent judicial questioning of "the validity of [his] authority as Acting Secretary." Wolf Resignation Message (referencing "the ongoing and meritless court rulings regarding the validity of my authority"); *cf. Intercollegiate Broad. Sys.*, 796 F.3d at 121-22, 124 (rejecting arguments as to lack of independence because properly constituted agency conducted *de novo* review prior to ratification, with no evidence of unlawful predecessors' "hidden influence" or "continuing taint" of prior violation).

### C.    Secretary Mayorkas' Ratification Of The Timeline Repeal Rule Is Similarly Unlawful

The latest ratification—Secretary Mayorkas' May 4, 2021 ratification of the Timeline Repeal Rule (Dkt. 19-1, "Mayorkas Ratification")—is equally unlawful because Secretary Mayorkas did not make a considered judgment to ratify that Rule and the FVRA's anti-ratification penalty still prohibited anyone else from ratifying the Rule. The Mayorkas Ratification tersely

records that the Secretary "review[ed]" and "familiarized" himself with the Rule and its NRPM. Dkt. 19-1. But it is devoid of any "reasoned conclusion" capable of supporting a "considered judgment" as to why ratification was appropriate. *Doolin Sec. Sav. Bank, F.S.B.*, 139 F.3d at 213. This deficit is particularly glaring because, unlike Mr. Wolf at the time he issued the Rules, Secretary Mayorkas had the benefit of the *Casa de Maryland* court's intervening reasons explaining why the Timeline Repeal Rule was "likely . . . arbitrary and capricious" and "not the product of reasoned decisionmaking." *Casa de Maryland,* 486 F. Supp. at 961, 967. As Judge Xinis explained, DHS' "claimed inability to reliably predict future processing timeline runs counter to the record," "the agency[] … total[ly] fail[ed] to consider the important alternative of a longer timeframe," and "the agency's attempts to minimize the import of its decision" were contrary to "both logic and the record." *Id.* at 962-64. Secretary Mayorkas' failure to explain why he disagreed with these judicial concerns renders his ratification an ineffective "barebones blanket affirmation." *Advanced Disposal Servs. E., Inc.*, 820 F.3d at 603.

Even assuming that Secretary Mayorkas made a considered judgment to ratify the Timeline Repeal Rule and removed the taint of Mr. Wolf's unlawful service, those conditions are necessary but not sufficient—the Mayorkas Ratification must also comply with the FVRA. As explained above (Argument, Section III.A), Mr. Wolf was performing a "function or duty" of the Secretary's office within the meaning of the FVRA's penalty provision when he approved the Rules. Because Mr. Wolf lacked the authority to be Acting Secretary under the FVRA or the HSA, his unlawful approval of the Rules "may not be ratified" by Secretary Mayorkas. 5 U.S.C. § 3348(d)(2).

## IV.    THIS COURT SHOULD VACATE THE RULES IN THEIR ENTIRETY

Because Mr. Wolf could not lawfully exercise the functions of Acting DHS Secretary and neither Secretary Mayorkas nor Mr. Wolf possessed authority to ratify the Rules, the Rules have

no force or effect and must be set aside. If the Court determines that the Rules are unlawful under the FVRA, the HSA, and/or the Appointments Clause, the Rules must be vacated in their entirety.

The FVRA requires vacatur of the Rules in their entirety because Mr. Wolf was serving as Acting Secretary in violation of the FVRA when he issued the Rules. As explained above (Argument, Section III.A), Mr. Wolf issued the Rules while exercising a "function or duty" that Congress vested in the DHS Secretary. Mr. Wolf had no legal authority to serve as Acting Secretary under the FVRA, and he violated the FVRA's 210-day time limit for the entirety of his purported service. Under the FVRA, actions by individuals unlawfully exercising a "function or duty" of a vacant office "shall have no force or effect." *Id.* § 3348(d)(1). Accordingly, "actions taken in violation of the FVRA are void *ab initio*." *SW Gen., Inc.*, 137 S. Ct. at 938 n.2; *see L.M.-M.*, 442 F. Supp. 3d at 36-37 (actions in violation of the FVRA "must be set aside as *ultra vires*").

Vacatur of the Rules in their entirety is also required by the APA if the Court concludes that Mr. Wolf's service violated the FVRA, the HSA, and/or the Appointments Clause. Under the APA, vacatur is the appropriate final remedy for an agency rule found to be unlawful. 5 U.S.C. § 706(2) ("hold unlawful and set aside"). Moreover, relief from actions of an unlawfully serving acting official is warranted if a court "cannot be confident that the [agency action] would have issued under an Acting [official] other than [the one in question]." *Sw. Gen., Inc.*, 796 F.3d at 80. In this circumstance, "uncertainty is sufficient" for relief. *Id.* And the "burden of demonstrating that the FVRA violation is non-harmless . . . is not [] particularly onerous." *Id.* at 80-81.

