UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASYLUMWORKS, *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>ALEJANDRO N. MAYORKAS, in his<br>official capacity as the Secretary of<br>Homeland Security, *et al.*,<br><br>                    Defendants. | No. 2020-cv-03815-BAH |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(c)(1), Plaintiffs submit the following statement of undisputed material facts in support of their Motion for Partial Summary Judgment.

## I.   THE CHALLENGED RULES

1.      On September 9, 2019, the Department of Homeland Security ("DHS") issued a notice of proposed rulemaking ("NPRM") that announced its intention to repeal a regulatory provision requiring USCIS to adjudicate initial Form I-765(c)(8) employment authorization applications within 30 days of the date on which the agency receives the application. Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148 (Sept. 9, 2019), https://bit.ly/3uHbPNS. Kevin McAleenan, the purported Acting Secretary of DHS, signed this NPRM. *Id.* at 47,170.

2.      On June 22, 2020, DHS issued a final rule repealing that 30-day regulatory timeline. Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765

Employment Authorization Applicants, 85 Fed. Reg. 37,502 (June 22, 2020), https://bit.ly/3fIjmb0.

3.      The Timeline Repeal Rule was "reviewed and approved" by the then-purported Acting Secretary of DHS, Chad Wolf. *Id.* at 37,545.

4.      Mr. Wolf "delegated the authority to electronically sign" the Timeline Repeal Rule to Chad Mizelle in his capacity as "the Senior Official Performing the Duties of the General Counsel for DHS." *Id*. at 37,545. Mr. Mizelle in turn signed the Timeline Repeal Rule.

5.      The Timeline Repeal Rule became effective on August 21, 2020. *Id.* at 37,502.

6.      On November 14, 2019, DHS issued an NPRM announcing its intention to impose additional limitations on asylum seekers' eligibility for work authorization and to modify certain aspects of DHS processing of applications for asylum and for employment authorization. Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62,374 (Nov. 14, 2019), https://bit.ly/3p9L8At. Kevin McAleenan, the purported Acting Secretary of DHS, signed this NPRM. *Id.* at 62,424.

7.      On June 26, 2020, DHS issued a final rule on this matter. Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38,532 (June 26, 2020) ("EAD Bar Rule"), https://bit.ly/3fHxbqd.

8.      The EAD Bar Rule was "reviewed and approved" by the then-purported Acting Secretary of DHS, Chad Wolf. *Id.* at 38,626.

9.      Mr. Wolf "delegated the authority to electronically sign" the EAD Bar Rule to Mr. Mizelle in his capacity as "the Senior Official Performing the Duties of the General Counsel for DHS." *Id*. at 38,626. Mr. Mizelle in turn signed the EAD Bar Rule.

10.     The EAD Bar Rule became effective on August 25, 2020. *Id.* at 38,532.

2

## II.   INDIVIDUAL PLAINTIFFS[1]

### A.   <u>Plaintiff D.M.C.</u>

11.     Plaintiff D.M.C. is a Honduran woman who is seeking asylum because her family has been targeted by drug cartels. Declaration of D.M.C., Dkt. 1-1, Ex. A to First Pseudonym Motion, ¶ 2.

12.     Cartels threatened to kill D.M.C. and kidnap her son, and other members of her family have gone into hiding or otherwise fled for their lives out of fear. *Id*. ¶¶ 3-5.

13.     D.M.C. lives in Illinois and applied for asylum on October 1, 2020. D.M.C. applied for asylum more than a year after she entered the United States due to confusion about the asylum application process and after mistakenly believing she had taken the necessary steps to seek asylum when she had a credible fear interview at the border. *Id*. ¶¶ 8-9, 11.

14.     Because D.M.C. did not formally apply for asylum until after August 25, 2020, the Rules preclude her from obtaining work authorization for the duration of her immigration proceedings, unless an immigration judge ("IJ") finds that she qualifies for an exception to the asylum statute's one-year filing deadline. *Id*. ¶ 13.

15.     She will not have an opportunity to make such an argument until her next Master Calendar hearing on April 1, 2022. *Id*. ¶ 12.

16.     D.M.C. sought to mitigate this harm by joining the Asylum Seeker Advocacy Project ("ASAP"), which would allow her to rely on a partial preliminary injunction in another case to seek work authorization despite the Rules. *Id*. ¶ 16.

---

[1]  This statement of undisputed facts reflects the circumstances for each individual plaintiff at the time of the filing of the amended complaint. Some plaintiffs have since been granted or denied work authorization, and where applicable those facts are also provided.

17.     As of March 23, 2021, the time of the filing of the amended complaint, D.M.C. had not yet applied for an EAD. She has since applied for but not yet received an EAD.

18.     D.M.C.'s lack of work authorization interferes with her ability to send financial support to her mother in Honduras or care for her two small children here in the United States. *Id*. ¶ 14. Her mother lacks stable work and depends on her for support, which D.M.C. is unable to provide because she cannot work legally. *Id*. ¶¶ 14-15.

### B.     Plaintiff K.N.E.

19.     Plaintiff K.N.E. is a lesbian from Uganda who fled the violence LGBTQ+ people in her country face. Declaration of K.N.E., Dkt. 1-1, Ex. B to First Pseudonym Motion, ¶ 1.

20.     K.N.E. lives in Indiana, and she applied for asylum on June 23, 2020. *Id*. ¶¶ 10, 13.

21.     Because K.N.E.'s application for asylum had not been pending for 150 days when the Rules took effect, she was not yet eligible to apply for an EAD. *Id*. ¶ 14.

22.     Under the Rules, K.N.E.'s wait to apply for a work permit grew from 150 to 365 days, and she was required to pay an $85 fee even though her application previously would have been free. *Id*.

23.     In addition, K.N.E. entered the United States without inspection after falling ill and being hospitalized in Mexico. *Id*. ¶¶ 8-9.

24.     She was convicted of illegal entry under 8 U.S.C. § 1325, and feared that this conviction would form the basis for a discretionary denial of her application for work authorization. *Id*. ¶ 9.

25.     K.N.E. sought to mitigate these harms by joining ASAP and filing her application for work authorization on November 25, 2020. *Id*. ¶ 15.

26.     K.N.E. did not receive a receipt notice until February 22, 2021. Though the USCIS online system listed the receipt date as February 13, 2021, the paper receipt was dated as November 25, 2020.

27.     As of March 23, 2021, the time of the filing of the amended complaint and four months after K.N.E. submitted her application, K.N.E. had not received work authorization. *Id*. ¶ 15. Subsequently, on or about April 20, 2021, K.N.E. received her work authorization.

28.     K.N.E.'s lack of work authorization interfered with her ability to provide financial support to her son in Uganda to cover his expenses. *Id*. ¶ 16.

### C.     **Plaintiffs N.E.F. and C.A.**

29.     Plaintiff N.E.F. is an asylum seeker who fled gender-based violence in her native Morocco with her minor son, C.A. Declaration of N.E.F. and C.A., Dkt. 1-1, Ex. C to First Pseudonym Motion, ¶ 1.

30.     They live in Illinois, and they applied for asylum on April 27, 2020. *Id*. ¶ 9.

31.     Because N.E.F.'s application for asylum had not been pending for more than 150 days when the Rules took effect, she was not yet eligible to apply for work authorization. *Id*. ¶ 10.

32.     Under the Rules, N.E.F.'s wait to apply for a work permit grew from 150 to 365 days, and she was required to pay an $85 fee even though her application previously would have been free. *Id*.

33.     N.E.F. tried to mitigate these harms by joining ASAP and filing for a work permit, but in November 2020, Defendants denied her application based on a provision of the Rules not covered by that limited injunction. *Id*. ¶ 11.

34.     According to Defendants, N.E.F. caused a "delay" in the adjudication of her asylum case because she apparently missed a fingerprinting appointment, even though the notice

for the appointment did not arrive until after its scheduled date. Under the Rules, this "delay" rendered N.E.F. ineligible for an EAD. *Id*.

35.     C.A. is the minor child of N.E.F. *Id*. ¶ 1.

36.     He is a derivative applicant on his mother's asylum claim. *Id*. ¶ 9.

37.     Because his mother's application for asylum had not been pending for more than 150 days when the Rules took effect, he was not yet eligible to apply for an EAD. *Id*. ¶ 10.

38.     Under the Rules, C.A.'s wait to apply grew from 150 to 365 days, and he was required to pay an $85 fee even though his application previously would have been free. C.A. joined his mother's ASAP registration, but he was denied an EAD anyway based on the provision regarding applicant-caused delays. *Id*.

39.     Due to their urgent need for work authorization, N.E.F. and C.A. applied again for EADs on or about March 9, 2021. As of March 23, 2021, the time of the filing of the amended complaint, neither N.E.F. nor C.A. had received receipts for those applications or adjudications of them. N.E.F. and C.A.'s applications were subsequently approved on or about April 27, 2021 and April 6, 2021, respectively.

