## DECLARATION OF JOAN HODGES-WU,
## FOUNDER AND EXECUTIVE DIRECTOR, ASYLUMWORKS

1. I, Joan Hodges-Wu, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2. I am the Founder of AsylumWorks and have served as the Executive Director since its inception in July 2016. AsylumWorks is a nonprofit and nonpartisan organization that provides holistic non-legal services and support free of charge to asylum seekers living in the Washington D.C. metropolitan area.

3. In my role, I oversee each of AsylumWorks' programs as well as the organization's administration, finances, strategic planning, fundraising, outreach, marketing, and advocacy.

4. My career before AsylumWorks primarily focused on the needs of survivors of torture, most of whom sought services as asylum seekers. I served as a paid consultant for the Connecticut Institute for Refugees and Immigrants from 2014 to 2018. In my role as an advisor for the organization's Refugee and Immigrant Services Program, I built and evaluated the organization's torture treatment program, which provides legal, employment, and social services to torture survivors. I continued in this role after founding AsylumWorks until it was no longer feasible to hold both positions simultaneously.

5. From 2012 to 2014, I worked for the U.S. Committee for Refugees and Immigrants (USCRI) as a Refugee Services Division Program Officer. From 2010 to 2012, I was the Lead Case Manager at the Program for Survivors of Torture and Severe Trauma. From 2012 to 2016, I served on the National Capacity Building Project for the Center for Victims of Torture.

6. I am the lead author of the Survivor of Torture Psychosocial Well-Being Index, a version of which serves as the national program evaluation measure for the United States Office of Refugee Resettlement's Survivor of Torture program.

7. I received my Master's Degree in Social Work from the Catholic University of America in 2016; my Master's Degree in Refugee Care from the University of Essex in 2010; and my Bachelor of Science degree from Skidmore College in 2005.

### AsylumWorks' Mission and Scope Centers on Empowering Asylum Seekers

8. AsylumWorks is the first and only nonprofit exclusively dedicated to serving the needs of the estimated 50,000 asylum seekers living in the D.C. region.

9. AsylumWorks' mission is to strengthen communities by empowering asylum seekers to rebuild their lives with dignity and purpose through the provision of direct services, education, and community support.

10. To that end, AsylumWorks provides asylum seekers and their families with holistic, non-legal services and support to complement the work of immigration legal providers. Our three core service areas are employment, social services, and community building.

11. AsylumWorks' staff includes myself and ten others who manage each core program and provide direct services, as well as providing development, technological, and administrative support.

12. In the past year, AsylumWorks has assisted approximately 300 asylum seekers in the Washington D.C. Metropolitan area. The vast majority of our clients receive an Employment Authorization Document (EAD) while working with our organization. Through our programs, AsylumWorks diligently works with clients to help them retain and work with legal providers who go on to assist them in applying for employment authorization. Once our clients are eligible for an EAD, we generally enroll them in one of the Employment Programs (discussed in detail below) to prepare them to seek employment when their EAD is issued.

13. We serve clients from approximately 40 different countries. Our largest client population comes from African nations, especially Ethiopia and Cameroon. The second largest client population (approximately 20% of the total) fled Latin America.

14. The majority of our clients' asylum claims relate to political persecution and/or membership in a particular social group, including persecution for sexual orientation and/or gender expression. Our clients have extremely diverse professional backgrounds. We work with individuals who were employed in their home countries as doctors, lawyers, teachers, scientists, engineers, journalists, business owners, religious clergy, and community organizers, among other professions.

15. Due to capacity constraints and the high demand for asylum-related services, AsylumWorks maintains a waitlist of approximately 125 potential clients. Most of our clients spend approximately six months on our waitlist prior to receiving services.

## AsylumWorks' Three Core Service Areas

16. As mentioned above, AsylumWorks' three core service areas are social services, employment, and community building.

17. Our model requires new clients to connect first with our Social Services Program. There, we work with them to address unmet needs, provide emotional support, manage crises and develop a plan to achieve safety and security in the United States. The most common needs reported by new clients at intake include finding employment, securing immigration legal representation, and expanding their social support network in the U.S.,

in that order. Other commonly identified needs include gaining access to basic necessities like food, shelter, and climate appropriate clothing, and accessing mental and physical healthcare. In FY 2020, we served 301 individuals through our Social Services Program.

