**DECLARATION OF CRISTINA DOS SANTOS, ESQ.**
**IMMIGRATION PROGRAM DIRECTOR,**
**COMMUNITY LEGAL SERVICES IN EAST PALO ALTO**

I, Cristina dos Santos, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. Since May 2020, I have served as Immigration Program Director at Community Legal Services in East Palo Alto ("CLSEPA"), a nonprofit organization providing legal and social services to low-income families in and around East Palo Alto, California.

2. In this role, I oversee a team of nine attorneys, three paralegals, an intake coordinator, and a social worker. I am responsible for managing our grants and fundraising for our work. I meet regularly with the other Program Directors at CLSEPA to coordinate our work. I represent CLSEPA with external stakeholders including funders, community-based organizations, and other legal service providers. I lead our program's response to new policies that threaten our mission. This includes communicating with elected representatives and drafting public comment in response to rule changes. I also make strategic decisions regarding how to use our resources to best serve our mission. As Program Director, my decisions are informed by nine years of prior experience as an immigration attorney representing low-income immigrants including asylum seekers, survivors of crime, and unaccompanied children. Through this experience, I am acutely aware of the importance of work authorization to the people we serve.

3. I have worked at CLSEPA since 2015. Prior to joining CLSEPA, I worked as a Staff Attorney at Ayuda, an organization serving low-income immigrants in the Washington, DC metro area. Before that I was a Contract Attorney for the United Nations High Commissioner for Refugees and a Volunteer Attorney at the Tahirih Justice Center.

I. **CLSEPA's Mission and Programs Seek to Empower Low-Income Community Members and Clients, Including Significant Numbers of Asylum Seekers**

4. CLSEPA's mission is to provide transformative legal services that enable diverse communities in East Palo Alto and beyond to achieve a secure and thriving future. We seek to help low-income clients and clients of color experience decreased displacement, increased stability and family unity, reduced poverty and stress, and improved health and educational outcomes. To this end, CLSEPA provides free legal services to low-income community members in three main program areas.

5. CLSEPA's economic advancement program helps community members increase and protect their earnings and earning potential. The housing program seeks to increase the availability of affordable housing and assist individuals obtain and retain safe and habitable housing and avoid eviction and homelessness. These programs often take cases of immigrant workers and tenants (including asylum seekers), recognizing that they are particularly vulnerable to intimidation, discrimination, retaliation, and other mistreatment.

6. CLSEPA's third program area is immigration. The mission of CLSEPA's immigration program is to provide transformative immigration legal services that enable low-income immigrants in East Palo Alto and the surrounding areas to achieve a secure and thriving future. We seek to achieve transformative change by providing high quality services and assisting as many people as possible who are eligible for immigration relief to apply for and obtain that relief.

7. The immigration program represents detained and non-detained adults and children at all levels of immigration proceedings—including before the Asylum Office, the Immigration Courts, the Board of Immigration Appeals ("BIA"), and the federal Courts of Appeal. In addition, CLSEPA conducts *pro se* clinics to help individuals without legal representation apply for immigration-related relief such as asylum and related forms of protection. CLSEPA's staff members also train and mentor volunteer attorneys who offer their services *pro bono* and gives "know your rights" presentations to help community members learn about forms of immigration relief for which they might be eligible.

8. Immigration is the largest of CLSEPA's programs, and a significant number of the immigrants we serve seek asylum and related protection. Approximately a third of CLSEPA's immigration program clients to whom it provides direct representation are asylum seekers. CLSEPA currently provides full representation to more than 130 asylum seekers. For the last two years, CLSEPA has also assisted more than 140 asylum seekers per year to fill out their asylum applications at *pro se* clinics. CLSEPA currently provides mentorship on more than 200 cases placed with pro bono counsel, which includes pro bono representation of more than 100 asylum seekers.

