## DECLARATION OF ADILENE NUNEZ HUANG, CO-DIRECTOR OF ADVOCACY, LEGAL SERVICES, TAHIRIH JUSTICE CENTER

I, Adilene Nunez Huang, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are known personally to me and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2. Since October 2020, I have served as Co-Director of Advocacy, Legal Services, at the Tahirih Justice Center. In my role, I oversee the legal staff and legal work across all of Tahirih. I am also responsible for risk mitigation in Tahirih's legal department, managing organizational pro bono relationships, and ensuring that policies and practices are in place to best support staff in furtherance of Tahirih's mission.

3. Tahirih's mission is to provide free holistic services to immigrant women and girls fleeing gender-based violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law. We thoroughly screen each service seeker and offer legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings. In addition, for those for whom we cannot provide full services (due to limits of mission or capacity) we devote significant resources to providing at least limited advice and information services, as well as referrals to organizations that may be able to provide further assistance.

4. In addition to free legal direct services and social services case management, Tahirih also advocates for its clients more broadly. Through administrative advocacy, legislative campaigns, and outreach, Tahirih aims to increase the efficiency and fairness of the asylum system.

5. Tahirih also provides training and education services to professionals in a position to assist immigrant victims of violence. In 2020, we provided training to almost 14,000

professionals and community members, including attorneys, judges, police officers, healthcare staff, and social service providers. In addition, Tahirih provides information to immigrants through Know-Your-Rights presentations as well as at asylum and other immigration clinics.

6. In addition to our legal and social services staff, Tahirih leverages its expertise by working directly in a co-counsel relationship with pro bono attorneys on many of its cases. We work with over 2000 attorneys in 300+ law firms, as well as compassionate attorneys, doctors, psychologists, and other professionals who donate their time and expertise to create a world where women and girls enjoy equality and live in safety and with dignity.

7. Since Tahirih's founding in 1997, we have provided immigration legal services to more than 30,000 people. In 2020, we provided legal representation and other services to 1,796 clients, and to more than 1,400 of their family members.

8. Although Tahirih represents clients who seek T and U nonimmigrant status and other kinds of protection, until 2020, more of our clients sought asylum than any other form of immigration relief.

9. In August 2020, two new rules took effect that make it far more difficult for asylum seekers to receive employment authorization documents (EADs) in the United States.

10. The first rule revoked the regulation that required U.S. Citizenship and Immigration Services (USCIS) to adjudicate EAD applications filed by asylum seekers within 30 days. *See* USCIS, *Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications*, 85 Fed. Reg. 37,502 (June 22, 2020) (timeline repeal rule).

11. The second rule enacted a host of new bars to EADs and changes to the asylum process, all of which were unfavorable to applicants. *See* USCIS, *Asylum Application, Interview, and*

*Employment Authorization for Applicants*, 85 Fed. Reg. 38,532 (June 26, 2020) (EAD bar rule). The EAD bar rule's provisions, among other things, (1) require asylum seekers to wait 365 days after filing an asylum application before applying for an EAD; (2) bar EADs for individuals who file for asylum after August 25, 2020, and more than one year after their arrival in the United States; (3) bar EADs for any asylum seeker who enters the United States without inspection after August 25, 2020; (4) require the rejection of an asylum seeker's EAD application if there is an "applicant-caused delay" in the underlying asylum case at the time the EAD application is filed; (5) force EADs to terminate upon the denial of relief by the Board of Immigration Appeals (BIA), even if an asylum seeker files a petition for review of the BIA's decision in federal court; (6) give DHS the discretionary authority to deny EADs to those who are otherwise eligible; and (7) render ineligible for an EAD any asylum seeker if the individual "fails to establish that he or she is not subject to a mandatory denial" of asylum on "criminal grounds" or if there are "serious reasons to believe" the individual "committed a serious non-political crime outside the United States" after August 25, 2020.

12. Both of these rules (the EAD rules) will seriously frustrate Tahirih's mission, divert organizational resources, and cause irreparable harm to the organization.

13. Tahirih's mission as it relates to asylum applicants will be severely compromised by the EAD rules.

14. Tahirih's asylum clients come from all over the globe, and under the terms of the EAD bar rule, the vast majority of those clients will be ineligible for EADs while their asylum applications are pending.

15. Further, even those asylum clients who would remain potentially eligible for an EAD will, under the timeline repeal rule and the new 365-day waiting period, be forced to wait longer

before they receive EADs. In 2018, a federal court required USCIS to adhere to the 30-day deadline for adjudicating asylum seekers' EAD applications as required by then-applicable regulations. And when held to its deadline, USCIS complied: Although it had previously missed the 30-day deadline in many cases, its compliance with that deadline rose to 98% after the court decision. Now, with the deadline repealed, USCIS is likely to delay adjudication once again.

