**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASYLUMWORKS, *et al.*, | |
| Plaintiffs, | |
| v. | No. 2020-cv-03815-BAH |
| ALEJANDRO N. MAYORKAS, in his official capacity as the Secretary of Homeland Security, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR <u>PARTIAL SUMMARY JUDGMENT</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ...................................................................................................4

I.    The Rules Are *Void Ab Initio* Because Mr. McAleenan Never Validly Succeeded Secretary Nielsen ...................................................................................4

    A.    The Plain Text Of The April 2019 Order And Delegation Belies the Government's Arguments ....................................................................5

        1.    The Text Unambiguously Demonstrates That Secretary Nielsen Did Not Amend The Resignation Line .........................................5

        2.    The Government's Attempts To Explain Away The Text Fail.................8

        3.    The April 2019 Order's Prefatory Clause Cannot Change Its Plain Meaning ...........................................................................12

    B.    DHS's Proffered Agency Practice Is Entitled To No Weight...............15

    C.    Mr. McAleenan's Invalid Succession Is Dispositive Of Plaintiffs' Challenge To The EAD Bar Rule ...................................................18

II.    The Rules Are Void *Ab Initio* Under The HSA And FVRA ............................19

    A.    Section 113(g)(2) Of The HSA Did Not Authorize Mr. McAleenan To Amend The Line Of Succession ....................................................19

    B.    Mr. McAleenan Amended The Line of Succession And Mr. Wolf Assumed Office And Issued The Rules In Violation Of The 210-Day Limit...........................................................................................25

    C.    Mr. Mizelle Signed The Rules In Violation Of The 210-Day Limit ..................30

III.    The Rules Are Void *Ab Initio* Under The Appointments Clause ......................31

    A.    Mr. Wolf's Prolonged Service Exceeded The Temporary Service The Appointments Clause Permits...................................................31

    B.    President Trump And Mr. Wolf Overreached And Circumvented The Appointments Clause ................................................................33

    C.    Congress Did Not Ratify Mr. Wolf's Unlawful Service......................35

    D.    The Constitutional Avoidance Canon Applies ...................................36

IV.    Secretary Mayorkas's Purported Ratification Of The Timeline Repeal Rule Is Invalid ......................................................................................................38

    A.    The FVRA Prohibits Secretary Mayorkas From Ratifying The Timeline Repeal Rule.............................................................................38

i

1.       The FVRA Prohibits Ratification Of All Functions Or Duties
         Assigned By Statute To Only One Officer .................................................38

2.       The 2003 Delegation Does Not Support Defendants' Position .................42

B.    Secretary Mayorkas Did Not Make A Considered Judgment To Ratify The
      Timeline Repeal Rule ............................................................................................44

CONCLUSION.........................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>CASES</u>

*Advanced Disposal Servs. East, Inc. v. N.L.R.B.*,
  820 F.3d 592 (3d Cir. 2016)..................................................................... 44, 45

*All. of Artists & Recording Cos. v. DENSO Int'l Am., Inc.*,
  947 F.3d 849 (D.C. Cir. 2020) ....................................................................... 42

*Almendarez-Torres v. United States*,
  523 U.S. 224 (1998)........................................................................................ 11

*Barber v. Thomas*,
  560 U.S. 474 (2010)........................................................................................ 20

*Batalla Vidal v. Wolf*,
  501 F. Supp. 3d 117 (E.D.N.Y. 2020) .................................................... passim

*Batalla Vidal v. Wolf*,
  No. 16-cv-4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020)........................ 18

*Behring Reg'l Ctr. LLC v. Wolf*,
  No. 20-cv-09263, 2021 WL 2554051 (N.D. Cal. Jun. 22, 2021) ............... passim

*Bostock v. Clayton Cty., Georgia*,
  140 S. Ct. 1731, 1749 (2020)......................................................................... 16

*Bowles v. Seminole Rock & Sand Co.*,
  325 U.S. 410 (1945)........................................................................................ 15

*Bullock v. United States*,
  489 F. Supp. 3d 1112 (D. Mont. 2020)............................................... 32, 33, 38

*Byers v. Comm'r*,
  740 F.3d 668 (D.C. Cir. 2014) ....................................................................... 15

*Casa de Maryland, Inc. v. Wolf*,
  486 F. Supp. 3d 928 (D. Md. 2020).......................................................... passim

*Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*,
  140 S. Ct. 1462 (2020)................................................................................... 29

*D.C. v. Heller*,
  554 U.S. 570 (2008)........................................................................................ 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  140 S. Ct. 1891 (2020)............................................................................. 16, 36

*Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*,
139 F.3d 203 (D.C. Cir. 1998) .................................................................................. 32, 44

*Edmond v. United States*,
520 U.S. 651 (1997) ...................................................................................................... 1

*English v. Trump*,
279 F. Supp. 3d 307 (D.D.C. 2018) ............................................................................ 23

*Exxon Mobil Corp. v. Allapattah Servs.*,
545 U.S. 546 (2005) .................................................................................................... 41

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .................................................................................................... 26

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
140 S. Ct. 1649 (2020) .......................................................................................... 27, 34

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012) .................................................................................................... 15

*Freytag v. Comm'r*,
501 U.S. 868 (1991) .............................................................................................. 35, 36

*Gen. Dynamics Land Sys., Inc. v. Cline*,
540 U.S. 581 (2004) .................................................................................................... 20

*\*In re Grand Jury Investigation*,
916 F.3d 1047 (D.C. Cir. 2019) ...................................................................... 14, 21, 24

*Guedes v. BATFE*,
356 F. Supp. 3d 109 (D.D.C.), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019),
*cert. denied*, 140 S. Ct. 789(2020) ................................................................... 2, 37, 38

*Guedes v. BATFE*,
920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) ................................... 42

*Hawaii v. Off. of Hawaiian Affs.*,
556 U.S. 163 (2009) .................................................................................................... 13

*Huashan Zhang v. United States Citizenship & Immigr. Servs.*,
978 F.3d 1314 (D.C. Cir. 2020) .................................................................................. 15

*\*Immigrant Legal Res. Ctr. v. Wolf*,
491 F. Supp. 3d 520 (N.D. Cal. 2020) ................................................................ passim

*J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
534 U.S. 124 (2001) .............................................................................................. 22, 29

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) .................................................................................................. 37

*Jooce v. FDA*,
    No. 18-1615, 2020 WL 680143 (D.D.C. Feb. 11, 2020),
    *aff'd*, 981 F.3d 26 (D.C. Cir. 2020) ................................................................ 44

*Kajmowicz v. Whitaker*,
    No. 2:19-cv-00187, 2021 WL 2200795 (W.D. Pa. June 1, 2021) ............................ 40, 42

*Kingdomware Tech, Inc. v. United States*,
    136 S. Ct. 1969 (2016) ................................................................ 6, 12, 13

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ................................................................ 15, 16, 17

*L.M.-M. v. Cuccinelli*,
    442 F. Supp. 3d 1 (D.D.C. 2020) ............................................ 22, 40, 41, 42, 43

*La Clinica De La Raza v. Trump*,
    477 F. Supp. 3d 951 (N.D. Cal. 2020) ...................................... 8, 10, 12, 17, 23

*La Clinica De La Raza v. Trump*,
    No. 19-cv-04980, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020) ........................ passim

*Lamie v. U.S. Tr.*,
    540 U.S. 526 (2004) ................................................................................ 7

*Miles v. Apex Marine Corp.*,
    498 U.S. 19 (1990) ................................................................................ 30

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012) ............................................................................... 20

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    138 S. Ct. 617 (2018) ........................................................................... 6, 19

*Nat'l Lifeline Ass'n v. FCC*,
    983 F.3d 498 (D.C. Cir. 2020) ................................................................. 16

*NLRB v. SW Gen, Inc.*,
    137 S. Ct. 929 (2017) ................................................... 22, 26, 27, 28, 36

*Nw. Imm. Rights Proj. (NWIRP) v. USCIS*
496 F. Supp. 3d 31 (D.D.C. 2020)
*appeal dismissed*, No. 20-5369, Dkt. 7 (D.C. Cir. Jan. 12, 2021) ........................ passim

*NRDC v. DOE*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) ..................................................... 31

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
    512 F. Supp. 3d 966 (2021) ............................................................ 4, 6, 7, 18

*Pub. Emples. for Envtl. Responsibility v. Nat'l Park Serv.*,
    No. 19-3629, 2021 WL 1198047 (D.D.C. Mar. 30, 2021) ............................. 41

*Rothe Dev., Inc. v. United States Dep't of Def.*,
   836 F.3d 57 (D.C. Cir. 2016) ............................................................ 24, 27, 37

*Russello v. United States*,
   464 U.S. 16 (1983) ................................................................................... 27

*Scialabba v. Cuellar de Osorio*,
   573 U.S. 41, (2014) ................................................................................. 13

*SW Gen., Inc. v. NLRB*,
   796 F.3d 67 (D.C. Cir. 2015), *aff'd* 137 S. Ct. 929 (2017) ...................... passim

*United States v. Cano-Flores*,
   796 F.3d 83 (D.C. Cir. 2015) .................................................................. 37

*\*United States v. Eaton*,
   169 U.S. 331 (1898) ............................................................................ passim

*United States v. Harris County*,
   No. 4:16-cv-2331, 2017 WL 7692396 (S.D. Tex. Apr. 26, 2017) .................... 42

*United States v. Hilario*,
   218 F.3d 19 (1st Cir. 2000) .................................................................... 32

*United States v. Nixon*,
   418 U.S. 683 (1974) ............................................................................. 21

*United States v. Pellicci*,
   504 F.2d 1106 (1st Cir. 1974) ................................................................ 21

*United States v. Smith*,
   962 F.3d 755, (4th Cir. 2020) .............................................................. 32, 34

*United States v. Tinley Park*,
   No. 16-10848, 2017 U.S. Dist. LEXIS 234517 (N.D. Ill. July 17, 2017) ......... 42

*United States v. Valencia*,
   No. 17-cr-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018) ................. 32, 33

*United States v. Villanueva-Sotelo*,
   515 F.3d 1234 (D.C. Cir. 2008) .............................................................. 40

*Weiss v. United States*,
   510 U.S. 163 (1994) ........................................................................... 24, 36

## <u>STATUTORY AUTHORITIES</u>

5 U.S.C. § 3345 ....................................................................................... 27, 28

5 U.S.C. § 3345(A) ...................................................................................... 29

5 U.S.C. § 3345(a)(2) ............................................................................... 22, 29

5 U.S.C. § 3345(a)(3) .................................................................................................... 22, 29

5 U.S.C. § 3346 ........................................................................................................... 27, 28

5 U.S.C. § 3346(a) ................................................................................................ 25, 27, 28

5 U.S.C. § 3346(a)(1) ........................................................................................................ 25

5 U.S.C. § 3346(a)(2) ........................................................................................................ 33

5 U.S.C. § 3346(b)(1)-(2) .................................................................................................. 33

5 U.S.C. § 3347 ........................................................................................................... 27, 28

5 U.S.C. § 3347(a) ....................................................................................................... 27, 28

5 U.S.C. § 3347(a)(1) ............................................................................................. 21, 22, 28

5 U.S.C. § 3347(a)(1)(A) ............................................................................................. 25, 26

5 U.S.C. § 3347(a)(1)(B) ............................................................................................. 25, 26

5 U.S.C. § 3348(a) ............................................................................................................. 32

5 U.S.C. § 3348(a)(2) ........................................................................................................ 38

5 U.S.C. § 3348(d)(1) .................................................................................................. 18, 38

5 U.S.C. § 3348(d)(2) ........................................................................................................ 38

5 U.S.C. § 553(d) ............................................................................................................... 31

6 U.S.C. § 112(a)(1) ........................................................................................................... 29

6 U.S.C. § 112(a)(2) ........................................................................................................... 20

6 U.S.C. § 112(a)(2)(d) ...................................................................................................... 20

6 U.S.C. § 112(a)(2)(e) ...................................................................................................... 20

6 U.S.C. § 112(b)(1) ........................................................................................................... 39

6 U.S.C. § 113 .................................................................................................................... 23

6 U.S.C. § 113(a)(1)(A) ..................................................................................................... 29

6 U.S.C. § 113(a)(1)(J) ....................................................................................................... 30

6 U.S.C. § 113(g) ............................................................................................................... 20

6 U.S.C. § 113(g)(1) ........................................................................................... 14, 19, 20, 23

6 U.S.C. § 113(g)(2) ................................................. 5, 12, 14, 19, 20, 21, 22, 23, 24, 28, 29

6 U.S.C. § 706(2)(A) ................................................................................................ 18

6 U.S.C. § 706(2)(C) ................................................................................................ 18

8 U.S.C. § 1103(a) .................................................................................................... 39

8 U.S.C. § 1103(a) .................................................................................................... 39

8 U.S.C. § 1103(a)(3) ............................................................................................... 40

8 U.S.C. § 1158(d)(2) ............................................................................................... 39

28 U.S.C. § 508 ........................................................................................................ 14

28 U.S.C. § 508(a) ............................................................................................. 21, 24

28 U.S.C. § 508(b) .................................................................................................... 21

44 U.S.C. § 1507 ...................................................................................................... 31

## LEGISLATIVE MATERIALS

S. Rep. No. 105-250 (1998) ................................................................................ 22, 41

H. Rep. 107-609 (2002) ............................................................................................ 29

## ADDITIONAL AUTHORITIES

Nina A. Mendelson, *The Permissibility of Acting Officials: May The President Work
    Around Senate Confirmation?*, 72 Admin L. Rev. 533 (2020) ......................................... 36

Office of Legal Counsel,
    *Guidance on Application of Federal Vacancies Reform Act of 1998,*
    23 Op. O.L.C. 60 (Mar. 22, 1999) ................................................................... 30

The Federalist No. 76, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ..................... 34

Plaintiffs submit this Memorandum of Law in support of their Motion for Partial Summary Judgment (Dkt. 25), and in opposition to Defendants' Cross-Motion (Dkt. 28).