The government's stated intention to "engage in rulemaking related to the [Rules]" itself demonstrates that the Rules may have been drafted differently if they had been promulgated by a

properly serving official. Dkt. 19, at 1. And that possibility is sufficient for vacatur. *See Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 7121849, at *1 (E.D.N.Y. Dec. 4, 2020) (vacating action by Mr. Wolf after holding that Mr. Wolf was serving in "violation" of the HSA).

This Court should vacate both of the Rules in their entirety. Plaintiffs have standing to challenge every provision of the Rules. *See supra*, Statement of Facts, Section II(A) (summarizing how the provisions of the Rules harm the Individual and Organizational Plaintiffs). And even if they did not, the Rules are not severable. Severability is premised on the court's ability to separate "valid" rule provisions from "invalid" provisions. *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020). Where, as here, the legal defect infects every provision of the challenged rules, there are no "lawful" or "valid" portions to excise and preserve. Indeed, the severability clause in the EAD Bar Rule is itself tainted by the unlawful Appointments defect: crediting that clause would improperly sanction the unlawful process that produced it. Courts that have recently addressed the unlawful Appointments issue have applied this principle in holding that Mr. Wolf's unlawful appointment infects all aspects of the rules he purported to issue. *See*, *e.g.*, *NWIRP*, 496 F. Supp. 3d at 83 ("[B]ecause the Court concludes that Wolf acted without authority when he approved the Final Rule and later attempted to ratify that action and McAleenan's issuance of the Proposed Rule, the legal infirmity at issue reaches all portions of the Rule."); *Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *19-20 (same); *see also Pangea Legal Servs.*, 2021 WL 75756, at *1, 6-7 (enjoining in its entirety rule that "would make sweeping changes to the [] asylum system" based on likelihood of success on the merits of claim that Mr. Wolf was unlawfully appointed).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment on their third, fourth, fifth, and sixth HSA, FVRA, APA, and Appointments Clause claims and vacate the Timeline Repeal Rule and the EAD Bar Rule in their entirety.

Dated: June 9, 2021                                   Respectfully submitted,

                                          By:   */s/ Keren Zwick*
                                                _____

Deepa Acharya (D.C. Bar No. 996412)          Keren Zwick (D.D.C. Bar. No. IL0055)
Carl Spilly (D.C. Bar No. 230830)            Mark Fleming*
Brian McGrail (D.C. Bar No. 1672349)         Drew Heckman
QUINN EMANUEL URQUHART &                      NATIONAL IMMIGRANT JUSTICE CENTER
SULLIVAN, LLP                                224 S. Michigan Ave., Suite 600
1300 I St. NW, Suite 900                     Chicago, IL 60604
Washington, DC 20005                         312-660-1370
202-538-8000                                 kzwick@heartlandalliance.org
deepaacharya@quinnemanuel.com                mfleming@heartlandalliance.org
carlspilly@quinnemanuel.com                  gborroto@heartlandalliance.org
brianmcgrail@quinnemanuel.com                dheckman@heartlandalliance.org

Nicholas A. S. Hoy                           Jamie Crook (D.C. Bar No. 1002504)
QUINN EMANUEL URQUHART &                      Annie Daher
SULLIVAN, LLP                                CENTER FOR GENDER & REFUGEE STUDIES
51 Madison Ave., 22nd Floor                  200 McAllister St.
New York, NY 10010                           San Francisco, CA 94102
212-849-7000                                 415-565-4877
nicholashoy@quinnemanuel.com                 crookjamie@uchastings.edu
                                             daherannie@uchastings.edu

Richard Caldarone***                         Scott Shuchart (D.C. Bar No. 1531377)**
TAHIRIH JUSTICE CENTER                        KIDS IN NEED OF DEFENSE
6400 Arlington Blvd., Suite 400              1201 L St., NW, Floor 2
Falls Church, VA 22042                       Washington, DC 20005
571-282-6161                                 202-318-0595
richardc@tahirih.org                         sshuchart@supportkind.org

*Certification to practice pursuant to       Wendy Wylegala**
LCvR 83.2(g) to be submitted*                KIDS IN NEED OF DEFENSE
                                             252 West 37th Street, Floor 15
*** Counsel for Individual Plaintiffs only*   New York, NY 10018
                                             646-970-2913
**** Counsel for Tahirih Justice Center**     wwylegala@supportkind.org
*only*

                                             *Counsel for Plaintiffs*