**D.     Plaintiff U.O.**

40.     Plaintiff U.O. is a gay man from Nigeria who fled following serious violence directed at him because of his sexual orientation in his country. Declaration of U.O., Dkt. 1-1, Ex. D to First Pseudonym Motion, ¶ 1.

41.     U.O. applied for asylum in September 2017, and he lives in New York. *Id*. ¶¶ 7, 9.

42.     Because U.O. had been detained at the border, he was required to file his asylum application defensively, in an immigration court. *Id*. ¶ 6.

43.     He waited several months for his case to be calendared, but it never was, so he filed affirmatively with DHS. *Id*. ¶ 7.

44.     U.O. applied for an EAD after his affirmative asylum application was pending for 150 days and received it in April 2018. *Id*. ¶ 8.

45.     In June 2019, after his asylum application had been pending with DHS for nearly two years, he received notice that his case would be calendared with the immigration court and that he would have to re-file his asylum application. *Id*. ¶ 10.

46.     U.O.'s case was not calendared with the immigration court until October 2020, so U.O. was unable to re-file his asylum application until early December 2020. *Id*. ¶ 13.

47.     Because U.O.'s asylum application was not considered filed until December 2, 2020, the Rules preclude him from renewing his work authorization *at all*, until an IJ finds that his application for asylum was timely. *Id*. ¶¶ 13, 15.

48.     And even if an IJ finds that U.O. meets an exception to the filing deadline, he will still have to wait until December 2021 to renew his EAD because DHS will not treat the September 2017 filing date as operative. *Id*. ¶ 15.

49.     He will also have to pay an additional $85 biometrics fee under the Rules, even though his biometrics have already been collected. *Id*.

50.     As of March 23, 2021, the time of the filing of the amended complaint, U.O. had not yet applied for an EAD renewal. However, he is currently in the process of seeking to mitigate his injury by filing for membership in ASAP and relying on that membership to apply for renewal of his work authorization.

### E.     Plaintiffs L.G.M. and L.M.M.G.

51.     L.G.M. is an asylum seeker from Nicaragua who fled to the United States with her minor daughter L.M.M.G. because of political persecution in her country. Declaration of L.G.M. and L.M.M.G., Dkt. 1-1, Ex. E to First Pseudonym Motion, ¶ 1.

52.     L.G.M. and L.M.M.G. now live in Wisconsin. They applied for asylum on June 5, 2020. *Id*. ¶¶ 6, 12.

53.     Because L.G.M. and her daughter had been detained at the border, they were required to file their asylum application defensively, in an immigration court. *Id*. ¶ 5.

54.     They waited almost a year for their case to be calendared with the immigration court, but it never was, so they filed affirmatively with DHS to avoid missing the one-year filing deadline. *Id*. ¶ 6.

55.     L.G.M.'s case was subsequently transferred to the immigration court. *Id*. ¶ 8.

56.     Because of the delay, L.G.M.'s application for asylum had not been pending for more than 150 days when the Rules took effect, so she was not yet eligible to apply for work authorization and the amount of time her application was pending with DHS will not count for the purposes of her EAD application.

57.     L.G.M. re-filed her asylum application with the court in December 2020, after her one-year filing deadline. *Id*. ¶ 8.

58.     Because of this timing, the Rules preclude her from receiving work authorization at all, until an IJ finds her prior application was timely. *Id*. ¶ 10.

59.     Even if an IJ finds that she meets an exception to the filing deadline, she will still have to wait nearly a year to apply for an EAD because DHS will not treat the earlier filing date as operative. *Id*.

60.     L.G.M. will also have to pay an additional $85 biometrics fee under the Rules, even though her application previously would have been free. *Id*. ¶ 9.

61.     L.G.M.'s lack of work authorization interferes with her ability to send financial support to her family members in Nicaragua. *Id*. ¶ 12. L.G.M.'s youngest daughter remains in

Nicaragua with L.G.M.'s mother, who is elderly and unable to support L.G.M.'s daughter on her own. *Id*.

62.     Because L.G.M. lacks work authorization, she was unable to obtain a Social Security number. *Id*. ¶ 13. Because she lacks a Social Security number, she failed to qualify for the rental assistance program of an organization that provides rental and food assistance.  *Id*.

63.     L.M.M.G. is both a derivative applicant on her mother's asylum claim and has her own independent asylum application. *Id*. ¶ 6. Because her and her mother's application for asylum had not been pending for more than 150 days when the Rules took effect, L.M.M.G. was not yet eligible to apply for work authorization. *Id*. ¶ 9.

64.     Under the Rules, L.M.M.G. is vulnerable to delay or denial of her work permit for the same reasons as her mother: the operative application was filed after the one-year filing deadline; if she overcomes that provision, the wait to apply for a work permit grows from 150 to 365 days and the application is subject to an $85 fee. *Id*. ¶ 9.

65.     And because L.M.M.G. missed a fingerprinting appointment related to her asylum application before DHS (an application that DHS has not allowed her to benefit from in any event), she is vulnerable to the provision of the Rules that calls for denials of work authorization based on applicant-caused delays. *Id*. ¶ 10.

66.     As of March 23, 2021, the time of the filing of the amended complaint, L.G.M. and L.M.M.G. had not yet applied for an EAD. However, they have since filed for membership in ASAP and are in the process of seeking to mitigate their injury by relying on that membership to apply for work authorization.

     **F.     <u>Plaintiff C.H.A.</u>**

67.     Plaintiff C.H.A. is a transgender woman from Cuba. Declaration of C.H.A., Dkt. 11-1, Ex. A to Amended Complaint, ¶ 1.

68.     She fled Cuba because of physical violence, sexual abuse, and arbitrary police detention stemming from her gender identity. *Id*. ¶ 2.

69.     In December 2020, C.H.A. walked across the southern United States border into Texas, where she was apprehended by border patrol within minutes. *Id*. ¶ 5.

70.     She was released with an ankle monitor, and is pursuing asylum while living in Pennsylvania. C.H.A. applied for asylum on January 8, 2021. *Id*. ¶ 6.

71.     Because C.H.A. entered the United States without inspection after August 25, 2020, she is barred from seeking work authorization, and the limited exception to this provision in the EAD Bar Rule does not apply. *Id*. ¶ 8.

72.     Even if C.H.A. could demonstrate that she qualified for the exception to the bar despite her manner of entry, she would still have to wait one year to seek work authorization, would be vulnerable to a discretionary denial, and would still have to pay the $85 filing fee. *Id*. ¶ 8.

73.     Although she could mitigate these latter harms by joining ASAP, doing so will not help her overcome the bar based on her manner of entry because the injunction in *Casa de Maryland* did not include individuals who are impacted by that provision. Accordingly, although C.H.A.'s asylum application has now been pending for nearly 150 days—the waiting period that existed prior to the Rules—she has not sought work authorization because she does not qualify.

74.     Because C.H.A. lacks work authorization, she has struggled to obtain gender affirming care. *Id*. ¶ 10. Without work authorization, she is unable to earn money lawfully that she could use to access healthcare related to her gender identity. *Id*. Similarly, she is unable to provide government-issued identification because she lacks work authorization, which has caused her to experience problems in accessing healthcare related to her gender identity. *Id*.

### G.     Plaintiff R.P.P.

75.     R.P.P. is a gay man from Cuba who fled harm related to his LGBTQ activism.

Declaration of R.P.P. Dkt. 11-3, Ex. C to Amended Complaint, ¶ 1.

76.     He attempted to enter the United States near Tijuana around August 2020 but was

turned away at the border. *Id*. ¶ 9.

77.     On approximately December 8, 2020, R.P.P. entered the United States near

Presidio, Texas without presenting himself at a port of entry. *Id*. ¶ 10.

78.     Border patrol subsequently apprehended him and detained him in El Paso.

*Id*. ¶¶ 10-11.

79.     He applied for asylum on January 7, 2021 and was released from detention in

February 2021. *Id*. ¶ 11.

80.     He currently lives with sponsors in California. *Id*.

81.     Because R.P.P. entered the United States without inspection after August 25,

2020, he is barred from seeking work authorization, and the limited exception to this provision in

the EAD Bar Rule does not apply. *Id*. ¶ 13.

82.     Even if R.P.P. could demonstrate that he qualified for the exception to the bar

despite his manner of entry, he would still have to wait one year to seek work authorization, be

vulnerable to a discretionary denial, and still have to pay the $85 filing fee. *Id*.