18. In our Social Services Program, clients are assigned to a Community Support Worker who helps clients understand and manage the effects of trauma; provides information and referrals to local organizations that can help with food, clothing, and supplies; connects clients to trusted free and low cost immigration attorneys; introduces clients to healthcare providers trained to work with asylum seekers; offers safe and supportive relationships to listen and validate feelings and stress; and helps clients problem solve to navigate their way out of crisis.

19. After enrolling in our Social Services Program and achieving a relative level of safety and stability, our clients are invited to enroll in our Employment and Community Programs. As of November 2020, we have approximately 65 clients enrolled in our two Employment programs, Path Forward and Reach Higher.

20. Our first Employment Program, Path Forward, helps prepare asylum seekers for entry-level employment. This program consists of a two-day skill building workshop emphasizing networking techniques, a Know-Your-Rights training, and workplace role-plays; one-on-one job planning; regular follow-up check-ins; and introduction to employers. The workshop is followed by regular check-ins from a job coach for up to six months. Training and coaching services are available in English, Spanish, and Amharic.

21. The second Employment Program, Reach Higher, helps asylum seekers prepare for career re-entry. Reach Higher includes a five-day skill building workshop that offers one-on-one help with resume preparation, interview practice, and workplace role-plays; tailored career planning; informational interviews with professionals in the client's field; and introductions to employers. This training is followed up individualized job mapping, informational interview matching, resume and cover letter preparation, employer introductions, interview prep, among other support for up to one year.

22. Prior to the issuance of the EAD Rules being challenged in this litigation, 85% of clients who engaged in our Employment Programs were hired for a new job within six months. The vast majority of those new jobs (95%) pay above minimum wage, and the majority of them (75%) are full-time positions. After securing appropriate employment, many of our clients cycle out of our organization because they no longer need our assistance.

23. Through our Community Program, AsylumWorks offers asylum seekers a safe space to make meaningful connections within their new community and with each other. We facilitate community groups for families caring for young children, LGBTQ clients, and client advocates. We organize social events for our clients and the broader community to interact. We also facilitate numerous volunteer engagement opportunities through our Friendly Neighbor program, which seeks to reduce the social isolation faced by many asylum seekers.

### By Delaying or Denying Access to Work, the EAD Rules Seriously and Irreparably Harm AsylumWorks and Our Clients

24. Two new Rules took effect in August 2020 that make attaining an EAD in the United States far more difficult and time-consuming for asylum seekers. One of the rules revoked the requirement that the U.S. Citizenship and Immigration Service (USCIS) adjudicate EAD applications filed by asylum seekers within 30 days. See USCIS, Removal of 30-day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 85 Fed. Reg. 37,502 (June 22, 2020) (Timeline Repeal Rule). The other rule contains several provisions, nearly all of which prejudice AsylumWorks' clients. See USCIS, Asylum Application, Interview, and Employment Authorization for Applicants, 85 Fed. Reg. 38,532 (June 26, 2020) (Broader EAD Rule).

25. Among other changes, the Broader EAD Rule:

   a. More than doubles the amount of time asylum seekers must wait to seek an EAD—from 150 days after submission of the asylum application to 365 days after submission;

   b. Bars EADs for people who after August 25, 2020 file for asylum more than a year after their arrival to the United States, entered the United States without inspection, or have committed a crime that an immigration official believes may bar asylum;

   c. Mandates a rejection of an EAD application if there is an "applicant caused delay" in the applicant's corresponding asylum case;

   d. Cancels EADs upon the denial of relief at the Board of Immigration Appeals (BIA), even if the asylum seeker seeks review of that decision in federal court;

   e. Allows the Department of Homeland Security (DHS) to discretionarily deny otherwise eligible EAD applicants;

   f. Limits the duration of an EAD to a maximum of 2 years; and

   g. Imposes new financial burdens on the EAD application process, including redundant biometrics requirements and an $85 biometric fee.