9. While our clients all face significant challenges, the asylum seekers with whom we work are among the most vulnerable. These clients often arrive with very little in the way of savings and without family or other community support. Without immigration status, they cannot access many of the social services and resources available to others with similar financial means. Limited education and language skills, and lingering effects of past trauma—resulting from experiences in their home countries, their flight to the United States, as well as in immigration detention—often increase their susceptibility to exploitation and other harm. Obtaining an employment authorization document ("EAD") is frequently one of our asylum clients' most pressing concerns, because without legal work, they cannot support themselves or their families.

10. The COVID-19 pandemic only exacerbated these issues. Many of our asylum-seeking clients, having recently arrived in the United States, rely on networks of family members or friends for financial support and housing. Given the devastation of the economy during the pandemic and the disproportionate impact on communities of color, the support networks for the asylum seekers we typically serve are not available in the same ways as before. This means it is even more challenging for them to find safe housing. Many live in extremely crowded conditions that expose them to the coronavirus. If they experience illness, they are unlikely to have access to medical care. Many friends or family that might have helped them obtain basic necessities like food have lost their own jobs, and so many asylum-seeking families we work with are facing both food insecurity as and housing insecurity.

## II. New EAD Rules Significantly Impede our Clients' Ability to Legally Work and Sustain Themselves while Seeking Protection

11. Two regulations took effect in August 2020 (collectively, the "EAD Rules") which increase the time asylum seekers must wait to obtain employment authorization and make it more difficult, and even impossible in certain circumstances, to obtain and maintain employment authorization. *See Removal of 30-day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications,* 85 Fed. Reg. 37,502 (June 22, 2020); *Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532 (June 26, 2020). Below are some of the ways in which the most harmful aspects of these rules impact our clients.

### A. *Further Delays for our Clients Seeking Work Authorization*

12. By increasing the time an asylum seeker must wait to apply for an EAD, eliminating the "deemed complete" rule, and eliminating the requirement that the agency rule on the EAD application within 30 days (the "timeline repeal rule"), the EAD Rules will more than double the amount of time our clients must wait before they can receive EADs, and some will have to wait even longer than that. For example, individuals released from immigration detention to the San Francisco Bay Area because they have family or other community support here often reach out to us for assistance after having been served with notices to appear or other hearing notices in immigration courts far from where they currently live. This happens frequently because Immigration and Customs Enforcement (ICE) often files individuals' cases in courts near where they were detained upon arrival in the United States rather than where they are released, even when the individuals provide ICE the addresses where they will reside as part of their release process. CLSEPA staff routinely help such individuals file motions to change venue to the San Francisco Immigration Court because it is not possible for them to travel to such distances for their proceedings. Often, these people submit their asylum applications while in detention and significant time passes before their next appearance in court. Under the previous rules, changing venue would not preclude individuals who had previously accrued 180 days on their EAD clocks from obtaining an EAD. Under the new EAD Rules, however, they would be prohibited from receiving an EAD until the delay is resolved, which could take a great deal of time.

13. The rescission of the deemed complete rule and the timeline repeal rule also combines to cause clients significant delays in eligibility for attainment of EADs, if another bar (discussed below) does not render them newly ineligible. Since there is no longer a limit on how long the government can take to return an "incomplete" asylum application for purposes of EAD eligibility, CLSEPA's clients could face very long delays if the government belatedly rejects an asylum application as incomplete. Our staff and other colleagues have observed that the government frequently rejects asylum applications for nonsensical, arbitrary reasons. With frequent rejections of asylum applications, no deadline for deeming an application "complete," and no requirement that the government adjudicate EAD applications within 30 days, clients may be (a) delayed for long periods of time from receiving EADs for which they are eligible, or (b) denied EADs for which they were eligible when they applied if U.S. Citizenship and Immigration Services (USCIS) delays its EAD adjudication until after their claims have been denied.