16. In addition, the rule barring EADs while a petition for review is pending in a federal court of appeals means that some clients who are eligible for EADs will face *two* periods without them—the initial 365-day period plus the time it takes USCIS to adjudicate the petitions and then the months- or years-long period during which the petition for review remains pending.

17. These effects on Tahirih's clients will force Tahirih itself to divert its resources and to provide social services to a smaller percentage of its clients. Many of Tahirih's clients require extensive social-services support: Survivors of gender-based violence are significantly more vulnerable to negative short and long-term health outcomes, including injury, chronic health problems, depression, post-traumatic stress, exposure to sexually transmitted infections, and gynecological problems. Survivors also require mental health services to deal with the often severe aftereffects of trauma, and of the secondary effects of trauma on their children.

18. Under the prior EAD regulations, the vast majority of Tahirih's clients were able to secure EADs within a year after filing their asylum application. This allowed our social services staff to serve more clients. An asylum client who has an EAD is able to work and earn money to support herself and her family; an asylum client who is denied an EAD, or is still awaiting adjudication of an EAD application, cannot do so. And an asylum client who is self-sufficient financially is more likely to be able to address her trauma and other psychological issues, and is therefore likely to need less other support from social services. In particular, such clients require

significantly less assistance with complex issues such as navigating the health-care system and the options for medical debt forgiveness.  Tahirih staff also must spend substantially more time per client with non-EAD-holding clients on issues such as financial assistance, transportation, and mental health services, as well as housing.

19. For these reasons, by dramatically decreasing the percentage of clients who receive EADs and increasing the wait time for EADs, the rule will force Tahirih's social services staff to spend more time with each individual client. As a direct consequence, Tahirih will be able to provide social services to a smaller percentage of clients.

20. Tahirih's legal work will also be adversely affected by the EAD bar rule. In particular, the "applicant-caused delay" rule deprives legal staff of the ability to present new evidence—including evidence newly received from an asylum applicant's home country—in order to supplement an application or in advance of an asylum interview. The client's best interest, and thus the rules of legal ethics, as well as the interests of justice, generally compel lawyers to present new, favorable evidence no matter when it arrives. If legal staff do so, however, they are forced to jeopardize or at least further delay the client's ability to become self-supporting by triggering a rejection, or a forced delay in the submission, of the client's EAD application.

21. Likewise, Tahirih's legal and social services work will be adversely affected by the rule terminating EADs immediately upon the BIA's denial of relief, even if the client files a petition for review.  Those petitions can take years to resolve.[1]  When a client who has been self-sufficient suddenly loses her EAD and her ability to care for herself and her family, Tahirih will

---

[1]    For instance, the Ninth Circuit—one of the circuits in which Tahirih works—tells practitioners that a civil case will normally take 12-20 months after filing just to reach oral argument date, exclusive of the time needed for the court to issue a ruling. And immigration cases often take much longer.

have to again provide more intervention from social services staff (as discussed above), meaning they can serve fewer new clients. Moreover, a client who is suddenly jobless and homeless may be less able to fully assist in development of her case on appeal, requiring more time from Tahirih's legal staff.

22. The new rules concerning "serious reasons to believe" an asylum seeker engaged in a non-political crime and forcing asylum seekers to disprove any potential crime bars to asylum as a prerequisite to an EAD will also force Tahirih's legal staff to divert resources. Specifically, these rules will require legal staff to spend time and resources to gather all evidence related to clients' past actions, and present full-fledged arguments concerning those actions, well in advance of a merits hearing or asylum interview. And no matter the disposition of those issues at the EAD stage, the same issues will then have to be re-litigated when EOIR or USCIS makes a final decision on the client's underlying asylum application. In both cases, staff will be forced by the rule to divert this substantial time from working on other cases and will result in Tahirih being able to offer assistance to fewer clients.

23. Finally, each provision of the new rules has required, and will continue to require, Tahirih to expend staff time on updating trainings for pro bono attorneys and other materials and working with clients and pro bono attorneys on strategies for dealing with the new provisions.

24. The combined effect of the EAD rules and other regulations and policies attacking asylum seekers caused our capacity to take asylum cases to drop significantly in 2020. Although we worked on asylum cases for 37.3% of our clients in 2019, we were able to do so for only 29.8% of our clients in 2020.

                                                                                                                     _____
                                                                                                                       Adilene Nunez Huang

                                                                                      Executed this 1st day of June 2021