## PRELIMINARY STATEMENT

The EAD Bar Rule and Timeline Repeal Rule ("Rules") that Chad F. Wolf issued in June 2020 while purporting to serve as Acting Secretary of the Department of Homeland Security ("DHS") are void *ab initio* because Mr. Wolf's unlawful service violated multiple statutory and constitutional safeguards.[1] Mr. Wolf took office pursuant to purported amendments to DHS's line of succession that were invalid under both the Homeland Security Act ("HSA") and the Federal Vacancies Reform Act ("FVRA"), issued the Rules in violation of the FVRA's 210-day time limit on acting service, and served well beyond the limited time for acting service that the Constitution's Appointments Clause permits.

To evade the unlawfulness of Mr. Wolf's service, the government suggests that the plain text of Secretary Kirstjen Nielsen's April 2019 amendments to the line of succession does not mean what it says. It further contends that the HSA and the FVRA permit indefinite acting service by a series of Acting Secretaries (including inferior officers). And, it claims, Mr. Wolf's 426 days of service while purporting to fill an office that was vacant for 665 days was compatible with the Appointments Clause. None of that is persuasive. The HSA, the FVRA, and the Appointments Clause were enacted to impose meaningful limits to ensure executive accountability, the separation of powers, and a "judicious choice of persons" for important positions. *Edmond v. United States*, 520 U.S. 651, 659 (1997).[2] As many other courts have done, the Court should reject the government's strained and tortured arguments and vacate the Rules in their entirety.

---

[1]  Defined terms have the same meaning as in Plaintiffs' Memorandum of Law in Support of Their Motion for Partial Summary Judgment, Dkt. 25-1 ("Plfs. Br.").

[2]  Unless noted, internal citations, quotation marks, and alterations are omitted from citations.

The statutory and constitutional violations Plaintiffs have identified are not harmless. Organizations serving asylum seekers, members of those organizations, and asylum applicants "have suffered and will continue to suffer a concrete harm" due to the Rules. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020), *appeal dismissed*, No. 20-2217, Dkt. 23 (4th Cir. Mar. 23, 2021). That is why Plaintiffs ask this Court to "polic[e] [Mr. Wolf's] 'acting' appointment that [became] effectively permanent" and make clear that these statutory and constitutional requirements are "no mere formality." *Guedes v. BATFE*, 356 F. Supp. 3d 109, 153 (D.D.C.), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020).

Plaintiffs are entitled to summary judgment for four reasons. *First*, the Rules are void *ab initio* because Kevin McAleenan never validly succeeded Secretary Nielsen and thus had no power to designate Mr. Wolf as his successor. No amount of hand-waving or invocation of extrinsic evidence can paper over the plain text of the documents that Secretary Nielsen signed and issued: Secretary Nielsen only amended the delegation of authorities in the event that a Secretary is sidelined by an emergency ("emergency line"), not the line of succession applicable in cases of a Secretary's resignation ("resignation line"), and Mr. McAleenan was not next in the resignation line. If the Court rules against the government on this issue, as six other courts have already done, then it must vacate the EAD Bar Rule, because Secretary Alejandro Mayorkas never ratified that Rule and the government has not even attempted to defend Mr. Wolf's unlawful attempts to do so.

*Second*, the Rules are void *ab initio* under the HSA and FVRA for three additional reasons. The HSA did not authorize Mr. McAleenan to amend the line of succession because he was only an Acting Secretary; Mr. McAleenan purported to amend the line of succession and Mr. Wolf took office and issued the Rules in violation of the FVRA's 210-day limit; and Chad Mizelle signed the Rules in violation of the FVRA's 210-day limit. Plaintiffs' position on the HSA and FVRA is

based on those statutes' plain text and confirmed by their context, structure, and purpose, as well as powerful constitutional considerations. Defendants' position—that the HSA and the FVRA together permit indefinite acting service by a series of Acting Secretaries (including inferior officers)—is contrary to all of these factors and should be rejected.

*Third*, to the extent the Court finds that the HSA and the FVRA are ambiguous, it should interpret those statutes as Plaintiffs have suggested to avoid a constitutional problem under the Appointments Clause. Mr. Wolf's prolonged acting service cannot reasonably be described as "temporary." And Mr. Wolf's purported service as the "acting" secretary, which permitted him to serve for 426 days without Senate approval in an office that remained vacant for 665 days, is an affront to the Appointments Clause. Indeed, Mr. Wolf's service violated the Appointments Clause, though the Court need not reach that issue so long as it adopts one of Plaintiffs' four, independently sufficient, statutory arguments.

*Finally*, ratification cannot save the Rules from vacatur. Defendants have abandoned ratification arguments for the EAD Bar Rule. And Secretary Mayorkas' blanket affirmation of the Timeline Repeal Rule is both precluded by the FVRA's anti-ratification provision and fails the legal requirement that the ratifier make a detached and considered judgment to ratify. The government's contrary interpretation of the FVRA would gut that provision of its effectiveness and must be rejected.

## **ARGUMENT**

### I.  THE RULES ARE *VOID AB INITIO* BECAUSE MR. MCALEENAN NEVER VALIDLY SUCCEEDED SECRETARY NIELSEN

As the Government Accountability Office ("GAO") has decided and six courts have already ruled,[3] Mr. McAleenan never validly succeeded Secretary Nielsen as Acting Secretary, and he thus lacked authority to amend the order of succession so that Mr. Wolf could succeed him. The reason is simple: Secretary Nielsen did not amend the applicable order of succession, the resignation line, but instead amended the emergency line, and Mr. McAleenan was not next in line under the resignation line. The plain text of the April 2019 Order that Secretary Nielsen signed and the April 2019 Delegation that she issued permits no other conclusion. As the GAO concluded, this "plain language … controls, and it speaks for itself." Dkt. 25-4 at 90.

This Court should reach the same conclusion. While the government asks the court to exercise its "independent judgment" (Dkt. 28-1 ("Govt. Br.") at 15), it has neither advanced any new arguments that the GAO and other courts have not already considered and rejected nor explained why the prior decisions were wrong. Instead, it "has recycled exactly the same legal and factual claims made in the prior cases, as if they had not been soundly rejected in well-reasoned opinions by several courts," and "contents itself simply with saying the prior courts were wrong, with scant explanation." *Pangea*, 512 F. Supp. 3d at 971; *cf.* Govt. Br. at 15 (dismissing adverse decisions as the work of "a handful of other district courts"). But it is the government that is wrong, not the GAO and the consistent line of cases rejecting the government's arguments. Neither the

---

[3]  *See* Dkt. 25-4 at 82-93; *Behring Reg'l Ctr. LLC v. Wolf*, No. 20-cv-09263, 2021 WL 2554051 (N.D. Cal. Jun. 22, 2021); *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 971-73 (N.D. Cal. 2021); *La Clinica De La Raza v. Trump*, No. 19-cv-4980, 2020 WL 7053313, at *7-*9 (N.D. Cal. Nov. 25, 2020); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 123 (E.D.N.Y. 2020); *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 529-36 (N.D. Cal. 2020); *Casa de Maryland*, 486 F. Supp. 3d at 954-60.

government's "tortured" reading of the April 2019 Order and Delegation nor its "*ex post* explanations that the text means something other than what it says" should be credited, *Batalla Vidal*, 501 F. Supp. at 132, and both Rules are accordingly void *ab initio*. If the Court accepts this conclusion, it must vacate the EAD Bar Rule because Secretary Mayorkas never ratified that Rule, and the government has not contested Plaintiffs' submission that Mr. Wolf's various attempts to ratify it were unlawful and ineffective. *See* Plfs. Br. at 33-42.

### A.   The Plain Text Of The April 2019 Order And Delegation Belies the Government's Arguments

#### 1.   The Text Unambiguously Demonstrates That Secretary Nielsen Did Not Amend The Resignation Line

At the time Secretary Nielsen issued the April 2019 Delegation and Order, Delegation Order 00106 set out two tracks to determine which officials could exercise the authority of the Secretary: (1) the resignation line governed by E.O. 13,753, and (2) the emergency line governed by a separate list, Annex A. *See* SUF ¶¶ 186, 192, 199. The resignation line provided that "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753." Dkt. 25-4 at 48. If the Secretary was "unavailable to act during a disaster or catastrophic emergency," then the emergency line empowered the "officials occupying the identified positions in the order listed (Annex A)" with "authority to exercise the powers and perform the functions and duties of [the] office." *Id*.

Shortly before she left office, on April 9, 2019, Secretary Nielsen signed the April 2019 Order. SUF ¶¶ 197-99. That order provides (Dkt. 25-4 at 103):

> By the authority vested in me as Secretary of Homeland Security, including the Homeland Security Act of 2002, 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows:
>
> Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof:

> Annex A. Order for Delegation of Authority by the Secretary of the Department of Homeland Security.[4]
>
> [A numbered list of 18 officials appears here].
>
> No individual who is serving in an office herein listed in an acting capacity, by virtue of so serving, shall act as Secretary pursuant to this designation.

The next day, on April 10, 2019, Secretary Nielsen issued the April 2019 Delegation, a revised version of Delegation Order 00106. The April 2019 Delegation replaced the previous version of Annex A with the updated list of officials from the April 2019 Order. SUF ¶ 200; Dkt. 25-4 at 105, 109. But the April 2019 Delegation left the Section II.A resignation line unchanged. Section II.A of Delegation Order 00106 continued to provide that "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753." SUF ¶ 201; Dkt. 25-4 at 105.

"Because the plain language of [the April 2019 Order and Delegation] is unambiguous," the text is both the "begin[ning]" and the "end[]" of the analysis. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018).[5] The plain text of the April 2019 Order unambiguously provides that Secretary Nielsen amended only the emergency line of Delegation Order 00106, not the resignation line. Secretary Nielsen only made a single amendment to Delegation Order 00106, namely "amend[ing]" Annex A to elevate the CBP Commissioner's position. Dkt. 25-4 at 103;

---

[4]  At the time of the April 2019 Order, Annex A's title was also "Order for Delegation of Authority by the Secretary of the Department of Homeland Security." *See* Dkt. 25-4 at 52. The April 2019 Order thus did not change Annex A's title.

[5]  As the court held in *La Clinica*, "it is appropriate to apply rules of statutory construction to administrative orders delegating authority." *La Clinica De La Raza*, 2020 WL 7053313, at *6 n.3. All six courts to rule on this issue applied statutory interpretation rules to interpret the April 2019 Order and Delegation, and so should this Court. *See id.*; *Casa de Maryland*, 486 F. Supp. 3d at 959 (applying statutory interpretation rules from *Kingdomware Tech, Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016)); *ILRC*, 491 F. Supp. 3d at 535 (following *Casa de Maryland*); *Behring Regional Center*, 2021 WL 2554051, at *4 (same); *Batalla Vidal*, 501 F. Supp. 3d at 132 (same); *Pangea Legal Servs.*, 512 F. Supp. 3d at 973-74 (following *Batalla Vidal*).

SUF ¶ 198. And the version of Delegation Order 00106 then in force provided that Annex A only governed in the event Secretary Nielsen was "unavailable to act during a disaster or catastrophic emergency." Dkt. 25-4 at 48; SUF ¶ 199. As the government admits, the April 2019 Order did not "specifically amend [the resignation line] in Part II.A of Delegation [Order] 00106," Govt. Br. at 17, which applied "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office." Dkt. 25-4 at 48. And because Secretary Nielsen left unchanged the order of succession applicable "in the event of resignations or other vacancies, [it] continued to be governed by Executive Order (EO) 13753." *Pangea Legal Servs.*, 512 F. Supp. 3d at 974.

The plain meaning of the April 2019 Delegation is equally clear. It provided that in the event of "disaster or catastrophic emergency," the delegation of authority is determined by the updated version of Annex A included in the April 2019 Order. Dkt. 25-4 at 105, 109. And because the April 2019 Order made no other amendments to Delegation Order 00106, the April 2019 Delegation left the resignation line unchanged: Section II.A continued to provide that E.O. 13,753 governed succession following the Secretary's resignation. *See* Govt. Br. at 18 (admitting that the April 2019 Delegation "did not change Part II.A," the resignation line).