83.     Although R.P.P. could mitigate these latter harms by joining ASAP, doing so will

not help him overcome the bar based on his manner of entry because the injunction in *Casa de

Maryland* did not include individuals who are impacted by that provision. Accordingly, although

R.P.P.'s asylum application has now been pending for nearly 150 days—the waiting period that

existed prior to the Rules—he has not sought work authorization because he does not qualify.

84.    R.P.P.'s lack of work authorization interfered with his ability to send financial support to his mother and sister in Cuba, who were out of work because of the COVID-19 pandemic. *Id*. ¶ 15.

### H.    Plaintiffs L.E.J.J. and M.C.J.J.

85.    Plaintiff L.E.J.J. is an unaccompanied immigrant child from El Salvador who fled to the United States with his minor sister, Plaintiff M.C.J.J. Declaration of W.C.J.A. as the next friend of L.E.J.J. and M.C.J.J., Dkt. 11-4, Ex. D to Amended Complaint, ¶ 1.

86.    L.E.J.J. and M.C.J.J. fled El Salvador around September 2020 because their lives were threatened after their father, a gang leader, was arrested and agreed to testify against other gang members. *Id*. ¶ 2.

87.    L.E.J.J. and M.C.J.J. were released from immigration custody in October 2020 to live with their mother in California, who herself fled to the United States over ten years ago due to violence she faced in El Salvador. *Id*. ¶ 6.

88.    L.E.J.J. and M.C.J.J. filed asylum applications to USCIS on January 4, 2021. *Id*.

89.    Both L.E.J.J. and M.C.J.J. are charged with having entered the United States without inspection after the Rules' effective date of August 25, 2020, and thus the Rules prevent them from seeking employment authorization documents during the pendency of their proceedings. *Id*. ¶ 8.

90.    Neither L.E.J.J. nor M.C.J.J. can seek to mitigate all of the harm caused by the Rules by joining ASAP, because *Casa de Maryland* did not enjoin the Rules' entry-without-inspection provision. Even if they could get around the manner-of-entry bar, L.E.J.J. and M.C.J.J. would still have to wait one year to seek work authorization, would be vulnerable to a discretionary denial, and would still have to pay the $85 filing fee. Notwithstanding these limits,

M.C.J.J. and L.E.J.J. plan to apply for membership and seek work authorization through that membership. *Id*. ¶¶ 8-10.

**I.**    **Plaintiff J.H.C.**

91.    Plaintiff J.H.C. is an unaccompanied immigrant child who came to the United States from Honduras to seek asylum because of gang-related violence. Declaration of J.H.C., Dkt. 1-1, Ex. G to First Pseudonym Motion, ¶ 1.

92.    He lives in Indiana, and he applied for asylum on May 7, 2020. *Id*. ¶¶ 6, 8.

93.    Because J.H.C.'s application for asylum had not been pending for more than 150 days when the Rules took effect, he was not yet eligible to apply for work authorization. *Id*. ¶ 9.

94.    Under the Rules, J.H.C.'s wait to apply grew from 150 to 365 days, and he must now pay an $85 fee even though his application previously would have been free. *Id*.

95.    Initially, J.H.C. could not seek to mitigate the harm caused by the Rules by joining ASAP because he is 15, and ASAP did not accept members who were under the age of 18. *Id*. ¶ 11.

96.    ASAP recently lowered the age threshold for membership to 14, so J.H.C. is in the process of registering for membership in ASAP and will subsequently seek work authorization.

**J.**    **Plaintiff H.M.R.**

97.    H.M.R. is an unaccompanied immigrant child who came to the United States from Honduras to seek asylum because of child abuse he faced in his home country. Declaration of H.M.R., Dkt. 1-1, Ex. H to First Pseudonym Motion, ¶ 1.

98.    He lives in Wisconsin, and he applied for asylum on August 14, 2020. *Id*. ¶¶ 6-7.

99.     Although H.M.R. is a minor, access to work authorization is critical as a means of access to a government-issued identity document, which H.M.R. needs to access certain government services. *Id*. ¶ 9.

100.     Because H.M.R.'s application for asylum had not been pending for more than 150 days when the Rules took effect, he was not yet eligible to apply for an EAD. *Id*. ¶ 8.

101.     Under the Rules, H.M.R.'s wait grew from 150 to 365 days, and he must now pay an $85 fee even though his application previously would have been free. *Id*.

102.     H.M.R. cannot seek to mitigate the harm caused by the Rules by joining ASAP because he is 13, and ASAP does not accept members who are under 14. *Id*. ¶ 11. H.M.R. turned 14 in April 2021, and will likely register for ASAP membership and seek work authorization based on that membership; he has not yet done so.

**K.     Plaintiff M.L.V.**

103.     M.L.V. is eight years old and from Guatemala.  Declaration of M.V.M. as the next friend of M.L.V., Dkt. 1-1, Ex. I to First Pseudonym Motion, ¶ 3.

104.     Early in life he suffered kidney damage and near-total hearing loss. *Id*. ¶¶ 6-7.

105.     He now lives in California with his grandmother, who is his legal guardian. *Id*. ¶ 2.

106.     His guardian fears for his safety if he were forced to return to Guatemala, where he was targeted based on his disability. *Id*. ¶ 8.

107.     M.L.V. applied for asylum in March 2020. *Id*. ¶ 12.

108.     Under the Rule, M.L.V.'s wait to apply for an EAD grew from 150 to 365 days, and he must now pay an $85 fee even though his application previously would have been free. *Id*. ¶ 14.

109.    Although M.L.V. does not need a work authorization card to work, he has been living in a homeless shelter and other temporary housing with his grandmother, and he needs an EAD to access stable housing through publicly administered programs. *Id.* ¶¶ 13, 15.

110.    M.L.V. cannot himself seek to mitigate the harm caused by the Rules by joining ASAP because he is 8, and ASAP does not accept members who are under 14. *Id.* ¶ 15.

111.    His grandmother attempted to mitigate this harm by joining ASAP. *Id.*

112.    Relying on his grandmother's ASAP membership, M.L.V. applied for work authorization around March 5, 2021. USCIS issued a receipt for that application dated March 11, 2021. On April 20, 2021, USCIS denied the I-765 application, stating that "[i]n order for a child to gain eligibility for relief under the CASA/ASAP injunction, the parent must be eligible for relief. Eligibility for relief is not afforded based on legal guardianship."

**L.    Plaintiff M.C.R.**

113.    Plaintiff M.C.R. is a transgender woman from Honduras who is seeking asylum in the United States following years of abuse and physical and sexual violence based on her gender identity and sexual orientation. Declaration of M.C.R., Dkt. 1-1, Ex. J to First Pseudonym Motion, ¶¶ 1-2.

114.    She currently lives in New York, but she applied for and was denied asylum while detained in California. *Id.* ¶¶ 3-4.

115.    She appealed her case to the Ninth Circuit, and that court remanded her case in March 2020. *Id.* ¶ 4.

116.    M.C.R. was detained until August 2020, so she did not apply for an EAD until September 2020. *Id.* ¶ 7.

117.    Because her application was subject to the new Rules, she included the newly required $85 fee. *Id.* ¶¶ 7, 10.

118.    Before her application for work authorization was adjudicated, the immigration

court denied her asylum application again, on October 21, 2020. *Id.* ¶ 8.

119.    M.C.R. is appealing for a second time. *Id.*

120.    USCIS subsequently denied her application for a work permit on November 4,

2020. The notice of denial cited the fact that, notwithstanding M.C.R.'s subsequent successful

appeal of the decision, the immigration court had denied her asylum on March 25, 2019, which

was within 365 days from when she applied for asylum and before the adjudication of her initial

request for employment authorization. *Id.* ¶ 9.

121.    Because she lacks work authorization, M.C.R. has struggled to obtain gender

affirming care. *Id.* ¶¶ 11-12. She cannot afford health insurance or hormones, and she lacks

enough money to purchase feminine clothes or makeup. *Id.* ¶ 11-12. Additionally, she is unable

to save enough money to have surgery and pursue other treatments to support her gender

transition. *Id.* ¶ 12.

**M.    Plaintiff G.S.M.**

122.    Plaintiff G.S.M. is a transgender woman from Mexico who fled to the United

States after enduring violence based on her sexuality. Declaration of G.S.M., Dkt. 1-1, Ex. K to

First Pseudonym Motion, ¶ 1.

123.    She applied for asylum in September 2013 and lives in California. *Id.* ¶ 6.

124.    Her case is currently on remand from the Ninth Circuit. G.S.M. recently

registered for ASAP membership and applied to renew her EAD, which officially expired in

January 2021 but was subject to a brief extension of the expiry date based on delays in EAD

processing. *Id.* ¶ 7.