26. These rules and their many sub-provisions will seriously frustrate AsylumWorks' mission, cause AsylumWorks to divert organizational resources, and cause irreparable harm to the organization.

27. Each of these rules, individually and together, will make it more difficult for AsylumWorks' clients to secure EADs. AsylumWorks clients will see vast increases in the amount of time they spend waiting for authorization to work. Many will be unable to receive authorization at all.

28. The consequences of these changes are numerous. First, AsylumWorks diligently works to connect asylum seekers with trusted immigration counsel. Many of the attorneys to whom AsylumWorks refers clients provide asylum representation for a reduced fee. Access to free legal services are limited. I expect that many of the practitioners that serve asylum seekers for a reduced fee will be less able to serve clients because they require legal fees to be paid in full within a limited amount of time averaging three to six months. Knowing that those clients will be unable to work, and thus unable to complete payment within the allotted timeframe means fewer clients will be able to retain and work with qualified immigration legal representation.

29. Second, evidence consistently shows that asylum seekers are far more likely to prevail on the merits of their asylum claim when represented by counsel. I expect that the necessity to pursue asylum without legal counsel will increase the amount of anxiety and uncertainty our clients face, as will the denials, appeals, and/or referrals of their cases that would not have occurred but for the lack of counsel. Such stress will in turn increase demand for AsylumWorks staff to provide emotional support and referrals to mental health services.

30. Third and relatedly, the ability to work is a key contributor to improved mental health outcomes. When asylum seekers arrive to AsylumWorks, many are in crisis and experience thoughts of suicide because they do not know how they will survive in the United States. Work gives our clients a reason to get out of bed, a feeling that they are a part of society, and the means to take care of themselves and their loved ones. We consistently see a marked improvement in our clients' mental health once they have begun to work. Without the promise of the ability to work on the horizon, I expect our clients will remain in crisis for much longer periods of time and that our social services will be taxed to a significantly greater degree than they already are.

31. Fourth, AsylumWorks' mission centers on the idea of empowering asylum seekers and supporting them as they rebuild dignified, purposeful lives. One of the most fundamental building blocks of that mission is stable employment. While we support our clients to reduce food and housing insecurity by referring them to free services, our fundamental goal is to help them overcome those challenges so that they can eventually pay for their own basic necessities. Access to work is the most efficient and realistic way for our clients to secure these necessities.

32. Fifth, an entire program that AsylumWorks offers, our Employment Program, will be derailed due to the changes in the Rules. We typically enroll clients in our Employment Programs before they receive their EAD. We do so in order to prepare them to seek employment as soon as possible once they do receive authorization. Our job re-entry training, resume building workshops, informational interview programming, and on-the-job simulations are all dependent on the notion that our clients will be able to get work permits. If the current policy stands and we have no way to know when clients will receive permission to work, this entire aspect of AsylumWorks' programming will be

frustrated. We will have to seriously redesign or discontinue some of the pre-employment services that we offer.

33. Finally, the changes implemented by these Rules will dramatically increase the amount of time that I expect AsylumWorks' clients will require our most intensive services. Our programming is designed to provide more intensive assistance during the first six months of our relationship. After acquiring work authorization, clients overwhelmingly exhibit a greater level of psychosocial well-being and economic security, thus their need to rely on AsylumWorks' Social Services Program diminishes. By delaying or denying asylum seekers' ability to work, our clients' needs for food, housing, medical care, and other unmet needs addressed by our social service program will intensify and last for longer durations.

34. This increased burden on our Social Services program will reduce our capacity to take on new clients and stretch a model that is not designed for long-term case management. It will also increase our clients' anxiety about the future, contributing to a sense of hopelessness, helplessness and depression, which in turn will require greater support from our Social Services program. We will be required to divert significant resources to meet these new demands and support our clients as they navigate this uncertainty. We will have to seriously redesign the employment services that we offer, shifting focus to keeping clients motivated and preventing skill atrophy, rather than preparing them for professional opportunities that would otherwise be within reach.