### B. *Increased Costs for our Clients to Apply for EADs*

14. Coming up with an extra $85 to satisfy the new biometrics requirement is very difficult, if not impossible, for many of our clients, who often struggle to afford basic necessities like food and clothing for themselves and their families. Some of our asylum seeker clients have struggled even to afford the bus fare to reach our offices. Aside from causing added financial burden for many clients, this fee creates a *de facto* barrier to employment authorization for others who cannot come up with the money.

### C. *Bars on our Clients' EAD Eligibility and Discretionary Denials*

15. Our client base includes many asylum seekers who stand to be denied EADs under provisions of the rules that establish new eligibility bars and allow for discretionary denials.

16. With respect to the EAD bar for not filing an asylum application within one year, while we seek to assist our clients to file their asylum applications within one year whenever possible, we frequently represent people who were unable to file their claims within one year for reasons that adjudicators conclude fit within the exceptions to the one-year bar to asylum eligibility under U.S. law. But the one-year EAD bar contains no exceptions. Thus, these individuals—who would *not* ultimately be barred from asylum for failing to file within one year—would be unable to obtain work authorization until the one-year bar issue in their cases is decided, which typically does not happen until the hearing on the merits of their claims. Under current scheduling practices in our local Asylum Office and Immigration Court, this can take years.

17. We also represent clients who have entered the country without inspection, often as a result of the government's practice of "metering" asylum seekers at the southern border, which has caused long delays in unsafe conditions in Mexico. Many CLSEPA clients who as of August 25, 2020, have entered or will enter without inspection would be denied EADs under the new EWI EAD bar because they will not be able to provide evidence to prove that they satisfy the exception to the bar. For example, our clients typically do not have evidence establishing when they initially sought to enter, or actually entered, the United States, so it would be extremely challenging to prove that they presented themselves to a Department of Homeland Security agent "without delay" and within 48 hours.

18. CLSEPA also represents many asylum seekers with criminal histories that would not render them ineligible for asylum but would likely result in EAD ineligibility under the new criminal EAD bars. Even in meritorious cases, convincing USCIS that the criminal bars do not apply in the context of EAD applications—which historically have not involved analyzing complicated evidence and legal arguments, and do not allow for applicant testimony, among other limitations—will be extremely difficult.

19. Furthermore, clients with criminal histories that do not preclude EAD eligibility based on the new criminal EAD bars will nevertheless struggle to demonstrate that USCIS should grant them EADs in its discretion. Clients with minor convictions (or even charges) may still be denied an EAD.

4

20. For example, after being detained in ICE custody, one of our clients suffered severe mental health consequences and was subsequently convicted of possessing a controlled substance. Clients in circumstances like these will face great difficulty in establishing both that they are not ineligible for an EAD under the new criminal EAD bars and that they should not be denied an EAD in the exercise of discretion.

21. Many of our clients will also likely be precluded from EAD eligibility based on the asylum denial bar. For example, most of CLSEPA's detained clients receive decisions in their immigration court cases within a year of filing their asylum applications. Previously, being denied asylum before accruing 180 days on their "EAD clocks" meant asylum seekers could not obtain EADs while pursuing their cases on appeal. However, many of those who prevailed on appeal and whose cases were remanded were able to obtain EADs while they awaited further hearings in Immigration Court. Under the new asylum denial bar, people in these circumstances may now remain barred from receiving an EAD no matter how much time passes. As noted above at ¶ 13, because there is no longer a deadline for USCIS to respond to EAD applications, many clients could be found ineligible for EADs because a denial in their asylum cases issues before USCIS makes a decision on their EAD.

### D. *Loss of Employment Authorization While our Clients' Cases Are Pending Before the Federal Courts of Appeal*

22. CLSEPA handles asylum appeals to the BIA and the federal courts. In our experience, petitions for review can take more than a year to resolve. By requiring immediate termination of employment authorization upon an adverse decision by the BIA, the EAD Rules create significant hardship to our clients. In practice, it will also deter many of them from exercising their rights to federal court review because they will struggle to sustain themselves and their families while their cases are pending.