That plain language must be "enforce[d] [] according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). All six courts that have ruled on this issue have done so. Applying governing law, they have enforced the "clear language [of the April 2019 Order and Delegation] limiting [its] application to disaster and emergency" and found that that "plain language … controls [and] speaks for itself." *Casa de Maryland*, 486 F. Supp. at 959. They have also properly rejected the government's attempts "to eschew the plain meaning of Nielsen's order and divine her intent as meaning something else" as contrary to precedent and supported by "no authority." *Id.* And for this reason, they have held that "[b]ased on the plain text of the operative order of succession,

neither Mr. McAleenan nor, in turn, Mr. Wolf, possessed statutory authority to serve as Acting Secretary." *Batalla Vidal*, 501 F. Supp. 3d at 132.

## 2.   The Government's Attempts To Explain Away The Text Fail

Indeed, the only arguments on the text of the April 2019 Order's operative clauses that the government offers are attempts to explain away why those clauses do not say what the government now wishes they said. The government variously argues that (1) there was "no[] need" for the April 2019 Order to "specifically amend" the resignation line set out in Section II.A of Delegation Order 00106, Govt. Br. at 17, (2) the plain text of Delegation Order 00106 should be disregarded because it is "an administrative [document used] for internal purposes," *id*. at 18, and (3) the April 2019 Order's continuation of Annex A's original title showed only that it "would *also* continue to serve its original function" in addition to its purported new function, *id*. at 19 (emphasis in original). These attempts fail because "[h]ad Secretary Nielsen intended to modify the [resignation line], then her order could have"—and would have—"so stated." *La Clinica De La Raza v. Trump*, 477 F. Supp. 3d 951, 972 (N.D. Cal. 2020), *reconsideration granted*, No. 19-cv-04980, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020). It did not, and no amount of "*ex post* explanations" by the government can overcome that fact. *Batalla Vidal*, 501 F. Supp. 3d at 132.

The government's first argument—that there was "no[] need [for the April 2019 Order] to amend[]" the resignation line set out in Section II.A of Delegation Order 00106 because that document "merely identif[ies]" E.O. 13,753 as the applicable order of succession (Govt. Br. at 17-18)—fails and is inconsistent with the government's own repeated actions. Delegation Order 00106's very title indicates that it sets out the "DHS Orders of Succession and Delegation." Dkt. 25-4 at 48. As the government has previously accepted, "Delegation Order 00106 is the only written repository that memorializes [the] Secretary's changes to the succession orders," *Casa de Maryland*, 486 F. Supp. 3d at 959-60. Because it was a Delegation document issued by the

8

Secretary, a DHS directive made "[a]ll DHS officers and employees [] responsible for acting in accordance with [it]." Ex. 1 at 2; *see* Supplemental Statement of Undisputed Facts ("Supp. SUF") ¶¶ 1-5.[6] Secretary Nielsen updated it every time she amended the order of succession for the Secretary or another named position, and Mr. McAleenan did the same following his purported amendment to the lines of succession in November 2019. SUF ¶¶ 191-92, 200, 216. Consistent with the significance and role of Delegation Order 00106, the April 2019 Order expressly referenced and amended that document when it elevated the CBP Commissioner's position in the emergency line. *See* Dkt. 25-4 at 103. Mr. McAleenan's November 2019 Delegation similarly purported to amend the resignation line in Section II.A of Delegation Order 00106—the very provision the government says it was unnecessary for Secretary Nielsen to amend. *Id*. at 142. The September and November 2019 Gaynor Memos purporting to amend the line of succession likewise provided that they operated "notwithstanding … DHS Delegation No. 00106." *Id*. at 308, 314. The April 2019 Order neither amended the Section II.A resignation line contained in Delegation Order 00106 nor expressly displaced it, and thus it remained in force.

The April 2019 Order failed to "specifically amend Part II.A of Delegation 00106," Govt. Br. at 17, and also failed to specifically amend or displace E.O. 13,753 itself—and the government admits that E.O. 13,753 "established an order of succession." *Id*. at 18. In fact, the April 2019 Order made no mention of E.O. 13,753. The government's argument is thus the indefensible one that the April 2019 Order somehow silently amended Section II.A of Delegation Order 00106 and displaced the E.O. 13,753 line of succession without naming either document. *See La Clinica De La Raza*, 477 F. Supp. 3d at 972 (rejecting identical silent amendment argument).

---

[6]   All Exhibits cited herein are either previously docketed (Dkt. 25-4) or attached to the Supplemental Declaration of Brian McGrail, dated August 18, 2021, submitted with this Reply.

The government's second argument—that the Court should disregard the April 2019 Delegation's preservation of the E.O. 13,753 resignation line because Delegation Order 00106 was a mere "administrative [document used] for internal purposes" (Govt. Br. at 18)—should be rejected for the same reasons.[7] As explained above, "Delegation Order 00106 is the only written repository that memorializes [the] Secretary's changes to the succession orders," *Casa de Maryland*, 486 F. Supp. 3d at 959-60, was updated every time the Secretary amended lines of succession, and was expressly referenced by all the orders amending the line of succession for the Secretary. The government's attempted dismissal of the significance of Delegation Order 00106 is thus nothing more than an "*ex post* explanation[]" contradicted by the documents themselves. *Batalla Vidal*, 501 F. Supp. 3d at 132 (rejecting government's request "to ignore official agency policy documents and invalidate the plain text of [Delegation Order 00106]," which "comport[s] perfectly with the text of [the April 2019] [O]rder"); *see also Casa de Maryland*, 486 F. Supp. 3d at 959-60 (rejecting argument that Delegation Order 00106 is "administrative" and "non-binding" as supported by "no authority" and contrary to the government's admissions); *La Clinica De La Raza*, 2020 WL 7053313, at *6 (Delegation Order 00106 "is persuasive contemporaneous evidence that the replacement of Annex A was the only [] change effected by the [April 2019] [O]rder.").

The government's third argument, that the April 2019 Order repurposed Annex A to replace the E.O. 13,753 resignation line even though its title remained the same, is contrived and inconsistent with both the Order's text and the text of Delegation Order 00106. The April 2019

---

[7] The argument that Delegation Order 00106 should be disregarded because it was used for "internal purposes" (Govt. Br. at 18) also fails because that is equally true of the April 2019 Order. That order is attached to an internal memorandum to Secretary Nielsen from DHS's General Counsel containing legal advice that was redacted for privilege. Dkt. 25-4 at 102-03.

Order did not change Annex A's prior title, "Order for Delegation of Authority by the Secretary of the Department of Homeland Security." *Compare* Dkt. 25-4 at 103 *with id*. at 52. If the title of Annex A was intended to indicate that it would both serve its purported new function (the resignation line) and also "continue to serve its original function," Govt. Br. at 19, then it would have said so. The titles of the lists of officials in Delegation Order 00106 made clear whether those lists governed only delegation (including delegation during an emergency) or both delegation and succession. Annex A was only titled "Order for Delegation of Authority" because it governed only delegation during an emergency, not succession following resignation. Dkt. 25-4 at 48, 52. In contrast, the 25 Annexes that governed both succession and delegation for positions other than the Secretary, *see id*. at 48, were each titled ***"DHS Orders of Succession and*** Orders for Delegation of Authorities." *Id*. at 53-77 (Annexes B-Z) (emphasis added).

Secretary Nielsen could have easily retitled Annex A to read "***Order of Succession and*** Order for Delegation of Authority" like the other Annexes to demonstrate that Annex A would now govern succession following resignation, but she did not. Instead, as the *ILRC* court found, the April 9 Order "continue[d]" Annex A's "Order for Delegation of Authority" title. *ILRC*, 491 F. Supp. 3d at 535 (noting that the title in "[t]he replacement text [of the April 2019 Order] continues to state 'Annex A. Order for Delegation of Authority….'"). The delegation-specific title that she preserved is a textual indicator that refutes the government's argument that this order somehow amended the resignation line as well as the emergency line. *Id.* (relying on what Annex A's title "continue[d]" to state to reject government argument based on "distinction between a delegation of authority and an order of succession"). It also resolves any possible doubt about the April 2019 Order's meaning in favor of Plaintiffs. *See Almendarez-Torres v. United States*, 523

11

U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.").

### 3. The April 2019 Order's Prefatory Clause Cannot Change Its Plain Meaning

Rather than confront the text of the April 2019 Order and Delegation, the government relies heavily on the prefatory clause of the April 2019 Order, in which Secretary Nielsen stated that she was exercising her authority under Section 113(g)(2) of the HSA to "designate[] the order of succession." Govt. Br. at 16-17 (quoting Dkt. 25-4 at 103). That prefatory clause, the government says, repurposed Annex A's emergency line to "ensure[] that the order of succession in the event of vacancy and the order of delegation in cases of emergency would be the same," *id* at 16, even though the operative clause "did not specifically amend" the resignation line of Delegation Order 00106, *id*. at 17. Plaintiffs' interpretation, the government claims, would render the prefatory clause "superfluous" and "unnecessary" because "there would have been no reason for the Order to rely on § 113(g)(2)." *Id*. at 19.

But the government's argument fails because "prefatory clauses [] cannot change the plain meaning of the operative clause," *Kingdomware Techs.*, 136 S. Ct. at 1978, and every textual indicator in the operative clause rebuts the government's argument based on the prefatory clause. The April 2019 Order makes clear that Secretary Nielsen only "designate[d] the order of succession for the Secretary of Homeland Security ***as follows***," Dkt. 25-4 at 103 (emphasis added), language that "is critical to understanding what exactly Secretary Nielsen ordered," *La Clinica De La Raza*, 477 F. Supp. 3d at 971. And "what followed" was an amendment to Annex A's emergency line, but "no other changes to Delegation [Order] 00106." *Id*. The operative portion "purported to strike the text of Annex A in its entirety" and replace it with a new list of officials, but contained no language purporting to repurpose Annex A to replace the resignation line. *ILRC*,

491 F. Supp. 3d at 535. Even the title of Annex A stayed the same. *ILRC*, 491 F. Supp. 3d at 534-35; *compare* Dkt. 25-4 at 103 *with id*. at 52.

The plain meaning of the operative clause is thus that the April 2019 Order made a single "specific change"—to amend Annex A—but "did not amend the circumstances that would trigger Annex A's application." *La Clinica De La Raza*, 2020 WL 7053313, at \*6. As the *La Clinica* court and many others have concluded, "[i]n light of th[is] plain meaning, defendants' arguments concerning the surrounding references to order of succession are unpersuasive." *Id*. (citing *Kingdomware Techs.*, 136 S. Ct. at 1978); *see also Casa de Maryland*, 486 F. Supp. 3d at 959-60 (rejecting identical argument as an improper attempt "to eschew the plain meaning of Nielsen's order") (also citing *Kingdomware Techs.*, 136 S. Ct. at 1978); *Batalla Vidal*, 501 F. Supp. 3d at 132 (rejecting identical argument as an improper attempt to "invalidate the plain text" of the April 2019 Order and Delegation). The prefatory clause "cannot bear the weight that [the government would] place[] on [it]," and that the government has "resort[ed] to" that clause "is in itself fatal to the [government's] claim." *Hawaii v. Off. of Hawaiian Affs.*, 556 U.S. 163, 175 (2009).

The government's invocation of the surplusage canon similarly fails because that canon only applies to operative provisions, not prefatory clauses. *See D.C. v. Heller*, 554 U.S. 570, 578 n. 3 (2008) (rejecting application of surplusage canon to preamble because "where the text of a clause itself indicates that it does not have operative effect, … a court has no license to make it do what it was not designed to do"). Prefatory clauses neither "change the plain meaning of the operative clause," *Kingdomware Techs.*, 136 S. Ct. at 1978, nor "expand [its] scope," *Heller*, 554 U.S. at 578, and thus are incapable of having the operative effect required to trigger the surplusage canon. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 78 n.3 (2014) (Roberts, C.J., concurring)

13

("[W]ho gets relief under a statute depends entirely on the meaning of the statute's operative provision, not on the reach of the introductory clause.").

But even leaving this aside, applying the plain text of the April 2019 Order does not render the prefatory clause unnecessary. As the government admits, Section 113(g)(2) of the HSA gives the Secretary authority to designate a further order of succession not only when there is a "vacancy," but also in cases of "absence" or "disability." Govt. Br. at 19 (quoting 6 U.S.C. § 113(g)(1)). Section 113(g)(2) thus grants the Secretary the authority to amend the emergency line because a Secretary who is temporarily absent or disabled "during a disaster or catastrophic emergency" may also be "unavailable to act" as the emergency line contemplates. Dkt. 25-4 at 48; *see In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019) ("'disability' means the inability to do something"). Indeed, the D.C. Circuit has held that a provision similar to Section 113(g)(2), which empowers the Deputy Attorney General to exercise the Attorney General's powers in the event of the latter's "absence or disability," 28 U.S.C. § 508, was triggered by a "single-issue recusal," and does not require a "wholesale absence or disability." *In re Grand Jury Investigation*, 916 F.3d at 1055-56. And by invoking Section 113(g)(2), which applies "notwithstanding" the FVRA, Secretary Nielsen could ensure that the Annex A emergency line would govern in the event that both the resignation and emergency lines were triggered by a disaster or catastrophic emergency.