125.    As of March 23, 2021, the timing of the filing of the Amended Complaint, G.S.M.

anticipated that her application could be barred by the provision in the Rules that allows for

discretionary denials. Her concern was based on numerous factors including that she (1) was seeking her fifth year of working status, (2) entered the United States without inspection, (3) filed for asylum after the one-year deadline, and (4) has two DUI convictions. *Id.* ¶¶ 9-10.

126.    On or about April 29, 2021, G.S.M. received approval notice of her renewed EAD application.

### N.    **Plaintiff V.M.B.**

127.    Plaintiff V.M.B. is a transgender woman from Mexico. Declaration of V.M.B., Dkt. 1-1, Ex. L to First Pseudonym Motion, ¶ 1.

128.    She was perceived as a gay man and subject to violence against LGBT people in that country; she worries that she will face a worse fate if she returns now that she is open about her gender identity. *Id.* ¶¶ 2-3, 15.

129.    V.M.B. lives in Indiana, and she filed her application for asylum on November 13, 2020. *Id.* ¶¶ 6, 9.

130.    V.M.B applied for asylum more than a year after she entered the United States, but her delay relates partially to her process of coming to terms with her identity and openly identifying as a transgender woman.

131.    Because V.M.B. applied for asylum after August 25, 2020, the Rules preclude her from obtaining work authorization for the duration of her immigration proceedings, unless an IJ finds that she qualifies for an exception to the asylum statute's one-year filing deadline. *Id.* ¶ 10.

132.    In addition, V.M.B. faces a discretionary denial of her EAD application because of the Rules' focus on individuals who entered the United States without inspection and who have certain criminal convictions. *Id.* ¶ 11.

133.     Though these provisions of the Rules should not apply directly to V.M.B., she fears that Defendants will nonetheless rely on the existence of these new bars to deny her work permit in the exercise of discretion. *Id*. ¶¶ 10-11.

134.     V.M.B. has struggled to obtain gender affirming care because she lacks work authorization. *Id*. ¶¶ 13-14. She is unable to pay for hormone pills that she needs to continue her gender transition.  *Id*. ¶ 13. And because she cannot obtain an Indiana state ID without a work permit, she would struggle to obtain gender affirming care even if she was able to pay for it. *Id*. ¶ 14.

135.     Because V.M.B. lacks work authorization, she lacks the means to provide support to her sister in Mexico. *Id*. ¶ 12. Her sister is very sick and needs money to cover the cost of expensive treatments. *Id*.

136.     As of March 23, 2021, the time of the filing of the amended complaint, V.M.B., had not yet applied for an EAD. She is presently, however, in the process of seeking to mitigate her injury by filing for membership in ASAP and relying on that membership to apply for work authorization.

**O.     Plaintiff M.A.S.**

137.     M.A.S. is a Honduran woman who has survived severe gender-based violence. Declaration of M.A.S., Dkt. 11-2, Ex. B to Amended Complaint, ¶¶ 1-2.

138.     She suffered decades of beatings, sexual abuse, and murder threats from the man she married as a teenager. *Id*. ¶ 2.

139.     Fearing for her life, she fled to the United States in 2013. *Id*. ¶ 4.

140.     M.A.S. was detained in Texas but released after she was found to have a credible fear of return to Honduras. *Id*.

141.    M.A.S. then moved to Virginia, where she continues to pursue her asylum case. *Id*.

142.    An IJ denied relief in May 2018, and the Board of Immigration Appeals ("BIA") dismissed her appeal in late August 2020. *Id*. ¶ 5.

143.    M.A.S. is currently appealing her case to the Fourth Circuit Court of Appeals. *Id*.

144.    In 2019, M.A.S. received employment authorization that stated it was valid from May 2019 through May 2021. *Id*. ¶ 6.

145.    However, the Rules took effect before the dismissal of M.A.S.'s BIA appeal, and under the Rules, a dismissal at the BIA automatically terminates work authorization. *Id*.

146.    In addition to terminating M.A.S.'s prior work authorization, the Rules also prevent M.A.S. from renewing or reapplying for work authorization while her case is pending before the Fourth Circuit. *Id*.

147.    M.A.S. cannot seek to mitigate these harms through ASAP membership because the injunction in *Casa de Maryland* does not extend to these provisions of the Rule.

### III.    ORGANIZATIONAL PLAINTIFFS

#### A.    <u>Plaintiff AsylumWorks</u>

148.    Plaintiff AsylumWorks is a nonprofit organization providing services to asylum seekers living in the Washington, D.C. region. Its mission is to strengthen communities by empowering asylum seekers to rebuild their lives with dignity and purpose through the provision of direct services, education, and community support. *See* Declaration of Joan Hodges-Wu (Dec. 21, 2020), ¶¶ 8-9.

149.    AsylumWorks' three core service areas are employment, social services, and community building. *Id*. ¶ 10.

150.    AsylumWorks' employment programs focus on preparing participants for entry-level employment and career re-entry. AsylumWorks connects participants with counsel to apply for work authorization, conducts trainings focused on resume-writing, interviewing, and building job skills, and facilitates informational interviews with potential employers for program participants. *Id.* ¶ 19-21.

151.    These programs all depend on their clients' ultimate ability to obtain work permits. *Id.*

152.    The Rules create uncertainty about whether or if clients will be granted an EAD.

153.    This uncertainty has increased demand for AsylumWorks staff to provide emotional support and referrals to mental health services. *Id.* ¶ 29.

154.    AsylumWorks observes a marked improvement in clients' mental health once they have begun to work. Without the promise of the ability to work on the horizon, the Rules have left AsylumWorks clients in crisis for longer, requiring AsylumWorks to divert resources and spend more on its social services program to support clients' psychological and material needs. *Id.* ¶¶ 29-31, 33.

155.    The Rules have also impaired AsylumWorks' ability to refer clients to trusted immigration counsel and is interfering with those relationships, as clients who lack work authorization have no way to generate the income necessary to pay these attorneys' fees. *Id.* ¶ 28.

156.    The Rules have increased demand for the most labor-intensive part of AsylumWorks' services among its clients. *Id.* ¶ 34. AsylumWorks' programming is designed to provide more intensive assistance during the first six months and then to taper off as clients gain independence. *Id.* ¶ 33.

157.     The Rules have reduced AsylumWorks' organizational capacity to accept new clients from its already months-long waitlist. *Id*. ¶¶ 15, 34, 48. AsylumWorks' funding model depends, in part, on the number of clients the organization is able to serve, a number that is reduced by the increased demand for labor-intensive services. *Id*. ¶¶ 47-48. Accordingly, the Rule jeopardizes AsylumWorks' ongoing funding.

158.     Because the Rules delay or deny asylum seekers' ability to work, they force AsylumWorks to divert resources from other critical work to expend on food, housing, and medical care for clients who could have obtained an EAD under the prior regulations. *Id*. ¶¶ 34, 49.

159.     The Rules have forced AsylumWorks to divert resources to retraining staff, to develop new policies, procedures, and training materials for both staff and clients, and to create informational, promotional, and programmatic materials at significant expense. *Id*. ¶ 45.

**B.     Plaintiff CLSEPA**

160.     Plaintiff CLSEPA is a nonprofit organization providing legal and social services to low-income families in and around East Palo Alto, California. *See* Declaration of Cristina dos Santos (May 21, 2021), ¶ 4.

161.     CLSEPA provides free and low cost legal services to low-income community members in the areas of economic advancement, housing, and immigration. *Id*. ¶¶ 4–6.

162.     The Rules impose an increased burden on CLSEPA's social workers as clients prevented from receiving EADs under the Rules increasingly face labor exploitation, housing insecurity, and abusive relationships, which they do not have the means to escape. *Id*. ¶¶ 11–24, 28.

163.     The Rules have also forced CLSEPA to cancel plans for pro se clinics for work authorization preparation because the Rules complexity makes them impracticable. *Id*. ¶ 33.

164.    Instead, CLSEPA must now dedicate significantly more time and resources to training staff and pro bono partners, researching and filing Freedom of Information Act requests for EAD applications, and compiling and seeking review of EAD applications from managing attorneys. *Id*. ¶¶ 26–27, 30.

165.    The Rules require CLSEPA staff to devote more time to counseling asylum seekers regarding EAD eligibility and preparing the actual applications. *Id.* ¶ 27.

166.    The Rules have thus decreased the number of clients CLSEPA can serve. *Id*. ¶¶ 30, 32.

167.    Because the Rules have resulted in significant delays in EAD application adjudication and increased denial rates, CLSEPA has had to invest increased resources in its clients' cases to mitigate for the harmful consequences of being unable to work. *Id.* ¶ 28.

168.    Because a significant part of CLSEPA's funding is tied to the number of clients served, the Rules threaten the organization's revenue. Decreased funding will in turn decrease the number of clients CLSEPA can serve. *Id*. ¶ 32.