35. With these Rules, the United States has become the only country that purports to accept individualized asylum applications while simultaneously deeming asylum seekers ineligible to access to benefits or services to meet their basic needs and denying them the ability to work to sustain themselves while those applications are pending. As a result, most asylum seekers we see at AsylumWorks survive on remittances sent from abroad, spend down their life savings, or rely on the kindness of strangers. This dependency puts many of our clients at serious risk of exploitation and abuse.

36. The longer asylum seekers go without the ability to earn an income, the greater the likelihood they will exhaust their financial, emotional, psychological, and social resources. The concept of self-sufficiency and its attendant psychological and emotional benefits is at the core of AsylumWorks' mission to empower asylum seekers to rebuild their lives with dignity and purpose. The Rules frustrate AsylumWorks' mission by impeding our clients' access to work, the primary way by which they achieve such self-sufficiency.

37. The COVID-19 pandemic has highlighted the critical importance of access to work, as many people have suddenly lost their jobs. Before the pandemic, the most common client needs reported at intake were (1) legal immigration representation; (2) employment; and (3) social support in the U.S. During the pandemic, new clients are asking for (1) food and (2) material needs (clothing, bedding, hygiene products, etc.) much more frequently than before. The need for work authorization is especially urgent given these times.

## Several of the Broader EAD Rule's Provisions Will Be Particularly Pernicious for AsylumWorks and Our Clients

38. In addition to the overall ways that changes to the EAD system harms AsylumWorks and our clients, there are number of provisions in the Broader EAD Rule that are particularly problematic.

39. First, there are three bars in the rule that make a person ineligible for a work permit outright for the duration that their application is pending. Those are the new one-year deadline bar, the criminal bar, and entry without inspection bar.

40. These bars will significantly prejudice our clients, many of whom wait two years or more to have their asylum cases fully adjudicated. For example, many of AsylumWorks' clients sought asylum more than one year after their arrival, often due to changed circumstances in their home country, improper technical rejections of timely filed applications by USCIS, or in the case of some of our LGBT clients, subsequent public disclosure of their sexual orientation or gender identity. Though these clients would likely overcome the one-year bar in their asylum claim, they will be unable to get an EAD unless and until they do so, which will cause them to rely on AsylumWorks' services indefinitely.

41. Similarly, many of our clients have faced persecution in their home countries that involved some time in jail or prison in those countries. Some were imprisoned for refusing to join armed forces, others for their political opinion, and still others for their sexual orientation and/or gender expression. If these clients are unable to demonstrate that such "crimes" were non-serious and/or apolitical in their EAD application, they will now face an EAD denial. This is particularly problematic because the EAD adjudication process occurs entirely on paper and does not involve the ability to provide testimony to an immigration judge or a specially trained asylum officer. As such, even though a full adjudication of these issues on the merits at the asylum hearing would not bar their asylum claims, many clients face improper denials on this basis. Once again, these clients will be forced to rely on AsylumWorks' services indefinitely, even though they are able and willing to work to provide for themselves and their families.

42. The new fees and biometrics requirements for EAD applications will also put a strain on AsylumWorks' resources. We have only a small fund from which we can make direct expenditures on clients' behalf. Many of the needs we cannot provide in-house are addressed through coordinated referrals to partner organizations and agencies. For the most part, our client fund is limited to covering urgent needs such as emergency groceries or eviction-preventing rental assistance. At present, we do not cover clients' fees for biometrics. If the current rule remains, we would need to consider diverting organizational resources and fundraising capacity in order to help clients pay the filing fee for their asylum applications, without which they will not even be able to apply for the EAD. If the biometrics fee for EAD applications becomes a burden for our clients, as we imagine it will, we will likely have to divert organizational resources to help fill this gap as well.