23. By increasing the cost and burden of pursuing EADs and significantly restricting their access to employment authorization, the new EAD Rules make our asylum seeker clients less secure. Preventing them from working legally increases already significant levels of financial stress and, in turn, impedes their ability to provide for their basic necessities and safety. This can exacerbate lingering effects of trauma and lead to serious adverse physical and mental health consequences. The new EAD Rules put our asylum seeker clients' immediate health, safety, and well-being at risk.

24. The new EAD Rules also hinder our clients' ability to pursue and obtain substantive immigration status, a necessary step toward long-term stability and security. Those who are subject to longer waiting periods or are precluded from getting EADs may abandon their cases. Prolonged indigency also impedes our clients' ability to assist with various aspects of preparing their cases, such as attending meetings with their lawyers and collecting evidence. Increased stress and insecurity makes it harder for them to recount the facts of their cases to the satisfaction of an adjudicator, because it exacerbates the effects of past trauma, which affects asylum seekers' ability to recount the facts of their cases even under ideal circumstances. All of these factors decreases our clients' likelihood of obtaining long-term lawful immigration status.

### III. The EAD Rules Irreparably Harm CLSEPA

25. In addition to prejudicing the asylum seekers CLSEPA serves, the new EAD Rules also irreparably harm us in multiple ways.

26. The EAD Rules mark a major shift in the legal standards applicable to employment authorization and significantly raise the complexity of applying for EADs. As a result, we must invest additional resources to train our staff and provide additional assistance to the *pro bono* attorneys we mentor. For example, since the new EAD Rules took effect, we have already held multiple meetings attended by staff attorneys and supervisors to ensure that all CLSEPA staff who represent clients and mentor *pro bono* attorneys have a clear understanding of the rule changes and strategies for responding to them in our clients' cases.

27. These changes also require CLSEPA staff to devote more time to counseling asylum seeker clients regarding EAD eligibility issues and helping them submit EAD applications. For example, the EWI and criminal EAD bars, as well as the discretionary denial rule, require our staff to dedicate significantly more time to preparing clients' EAD applications than was necessary before the EAD Rules took effect. Demonstrating that these rules should not result in the denial of an EAD requires obtaining evidence and conducting complex analysis never previously required for these types of applications. Our attorneys now have to obtain and review certified criminal records to show that the criminal EAD bar does not apply to their clients' cases, and Freedom of Information Act records containing information regarding individuals' apprehension by government officials after entering the country without inspection to show that the EWI EAD bar does not apply. Obtaining and reviewing these types of documents and crafting legal arguments to substantiate clients' eligibility for employment authorization in this new landscape take significant time. The increase in complexity and background research necessary as a result of the new EAD Rules means that preparing EAD applications for our asylum seeker clients can take our staff twice as long as they did prior to the rule changes. Our staff attorneys also now frequently request assistance and further review of clients' EAD applications by our managing attorneys, which was not common previously.

28. Increased delays and denials of EADs also increase the other resources that we must devote to each client's case. Asylum seekers that lack work authorization are more likely to face challenges like labor exploitation, housing insecurity, and abusive relationships which they do not have the means to escape. Thus, the new EAD Rules has increased the need for interventions by other CLSEPA staff including our social worker and attorneys that work in our other program areas (like housing and workers' rights). Our social worker evaluates her case load and estimates how much time each case will take using a "self-sufficiency scale." Individuals who lack employment authorization generally rank lower on that scale and thus would be expected to require more assistance than individuals with EADs. As CLSEPA takes a holistic approach to addressing our clients' needs, staff from other program areas also step in as needed to assist asylum seekers with non-immigration issues. For example, asylum seekers facing housing insecurity have needed to access our Rescue Housing Fund, and asylum seekers facing labor exploitation have required assistance from our workers' rights attorneys.

29.     Individuals under significant levels of stress and lacking the resources to meet their basic needs will also likely require more time from their legal representatives to prepare their EAD applications and substantive asylum cases. As noted above, increased indigency and the stress created thereby compromises individual asylum seekers' ability to assist with their representation, *see supra* at ¶ 23-24, which translates into more time required for our staff to adequately prepare clients' EAD applications and substantive asylum cases.