For this reason, as the *Casa* court recognized, the designation language that the government relies on "at best states the obvious—that Nielsen had the authority to change the succession order as applied to the office of the Secretary" and that "she made [the changes to Annex A] pursuant to her authority under section 113(g)"—but it "does not support that Nielsen changed two separate succession lists applicable to each scenario." *Casa de Maryland*, 486 F. Supp. 3d at 959. The government thus cannot "expan[d] [the] limited text [of the April 2019 Order] by the positing of

an unlimited purpose" of changing the succession order because the April 2019 Order achieved its purpose by the "particular means" of amending the order applicable during emergencies. *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012). For that reason, the government's invocation of purpose "provide[s] no warrant for expanding [the April 2019 Order] beyond the field to which it is unambiguously limited," namely the Secretary's unavailability to act in an emergency. *Id.*

### B.    DHS's Proffered Agency Practice Is Entitled To No Weight

The government also asks this court to give "significant weight," Govt. Br. at 20, to the extrinsic evidence and agency practice regarding the transfer of duties, but that evidence is entitled to no weight at all, because "the meaning of the words used [in the April 2019 Order and Delegation] is [not] in doubt." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[A] court should not afford [] deference [to an agency's interpretation of its rules] unless the regulation is genuinely ambiguous" and the court has "exhaust[ed] all the traditional tools of construction"). Specifically, the government invokes a news article recording that Secretary Nielsen swore Mr. McAleenan in as Acting Secretary, the attorney-client memo accompanying the April 2019 Order, and the FVRA notices that DHS submitted to Congress. *See* Govt. Br. at 17, 20. But "given the clarity of the [April 2019 Delegation and Order], [this Court] cannot defer to the agency's contrary interpretation." *Huashan Zhang v. United States Citizenship & Immigr. Servs.*, 978 F.3d 1314, 1322 (D.C. Cir. 2020). Even "longstanding agency practice can[not] trump … the force of law" embodied in the "plain … text" of the April 2019 Delegation and Order, and the few scattered examples of agency practice that the government has identified cannot do so either. *Byers v. Comm'r*, 740 F.3d 668, 677 (D.C. Cir. 2014).

And "[p]articularly when so much is at stake" for Plaintiffs due to the Rules' harsh impact, the Court should "hold[] [DHS] to [its] word" and require it to "turn square corners in dealing with

the people" rather than evading the plain meaning of Nielsen's order. *Casa de Maryland*, 486 F. Supp. 3d at 960 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020)). At most, the extrinsic evidence the government proffers might support an inference that Secretary Nielsen may have subjectively intended to designate Mr. McAleenan as her successor. But whatever the Secretary's subjective intentions, "only the words on the page[s] [of the April 2019 Order and Delegation] constitute the law." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1738 (2020). And Plaintiffs "are entitled to rely on [those documents] as written, without fearing that courts might disregard [their] plain terms based on some extratextual consideration," such as Secretary Nielsen's subjective intention. *Id*. at 1749. Secretary Nielsen's supposed intent cannot defeat the text of the documents that she signed and issued, just as "legislative history can never defeat unambiguous statutory text." *Id*. at 1750.

Even if there were any ambiguity—and there is not—DHS's *post hoc* rationalization of the April 2019 Order and Delegation still would not be entitled to deference because it fails all four additional requirements that *Kisor* establishes. To be entitled to deference, an interpretation must (1) "be the agency's authoritative or official position," not an "ad hoc statement," (2) "implicate [the agency's] substantive expertise," (3) "reflect fair and considered judgment," and (4) "fall within the bounds of reasonable interpretation." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020). The government does not even attempt to meet these requirements. The news article containing ad hoc statements about Mr. McAleenan's swearing-in is not even an agency position, *see* Govt. Br. at 20, and the attorney-client memo accompanying the April 2019 Order is an internal document, *id.* at 17. Unlike the April 2019 Order and Delegation, neither document is a "vehicle[] understood to make authoritative policy." *Kisor*, 139 S. Ct. at 2416. Nor has the government explained how the April 2019 Order and Delegation pose a "regulatory ambiguity"

that engages DHS's expertise—instead, DHS lacks subject matter expertise in "interpretive issues" that "fall more naturally into a judge's bailiwick." *Id*. at 2417. And DHS's reading of the regulations neither reflects fair and considered judgment nor falls within the bounds of reasonable interpretation. Instead, it is a "tortured" reading offered to argue that the text "meant something other than what it says," *Batalla Vidal*, 501 F. Supp. 3d at 132, and thus falls outside of the "text[ual] … bounds of permissible interpretation." *Kisor*, 139 S. Ct. at 2416.

In contrast, the most authoritative DHS documents—the April 2019 Delegation and Mr. McAleenan's November 2019 Delegation—actually confirm Plaintiffs' position.[8] As discussed above, Delegation Order 00106 is a "vehicle[] understood to make authoritative policy." *Kisor*, 139 S. Ct. at 2416; *see Batalla Vidal*, 501 F. Supp. 3d at 132; *Casa de Maryland*, 486 F. Supp. 3d at 959-60. For this reason, the April 2019 Delegation amending Delegation Order 00106 "is persuasive contemporaneous evidence that the replacement of Annex A was the only [] change effectuated by the [April 2019] [O]rder." *La Clinica De La Raza*, 2020 WL 7953313, at *6. Similarly, the November 2019 Delegation expressly amending Section II.A of Delegation Order 00106 is "strong evidence that E.O. 13753 was the operative law at the time." *Batalla Vidal*, 501 F. Supp. 3d at 132; *see also La Clinica De La Raza*, 477 F. Supp. 3d at 972 (same). Just as in *ILRC*, here too the government has "not provide[d] a persuasive argument as to why it was necessary for Mr. McAleenan to amend Section II.A of Delegation 00106 if Secretary Nielsen had already accomplished that change." *ILRC*, 491 F. Supp. 3d at 535; *see* Govt. Br. at 18 n.6 (asserting that Mr. McAleenan "merely provided additional clarity"). The only documents that might merit any

---

[8]  As explained above, Plaintiffs' position is that the April 2019 Delegation is a legally operative document, not a mere "administrative [document used] for internal purposes" as the government submits. Govt. Br. at 18. But even on the government's logic, the April 2019 Delegation is still a "vehicle[] understood to make authoritative policy." *Kisor*, 139 S. Ct. at 2416.

deference are the authoritative April 2019 and November 2019 Delegations, not DHS's litigation position and the scattered non-authoritative examples of agency practice it relies on. *See La Clinica De La Raza*, 2020 WL 7953313, at *6.

C.   **Mr. McAleenan's Invalid Succession Is Dispositive Of Plaintiffs' Challenge To The EAD Bar Rule**

Mr. McAleenan's invalid succession is dispositive of Plaintiffs' challenge to the EAD Bar Rule. While Mr. McAleenan "purported to be Acting Secretary" following Secretary Nielsen's resignation, he was seventh in the E.O. 13,753 line of succession and thus "possessed no statutory authority to" serve as Acting Secretary and exercise the Secretary's power to amend the line of succession. *Batalla Vidal*, 501 F. Supp. 3d at 131-32; *see* SUF ¶ 203. Thus, "[b]ecause the passing of the torch from Nielsen to McAleenan was ineffective, the attempt by McAleenan to pass it in turn to Wolf [in November 2019] had no legal effect whatsoever." *Pangea Legal Servs.*, 512 F. Supp. 3d at 974; *Batalla Vidal*, 501 F. Supp. 3d at 132 (same). Accordingly, Mr. Wolf was not lawfully serving as Acting Secretary, and lacked lawful authority to issue the Rules, so the Rules have "no force or effect" under the FVRA, 5 U.S.C. § 3348(d)(1), and are equally "not in accordance with law" and "in excess of … authority" under the APA, *id.* §§ 706(2)(A), (C).

Further, Secretary Mayorkas never ratified the EAD Bar Rule, and the government has not contested Plaintiffs' argument that Mr. Wolf's various attempts to ratify it were unlawful and ineffective. *See* Plfs. Br. at 33-42. Nor does the government dispute that vacatur of the EAD Bar Rule in its entirety is the proper remedy under both the FVRA and the HSA. *Id.* at 42-45; *see Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 7121849, at *1 (E.D.N.Y. Dec. 4, 2020) (vacating action by Mr. Wolf after holding that Mr. Wolf was serving in "violation" of the HSA); *Behring Reg'l*, 2021 WL 2554051, at *9-10 (vacating Final Rule issued by Mr. McAleenan in "violation" of the FVRA). Accordingly, if the Court concludes that Mr. McAleenan invalidly succeeded

Secretary Nielsen, then the EAD Bar Rule is necessarily void and must be vacated, and the Court need not consider any other alternative arguments that the EAD Bar Rule is void.

## II.   THE RULES ARE VOID *AB INITIO* UNDER THE HSA AND FVRA

Even if Mr. McAleenan had been validly appointed (and he was not), both Rules would remain void *ab initio* under the HSA and FVRA for three additional reasons: (1) Mr. McAleenan lacked authority under Section 113(g)(2) of the HSA to amend the line of succession; (2) Mr. McAleenan amended the line of succession and Mr. Wolf assumed office and issued the Rules in violation of the FVRA's 210-day limit; and (3) Mr. Mizelle signed the Rules in violation of the FVRA's 210-day limit.

### A.   Section 113(g)(2) Of The HSA Did Not Authorize Mr. McAleenan To Amend The Line Of Succession

Even if Mr. McAleenan had lawfully assumed office, he had no authority to amend the line of succession because "an Acting Secretary may not amend the Department's order of succession under § 113(g)(2) [of the HSA]," and "Wolf [thus] acted without authority when he approved" the Rules. *Nw. Imm. Rights Proj. (NWIRP) v. U.S. Dep't of Homeland Sec.*, 496 F. Supp. 3d 31, 70 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, Dkt. 7 (D.C. Cir. Jan. 12, 2021). The text of Section 113(g)(2) demands that interpretation, and none of the government's arguments dispel Judge Moss's careful and thorough conclusion in *NWIRP* that structure, purpose, and constitutional concerns confirm it. *See* Plfs. Br. at 34-36; *NWIRP*, 496 F. Supp. 3d at 61-70.

Just as with the April 2019 Order and Delegation, the text of Section 113(g)(2) is also the "begin[ning]" and the "end[]" of the analysis. *Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 631. Section 113(g)(2) provides that "the Secretary"—not the Acting Secretary—may designate such other officers of the Department in further order of succession to serve as Acting Secretary," 6 U.S.C. § 113(g)(2). Section 113(g)(1) reinforces the distinction that Section 113(g)(2) draws between

"Secretary" and "Acting Secretary" by stating that the "Under Secretary for Management shall serve as the *Acting* Secretary" when "neither the *Secretary* nor Deputy Secretary is available." 6 U.S.C. § 113(g)(1) (emphasis added). These textual choices signal "Congress' decision to use different terms to describe different categories of people" in Section 113(g), a choice that must be respected. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012). Plaintiffs' interpretation must carry the day because it "credits Congress' use of the disparate terms" of "Secretary" and "Acting Secretary" within the same subsection, while the government's "construction does not." *Id*.

Instead of engaging with the text, the government argues that applying "plaintiffs' logic" to other provisions in the HSA would prevent the Acting Secretary from exercising "any of the authority that the [HSA] assigns to 'the Secretary.'" Govt. Br. at 20-21. But there is no slippery slope because the HSA does provide a "textual basis" for "treating the Secretary's authority under § 113(g)(2) differently from" other grants of authority. *Contra id*. at 20. As explained above, Section 113(g) expressly distinguishes the "Secretary" from the "Acting Secretary." Other provisions of the HSA that grant broad authority to the Secretary do not draw this distinction and do not even reference the "Acting Secretary." *See*, *e.g.*, 6 U.S.C. §§ 112(a)(2), (d), (e). These textual differences also dispel the government's invocation of the uniform usage presumption, see Govt. Br. at 20, because that presumption "yields readily to indications that the same phrase used in different parts of the same statute means different things." *Barber v. Thomas*, 560 U.S. 474, 484 (2010); *see also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004) ("the presumption is not rigid" and can be displaced by context).

The text of Section 113(g) also displaces the government's argument that "[t]he scope of an acting official's authority does not depend on his underlying office." Govt. Br. at 24. The government does not dispute that Congress was free to restrict the terms of the Section 113(g)(2)

grant of authority to the Presidentially-appointed and Senate-confirmed ("PAS") Secretary. The text demonstrates that Congress did precisely that. The government's cases are inapposite, because they considered statutes expressly providing that the Deputy Attorney General or Solicitor General could exercise the powers of the Attorney General in the event of an absence, disability, or vacancy.[9] *See In re Grand Jury Investigation*, 916 F.3d at 1056; *United States v. Pellicci*, 504 F.2d 1106, 1107 (1st Cir. 1974) (Solicitor General can exercise the Attorney General's power because "the dispositive statute is 28 U.S.C. § 508(b)"); *United States v. Nixon*, 418 U.S. 683, 694 & n.9 (1974) (also assuming that the Solicitor General can exercise the Attorney General's power). As Judge Moss held in *NWIRP*, Section 113(g)(2) is not a statute that "expressly vest[s] the first assistants at issue with the authority to exercise the duties and functions of the vacant office." *NWIRP*, 496 F. Supp. 3d at 68. To the contrary, Section 113(g)(2) rebuts any supposed presumption that the Acting Secretary enjoys the Secretary's authority to designate a line of succession by distinguishing the Secretary from the Acting Secretary.