169.    The EAD Rules have frustrated CLSEPA's mission and will continue to frustrate its mission, by, among other things:

(a)  Preventing CLSEPA's low-income clients from achieving economic stability, self-sufficiency, or improved health and educational outcomes. *Id.* ¶ 31.

(b)  Increasing CLSEPA's clients' risk of displacement, poverty, and stress. *Id.* ¶ 31.

(c)  Overburdening staff through exhaustion and burnout, which in turn impairs the quality of services CLSEPA can provide and limits its impact. *Id.* ¶ 34.

(d) Requiring the organization to divert resources away from other planned work in order to meet the need for assisting clients applying for EADs. *Id.* ¶¶ 28, 33.

**C.     Plaintiff Tahirih Justice Center**

170.     Plaintiff Tahirih Justice Center is a nonprofit organization that provides free legal immigration services, including asylum services, to survivors of gender-based violence. Tahirih offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings. *See* Declaration of Adilene Nunez Huang (June 1, 2021), ¶ 3.

171.     Many of Tahirih's clients require various types of social support: Survivors of gender-based violence are significantly more vulnerable to negative short and long-term health outcomes, including injury, chronic health problems, depression, post-traumatic stress, exposure to sexually transmitted infections, and gynecological problems. *Id.* ¶ 17.

172.     Survivors also require mental health services to deal with the often severe aftereffects of trauma, and of the secondary effects of trauma on their children. *Id.*

173.     Clients who have EADs require significantly less social-services support from Tahirih than clients who lack EADs. Clients with EADs can work to support themselves and their families; are more likely to be able to address trauma and other psychological issues without extensive support from Tahirih staff; and require less staff support on a range of issues including housing, transportation, and financial assistance. *Id.* ¶ 18.

174.     Although most of Tahirih's asylum clients have historically received EADs within a year of seeking asylum, the EAD rules make the vast majority of those clients ineligible for EADs while their asylum applications are pending. *Id*. ¶¶ 14, 18.

175.     Any clients who are eligible for EADs will, in light of the Timeline Repeal Rule, be forced to wait longer to receive their EADs. *Id.* ¶ 15.

176.     Otherwise-eligible clients whose applications for relief are denied by the Board of Immigration Appeals will also not be able to retain EADs during the pendency of a petition for review in the federal courts of appeals. *Id.* ¶ 16.

177.     By dramatically decreasing the percentage of Tahirih's asylum clients who are eligible for EADs, the Rules force Tahirih's social-services staff to spend more time with each client, and therefore to provide social services to fewer clients overall. *Id.* ¶ 19.

178.     The Rules also adversely affect Tahirih's legal work. For example, the applicant-caused delay provision deprives Tahirih's legal staff of the ability to present new evidence, including evidence newly received from an asylum applicant's home country, to supplement an application or in advance of an asylum interview. The client's best interest— and thus the rules of legal ethics, as well as the interests of justice—generally compel lawyers to present new, favorable evidence no matter when it arrives. If legal staff do so, however, they will further delay the client's ability to become self-supporting by triggering a rejection of the client's EAD application. Thus, the Rules confront Tahirih attorneys with a Hobson's choice: present new evidence to maximize the probability of success for an asylum claim or prioritize an immediate, urgent, need for work and the associated financial stability. *Id.* ¶ 20.

179.     As another example, the provision concerning circumstances providing "serious reasons to believe" an asylum seeker engaged in a non-political crime and forcing asylum seekers to disprove any potential crime bars to asylum as a prerequisite to an EAD will require legal staff to gather all evidence related to clients' past actions, and present full-fledged arguments concerning those actions, well in advance of a merits hearing or asylum interview. And no matter the disposition of those issues at the EAD stage, the same issues will then have to be re-litigated when the asylum case is adjudicated on its merits. *Id.* ¶ 22.

180.     The Rules have also required, and will continue to require, Tahirih to expend staff time on updating trainings for pro bono attorneys and other materials and working with clients and pro bono attorneys on strategies for dealing with the new provisions. *Id.* ¶ 23.

181.     The EAD Rules, and other recent administrative attempts to restrict asylum, have already diminished Tahirih's ability to serve clients seeking asylum. *Id.* ¶ 24. Between 2019 and 2020, the percentage of Tahirih clients seeking asylum dropped from 37.3% to 29.8%—a relative decline of 20% in the span of a single year. *Id.*

## IV.   AMENDMENTS TO THE DHS SUCCESSION ORDER

### A.   President Obama And Secretary Johnson Designate An Order Of Succession For The Office Of The DHS Secretary

182.     Under the Appointments Clause of the Constitution, principal officers are subject to Presidential appointment and Senate confirmation ("PAS"). U.S. Const., Art. II, § 2, cl. 2. Consistent with this provision, the Homeland Security Act ("HSA") provides that the Secretary of Homeland Security and the General Counsel of the Department of Homeland Security are to be appointed by the President, by and with the advice and consent of the Senate. 6 U.S.C. §§ 112(a)(1), 113(a)(1)(J).

183.     Congress has enacted vacancy legislation that enables the President and the

Secretary of Homeland Security to establish a succession plan to designate officers to

temporarily fill these positions on an acting basis pending the appointment and confirmation of a

replacement officer. In the event of a vacancy in the Office of the Secretary of Homeland

Security, an Acting Secretary is designated via an order of succession that begins with the

Deputy Secretary of Homeland Security, followed by the Under Secretary for Management.

6 U.S.C. §§ 113(a)(1)(A), (F); 5 U.S.C. § 3345(a)(1). Additionally, the President has the

authority to appoint another person to "perform the functions and duties of the [] office [of the

Secretary] temporarily in an acting capacity," provided that person is already serving in a PAS

office, or if that person had held a position of the GS-15 pay rate, or higher, for at least 90 days

within the previous year. 5 U.S.C. §§ 3345(a)(2)-(3). Moreover, "the Secretary may designate

such other officers of the Department in further order of succession to serve as Acting

Secretary." 6 U.S.C. § 113(g)(2).

184.     On December 9, 2016, President Obama exercised his authority under the Federal

Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345-3349d, to set a line of succession for DHS

Secretary by issuing Executive Order 13,753. *See* Ex. 1 to Declaration of Brian McGrail

("McGrail Decl.") (June 8, 2021), Exec. Order No. 13,753, § 1, 81 Fed. Reg. 90,667 (Dec. 9,

2016), https://bit.ly/2RgY4bc. E.O. 13,753 set out the order in which DHS officials would serve

as Acting Secretary "during any period in which the [DHS] Secretary has died, resigned, or

otherwise become unable to perform the functions" of the Office. *Id.*, 81 Fed. Reg. at 90,667.

Officials may only serve under E.O. 13,753 "if they are eligible to act as Secretary under the

provisions of the [FVRA]." *Id.*

185.     On December 15, 2016, then-Secretary of Homeland Security Jeh H. Johnson
implemented E.O. 13,753 by issuing Revision 8 to the "DHS Orders of Succession and
Delegations of Authorities for Named Positions" contained in Delegation Order 00106. *See* Ex. 2
to McGrail Decl., DHS Delegation No. 00106, Rev. 8 (Dec. 15, 2016) ("Johnson Delegation").
Delegation Order 00106 "is a succession order for named positions and a delegation of authority
for the continuity of essential functions of officials at the Department of Homeland Security
(DHS) in case of absence, the inability of the incumbent to act during disasters or catastrophic
emergencies, or vacancies in office." *Id*. § 1.

186.     The Johnson Delegation specified a different source document for the order of
succession for each of two scenarios: in cases of the Secretary's death, resignation, or inability to
perform the functions of the office, the order of succession was governed by E.O. 13,753, Ex. 2 §
II.A, and in cases where the Secretary was unavailable to act during a disaster or catastrophic
emergency, the order of succession was governed by Annex A to the Johnson Delegation,
*id*. § II.B.

187.     Under the Johnson Delegation, the orders of succession in E.O. 13,753 and Annex
A were identical. Under both, the first four positions in the order of succession were: (1) the
Deputy Secretary (as required by 6 U.S.C. § 113(a)(1)(A)); (2) the Under Secretary of
Management (as required by § 113(g)(1)); (3) the Administrator of the Federal Emergency
Management Agency ("FEMA"); and (4) the Director of the Cybersecurity and Infrastructure
Security Agency ("CISA"). *Compare* Exec. Order No. 13,753, § 1, 81 Fed. Reg. 90,667 (Dec. 9,
2016), Ex. 1 to McGrail Decl., *with* Ex. 2 at B-1.

188.     The Johnson Delegation governed the order of succession to the Office of the
DHS Secretary from December 15, 2016 until April 10, 2019.