43. The limitation of EADs to two years also harms AsylumWorks and its clients. Our clients' asylum claims are rarely resolved in two years due to lengthy delays in the scheduling of immigration court hearings or delays after asylum interviews; for example, one client recently won asylum after eight years of proceedings. Each EAD renewal costs our clients time and money (an EAD renewal costs approximately $500, without legal fees) and causes them significant anxiety. Clients have also reported job loss when EADs are delayed or lost in the mail through no fault of their own. Clients cannot afford to lose their jobs due to an erroneous EAD denial, a situation which we have unfortunately seen all too often due to ministerial errors by the government. Collateral consequences of losing the EAD, in turn, include the loss of benefits and the expiration of the client's driver's license. Artificially short renewal windows for EADs will increase the burden on AsylumWorks Social Services staff who would be tasked to assist returning clients who would otherwise would be self-sufficient.

44. The new EAD rules and provisions that allow the government indefinite time to accept or deny an EAD application as well as discretionarily deny otherwise eligible applications serve to create a system that is unpredictable, anxiety-provoking, and not transparent. For our clients, asylum is their lifeline, and work authorization is the means by which they survive until their asylum claim can be adjudicated. When asylum seekers remain entirely dependent on others and cannot foresee when they will be granted work authorization or have the ability to take back control of their lives and provide for themselves, it is not difficult to see why someone would begin to question if they have a future and a life worth living. The indefinite delays and increase in EAD denials that these rules engender will worsen the mental health of asylum seekers and could lead to poor psychosocial outcomes, impaired daily functioning, increased feelings of helplessness, hopelessness, and worthlessness resulting in increased suicidal ideation and suicide attempts. AsylumWorks will be required to expend significant organizational time and resources in order to help clients plan for their safety, implement harm reduction strategies, provide emotional support, teach coping skills, and connect with external mental health providers.

## The New EAD Rules Directly Impact AsylumWorks' Staff and Funding

45. AsylumWorks will be required to retrain all staff on the new EAD rules so they can work with clients to identify appropriate referrals and programmatic resources. Because of the new EAD rules, AsylumWorks will also be required to develop new policies, procedures, and training materials for staff and clients, as well as informational, promotional, and programmatic materials at significant expense.

46. AsylumWorks staff will face greater personal stress as they endeavor to provide long-term services to asylum seekers who may never obtain work authorization. Despite our efforts to support staff, we expect that staff will face a higher level of burnout, compassion fatigue, and vicarious trauma resulting in increased staff turnover. Our staff is already at capacity, and increased burdens from the EAD rules will translate into fewer clients served. Our organization requires staff with specialized professional backgrounds, language skills, and experience—staff who cannot be easily replaced. AsylumWorks will thus have to expend resources to hire and train new staff when existing staff move on.

47. AsylumWorks will also likely face reduced program outcomes. More specifically, I expect that we will have to report to funders that we were able to serve fewer people and that client outcomes are below our expectations given the crushing environmental circumstances imposed upon asylum seekers. Our ability to maintain and attract new funding is dependent on our ability to demonstrate meaningful program impact. If the Rules hamper program outcomes as we expect, then we are at risk of losing funding, reducing our programming, and laying off staff.

48. As clients face higher rates of EAD denials and delays, it will also reduce the number of new clients that AsylumWorks can take on, increasing the number of people on our waiting list and the amount of time they will be forced to wait before receiving assistance. To date, most clients achieve social service goals within six months. If clients spend more time with our organization receiving social services rather than achieving self-sufficiency via employment, the overall number of clients we can serve will have to contract accordingly.

49. As discussed in greater detail above, I anticipate that AsylumWorks will have to divert significant resources away from the Employment program to the Social Services program in order to respond to the EAD Rules.

50. AsylumWorks also believes that the EAD Rules contribute to the needless suffering of those who have already fled horrific persecution in their countries of origin. The United States has already made it exceedingly difficult for those who come to the United States seeking protection from getting the protection they need and deserve under both international and U.S. law. Denying them access to lawful employment while they navigate a complicated and difficult system is cruel. This denial frustrates AsylumWorks' mission to help asylum seekers rebuild their lives with dignity and purpose by cutting off their primary vehicle for doing so. The Rules do nothing more than punish those who come to this country seeking legal protection from harm, and they should be overturned.

Executed this 21 day of December 2020

Joan Hodges-Wu, MA, MSW, LGSW