30.     Increasing the amount of time necessary to train staff, mentor *pro bono* attorneys, prepare EAD applications, and provide substantive asylum representation and other services has caused a corresponding decrease in the number of asylum seekers we can serve. CLSEPA uses an internal tracking system to manage attorney caseloads based on the complexity of and time-commitment required for each case. According to this tracking system, our attorneys are currently operating at an average of approximately 80 percent of their prior capacities, meaning that, on average, they are each handling about 20% fewer cases. The decrease in capacity has been caused by rising case complexity due to changes to the EAD Rules as well as other recent developments in immigration law, in conjunction with the significant stresses that the COVID-19 pandemic has placed on our clients. While the changes to the EAD Rules have not solely caused this decrease in capacity, the considerable additional time required per client as a result of those rule changes certainly accounts for a portion of the decrease in our attorneys' caseloads, i.e., the number of individuals we can assist. As noted above, part of the mission of our immigration program includes assisting as many people as possible who are eligible for immigration relief to apply for and obtain that relief. Decreasing the number of asylum seekers that we can serve thus directly frustrates our mission because it narrows our impact.

31.     Limiting the provision of EADs also directly impedes us from helping low-income clients and clients of color experience decreased displacement, increased stability and family unity, reduced poverty and stress, and improved health and educational outcomes, necessary steps toward achieving our mission to provide transformative immigration legal services that enable low-income immigrants in East Palo Alto and the surrounding areas to achieve a secure and thriving future. By limiting individuals' ability to legally work, and in turn reducing their likelihood of success in their substantive cases, the EAD Rules will increase displacement, decrease stability and family unity, increase poverty and stress, and worsen health and educational outcomes for our clients, frustrating our mission.

32.     Because a portion of CLSEPA's funding is based on the number of cases we can undertake and complete, the EAD Rules and corresponding decrease in the number of cases we can handle will also result in decreased revenue for our organization.

33.     The new EAD Rules have also precluded us from carrying out initiatives that we had previously planned. CLSEPA currently conducts monthly *pro se* clinics to assist people without legal representation to file their asylum applications in Immigration Court. Prior to the new EAD Rules, we had begun an initiative to provide *pro se* clinics several months after these asylum application clinics to help the individuals who had attended the asylum application clinics to request EADs. We planned to ramp up this project to serve the same number of individuals that we currently serve at our asylum application clinics. However, the new EAD Rules make holding these clinics untenable. We will lose touch with too many individuals over the course of a year for the clinics to be programmatically feasible. More importantly, it is no

longer possible to effectively assist individuals with EAD applications in a *pro se* clinic setting because the complexity of the new rules now require that attorneys engage in significantly more fact-finding and research. Thus, the time and financial resources spent planning this initiative have now been wasted. Decreasing the scope of our services by making these *pro se* EAD clinics impossible also frustrates our mission by limiting the number of individuals we can serve and impeding us from providing transformative immigration legal services that enable low-income immigrants in East Palo Alto and the surrounding areas to achieve a secure and thriving future, as discussed *supra* at ¶ 30-30.

34. At CLSEPA, our dedicated staff care deeply about our clients, and we will continue to do our best to respond to their needs and help them obtain the relief for which they are still eligible. However, providing services in the context of the new EAD Rules which so significantly limit individuals' access to work authorization, leaving them even more vulnerable and insecure than they would otherwise be, takes a toll which can lead to exhaustion and burnout. This impact on our staff may impair the quality of services we can provide and limit the scope of our impact going forward, further frustrating our mission.

35. For all of the foregoing reasons, the new EAD Rules frustrate our mission, require us to divert organizational resources, and result in a decrease of funding, causing us irreparable harm.

Cristina dos Santos

Executed in South San Francisco, California, this 21st day of May 2021