While the text of Section 113(g)(2) makes clear that acting officials cannot modify the order of succession, the context and structure of the HSA and the related FVRA confirm this interpretation. Plaintiffs' interpretation gives effect to the requirement in the "exception to the exclusive-means provision of the FVRA [that] a 'statutory provision expressly … authorizes … the head of an Executive department'" to temporarily designate an acting officer. *NWIRP*, 496 F. Supp. 3d at 63 (quoting 5 U.S.C. § 3347(a)(1)). The government's interpretation does not because

---

[9] The government's suggestion that the D.C. Circuit concluded in *In re Grand Jury Investigation* that the Deputy Attorney General became head of Department "not by virtue of his own office's statutory authority" is wrong. Govt. Br. at 24. The court in fact held that "Congress has authorized the Deputy Attorney General to perform 'all the duties of th[e] office' in case of a vacancy, 28 U.S.C. § 508(a), such that the Deputy becomes the 'Acting' Attorney General." *In re Grand Jury Investigation*, 916 F.3d at 1056.

"a provision that vests the 'Secretary' with authority to designate an order of succession" does not "expressly—or explicitly—authorize an 'Acting Secretary' to perform that same function." *Id.* at 64. The government's argument that the "notwithstanding" clause in Section 113(g)(2) ousts the FVRA's express authorization requirement fails because "notwithstanding" clauses are relevant only "in the event of a clash" between two provisions, and the government has identified no such clash. *NLRB v. SW Gen, Inc.*, 137 S. Ct. 929, 939 (2017). To the contrary, there is no conflict between the HSA's grant to the "Secretary" of the Section 113(g)(2) designation power and the FVRA's requirement that any exception "expressly … authorize[] the head of an Executive department" to make the designation (*see* 5 U.S.C. § 3347(a)(1)). The two statutes "are capable of coexistence." *J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143 (2001); *see NWIRP*, 496 F. Supp. 3d at 64 ("Because the FVRA demands an 'express' statutory authorization, the Court reads 'Secretary' in § 113(g)(2) to mean the Secretary, and not an Acting Secretary.").[10]

Plaintiffs' interpretation is also consistent with the FVRA's purpose of "recla[i]m[ing] [] Congress's Appointments clause power." *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015) (citing S. Rep. No. 105-250, at 5 (1998)), *aff'd* 137 S. Ct. 929 (2017). Relieving "'[t]he President . . . of responsibility and accountability for selecting acting officials'" as the government proposes would frustrate that purpose by permitting the Acting Secretary "to assign the duties of PAS offices to officers and employees, with little or no check from Congress." *NWIRP*, 496 F. Supp. 3d at 68 (quoting *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28 (D.D.C. 2020)). And the government's claim that Plaintiffs' reading reduces executive control (Gov't Br. 22) falls flat, because the President

---

[10]   The government misses the point with its claim that the FVRA "does not require statutes . . . expressly enumerate each of the functions" of acting officials. Govt. Br. at 21. While that may be true as a general matter, the FVRA does require an alternative statute to "expressly … authorize" authority to designate the line of succession, 5 U.S.C. § 3347(a)(1), and Section 113(g)(2) does not expressly authorize the "Acting Secretary" to do so. *See NWIRP*, 496 F. Supp. 3d at 63-64.

retains authority to name a successor under FVRA §§ 3345(a)(2) & (3) and to terminate an Acting Secretary designated under Section 113(g)(2). *See English v. Trump*, 279 F. Supp. 3d 307, 319 (D.D.C. 2018); *La Clinica De La Raza*, 477 F. Supp. 3d at 972. The government's focus on Presidential control also misses the very purpose of the FVRA, namely to reclaim Congress' Appointments Clause power in the face of widespread Presidential use of acting appointments by preventing the President from abusing this power to avoid congressional scrutiny of appointments. *See SW Gen., Inc.*, 796 F.3d at 70.

Moreover, authorizing an acting Secretary to amend the line of succession "would arguably expand [that provision] beyond constitutional limits" by permitting inferior officers to appoint other inferior officers." *NWIRP*, 496 F. Supp. 3d at 68. The government attempts to evade this concern by arguing that the reference to "such other officers" in § 113(g)(2) authorizes only the PAS officers enumerated in § 113 of the HSA to serve. Govt. Br. at 22. But the government ignores that the preceding subsection, Section 113(g)(1), provides that the Deputy Secretary and the Under Secretary for Management are first in line in the order of succession. 6 U.S.C. § 113(g)(1); *see* SUF ¶ 183. Section 113(g)(2) in turn authorizes the designation of a "further order of succession" if the offices of Deputy Secretary and Under Secretary for Management are vacant. 6 U.S.C. § 113(g)(2). The context thus demonstrates that "such other officers" in Section 113(g)(2) refers to officers other than the Deputy Secretary and Under Secretary for Management, and does not restrict the officers the Secretary may designate to the specific officers listed in Section 113. Moreover, even if the government were right and "Secretary" included "Acting Secretary," *see* Govt. Br. at 20, then references to "officers" also encompass "acting officers," who in turn might not be Presidentially-appointed and Senate-confirmed. And that poses the same constitutional

problem of inferior officers appointing other inferior officers that Judge Moss considered in *NWIRP* when interpreting Section 113(g)(2). *NWIRP*, 496 F. Supp. 3d at 69.

For this same reason, the government cannot rely on *Weiss v. United States*, 510 U.S. 163 (1994) to evade constitutional concerns. *Weiss* held that Congress may confer additional duties on a PAS officer if they are "germane to that office." 510 U.S. at 174. That is why Congress can authorize a Deputy Secretary to appoint inferior officers—"the authority to assume the role as 'Head of Department' is inherent in the job for which they were constitutionally appointed." *NWIRP*, 496 F. Supp. 3d at 68; *see In re Grand Jury*, 916 F.3d at 1049, 1056 (PAS Deputy Attorney General was a "head of Department" because statutorily authorized "to perform 'all the duties of the office [of Attorney General]' in case of a vacancy.'" (quoting 28 U.S.C. § 508(a))). But *Weiss* left "unresolved whether the Appointments Clause envisions appointment of some inferior officers by other inferior officers." *NWIRP*, 496 F. Supp. 3d at 65 (citing *Weiss*, 510 U.S. at 192-93, Souter J.). That is precisely the constitutional concern here—if an Acting Secretary could designate inferior officers to serve as Acting Secretary, then "each of those [inferior officers] could then … set a new order of succession, effectively designating the next Acting Secretary" and "arguably expand[ing] [Section 113(g)(2)] beyond constitutional limits." *Id.* at 68.[11] For this reason, even if Section 113(g)(2) could be read to permit the Acting Secretary to designate inferior officers to serve as Acting Secretary—it cannot—"the canon of constitutional avoidance directs that [the Court] not construe the statute in a manner that renders it vulnerable to constitutional challenge." *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 68 (D.C. Cir. 2016).

---

[11]   It is "irrelevant" that Mr. McAleenan and Mr. Wolf "ascended to the post of Acting Secretary from their own PAS positions" because "the Court must consider whether any application of the provision as interpreted by Defendants would raise constitutional concern." *NWIRP*, 496 F. Supp. 3d at 69.

### B.   Mr. McAleenan Amended The Line of Succession And Mr. Wolf Assumed Office And Issued The Rules In Violation Of The 210-Day Limit

The Rules are also void because Mr. Wolf assumed office and issued them after the expiration of the FVRA's 210-day limit on the service of an acting official. Section 3446(a)(1) of the FVRA provides that "the person serving as an acting officer as described under section 3345 may serve in the [vacant] office for no longer than 210 days beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). It is uncontested that, if that 210-day limit applies, Mr. Wolf issued the Rules unlawfully, because (1) Mr. McAleenan amended the line of succession so that Mr. Wolf could succeed him more than 210 days after the Office of the Secretary of Homeland Security became vacant; (2) Mr. Wolf assumed office more than 210 days after the vacancy began; and (3) Mr. Wolf issued the Rules more than 220 days after he began to purport to serve as Acting Secretary and 440 days or more after the vacancy began. SUF ¶¶ 211-212, 214, 222, 224; Plfs. Br. at 24-27. To evade the effect of the FVRA, the government submits that Congress placed "no [] [temporal] restriction on acting service" under the HSA. Govt. Br. at 25.[12]

That argument is contrary to the FVRA's text. The FVRA does permit agency-specific statutes such as the HSA to implement an alternative succession scheme, but only if those statutes "expressly" designate some other official to "temporarily" serve in an acting capacity. *Id*. §§ 3347(a)(1)(A), (B). This provision ensures that alternative succession schemes do not undermine the FVRA's requirement that the President can only authorize acting officials "to *temporarily* carry out the duties of [a vacant office]" by ensuring that the length of service of

---

[12]   The Court need not reach this argument if it accepts Plaintiffs' argument that Mr. McAleenan did not validly succeed Secretary Nielsen. Because the April 2019 Order and Delegation did not amend the resignation line, succession following resignation was governed by E.O. 13,753. And because E.O. 13,753 was issued under the FVRA, it subjected Mr. McAleenan and Mr. Wolf to the FVRA's 210-day limit and sanctions provisions. *See* Plfs. Br. at 27.

officials appointed under such schemes is limited. *SW Gen, Inc.*, 137 S. Ct. at 934 (emphasis added); *see* 5 U.S.C. §§ 3346(a). On the government's reading, there is nothing temporary about the service of Mr. Wolf or other officials purportedly designated under the HSA: Because the HSA does not contain any time restrictions and the government submits that the FVRA's time limit does not apply, Acting Secretaries could run DHS indefinitely without violating any statute. *See Casa de Maryland*, 486 F. Supp. 3d at 955 (government's reading permits "indefinite[]" service).

That approach contradicts the FVRA's express requirement that acting service under an alternative succession scheme be temporary. 5 U.S.C. §§ 3347(a)(1)(A), (B). The cases the government cites do not address the FVRA's critical temporary requirement.[13] Instead, the Court should adopt Plaintiffs' interpretation because it gives meaning to "temporarily," "interpret[s] [the FVRA] as a symmetrical and coherent regulatory scheme and fit[s] … all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

The government's interpretation also frustrates the FVRA's purpose and raises serious constitutional concerns. The FVRA, after all, is a "reclamation of Congress's Appointments Clause power," *SW Gen., Inc.*, 796 F.3d at 70, not an abdication of that power in favor of perpetual indefinite service by acting officials. And under the Appointments Clause, a "subordinate officer" may only be "charged with the performance of the duty of the superior for a *limited time*, and under special and *temporary* conditions." *United States v. Eaton*, 169 U.S. 331, 343 (1898) (emphases added); *see* Plfs. Br. 31. Even the courts that have ruled in favor of the government on this issue

---

[13]   *See Casa de Maryland*, 486 F. Supp. 3d at 955 (reasoning that the "Court cannot generally extend the FVRA's timing provisions to a person serving temporarily and in an acting capacity pursuant to an agency-specific statute" even while accepting that "this reading imposes no time limitations"); *Batalla Vidal*, 501 F. Supp. 3d at 130 (concluding that there is "no [time] limitation" without addressing the FVRA's temporary requirement); *ILRC*, 491 F. Supp. 3d at 536-38 (analyzing FVRA issue without addressing the FVRA's temporary requirement).

have acknowledged the "serious constitutional concerns" that this interpretation raises. *Batalla Vidal*, 501 F. Supp. 3d at 130 n.9; *see also Casa de Maryland*, 486 F. Supp. 3d at 955 (acknowledging "tension" with constitutional requirement for temporary service).[14] Precisely because the government's proposed interpretation "would raise [] serious constitutional problems," the Court should "construe the statute to avoid such problems." *Rothe Dev.*, 836 F.3d at 68.

The government's argument that Section 3346 of the FVRA "unambiguous[ly]" provides that the "210-day time limit does not apply to designations under the Homeland Security Act" is wrong. Govt. Br. at 25. Section 3346 does not state that it applies only to those officials appointed or designated under Section 3345. Instead of referring to officials "***temporarily authoriz[ed]***" by Section 3345 as Section 3347 does, *see* 5 U.S.C. § 3347(a) (emphasis added), Section 3346 provides that it applies to those "serving as an acting officer ***as described*** under Section 3345," 5 U.S.C. § 3346(a) (emphasis added). Congress could have used the same "temporarily authoriz[ed]" language in Section 3346 as in Section 3347, but it did not, and its choice to use "as described" instead must be given effect.[15] *See Russello v. United States*, 464 U.S. 16, 23 (1983). Thus, Section

---

[14]  The *Casa de Maryland* court was wrong to suggest that Congress's perceived desire to "prioritize continuity of service over quick nomination" lessens the constitutional concerns. *Casa de Maryland*, 486 F. Supp. 3d at 956. Purported policy objectives cannot oust the constitutional requirement that acting service be temporary. Nor can Congress abdicate its constitutional responsibility in pursuit of this policy objective because the Appointments Clause, "like all of the Constitution's structural provisions, is designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty." *SW Gen.*, 137 S. Ct. at 949 (Thomas J., concurring); *see Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020) ("the Appointments Clause helps to preserve democratic accountability").