27

### B.    February 2019 Delegation

189.    On December 5, 2017, the United States Senate confirmed Kirstjen Nielsen as the Secretary of Homeland Security. *See* Ex. 3 to McGrail Decl., Nomination of Kirstjen Nielsen for Department of Homeland Security, 115th Cong., Library of Congress, https://bit.ly/2TqTTtW.

190.    On February 15, 2019, Secretary Nielsen exercised her authority under the HSA to designate an order of succession following the Under Secretary for Management through Delegation Order 00106.  *See* Ex. 4 to McGrail Decl., DHS Delegation No. 00106, Rev. 8.4 (Feb. 15, 2019) ("February 2019 Delegation"). DHS represented to the Government Accountability Office ("GAO") that, in the February 2019 Delegation, "Secretary Nielsen had exercised the HSA power to designate an order of succession through Delegation [Order] 00106."  Ex. 5 to McGrail Decl., U.S. Government Accountability Decision, dated August 14, 2020, pertaining to the Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security, at 5, https://bit.ly/3vUU5QN.

191.    Prior to the February 2019 Delegation, Secretary Nielsen twice exercised her authority under the HSA to designate an order of succession on May 21, 2018 ("May 2018 Delegation") and October 23, 2018 ("October 2018 Delegation"). *See* Ex. 4, at 1-1 (recording May 2018 Delegation (Revision 08.2) & October 2018 Delegation (Revision 08.3)).

192.    The May 2018, October 2018, and February 2019 Delegations affirmed the lines of succession for the Office of the Secretary set out in the Johnson Delegation. Like the Johnson Delegation, these delegations maintained the E.O. 13,753 line of succession in cases of the Secretary's death, resignation, or inability to perform the functions of the office, Ex. 4 § II.A, and continued to use the Annex A order of succession in cases where the Secretary was unavailable to act during a disaster or catastrophic emergency, *id*. § II.B. At the time that the

February 2019 Delegation was issued, the orders of succession in E.O. 13753 and Annex A remained identical, as in the Johnson Delegation. *Compare* Ex. 1, Exec. Order No. 13,753, § 1, 81 Fed. Reg. 90,667 (Dec. 9, 2016), *with* Ex. 4 at B-1.

C. **April 2019 Delegation**

193.    On Sunday, April 7, 2019, Secretary Nielsen tendered her resignation, "effective April 7, 2019." Ex. 6 to McGrail Decl., Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President (Apr. 7, 2019), https://bit.ly/3uCeiJD.

194.    Later that day, President Trump announced via Twitter that Mr. McAleenan, then the U.S. Customs and Border Protection ("CBP") Commissioner, and seventh in line in the order of succession under E.O. 13,753, would assume the role of Acting Secretary. Ex. 7 to McGrail Decl., 4/7/2019 Tweet by President Donald J. Trump, @realDonaldTrump, Twitter, (Apr. 7, 2019, 6:02 p.m.).

195.    At 10:36 p.m. that same day, Sunday, April 7, 2019, Secretary Nielsen announced—via Twitter—that she would remain in the Office as Secretary of Homeland Security until April 10, 2019. Ex. 8 to McGrail Decl., Tweet by Kirstjen Nielsen, @SecNielsen, Twitter, (Apr. 7, 2019, 10:36 p.m.), https://bit.ly/3yUtuFd. Accordingly, Secretary Nielsen resigned from her position no later than April 10, 2019.

196.    The office of Secretary of Homeland Security became vacant when Secretary Nielsen resigned on or before April 10, 2019. Based on an April 10, 2021 resignation date, the office remained vacant for 665 days until the Senate confirmed Defendant Alejandro Mayorkas as Secretary on February 2, 2021.

197.    On April 9 and 10, 2019, Secretary Nielsen purported to amend the existing order of succession for the office of the Secretary set out in Delegation Order 00106, which had remained unchanged since the December 15, 2016 Johnson Delegation, Ex. 8. She did so by

29

signing an order amending Delegation Order 00106 on April 9, 2019 and issuing a revised

version of Delegation Order 00106 incorporating the April 9, 2019 amendments on April 10,

2019. *See* Ex. 9 to McGrail Decl., Designation of an Order of Succession for the Secretary (Apr.

9, 2019) ("April 2019 Order"); Ex. 10 to McGrail Decl., DHS Delegation No. 00106, Rev. 8.5

(Apr. 10, 2019) (the "April 2019 Delegation").

198.    The April 2019 Order is titled "Amending the Order of Succession in the

Department of Homeland Security." Ex. 9 at 2. It records that Secretary Nielsen exercised her

authority under the HSA to "designate[] the order of succession for the Secretary of Homeland

Security as follows: Annex A of … Delegation No. 00106 is hereby amended by striking the text

of such Annex in its entirety and inserting [a new list of offices] in lieu thereof." *Id*.

Specifically, the April 2019 Order updates Annex A by elevating the CBP Commissioner to third

in the Annex A order of succession. *Id*.  The April 2019 Order contains no other amendments to

Delegation Order 00106. *Id*.

199.    Under Secretary Nielsen's February 2019 Delegation, the version of Delegation

Order 00106 in effect at the time of the April 2019 Order, Annex A only applied in the event

Secretary Nielsen was "unavailable to act during a disaster or catastrophic emergency."

Ex. 4 § II.B.  Succession "[i]n case of the Secretary's death, resignation, or inability to perform

the functions of the Office" was instead "governed by Executive Order 13753," a different

source document that Secretary Nielsen did not modify. *Id*. § II.A.

200.    Consistent with the April 2019 Order, the April 2019 Delegation amending

Delegation Order 00106 that Secretary Nielsen issued on April 10, 2019 provided that in the

event of "disaster or catastrophic emergency," the delegation of authority is determined by the

updated version of Annex A included in the April 2019 Order. Ex. 10, § II.B & Annex A.

201.    Because the April 2019 Order only amended Annex A and made no other amendments to Delegation Order 00106, the April 2019 Delegation left the resignation line of Delegation Order 00106 unchanged. Thus the April 2019 Delegation, like the February 2019 Delegation and the Johnson Delegation, provides that "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," the order of succession is governed by Executive Order 13,753, amended on December 9, 2016. Ex. 10, April 2019 Delegation, § II.A; *see* Ex. 1 to McGrail Decl., Exec. Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016).

202.    On August 14, 2020, the GAO concluded that "the plain language of [Secretary Nielsen's] delegation controls, and it speaks for itself. When Secretary Nielsen issued the April Delegation, she only amended Annex A, placing the Commissioner of U.S. Customs and Border Protection as the next position in the order of succession in cases of the Secretary's unavailability to act during a disaster or catastrophic emergency. She did not change the ground for which Annex A would apply. DHS did not provide evidence of Secretary Nielsen's designation under [the] HSA in the case of her death, resignation, or inability to perform the functions of the office." Ex. 5 at 9 (citations omitted).

203.    Under Executive Order 13,753, the order of succession is, in relevant part, as follows: "(i) Deputy Secretary of Homeland Security; (ii) Under Secretary for Management; (iii) Administrator of the Federal Emergency Management Agency; (iv) Under Secretary for National Protection and Programs; . . . (vii) Commissioner of U.S. Customs and Border Protection." Ex. 1, Exec. Order No. 13,753, 81 Fed. Reg. at 90,667.

204.    In 2018, Public Law 115-278 renamed the position of Under Secretary for National Protection and Programs to be Director of the Cybersecurity and Infrastructure Security

Agency ("CISA"). Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No.

115-278, § 2202(b)(1), 132 Stat. 4168, 4169 (codified at 6 U.S.C. § 652(b)(1)),

https://bit.ly/3fEUCjS.

205.     On April 10, 2019, the position of Deputy Secretary was not filled, and that

position had been vacant since April 14, 2018. *See* Ex. 5, at 4.

206.     On April 10, 2019, the Under Secretary for Management resigned, leaving that

position vacant as well. *Id.*

207.     On April 10, 2019, the position of FEMA Administrator was not filled, and that

position had been vacant since March 3, 2019. *Id*. at 8 n.11.

208.     On April 10, 2019, the office of the Under Secretary for National Protection and

Programs, which had been renamed the Director of CISA by Public Law 115-278, was occupied

by Senate-confirmed official Christopher Krebs. *Id.* at 8 n.11.

209.     On April 11, 2019, after Ms. Nielsen's departure, Kevin K. McAleenan, who had

been serving as the Commissioner of U.S. Customs and Border Protection, purported to assume

the office of the Acting Secretary of DHS. Ex. 11 to McGrail Decl., Ltr. From Neal J. Swartz,

Associate General Counsel for General Law, DHS, to the Honorable Michael R. Pence, President

of the Senate (Apr. 11, 2019).

210.     At the time of Ms. Nielsen's resignation, the Senate-confirmed Director of CISA,

Christopher Krebs, was ahead of Mr. McAleenan under Delegation Order 00106. *See* Ex. 5, at 8.