[15]  None of the government's cases address the textual distinction the FVRA draws between acting officers "as described under Section 3345," 5 U.S.C. § 3346(a), and acting officers "temporarily authoriz[ed]" by Section 3345, *see* 5 U.S.C. § 3347(a). Neither *Casa de Maryland* nor *Batalla Vidal* addressed this textual distinction. *See Casa de Maryland*, 486 F. Supp. 3d at 952-53; *Batalla Vidal*, 501 F. Supp. 3d at 129-30. *ILRC* reasoned that the language of "as described under Section 3345" encompassed only officials "temporarily authorized" pursuant to Section 3345, but it did not address or give effect to the textual distinction the FVRA draws between acting officers "as

3346's time limit does not distinguish the relevant service according to the authority used to designate the individual, but instead encompasses all persons who fall within Section 3345's description of acting service. And Section 3345 in turn describes officers "perform[ing] the functions and duties of [an] office temporarily" when a Senate-confirmed "officer of an Executive agency … dies, resigns, or is otherwise unable to perform the functions and duties of the office"—that description applies equally to persons authorized by Section 3345 and by an agency-specific statute pursuant to Section 3347. *Id.* § 3345(a).

Nor can Section 113(g)(2) of the HSA's "notwithstanding" clause support the government's interpretation. On the government's view, by empowering the Secretary to designate an order of succession "notwithstanding" the FVRA, Section 113(g)(2) overrides both the 210-day time limit set out in Section 3346 and Section 3347(a)(1)'s requirement that an agency-specific statute "expressly" authorize only "temporary" service. *See* Govt. Br. at 21, 26. But that is not how notwithstanding clauses work. "A 'notwithstanding' clause just shows which of two or more provisions prevails in the event of a conflict." *SW Gen.*, 137 S. Ct. at 940.[16] While the government states that the notwithstanding clause would "resolve[] any conflict," Govt. Br. at 26, it has not identified any such conflict between Section 113(g)(2) and the FVRA's 210-day time limit, and no such conflict exists. Nothing in Section 113(g)(2) says that acting officers may serve indefinitely. The notwithstanding clause thus does no more than supersede the default order of

---

described under Section 3345," 5 U.S.C. § 3346(a), and acting officers "temporarily authoriz[ed]" by Section 3345, 5 U.S.C. § 3347(a). *See ILRC*, 491 F. Supp. 3d at 537.

[16]   The government's cases did not identify the required conflict between Section 113(g)(2) and the FVRA's 210-day time limit. *See Casa de Maryland*, 486 F. Supp. 3d at 955 (relying on "the FVRA's terms," not the "notwithstanding" clause, to conclude that the FVRA does not apply); *Batalla Vidal*, 501 F. Supp. 3d at 130 (citing "notwithstanding" clause but failing to identify any conflict between Section 113(g)(2) and the FVRA's 210-day time limit; *ILRC*, 491 F. Supp. 3d at 537 (reasoning that the notwithstanding clause "supersed[es] the [entire] FVRA" without identifying any conflict).

succession in § 3345(a) and permit the Secretary to issue an order of succession, a power that the FVRA reserves for the President. *Compare* 6 U.S.C. § 113(g)(2) to 5 U.S.C. §§ 3345(a)(2), (3). Accordingly, because the HSA and the FVRA "are capable of coexistence" and there is no "clearly expressed congressional intention to the contrary," "it is the duty of the courts . . . to regard each as effective." *J.E.M. Ag. Supply*, 534 U.S. at 143-44.

The government's interpretation also fails because it manufactures absurd internal inconsistencies within the HSA. As *Casa de Maryland* acknowledged, the government's reading would mean that the 210-day limit would apply to the "first assistant" positions of Deputy Secretary or Under Secretary of Management, but not to lower-ranked officers designated under Section 113(g)(2). 486 F. Supp. 3d at 957; *see* 6 U.S.C. § 113(a)(1)(A), (F) (designating the Deputy Secretary and Under Secretary as "first assistant[s]"). Such result would be absurd: Congress could not have intended that the Department's most senior PAS officers would be subject to the 210-day limit while lower-ranking officers, including non-PAS officers, would not. *See Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1476 (2020) (rejecting as "absurd" an interpretation that "creates a massive loophole in the [statutory] scheme.").[17]

The government's reliance on legislative history is similarly unavailing. *See* Govt. Br. at 25. The Senate Report on which the government relies relates to an earlier, significantly different version of the FVRA. *See SW Gen*, 796 F.3d at 77 (rejecting reliance on the Senate Report on this basis). And in any case, the 1998 Senate Report could not speak to the HSA, which was not enacted until 2002 (and did not contain the current acting officer provisions until 2016). The question is

---

[17]   This absurdity cannot be explained away by reasoning that "Congress … want[ed] to instill continuity in the functioning of [DHS]." *See Casa de Maryland*, 486 F. Supp. 3d at 957. To the contrary, Congress intended to make the Secretary's appointment subject to "the advice and consent of the Senate," H. Rep. 107-609 at *63 (2002), *see* 6 U.S.C. § 112(a)(1), not to permit an indefinite line of Acting Secretaries if the President did not fill the first assistant positions.

thus not whether Congress intended the FVRA to displace the HSA, but whether Congress, when amending the HSA in 2016 to provide an alternative procedure for acting appointments, sought to exclude the time limits set by the FVRA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("Congress is aware of existing law when it passes legislation.").[18] As explained above, it did not.

### C.   Mr. Mizelle Signed The Rules In Violation Of The 210-Day Limit

Finally, the Rules must be set aside because Mr. Wolf delegated the power to sign them to Mr. Mizelle, an acting official who was also serving in violation of the FVRA's 210-day limit. Plaintiffs' argument on this point is not "cursory" (Govt. Br. at 26) but factually and legally straightforward: Mr. Mizelle violated the FVRA by signing the Rules in the capacity of Acting General Counsel 280 and 284 days after the Office of the DHS General Counsel became vacant. *See* Plfs. Br. at 27-28; SUF ¶¶ 217-218, 223, 225. Indeed, the government does not contest that the FVRA's 210-day limit applied to the office of DHS General Counsel or that Mr. Mizelle violated the limit by signing the Rules more than two months after the limit expired. *See* 6 U.S.C. § 113(a)(1)(J) (DHS General Counsel is a PAS office).

Instead, the government attempts to evade the issue by arguing that because Mr. Mizelle only "sign[ed] the Rules on [Mr. Wolf's] behalf" but did not "approve" them, the lawfulness of his service as General Counsel is not in question. *See* Govt. Br. at 26. This argument fails, because an authorized signature is needed for publication in the Federal Register. *See* Timeline Repeal Rule, 85 Fed. Reg. at 37,545; Broader EAD Rule, 85 Fed. Reg. at 38,626 (each delegating signature

---

[18]   Defendants also point to an opinion by the Office of Legal Counsel ("OLC") to support its argument that the "FVRA's time limits 'do not apply' to office-specific vacancy statutes." Govt. Br. at 25. Yet at no point does the OLC opinion suggest the FVRA's limits on acting officers would never apply to an officer appointed under an agency-specific statute. Instead, the OLC opinion reaches the much more modest—and unrelated—conclusion that "the time limits of the [FVRA] do not apply to vacancies caused by sickness." Office of Legal Counsel, *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 66-67 & n.3 (Mar. 22, 1999).

authority to Mr. Mizelle "for purposes of publication in the Federal Register"). Mr. Mizelle's signature was not authorized because Mr. Mizelle was unlawfully serving as Acting General Counsel, and Mr. Wolf delegated signature authority to him in that same capacity. *See* SUF ¶¶ 4, 9. This requirement is far from a mere formality, because "publication in the Federal Register . . . is the culminating event in the rulemaking process." *See NRDC v. DOE*, 362 F. Supp. 3d 126, 143 (S.D.N.Y. 2019). Here, because Mizelle's signatures on the Rules are clearly invalid, the documents have not been duly issued or authorized for publication, and the Rules may not take effect until at least 30 days after they are signed and published in correct form. *See* 5 U.S.C. § 553(d) (requiring publication "not less than 30 days before" effective date); 44 U.S.C. § 1507 (creating "rebuttable presumption" "that [published document] was duly issued, prescribed, or promulgated" and that "all requirements for publication "have been complied with").

## III.   THE RULES ARE VOID *AB INITIO* UNDER THE APPOINTMENTS CLAUSE

### A.   Mr. Wolf's Prolonged Service Exceeded The Temporary Service The Appointments Clause Permits

Even if the government were right that Mr. McAleenan had been lawfully appointed and that no other statutory provision prohibited Mr. Wolf and Mr. Mizelle from issuing and signing the Rules, the Rules would remain void, because Mr. Wolf's prolonged service as Acting Secretary violated the Appointments Clause. Mr. Wolf did not serve "for a limited time, and under special and temporary conditions," as the Constitution requires. *See Eaton*, 169 U.S. at 343. Instead, he served for 426 days in a vacancy that President Trump left unfilled for 665 days. SUF ¶¶ 196, 214, 234, 246. Mr. Wolf was President Trump's longest-serving DHS Secretary, acting or otherwise. And he purported to issue the Timeline Repeal Rule and EAD Bar Rule on the 440th and 444th days, respectively, since the vacancy began. *Id*. ¶¶ 222, 224. This timeline was more than double the FVRA's 210-day limit, even further beyond the time limits in previous iterations of the

Vacancies Act that the government points to, and well in excess of the periods of time that other courts have accepted that would violate the Appointments Clause. *See* Govt. Br. at 27 (citing Act of Feb. 13, 1795, 1 Stat. 415 (six-month limit); 5 U.S.C. § 3348(a) (1994) (120-day limit));[19] *United States v. Valencia*, No. 17-cr-882, 2018 WL 6182755, at *7 (W.D. Tex. Nov. 27, 2018) (Appointments Clause violation when the President "fail[s] to nominate a permanent replacement within the timeframe designated by statute," there the FVRA's 210-day limit); *Bullock v. United States*, 489 F. Supp. 3d 1112, 1119, 1129 (D. Mont. 2020) (337 days of service by acting official "violates the Appointments Clause").

This is not a close case. Mr. Wolf's service cannot be described as temporary under any reasonable definition. Mr. Wolf "remain[ed] so long in office that he became indistinguishable" from a principal officer, *United States v. Hilario*, 218 F.3d 19, 29 (1st Cir. 2000), and his prolonged and indefinite service was "so lengthy that it … amounts to … a circumvention of the Appointments Clause." *United States v. Smith*, 962 F.3d 755, 764 n.3 (4th Cir. 2020). As the Court found in *Batalla Vidal*, the then "nearly 600 days since the Department of Homeland Security was led by a Senate-confirmed Secretary" "raise[d] serious constitutional concerns" about "allowing acting officers to serve without time limitations." *Batalla Vidal*, 501 F. Supp. 3d at 130 n.9.

The government's argument to the contrary is nothing more than a request for a constitutional blank check. Having argued that there is no "statutory time limit for acting service under the Homeland Security Act," Govt. Br. at 27, the government similarly attempts to evade

---

[19]   The absence of an express time limit in the Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281 does not assist the government because (1) within three years, Congress instituted a six month time limit (*see* Act of Feb. 13, 1795, 1 Stat. 415); and (2) the Supreme Court subsequently held that the Constitution only permits "temporary" acting service. *Eaton*, 169 U.S. at 343; *see also Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203, 210 (D.C. Cir. 1998) ("[F]rom the beginning Congress limited how long the President's designee could serve.").

the Appointments Clause by rendering the "temporary" requirement from *Eaton* a nullity. The Appointments Clause, the government says, does not set "an express limit on acting service," and the government suggests none. *Id*. Nor, according to the government, could the court use the 210-day limit in the FVRA as a rough constitutional proxy—a submission that is both unsupported by and contrary to authority. *Id*.; *contra Valencia*, 2018 WL 6182755, at *7 (Appointments Clause violation when the President "fail[s] to nominate a permanent replacement within the timeframe designated by statute"); *Bullock*, 489 F. Supp. 3d at 1129 (acting official's service "beyond the 210-day maximum allowed by the FVRA" necessarily "violates the Appointments Clause"). And the cited exceptions to the FVRA's 210-day limit (Govt. Br. at 27) are a red herring, because none of those exceptions applied until the 520th day of the vacancy—nearly three months after Mr. Wolf issued the Rules—when the President finally nominated Mr. Wolf to serve as Secretary. SUF ¶ 234; *see* 5 U.S.C. § 3346(a)(2) (permitting service "for the period that [a first or second] nomination is pending in the Senate"), (b)(1)-(2) (permitting service following the rejection, withdrawal, or return of a first or second nomination). The President himself is subject to election every 4 years and House members every two years—surely an acting official such as Mr. Wolf cannot outlast these terms of office.