### D.     November 2019 Delegation

211.     On November 8, 2019, Mr. McAleenan purported to issue an amendment to

Delegation Order 00106. *See* Ex. 12 to McGrail Decl., Department of Homeland Security,

Amendment to the Order of Succession for the Secretary of Homeland Security (Nov. 8, 2019)

("November 2019 Delegation"). The amendment revised the language of Section II.A to provide

that Annex A of Delegation Order 00106—not Executive Order 13,753—determined the order of
succession in the event of a Secretary's "death, resignation, or inability to perform the functions
of the Office." *Id.* The amendment also revised the succession order set forth in Annex A to be:
(i) Deputy Secretary of Homeland Security; (ii) Under Secretary for Management; (iii)
Commissioner of the U.S. Customs and Border Patrol; and (iv) Under Secretary for Strategy,
Policy, and Plans. *Id.*

212.    On November 13, 2019, Mr. McAleenan resigned from his purported role as
Acting Secretary of DHS. Ex. 13 to McGrail Decl., Declaration of Juliana Blackwell (Aug. 3,
2020), ¶ 7. At the time of Mr. McAleenan's resignation, the Office of the Secretary of Homeland
Security had been vacant for 218 days.

213.    At the time of Mr. McAleenan's resignation, the Deputy Secretary, Under
Secretary for Management, and CBP Commissioner positions were all vacant. Ex. 14 to McGrail
Decl., DHS.gov "Leadership" Page as of Nov. 13, 2019.

214.    On November 13, 2019, Chad F. Wolf was confirmed by the Senate as the DHS
Under Secretary for Strategy, Policy, and Plans. Ex. 15 to McGrail Decl., DHS Press Release,
"Chad Wolf Confirmed as Under Secretary of Homeland Security Office of Strategy, Policy, and
Plans" (Nov. 13, 2019), https://bit.ly/3ibPipU. On the same day, Mr. Wolf purported to assume
the Office of Acting DHS Secretary upon Mr. McAleenan's resignation. Ex. 16 to McGrail
Decl., Chad F. Wolf, Department of Homeland Security (Jan. 29, 2018), https://bit.ly/3c78jWv.

215.    But for the November Delegation, Mr. Wolf would not have been next in the line
of succession under Delegation Order 00106.

216.    On November 14, 2019, the Department of Homeland Security released another
order of succession and delegation. Ex. 17 to McGrail Decl., DHS Delegation No. 00106, Rev.

33

8.6 (Nov. 14, 2019) (Nov. 14, 2019). This amendment included the same order of succession as

Mr. McAleenan's November 8 pronouncement. *Id.* at A-1.

       E.      **Chad Mizelle's Purported Assumption Of The Office Of Acting General
Counsel Of DHS**

    217.    On February 15, 2018, the Senate confirmed John Mitnick as DHS General

Counsel. Ex. 18 to McGrail Decl., Nomination of John Marshall Mitnick for Department of

Homeland Security, 115th Cong., Library of Congress, https://bit.ly/3yTpTXW. He was the last

Senate-confirmed person to exercise the functions of DHS General Counsel.

    218.    On or about September 17, 2019, Mr. Mitnick was terminated. *Compare* Ex. 19 to

McGrail Decl., DHS.gov "Leadership" Page as of September 16, 2019, *with* Ex. 20 to McGrail

Decl., DHS.gov "Leadership" Page as of September 21, 2019.

    219.    On or about February 12, 2020, Chad Mizelle purported to assume the office of

Acting General Counsel of DHS. *Compare* Ex. 21 to McGrail Decl., DHS.gov "Leadership"

Page as of February 11, 2020, *with* Ex. 22 to McGrail Decl., DHS.gov "Leadership" Page as of

February 19, 2020.

    220.    Mr. Mizelle initially titled himself the Acting General Counsel of DHS. Ex. 22.

He subsequently purported to assume the title of "Senior Official Performing the Duties of the

General Counsel" for DHS and continued to purportedly exercise the powers of the office of

DHS General Counsel until January 2021. *See*, *e.g.*, Ex. 23 to McGrail Decl., Letter from Chad

Mizelle, Senior Official Performing the Duties of the General Counsel of Homeland Security to

Thomas Armstrong, General Counsel for the U.S. Government Accountability Office (Aug. 17,

2020), https://bit.ly/2RU97rd.

## V.     THE TIMING OF THE ISSUANCE OF THE RULES AND NPRMS

221.     When Mr. McAleenan purported to issue the NPRM for the EAD Bar Rule on November 14, 2019, he had served for 219 days without nomination or confirmation to the position of Secretary of Homeland Security, and the Office of the Secretary of Homeland Security had been vacant for 219 days.

222.     When Mr. Wolf purported to issue the Timeline Repeal Rule on June 22, 2020, he had served for 223 days without nomination or confirmation to the position of Secretary of Homeland Security, and the Office of the Secretary of Homeland Security had been vacant for 440 days.

223.     When Mr. Mizelle purported to sign the Timeline Repeal Rule on June 22, 2020 in the capacity of "Senior Official Performing the Duties of the [DHS] General Counsel," the Office of the DHS General Counsel had been vacant for 280 days.

224.     When Mr. Wolf purported to issue the EAD Bar Rule on June 26, 2020, he had served for 227 days without nomination or confirmation to the position of Secretary of Homeland Security, and the Office of the Secretary of Homeland Security had been vacant for 444 days.

225.     When Mr. Mizelle purported to sign the EAD Bar Rule on June 26, 2020 in the capacity of "Senior Official Performing the Duties of the [DHS] General Counsel," the Office of the DHS General Counsel had been vacant for 284 days.

VI.    **THE PURPORTED RATIFICATIONS**

A.    <u>The GAO And Courts Conclude That Mr. Wolf Was Not Lawfully Acting As DHS Secretary</u>

226.    On August 14, 2020, the GAO, which under the FVRA shall report to Congress any violation of the time limitations on acting officers, 5 U.S.C. § 3349, concluded that Mr. Wolf was unlawfully appointed. *See* Ex. 5.

227.    DHS objected to the GAO's August 14th Report and conclusions, and called upon it to rescind its report. Ex. 23, Letter from Chad Mizelle to Thomas H. Armstrong.

228.    The GAO declined to reverse or modify its report, noting that "DHS has not demonstrated that our prior decision contains error of either fact or law, nor has DHS presented information not previously considered that warrants reversal or modification of our decision." Ex. 24 to McGrail Decl., GAO, Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security—Reconsideration, B-332451 (Aug. 21, 2020), https://bit.ly/2SPgf8l.

229.    On September 11, 2020, the District of Maryland became the first court to conclude that Mr. Wolf was not lawfully acting as DHS Secretary. *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 954-60 (D. Md. 2020), *appeal dismissed*, No. 20-2217, Dkt. 23 (4th Cir. Mar. 23, 2021).

230.    From that date to January 8, 2021, five other courts reached similar conclusions. *See Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529-36 (N.D. Cal. 2020); *Nw. Imm. Rights. Proj. (NWIRP) v. USCIS*, 496 F. Supp. 3d 31, 55 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, Dkt. 7 (D.C. Cir. Jan. 12, 2021); *Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 6695076, at *1 (E.D.N.Y. Nov. 14, 2020); *La Clinica De La Raza v. Trump*, No. 19-cv-4980,

2020 WL 7053313, at *7-9 (N.D. Cal. Nov. 25, 2020); *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-9253, 2021 WL 75756, at *3-6 (N.D. Cal. Jan. 8, 2021).

231.    After many of these intervening decisions, Defendants endeavored to ratify prior decisions, including the issuance of the NPRMs and the Rules.

232.    In total, and as explained *infra*, Defendants have attempted to ratify the NPRMs and/or the Rules at issue here five times.

**B.    The Fall 2020 Ratifications**

233.    On August 25, 2020, President Trump announced on Twitter that the purported "Acting Secretary Chad Wolf will be nominated to be the Secretary of Homeland Security." Ex. 25 to McGrail Decl., Tweet by President Donald J. Trump, @realDonaldTrump, TWITTER (Aug. 25, 2020, 9:30 AM).