### B.   President Trump And Mr. Wolf Overreached And Circumvented The Appointments Clause

In another effort to circumvent *Eaton*, the government says that the 665-day vacancy does not violate the Appointments Clause because President Trump and Mr. Wolf did not engage in "Executive overreach." Govt. Br. at 27-28. But they did—Mr. Wolf's prolonged 426-day service is itself Executive overreach that violates the Appointments Clause. *See Eaton*, 169 U.S. at 343. While nothing more is required, abundant additional facts confirm that President Trump and Mr. Wolf engaged in Executive overreach. The President repeatedly stated that he preferred acting

officials. He stated that Cabinet-level vacancies were "OK," Ex. 3, and that he was "in no hurry" to fill vacancies because acting officials "g[a]ve[] [him] more flexibility," Ex. 2, and made it "easier [for him] to make moves" and to do so "quickly." Ex. 3; *see* Supp. SUF ¶¶ 6-7. That is exactly what the Appointments Clause prevents. The Framers recognized that giving the President "sole disposition of offices," however flexible and easy for the President, would result in a Cabinet "governed much more by his private inclinations and interests" than by the public good. *The Federalist No. 76*, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961). That is why the Framers enacted the Appointments Clause: to "check [the] spirit of favoritism in the President and [] guard against the appointment of unfit characters." *Fin. Oversight & Mgmt. Bd.*, 140 S. Ct. at 1657. As *Batalla Vidal* found, President Trump's own statements "validated [these] concerns about the effects of circumventing the appointments process." *Batalla Vidal*, 501 F. Supp. 3d at 130 n.9.

Instead of nominating a new Secretary, the President attempted to "circumvent[] [] the Appointments Clause" so that he could enjoy the flexibility he desired. *Smith*, 962 F.3d at 764 n.3. The President was content to let a series of Acting Secretaries—first, Mr. McAleenan, and later Mr. Wolf—preside over DHS and some of its most politically contentious matters, including not only the Rules at issue here, but also the President's attempt to end the Deferred Action for Childhood Arrivals program, *see Batalla Vidal*, 501 F. Supp. 3d at 122, and the deployment of DHS agents to "quell" protests in Portland, *see Don't Shoot Portland et al. v. Wolf et al.*, Case No. 1:20-cv-02040-CRC (D.D.C.), Dkt. 1 (Compl.) ¶¶ 4-5, 8. The President thus attempted to avoid the "accountab[ility] to political force and the will of the people" that the Appointments Clause mandates by declining to nominate Mr. McAleenan or Mr. Wolf and thus shielding them and the politically-contentious actions that they presided over from Congressional scrutiny. *Freytag v.*

*Comm'r*, 501 U.S. 868, 884 (1991). The President only nominated Mr. Wolf on September 10, 2020, because his hand was forced—by then, the August 14, 2020, GAO Report had concluded that Mr. Wolf was unlawfully serving as Acting Secretary and DHS faced multiple lawsuits challenging the lawfulness of his service. *See* SUF ¶¶ 226-30, 234.

When the GAO Report and legal challenges forced the President to nominate Mr. Wolf, DHS engaged in a concerted campaign to perpetuate Mr. Wolf's unlawful service pending his hoped-for confirmation and to berate the GAO and federal courts for attempting to hold him accountable. As detailed in Plaintiffs' opening brief, DHS made repeated attempts to evade federal court rulings and continue Mr. Wolf's unlawful service, creating a "self-made thicket" by its efforts to "recognize [Mr. Gaynor's] authority only for the sham purpose of abdicating his authority to" Mr. Wolf. *Batalla Vidal*, 501 F. Supp. 3d at 133 & n.11; *see* Plfs. Br. at 31-42. Not only that, but DHS lashed out at the GAO and federal courts when they tried to hold it accountable. DHS berated the careful ruling in *Batalla Vidal* as the work of "an activist judge," Ex. 4, Mr. Mizelle tried to discredit the GAO Report by alleging that the GAO was corrupt (Dkt. 25-4 at 297 ("something is afoot in the swamp")), and Mr. Wolf blasted what he termed "ongoing and meritless court rulings" because they questioned "the validity of my authority as Acting Secretary," *id*. at 343. *See* Supp. SUF ¶¶ 8-12. The President and Mr. Wolf overreached in their efforts to circumvent Senate confirmation and democratic accountability for more than 600 days, and the Rules must accordingly be set aside.

### C.   <u>Congress Did Not Ratify Mr. Wolf's Unlawful Service</u>

Finally, the government's unsupported suggestion that Congress ratified Mr. Wolf's unlawful service also fails. The government's submission that the Senate confirmed Mr. Wolf as Under Secretary for the Office of Strategy, Policy, and Plans "at a time when it was expected that he would assume the Acting Secretary position" is unsupported by record evidence or

Congressional hearing testimony. Govt. Br. at 28. The government's suggestion that Mr. Wolf's Under Secretary position was "germane to the Secretary role" similarly fails (Govt. Br. at 28 (citing *Weiss*, 510 U.S. at 176)). *Weiss* did not concern acting officials, but instead Senate-confirmed military officers whose additional judicial responsibilities were linked to their pre-existing "role in the operation of the military justice system." *Weiss*, 510 U.S. at 175. Furthermore, "no claims have been made that deputy secretaries"—let alone Under Secretaries like Mr. Wolf—"can, without another round of confirmation, serve as Cabinet-level secretaries." Nina A. Mendelson, *The Permissibility of Acting Officials: May The President Work Around Senate Confirmation?*, 72 Admin L. Rev. 533, 574 (2020). And while the authority to temporarily serve as "Head of Department" might be inherent in Senate confirmation to serve as Deputy Secretary, *see NWIRP*, 496 F. Supp. at 68, the same is not true of a non-first assistant like Mr. Wolf.

Moreover, the government neglects that the Appointments Clause, "like all of the Constitution's structural provisions, is designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty," *SW Gen.*, 137 S. Ct. at 949 (Thomas, J., concurring), and to prevent "despotism," *Freytag*, 501 U.S. at 884. Given the Rules' harsh impact on Plaintiffs, "the Government should turn square corners in dealing with" Plaintiffs by complying with the Appointments Clause, *Casa de Maryland*, 486 F. Supp. 3d at 960 (quoting *Regents of the Univ. of California*, 140 S. Ct. at 1909), regardless of whether Congress expected that Mr. Wolf might purport to serve as Acting Secretary upon confirmation to the Under Secretary role.

### D.    The Constitutional Avoidance Canon Applies

To avoid the constitutional problem that Plaintiffs have identified, the Court should apply the constitutional avoidance canon and resolve any ambiguity in the FVRA and HSA in favor of Plaintiffs. "[T]he canon of constitutional avoidance requires that if one of two linguistically permissible interpretations raises serious constitutional problems and the other does not, [the Court

is] to choose the second unless it is plainly contrary to the intent of Congress." *United States v. Cano-Flores*, 796 F.3d 83, 94 (D.C. Cir. 2015). Plaintiffs meet that test because the government's interpretation permits indefinite acting service that violates the Appointments Clause, just as Mr. Wolf did here, and the government has identified no corresponding constitutional problem with Plaintiffs' interpretation. And far from being plainly contrary to Congress's intent, Plaintiffs' interpretation is consistent with Congress's intent to "recla[i]m[] [its] Appointments Clause power." *SW Gen., Inc.*, 796 F.3d at 70. To be sure, the constitutional avoidance canon does not authorize the court to "rewrite" the statutes, and only operates if "after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). But as explained above, Plaintiffs' interpretation is not only at least as plausible as the government's, but even more plausible—it is rooted in the plain text of the FVRA and the HSA and buttressed by governing principles of statutory interpretation. Accordingly, the Court has a "responsibility to avoid [the] constitutional problems" that the government's reading poses because Plaintiffs' "reasonable statutory reading so permits." *Rothe Dev.*, 836 F.3d at 68 (constitutional avoidance canon "confirm[s] [court's] reading of the text").

But if the Court accepts the government's position that the only plausible construction of the FVRA and HSA permits a series of Acting Secretaries to run DHS indefinitely, *see Jennings*, 138 S. Ct. at 843, then Plaintiffs ask the Court to rule on their Appointments Clause claim. The Appointments Clause does impose meaningful limits, and "the 'special and temporary' conditions that *Eaton* requires are no mere formality." *Guedes*, 356 F. Supp. 3d at 153. For that reason, if the Court is unable to rule for Plaintiffs on statutory grounds and concludes that the constitutional avoidance canon does not apply, then the "court[] can and must play a role in policing 'acting' appointments that are effectively permanent." *Id*. In that scenario, it is appropriate for this Court

"to say where th[e] . . . constitutional boundaries lie," and it should set the Rules aside as unlawful on the basis that Mr. Wolf's service is an "unlawful attempt[] to avoid the constitutional requirements of the Appointments Clause." *Bullock*, 489 F. Supp. 3d at 1128-29.

## IV.    SECRETARY MAYORKAS'S PURPORTED RATIFICATION OF THE TIMELINE REPEAL RULE IS INVALID

Secretary Mayorkas purported to ratify only the Timeline Repeal Rule. *See* Dkt. 19-1 at 2. There is thus no dispute that the Broader EAD Rule has not been ratified and that the government's arguments are irrelevant to its validity. Even as to the Timeline Repeal Rule, the government's ratification arguments fall flat.

### A.    The FVRA Prohibits Secretary Mayorkas From Ratifying The Timeline Repeal Rule

#### 1.    The FVRA Prohibits Ratification Of All Functions Or Duties Assigned By Statute To Only One Officer

The government concedes that "'[a]n action taken by any person' not properly acting under the Federal Vacancies Reform Act provisions 'in the performance of any function or duty of a vacant office . . . shall have no force or effect,' and that such an action 'may not be ratified.'" Govt. Br. at 29 (quoting 5 U.S.C. § 3348(d)(1), (2)). But the government would rewrite the FVRA's text to prohibit ratification of only explicitly "non-delegable" functions and duties. Govt. Br. at 30. The FVRA does not define a "function or duty" of a vacant office in terms of what can be delegated. *See* 5 U.S.C. 3348(a)(2) (defining a "function or duty" as one "established by statute" and "required . . . to be performed by the applicable officer (and only that officer)"). Thus, the FVRA's plain text dictates that the anti-ratification provision applies to all statutorily prescribed functions of a given office that, "by statute," are assigned to "only that officer." *Behring Reg'l*, 2021 WL 2554051, at *6 ("The FVRA does not define function or duty as required by 'a statute that designates one officer to perform a *non-delegable* duty or function.'"). The statutory anti-

ratification provision of the FVRA asks a simple question: Whether a *statute or regulation* assigns a function or a duty to *only one* officer. If so, then such functions or duties may not ratified.

The Timeline Repeal Rule may not be ratified under the FVRA. The relevant statutory provisions of the INA assign both general rulemaking authority and the specific authority to regulate asylum seekers' access to work authorization to the DHS Secretary alone. *See* 8 U.S.C. § 1103(a) (general rulemaking authority); 8 U.S.C. § 1158(d)(2) (specific rulemaking authority for work authorization); *see also* 85 Fed. Reg. at 37,503 (citing 8 U.S.C. § 1103(a) and 8 U.S.C. § 1158(d)(2) as the basis of DHS Secretary's authority to "establish" the Timeline Repeal Rule). As explained in *Behring Regional*, "[t]hat the statute does not use the world 'only' is immaterial," because (as relevant here) § 1158(d)(2) provides that the DHS Secretary can promulgate the regulation "and does not identify any other official who can do so." 2021 WL 2554051, at *6. Hence, these rulemaking authorities fall within the scope of the FVRA's anti-ratification provision.

Moreover, the government's argument fails because the statutes that authorize the Secretary to issue the Rules do not authorize delegation. The government admits that the Rules were authorized by two statutory provisions of the INA, Govt. Br. at 31-32, but the only provision the government points to in support of its argument is found in an entirely different statute, the HSA. *See id.* at 32 (citing 6 U.S.C. § 112(b)(1)). Hence, the government's approach fails based on the plain language because Section 3348 of the FVRA "refers to a 'statute' in the singular," so "[t]he FVRA's unambiguous language does not support" the government's request to "look at a second, additional statute." *Behring Reg'l*, 2021 WL 2554051, at *6.

The government's contrary textual argument is unpersuasive. The Government argues that if a function or duty is delegable, then the statute creating the function or duty does not "require" it to be performed only by the applicable officer. Govt. Br. at 30. That is wrong. As the *L.M-M.*

court explained, Congress would not have drafted the FVRA as it did if it intended it to apply only to expressly non-delegable functions. 442 F. Supp. 3d at 32. Indeed, the court noted that "the word 'non-delegable' appears nowhere in the statute." *Id.* at 33. Nor does the word "require" imply that the statute must prohibit other officers from performing the function or duty as some courts have reasoned. *See Kajmowicz v. Whitaker*, No. 2:19-cv-00187, 2021 WL 2200795, at *6 (W.D. Pa. June 1, 2021). Instead, the more natural reading of "require"—and one consistent with similar mandatory language in the grant of authority that the government relies on—is that the statute must impose a public duty on the particular official. *See* 8 U.S.C. § 1103(a)(3) ("[The Secretary] *shall* establish [] regulations." (emphasis added)). Thus, the Government's argument lacks textual support. The more straightforward and plausible reading is that when (as here) a statute assigns a function or duty to an officer (and only that officer), then only that officer is permitted by statute to perform the function or duty. That is the plain meaning of the statute's text. *Behring Reg'l*, 2021 WL 2554051, at *6; *L.M.-M.*, 442 F. Supp. 3d at 32-33. The Court should enforce the statute as written, not as the Government wishes it were written. *See United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008) (When the "language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," the court's "inquiry ends and [it] appl[ies] the statute's plain language.").