234.    On September 10, 2020, 520 days after the Office of the Secretary of Homeland Security became vacant, President Donald Trump nominated Mr. Wolf to serve as DHS Secretary and submitted Mr. Wolf's nomination for Senate confirmation. *See* Ex. 26 to McGrail Decl., Nomination of Chad F. Wolf for Department of Homeland Security, 116th Cong., Library of Congress, https://bit.ly/3g3NYCK. However, Mr. Wolf was not confirmed by the Senate as DHS Secretary. *Id.*

235.    That same day—but apparently before Mr. Wolf's nomination was submitted to the Senate—Peter T. Gaynor, the FEMA Administrator, purporting to exercise the functions of Acting Secretary, issued a memo entitled "Order Designating the Order of Succession for Secretary of Homeland Security" ("First Gaynor Memo"). *See* Ex. 27 to McGrail Decl., Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security (Sept. 10, 2020) ("First Gaynor Memo"); Ex. 28 to McGrail Decl., Letter by DHS, *Batalla Vidal v. Wolf*, No. 16-cv-4756, Dkt. 341 (E.D.N.Y. Nov. 13, 2020) (addressing sequence of events).

236.    On November 14, 2020, Mr. Gaynor reissued the same memo. *See* Ex. 29 to McGrail Decl., Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security (Nov. 14, 2020) ("Second Gaynor Memo"), https://bit.ly/3pdazAQ (collectively, with the First Gaynor Memo, "Gaynor Memos").

237.    The Gaynor Memos stipulated an order of succession identical to the November 2019 Delegation. *Compare* Exs. 27 & 29, Gaynor Memos, *with* Ex. 12, November 2019 Delegation.

238.    The Gaynor Memos placed the office to which Mr. Wolf had been confirmed by the Senate, Under Secretary of Homeland Security Office of Strategy, Policy, and Plans, above Mr. Gaynor's office, FEMA Administrator, in the order of succession. Ex. 27, First Gaynor Memo at 1; Ex. 29, Second Gaynor Memo at 1.

239.    Nowhere in the Gaynor Memos did Mr. Gaynor claim to resign or vacate his office, and Mr. Gaynor did not tender a resignation letter from his purported role as Acting Secretary. *Id.*; Dkt. 24, Answer ¶ 308.

240.    Instead, in the Gaynor Memos, Mr. Gaynor purported to trigger the succession order and to dissolve his own authority to perform the duties and functions of the Secretary. Ex. 27, First Gaynor Memo at 1; Ex. 29, Second Gaynor Memo at 1.

241.    DHS did not submit a notice to Congress that Administrator Gaynor was serving as Acting Secretary. Dkt. 24, Answer ¶ 308.

242.    On September 17, 2020, Mr. Wolf issued a legal memorandum purporting to ratify the Timeline Repeal Rule and the EAD Bar Rule. This memorandum was subsequently published in the Federal Register. *See* Ex. 30 to McGrail Decl., Ratification of Department

Actions, 85 Fed. Reg. 59,651 (Sept. 23, 2020), https://bit.ly/3c9WBKZ ("First Ratification Memo").

243.     On October 7, 2020, Mr. Wolf issued a second ratification memorandum that purported to ratify Mr. McAleenan's Notices of Proposed Rulemaking for the Rules, which was also subsequently published in the Federal Register. *See* Ex. 31 to McGrail Decl., Ratification of Department Actions, 85 Fed. Reg. 65,653 (Oct. 16, 2020), https://bit.ly/3vIFtnn ("Second Ratification Memo").

244.     Mr. Wolf reissued the Second Ratification Memo on November 16, 2020, again purporting to ratify the Rules and Mr. McAleenan's Notices of Proposed Rulemaking for the Rules. This memo was subsequently published in the Federal Register. *See* Ex. 32 to McGrail Decl., Ratification of Department Actions, 85 Fed. Reg. 75,223 (Nov. 25, 2020), https://bit.ly/3fImOTe ("Third Ratification Memo").

245.     The First Ratification Memo does not mention the Rules. The Second and Third Ratification Memos list the NPRMs for the Rules but do not otherwise contain any discussion of the Rules or their respective NPRMs.

C.     **The January 2021 Ratifications**

246.     On January 11, 2021—Mr. Wolf's 426th day of purported service as Acting Secretary—Mr. Wolf designated a new order of succession for DHS Secretary that purportedly provided for Mr. Gaynor to be the most senior eligible successor. Ex. 33 to McGrail Decl., Chad F. Wolf, Order Designating the Order of Succession for the Secretary of Homeland Security (Jan. 11, 2021), https://bit.ly/3pdHXI4 ("January Designation"); *see also* Ex. 34 to McGrail Decl., Chad F. Wolf, Ratification, at 2 (Jan. 14, 2021), https://bit.ly/3caJolf ("January 2021 Ratification"). Mr. Wolf resigned on that same day and purported to return to his duties as the Under Secretary for Strategy, Policy, and Plans. Ex. 35, January 2021 Ratification at 2; *see also*

Ex. 36 to McGrail Decl., Chad F. Wolf, A Message from Acting Secretary Chad F. Wolf (Jan.

11, 2021), https://bit.ly/2TuyqQN. Mr. Wolf explained that his resignation was "warranted by

recent events, including the ongoing and meritless court rulings regarding the validity of my

authority as Acting Secretary." Ex. 35.

247.    On January 12, 2021, Mr. Gaynor—while purporting to exercise the authority of

DHS Acting Secretary—purported to delegate to Mr. Wolf the power of the Secretary "[t]o

review, approve or disapprove, and sign any regulatory action, including proposed rules [and]

final rules," "to ratify any prior regulatory actions of the Department of Homeland Security," and

"[t]o establish and issue written documents, including but not limited to guidance documents,

bulletins, and manuals, furthering policy goals." Ex. 36 to McGrail Decl., DHS Delegation No.

23,028, Delegation to the Under Secretary for Strategy, Policy, and Plans to Act on Final Rules,

Regulations, and Other Matters (Jan. 12, 2021), https://bit.ly/3pdIfyE ("January Delegation").

248.    Then, on January 14, 2021, Mr. Wolf purported to "ratify any and all prior

regulatory actions involving delegable duties that I have taken from November 13, 2019, through

January 11, 2021." Ex. 34, January 2021 Ratification, at 2. The January 2021 Ratification does

not mention the Rules.

249.    Mr. Wolf relied on his "full and complete knowledge of the contents and purpose

of any and all actions taken by me since November 13, 2019" to ratify his prior actions. *Id*.

250.    Mr. Wolf also purported to ratify Mr. McAleenan's issuance of the Notices of

Proposed Rulemaking for the Rules. *Id.* at 3-4.

251.    In purporting to ratify the Rules and the Notices of Proposed Rulemaking, Mr.

Wolf did not refer to any relevant changes in circumstances in the time since the promulgation of

the Rules.

### D.   <u>The Mayorkas Ratification</u>

252.   On February 2, 2021, the Senate confirmed Alejandro Mayorkas as the Secretary

of Homeland Security. Ex. 37 to McGrail Decl., Nomination of Alejandro Nicholas Mayorkas

for Department of Homeland Security, 117th Cong., Library of Congress,

https://bit.ly/2TBo1mA.

253.   On May 4, 2021, Secretary Mayorkas purported to ratify the Timeline Repeal

Rule. Dkt. 19-1.

254.   Mr. Mayorkas did not take any action, purported or otherwise, to attempt to ratify

the EAD Bar Rule.

Dated: June 9, 2021

Respectfully submitted,

By:   */s/ Keren Zwick*

Deepa Acharya (D.C. Bar No. 996412)
Carl Spilly (D.C. Bar No. 230830)
Brian McGrail (D.C. Bar No. 1672349)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005
202-538-8000
deepaacharya@quinnemanuel.com
carlspilly@quinnemanuel.com
brianmcgrail@quinnemanuel.com

Nicholas A. S. Hoy
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
212-849-7000
nicholashoy@quinnemanuel.com

Richard Caldarone***
TAHIRIH JUSTICE CENTER
6400 Arlington Blvd., Suite 400
Falls Church, VA 22042
571-282-6161
richardc@tahirih.org

*\* Certification to practice pursuant to
LCvR 83.2(g) to be submitted*

*\*\* Counsel for Individual Plaintiffs only*

*\*\*\* Counsel for Tahirih Justice Center
only*

Keren Zwick (D.D.C. Bar. No. IL0055)
Mark Fleming*
Drew Heckman
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
kzwick@heartlandalliance.org
mfleming@heartlandalliance.org
dheckman@heartlandalliance.org

Jamie Crook (D.C. Bar No. 1002504)
Annie Daher
CENTER FOR GENDER & REFUGEE STUDIES
200 McAllister St.
San Francisco, CA 94102
415-565-4877
crookjamie@uchastings.edu
daherannie@uchastings.edu

Scott Shuchart (D.C. Bar No. 1531377)**
KIDS IN NEED of DEFENSE
1201 L St., NW, Floor 2
Washington, DC 20005
202-318-0595
sshuchart@supportkind.org

Wendy Wylegala**
KIDS IN NEED of DEFENSE
252 West 37th Street, Floor 15
New York, NY 10018
646-970-2913
wwylegala@supportkind.org

*Counsel for Plaintiffs*