This plain text reading of the statute is reinforced by the FVRA's purpose because, as the *L.M-M.* court recognized, accepting DHS's argument about "non-delegable" duties or functions "is at odds with the statutory purpose of the FVRA." 442 F. Supp. 3d at 34. Nearly every agency and every cabinet-level department has a statute that vests the head of the agency or department with the authority to delegate functions. *Id.* As such, most actions by department heads are delegable. "It was the pervasive use of those vesting-and-delegation statutes, along with 'the lack

of an effective enforcement process,' that convinced Congress of the need to enact the FVRA." *Id.* (citing S. Rep. No. 105-250, at 7 (1998)); *see also SW Gen. Inc.*, 796 F.3d at 70-71; *Pub. Emples. for Envtl. Responsibility v. Nat'l Park Serv.*, No. 19-3629, 2021 WL 1198047, at *15 (D.D.C. Mar. 30, 2021) ("The FVRA's prohibition on ratification was designed to prevent the practice of a properly appointed official reissuing a decision taken in violation of FVRA provisions."). On the Government's reading, Congress recognized the persistent problem of the Executive Branch using acting officials to bypass Senate confirmation but nonetheless crafted the FVRA to apply only in the exceedingly rare circumstance that Congress expressly makes a duty non-delegable in a statute. Yet accepting that argument would mean that Congress did little "to restore [the] constitutionally mandated procedures that must be ratified before acting officials may serve in positions that require Senate confirmation." *L.M.-M.*, 442 F. Supp. 3d at 34 (citing, inter alia, S. Rep. No. 105-250, at 8 (1998)); *accord Behring Reg'l*, 2021 WL 2554051, at *7. Congress chose not to adopt such a crabbed definition because doing so would eviscerate the FVRA's remedial scheme.

Against this statutory text and purpose, the government's citation of legislative history is unavailing. Govt. Br. at 31. *L.M-M* rejected the government's reliance on the same legislative history cited here, explaining that "the word ['non-delegable' in the legislative history] does not have the meaning [DHS assigns] to it. To the contrary, the Senate Report used the term in the same breath in which it affirms that the 'non-delegable' functions and duties include those assigned by regulation 180 days before the vacancy arose, even if later reassigned." *Id.* at 33-34 (citing S. Rep. No. 105-250, at 18 (1998)). This legislative history is ambiguous at best. *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005) ("[L]egislative history is [] often murky, ambiguous, and contradictory."). And "ambiguous legislative history cannot trump clear statutory language." *All. of Artists & Recording Cos. v. DENSO Int'l Am., Inc.*, 947 F.3d 849, 862 (D.C. Cir. 2020).

The cases cited by the government also fail to move the needle. *Guedes v. BATFE*, 920 F.3d 1 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020), is inapposite because in that case the plaintiff conceded the issue and thus the question of the validity of the ratification under the FVRA was never actually litigated. *See id.* at 12. In fact, the *L.M.-M.* court explained that the language from *Guedes* that DHS relies on here was dictum and that the "meaning of the vacant-office provision was neither disputed nor decided in *Guedes*." 442 F. Supp. 3d at 33. In *NWIRP*, the Court did *not* hold that the FVRA applies only to functions or duties that are expressly non-delegable. Indeed, Judge Moss, who also was the presiding judge in *L.M.-M.*, held exactly the opposite: "The Court has previously interpreted the FVRA's definition of 'function or duty' to encompass delegable duties that were not delegated during the 180-day window proceeding the vacancy." *NWIRP*, 496 F. Supp. 3d at 59. The Government's reliance on *United States v. Harris County*, No. 4:16-cv-2331, 2017 WL 7692396, at *3 n.5 (S.D. Tex. Apr. 26, 2017), is similarly misplaced, as that court found that the FVRA argument was waived by the defendant because it was raised for the first time in reply, and even then it cited no authority nor engaged in any analysis in stating in dictum that non-delegable duties are not subject to the FVRA. And neither *Kajmowicz*, 2021 WL 2200795, nor *United States v. Tinley Park*, No. 16-10848, 2017 U.S. Dist. LEXIS 234517 (N.D. Ill. July 17, 2017), grapples with the statutory purpose of the FVRA or convincingly responds to Plaintiffs' textual argument. In sum, Secretary Mayorkas could not validly ratify the Timeline Repeal Rule under the FVRA.

### 2.     The 2003 Delegation Does Not Support Defendants' Position

Even if the Court does not agree with *Behring Regional*, it should, at minimum, adopt the analysis of the *L.M.-M.* court, under which Plaintiffs also prevail. Judge Moss's careful analysis in *L.M.-M.* reads the FVRA to require that statutorily delegable duties—like rulemaking duties— be delegated at least 180 days prior to the agency action in question. 442 F. Supp. 3d at 33.

Defendants point to a 2003 delegation document (DHS Delegation No. 00100.2 (June 23, 2003), Dkt. 29-2 at 3-4 ("2003 Delegation")) and argue that "the duty to issue rules … has in fact been delegated," Govt. Br. at 32, but they are still unable to convincingly support this position and lack the compelling evidentiary support necessary to prevail at summary judgment.

First, even on its face, the 2003 Delegation does not do what the government claims it does. The 2003 Delegation delegates to the Deputy Secretary the authority to take merely ministerial actions related to rules. *See* Dkt. 29-2 at 3 ("Acting for the Secretary, to sign, approve, or disapprove any proposed or final rule, regulation or related document"). Not only does the 2003 Delegation not delegate authority to establish the substantive content of rules, but it also does not delegate this authority wholesale—instead, this authority is delegated only when "[a]cting for the Secretary." Dkt. 29-2 at 3.[20]

Second, the government has failed to establish that the 2003 Delegation was operative when the Timeline Repeal Rule was issued. Instead, the 2016 Johnson Delegation revising Delegation Order 00106 established the delegation of authority and orders of succession at DHS and appears to have been designed to consolidate and clarify the existing delegation of authorities. *See* Dkt. 25-4 at 11-13. The Johnson Delegation does not mention any authority relating to rulemaking. *Id*. And even if the 2003 Delegation were still in effect, and regardless of the authority it purported to delegate to the Deputy Secretary, "[t]his delegation . . . does not apply as there was no Deputy Secretary of Homeland Security for which the authority to sign the [challenged] Rule could be delegated." *Behring Reg'l*, 2021 WL 2554051, at *7 (explaining why "The 2003

---

[20]   The differential burden explains why Defendants' reliance on the *NWIRP* opinion's treatment of the 2003 Delegation is misplaced: Because the issue arose in the context of a motion for preliminary relief, the plaintiffs bore the burden of proof, and thus could not benefit from the document's ambiguities, as Judge Moss noted. *See NWIRP*, 496 F. Supp. 3d at 59.

Delegation Does Not Apply"). The assertion by the government's affiant, Ms. Blackwell, that the 2003 Delegation "has not been rescinded or revoked," Dkt. 29-2 at 1, says nothing about the legal effect of the Johnson Delegation. What is more, every example the government provides of the Deputy Secretary ostensibly "engag[ing] in rulemaking," *see id.* at 1-2, occurred during 35 days in December 2008 and January 2009—i.e., years before the Johnson Delegation and in the middle of a presidential transition. This single example cannot be taken as dispositive.

## B.   Secretary Mayorkas Did Not Make A Considered Judgment To Ratify The Timeline Repeal Rule

Additionally, the Mayorkas Ratification must be set aside because he did not make a considered judgment to ratify that Rule. Contrary to the government, Plaintiffs do not seek "detailed reasons" from the Secretary. Govt. Br. at 28. The problem is that Secretary Mayorkas gave no reasons at all. The Secretary "review[ed]" and "familiarized" himself with the Rule and its NPRM, Dkt. 19-1, but left Plaintiffs and the Court guessing as to why he ratified the Rule. The Mayorkas Ratification is thus distinguishable from *Jooce v. FDA*, Civ A. No. 18-1615, 2020 WL 680143 (D.D.C. Feb. 11, 2020), aff'd 981 F.3d 26 (D.C. Cir. 2020), where the ratifier cited his "close involvement in policy matters relating to this rule and its implementation" and the rule's "public health importance" as reasons to ratify. *Id*. at *2. Similarly, *Advanced Disposal Servs. East, Inc. v. N.L.R.B.*, 820 F.3d 592 (3d Cir. 2016), does not assist the government because in that case, the court found that a "blanket express ratification" was only sufficient because it was coupled with an "implicit[] affirm[ation]," namely that the ratifier filed a Complaint and Notice of Hearing in an administrative proceeding. *Id*. at 605. The government has not identified any similar act of implied affirmation by Secretary Mayorkas here. And the government overlooks that *Doolin*, one of the seminal ratification cases, expressly relied on the fact that the ratifier did not, like Secretary Mayorkas, "simply write a letter or memorandum adopting the [unlawfully-serving official's

action] as his own," but instead "acted in the normal course of agency" practice and reached a "reasoned conclusion." 139 F.3d at 213.

Once again, the government seeks a blank check from this Court, asserting that the bar for ratification is so low that all that is required is that the Secretary says he reviewed the Timeline Repeal Rule without any reasons as to why he ratified it. But the bar is not so low. The Timeline Repeal Rule's rationality was thoroughly criticized in *Casa de Maryland*. *See* Plfs. Br. at 43. Following that decision, DHS itself stated that it intended to "engage in rulemaking related to the … Timeline Repeal Rule" in an effort to stay this action, Dkt. 19 at 1, only to simultaneously ratify that same Rule, Dkt. 19-1 at 2. Indeed, in its own brief DHS affirms that it "plans to … rescind or substantively revise" the same Rule that it claims that Secretary Mayorkas made a "considered judgment" to ratify. Govt. Br. at 9, 28-29. These unusual circumstances constitute sufficient "evidence that casts doubt on the agency's claim" that Secretary Mayorkas reached a reasoned conclusion that the Rule was not arbitrary and capricious and should be ratified. *See Advanced Disposal Servs.*, 820 F.3d at 604. They also support a plausible inference that the Secretary simply ratified the Rule to defeat Plaintiffs' lawsuit and allow DHS to engage in rulemaking at a more leisurely pace, as DHS already unsuccessfully sought to do in its stay motion.

## <u>CONCLUSION</u>

For the foregoing reasons and those stated in their motion, Plaintiffs respectfully request that the Court grant their motion for summary judgment on their third, fourth, fifth, and sixth HSA, FVRA, APA, and Appointments Clause claims, deny Defendants' cross-motion for summary judgment on those same claims, and vacate the Timeline Repeal Rule and the EAD Bar Rule in their entirety.

Dated: August 18, 2021                           Respectfully submitted,

                                        By:   /s/ Keren Zwick
                                              _____

Deepa Acharya (D.C. Bar No. 996412)        Keren Zwick (D.D.C. Bar. No. IL0055)
Carl Spilly (D.C. Bar No. 230830)          Mark Fleming*
Brian McGrail (D.C. Bar No. 1672349)       Drew Heckman
QUINN EMANUEL URQUHART &                   NATIONAL IMMIGRANT JUSTICE CENTER
SULLIVAN, LLP                              224 S. Michigan Ave., Suite 600
1300 I St. NW, Suite 900                   Chicago, IL 60604
Washington, DC 20005                       312-660-1370
202-538-8000                               kzwick@heartlandalliance.org
deepaacharya@quinnemanuel.com              mfleming@heartlandalliance.org
carlspilly@quinnemanuel.com                gborroto@heartlandalliance.org
brianmcgrail@quinnemanuel.com              dheckman@heartlandalliance.org

Nicholas A. S. Hoy                         Jamie Crook (D.C. Bar No. 1002504)
QUINN EMANUEL URQUHART &                   Annie Daher
SULLIVAN, LLP                              CENTER FOR GENDER & REFUGEE STUDIES
51 Madison Ave., 22nd Floor                200 McAllister St.
New York, NY 10010                         San Francisco, CA 94102
212-849-7000                               415-565-4877
nicholashoy@quinnemanuel.com               crookjamie@uchastings.edu
                                           daherannie@uchastings.edu

Richard Caldarone***                       Scott Shuchart (D.C. Bar No. 1531377)**
TAHIRIH JUSTICE CENTER                     KIDS IN NEED OF DEFENSE
6400 Arlington Blvd., Suite 400            1201 L St., NW, Floor 2
Falls Church, VA 22042                     Washington, DC 20005
571-282-6161                               202-318-0595
richardc@tahirih.org                       sshuchart@supportkind.org

*Certification to practice pursuant to     Wendy Wylegala**
LCvR 83.2(g) to be submitted               KIDS IN NEED OF DEFENSE
                                           252 West 37th Street, Floor 15
** Counsel for Individual Plaintiffs only  New York, NY 10018
                                           646-970-2913
*** Counsel for Tahirih Justice Center     wwylegala@supportkind.org
only

                                           Counsel for Plaintiffs