UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASYLUMWORKS et al.,

        *Plaintiffs*,

    v.

ALEJANDRO MAYORKAS,
Secretary of Homeland Security, et al.,

        *Defendants*.

Civil Action No. 20-3815 (BAH)

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS TO ENFORCE
JUDGMENT OR FOR INJUNCTIVE RELIEF AND FOR ATTORNEY'S FEES**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

BACKGROUND .............................................................................................................. 1

    A.  The Challenged Rules .......................................................................................... 1

    B.  Procedural Background......................................................................................... 2

    C.  USCIS's Post-Vacatur Changes to its Procedures for Adjudicating Asylum-Based EAD Applications ......................................................................................................... 3

    D.  USCIS's Efforts to Amend the Code of Federal Regulations Post-Vacatur...................... 6

    E.  USCIS's Efforts to Revise the Form I-765 and Instructions Post-Vacatur ........................ 8

ARGUMENT .................................................................................................................. 9

I.   This Court Should Deny Plaintiffs' Motion to Enforce.......................................................... 9

    A.  Plaintiffs Lack Standing To Obtain The Relief They Seek ............................................. 10

        1.  Plaintiffs fail to show personal injury to compel revision of the CFR ....................... 12

        2.  Plaintiffs fail to show injury to compel revision of Form I-765 ................................ 13

        3.  Plaintiffs fail to show personal injury to compel Defendants to process applications within 30 days ............................................................................................... 14

    B.  The Vacatur Order Did Not Entitle Plaintiffs to the Relief They Seek ............................ 14

    C.  Plaintiffs Are Not Entitled To An Injunction ................................................................. 15

II.  Plaintiffs Seek Excessive Attorneys' Fees........................................................................ 16

    A.  Plaintiffs Are Entitled To Fees at a Rate No Greater Than $125 Per Hour...................... 17

        1.  Defendants did not act in bad faith .......................................................................... 18

            a.  The decision to enact the challenged Rules was not in bad faith........................... 18

            b.  The decision to defend the challenged Rules was not in bad faith ........................ 19

            c.  The attempt to ratify the Timeline Repeal Rule was not in bad faith .................. 21

2. No special factor warrants enhanced fees ................................................................... 21

    a. Plaintiffs are not entitled to enhanced fees due to their attorneys' Spanish language skills ......................................................................................... 22

    b. Plaintiffs are not entitled to enhanced fees due to their attorneys' legal expertise 22

3. Plaintiffs billed an excessive number of hours ........................................................... 24

    a. Plaintiffs billed excessive hours prior to filing the complaint ............................ 25

    b. Plaintiffs cannot recover fees for time that their attorneys spent recruiting them for this case or preparing retainer agreements, or for work predating any attorney-client relationship ................................................................................. 26

    c. Plaintiffs billed excessive hours for summary judgment briefing ...................... 28

    d. Plaintiffs are not entitled to fees for their motion to enforce .............................. 29

    e. Plaintiffs billed excessive hours for their motion for attorney's fees ................. 29

4. This Court should award no more than $108,265.33 in fees ...................................... 30

CONCLUSION ..................................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Ga. v. Barnes*,
  168 F.3d 423 (11th Cir. 1999) ............................................................. 27

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ............................................................... 24

*Am. Emps. Ins. Co. v. Am. Sec. Bank, N.A.*,
  747 F.2d 1493 (D.C. Cir. 1984) ........................................................... 19

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019) ........................................................ 11, 12

*Am. Hosp. Ass'n v. Sullivan*,
  938 F.2d 216 (D.C. Cir. 1991) ............................................................. 18

*Am. Wrecking Corp. v. Sec'y of Lab.*,
  364 F.3d 321 (D.C. Cir. 2004) ............................................................. 22

*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) ........................................................... 11

*Ass'n of Am. Phys. & Surg. v. Clinton*,
  187 F.3d 655 (D.C. Cir. 1999) ........................................................ 18, 19

*Astrue v. Ratliff*,
  560 U.S. 586 (2010) ............................................................................ 27

*AT&T Corp. v. FCC*,
  970 F.3d 344 (D.C. Cir. 2020) ............................................................. 13

*Cierco v. Mnuchin*,
  857 F.3d 407 (D.C. Cir. 2017) ............................................................. 11

*Clark v. Feder, Semo & Bard, P.C.*,
  59 F. Supp. 3d 114 (D.D.C. 2014) ....................................................... 20

*Comm. on Jud. v. McGahn*,
  968 F.3d 755 (D.C. Cir. 2020) ............................................................. 11

*eBay, Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ............................................................................ 16

**Cases (cont.)**

*Elec. Priv. Info. Ctr. v. FBI*,
    80 F. Supp. 3d 149 (D.D.C. 2015) ........................................................................ 26

*Ford v. Karpathoes, Inc.*,
    Civ. A. No. 14-0824, 2015 WL 736809 (D. Md. Feb. 19, 2015) ........................... 27

*Friedman v. FAA*,
    841 F.3d 537 (D.C. Cir. 2016) .............................................................................. 13

*GasPlus, LLC v. Dep't of Int.*,
    593 F. Supp. 2d 80 (D.D.C. 2009) ........................................................................ 19

*Haselwander v. McHugh*,
    797 F.3d 1 (D.C. Cir. 2015) .................................................................................. 27

*Heartland Plymouth Court MI, LLC v. NLRB*,
    838 F.3d 16 (D.C. Cir. 2016) ................................................................................ 18

*Heartland Reg'l Med. Ctr. v. Leavitt*,
    415 F.3d 24 (D.C. Cir. 2005) ................................................................................ 10

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) .................................................................................. 24, 27, 29

*In re Grand Jury Investigation*,
    315 F. Supp. 3d 602 (D.D.C 2018) ....................................................................... 23

*In re Sealed Case 00-5116*,
    254 F.3d 233 (D.C. Cir. 2001) .............................................................................. 23

*In re Sealed Case*,
    829 F.2d 50 (D.C. Cir. 1987) ................................................................................ 23

*In re Sealed Case*,
    838 F.2d 476 (D.C. Cir. 1988) .............................................................................. 23

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    684 F.3d 1332 (D.C. Cir. 2012) ............................................................................ 23

*Kooritzky v. Herman*,
    178 F.3d 1315 (D.C. Cir. 1999) ............................................................................ 27

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ........................................................................................ 11, 13

**Cases (cont.)**

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
  336 F.3d 1094 (D.C. Cir. 2003) ........................................................................... 15

*Milton S. Kronheim Co., Inc. v. District of Columbia,*
  91 F.3d 193 (D.C. Cir. 1996) ............................................................................... 21

*Mir v. Little Co. of Mary Hosp.,*
  844 F.2d 646 (9th Cir. 1988) ............................................................................... 19

*N.E. Power Gens. Ass'n, Inc. v. FERC,*
  707 F.3d 364 (D.C. Cir. 2013) ............................................................................. 12

*N.Y. Stock Exch. LLC v. SEC,*
  962 F.3d 541 (D.C. Cir. 2020) ....................................................................... 11, 13

*Nat'l Ass'n of Mfrs. v. Dep't of Lab.,*
  962 F. Supp. 191 (D.D.C. 1997) .......................................................................... 23

*Nibbler v. USCIS,*
  Civ. A. No. 20-3207 (BAH), 2020 WL 7360215 (D.D.C. Dec. 15, 2020) ............... 15

*Nw. Immigrant Rights Project v. USCIS,*
  496 F. Supp. 3d 31 (D.D.C. 2020) ....................................................................... 21

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Dep't of Transp.,*
  879 F.3d 339 (D.C. Cir. 2018) ............................................................................. 11

*Pierce v. Underwood,*
  487 U.S. 552 (1988) ............................................................................... 21, 22, 23

*Powers v. Ohio,*
  499 U.S. 400 (1991) ....................................................................................... 11, 13

*Quintero v. Garland,*
  998 F.3d 612 (4th Cir. 2021) ............................................................................... 24

*Role Models Am., Inc. v. Brownlee,*
  353 F.3d 962 (D.C. Cir. 2004) ............................................................................. 22

*Rosario v. USCIS,*
  365 F. Supp. 3d 1156 (W.D. Wash. 2018) .............................................................. 1

*Salazar v. District of Columbia,*
  991 F. Supp. 2d 39 (D.D.C. 2014) ....................................................................... 27

**Cases (cont.)**

*Select Milk Prods., Inc. v. Johanns*,
    400 F.3d 939 (D.C. Cir. 2005) ........................................................................ 22, 23

*Select Specialty Hosp.-Denver, Inc. v. Azar*,
    Civ. A. No. 10-1356 (BAH), 2020 WL 3469685 (D.D.C. June 25, 2020) .............................. 19

*Select Specialty Hosp.-Denver, Inc. v. Becerra*,
    Civ. A. No. 10-1356 (BAH), 2021 WL 4262652 (D.D.C. Sept. 20, 2021) ............................. 10

*Truckers United for Safety v. Mead*,
    329 F.3d 891 (D.C. Cir. 2003) ........................................................................... 23

*Turner v. D.C. Bd. of Elections & Ethics*,
    354 F.3d 890 (D.C. Cir. 2004) ........................................................................... 16

*United States v. Mendoza*,
    464 U.S. 154 (1984) .............................................................................. 20, 21

*Viola v. FDIC*,
    Civ. A. No. 18-2351 (JEB), 2019 WL 2492786 (D.D.C. Jun. 14, 2019) ............................... 12

**Statutes**

5 U.S.C. § 3345 ..................................................................................... 3

28 U.S.C.
    § 2412(b) ......................................................................................... 17
    § 2412(d)(1)(A) ................................................................................... 16
    § 2412(d)(2)(A) ................................................................................... 17

44 U.S.C.
    § 1510 ............................................................................................ 6
    § 3501 ............................................................................................ 8
    § 3502(3)(A)(i) .................................................................................... 8
    § 3504(a)(1)(B)(i) ................................................................................. 8

**Regulations**

1 C.F.R.
    § 17.2(c) .......................................................................................... 7
    § 8.3 ............................................................................................. 6

5 C.F.R. § 1320.13 .................................................................................. 8

**Regulations (cont.)**

8 C.F.R. § 208.7(a)(1) ..................................................................................... 1

*Asylum Application, Interview, and Employment Authorization for Applicants,*
    85 Fed. Reg. 38,532 (June 26, 2020) ...................................................... 2

*Removal of 30-Day Processing Provision for Asylum Applicant- Related Form I–765*
    *Employment Authorization Applications,*
    85 Fed. Reg. 37,502 (June 22, 2020) ...................................................... 1

**Rules**

Fed. R. Civ. P. 8(a) ..................................................................................... 25

Sup. Ct. R. 10 ............................................................................................ 21

**Other Authorities**

*About the Code of Federal Regulations,*
    Nat'l Archives & Records Admin. ........................................................... 6

*Administrative Law: The American Public Law System,*
    Jerry Mashaw et al. (7th ed. 2014) ...................................................... 23

*Federal Register Office,*
    Nat'l Archives & Records Admin. ........................................................... 6

*Spring 2022 Unified Agenda of Regulatory and Deregulatory Actions,*
    RIN 1615-AC66 ......................................................................................... 7

*Statutory Maximum Rates Under the Equal Access to Justice,*
    U.S. Court of Appeals for the Ninth Circuit ........................................ 17

*The Federal Register,*
    Nat'l Archives & Records Admin. ........................................................... 6

*Unified Agenda of Regulatory and Deregulatory Actions,*
    87 Fed. Reg. 48,236 (Aug. 8, 2022) ...................................................... 7

*USCIS Stops Applying Certain EAD Provisions for Asylum Applicants,*
    USCIS ......................................................................................... 3, 13, 14

*What is the eCFR,*
    Nat'l Archives & Records Admin. ........................................................... 6

Defendants Alejandro Mayorkas, Secretary of Homeland Security, Jonathan Meyer, General Counsel, and the Department of Homeland Security, by and through undersigned counsel, respectfully respond in opposition to Plaintiffs' Motion to Enforce Judgment or for Injunctive Relief, ECF No. 47, and in partial opposition to Plaintiffs' Motion for Attorney's Fees, ECF No. 48. As explained further below, Defendants have made reasonable efforts to meet the goals that Plaintiffs desire, and Plaintiffs are entitled to no further relief. Defendants agree that Plaintiffs are entitled to an attorney's fees award, but the amount of fees they seek is excessive and unreasonable, and this Court should award them no more than $108,265.33. A proposed order is attached.

## BACKGROUND

Because the Court is by now well familiar with the underlying facts of this case, Defendants recount only those relevant to resolving the pending motions to enforce and for attorney's fees.

### A.    The Challenged Rules

The version of 8 C.F.R. § 208.7(a)(1) in effect on July 26, 2018 required U.S. Citizenship and Immigration Services ("USCIS") to adjudicate an asylum applicant's initial application for an employment authorization document ("EAD") within 30 days. On that day, in *Rosario v. USCIS*, the U.S. District Court for the Western District of Washington enjoined USCIS from failing to adhere to the 30-day deadline as to a class consisting of all non-citizens who have applied or will apply for an EAD that were or will not be adjudicated within 30 days, and have not been or will not be given an interim EAD. 365 F. Supp. 3d 1156, 1158 (W.D. Wash. 2018).

On June 22, 2020, the Department promulgated a Rule that amended 8 C.F.R. § 208.7(a)(1) to eliminate the 30-day processing time requirement. *See Removal of 30-Day Processing Provision for Asylum Applicant- Related Form I–765 Employment Authorization Applications*, 85 Fed. Reg. 37,502 (June 22, 2020) ("Timeline Repeal Rule"). This change became effective on August 21,

2020. Decl. of Connie Nolan ¶ 5. Four days later, the Department promulgated a second Rule that made many changes to the process for obtaining an asylum-based EAD. *See Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532 (June 26, 2020) ("Broader Asylum EAD Rule"). Among other things, this Rule changed when an asylum-based EAD application could be filed, and imposed new biometrics requirements and eligibility requirements. *Id.*; Ex. A, Decl. of Connie Nolan ¶ 6.

On September 11, 2020, in *Casa De Maryland, Inc. v. Wolf*, the U.S. District Court for the District of Maryland issued a preliminary injunction prohibiting USCIS from applying the Timeline Repeal Rule and certain aspects of the Broader Asylum EAD Rule to members of two organizations, Casa De Maryland, Inc. ("CASA") and the Asylum Seeker Advocacy Project ("ASAP"). 486 F. Supp. 3d 928, 935 (D. Md. 2020); Nolan Decl. ¶ 7. The Court held that the Rules were invalid because Chad Wolf, who had been named Acting Secretary of Homeland Security on November 13, 2019, had been invalidly appointed. 486 F. Supp. 3d at 943, 960. Because the *CASA* preliminary injunction applied only to CASA and ASAP members, USCIS established separate work streams, processes, and procedures for adjudicating asylum-based EAD applications submitted by CASA and/or ASAP members, while continuing to adjudicate all other applications as it had previously. Decl. of Connie Nolan ¶¶ 12-13. Establishing this bifurcated adjudication process was a complicated and time-consuming undertaking. Nolan Decl. ¶ 16.

### B.    Procedural Background

On December 23, 2020, Plaintiffs filed an unopposed motion to proceed under pseudonym, which this Court granted that same day. ECF Nos. 1, 2. Plaintiffs then filed their initial complaint. ECF No. 3. They challenged the Timeline Repeal and Broader Asylum EAD Rules ("challenged Rules") on the ground, among others, that Wolf's appointment was invalid because the version of

Delegation No. 106—which establishes succession protocol for the Department—in effect when he was named Acting Secretary did not authorize his accession to office. Compl. ¶¶ 274-77. In their prayer for relief, they sought declaratory and injunctive relief, along with vacatur of the challenged Rules. *Id.* at 97-98. Plaintiffs filed an unopposed motion for leave to file an amended complaint, which this Court granted. ECF No. 10; Min. Order (Mar. 23, 2021). Defendants moved for a stay, which this Court denied. ECF Nos. 16, 22. The parties then filed cross-motions for partial summary judgment. ECF Nos. 25, 28.

On February 7, 2022, this Court granted Plaintiffs' motion, denied Defendants' motion, and vacated the challenged Rules. Vacatur Order, ECF No. 41. The vacatur order did not provide injunctive or declaratory relief. *Id.* As explained in its accompanying Memorandum Opinion, the Court concluded that Wolf's appointment had been invalid, and that the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*, precluded the Secretary's effort to ratify the Timeline Repeal Rule. Mem. Op. at 2, ECF No. 42. Plaintiffs moved to enforce the Court's judgment or for injunctive relief on July 22, 2022, and for attorney's fees and expenses on August 1, 2022. ECF Nos. 47, 48.

### C. USCIS's Post-Vacatur Changes to its Procedures for Adjudicating Asylum-Based EAD Applications

USCIS ceased enforcing the challenged Rules immediately after the Court vacated them. Nolan Decl. ¶ 11; *USCIS Stops Applying Certain EAD Provisions for Asylum Applicants*, USCIS, https://www.uscis.gov/laws-and-policy/other-resources/class-action-settlement-notices-and-agreements/uscis-stops-applying-certain-ead-provisions-for-asylum-applicants ("Effective Feb. 8, 2022, USCIS has stopped applying 2 rules"). Instead, USCIS returned to processing initial asylum-based EAD applications under the Rules that had been in force before the challenged Rules had taken effect ("prior Rules"). *Id.* Among other things, USCIS immediately stopped:

- applying the vacated biometrics requirement, by ceasing scheduling biometrics appointments for affected asylum-based EAD applicants and/or resubmitting previously collected fingerprints;

- rejecting asylum-based EAD applications filed without a biometric services fee;

- applying the requirement that asylum applicants wait 365 days from the time of filing Form I-589, Application for Asylum, before they could file their initial asylum-based EAD application;

- denying asylum-based EAD applications based on treatment of unresolved amendments or supplements to the underlying asylum application as unresolved applicant-caused delays;

- considering criminal convictions, or issue denials based on criminal conduct other than aggravated felonies;

- considering entry without inspection as a basis for ineligibility;

- considering whether the applicant applied for asylum within one year of their previous entry;

- applying the prohibition on employment authorization during federal court appeals in the adjudication of renewal applications;

- reusing or scanning photos for card production.

Nolan Decl. ¶ 23. USCIS also began "applying the 180-day Asylum EAD Clock and 150-day waiting period to file initial asylum-based EAD applications." and "notifying affected operations, assessing the impacts of the decision, providing preliminary guidance, and identifying necessary system and form updates." *Id.*

Defendants did not appeal the vacatur order. Nolan Decl. ¶ 24. Until April 7, 2022, the deadline to file an appeal, USCIS continued to collect certain information from CASA and ASAP members but did not apply the challenged Rules to them. *Id.* ¶ 25. And although USCIS ceased enforcing the challenged Rules immediately after the Court vacated them, it did not begin to dismantle the bifurcated adjudication process it had established pursuant to the *CASA* preliminary injunction until the deadline to file an appeal passed. *Id.* On April 19, 2022, USCIS began

incorporating CASA and ASAP members' initial asylum-based EAD applications into a common adjudication work queue with all other applicants. *Id.* ¶¶ 26-27, 32.

One consequence of this Court's vacatur order was the immediate creation of a significant backlog of cases to which the 30-day processing timeframe suddenly applied. Nolan Decl. ¶ 28. Until then, the 30-day processing timeframe had applied only to applications by CASA and ASAP members. *Id.* After the vacatur, it applied to all applicants. *Id.* The number of applications to which the 30-day processing timeframe applied thus immediately swelled from about 8,138 to about 93,639. *Id.* ¶ 31. Of these, about 88,935 had been pending for 121 or more days. *Id.*

Since the vacatur, USCIS has increased resources for processing initial asylum-based EAD applications by hiring new staff, pulling existing staff from other work, and offering overtime pay. Nolan Decl. ¶ 33. As a result of these efforts, USCIS has substantially increased the number of monthly initial asylum-based EAD adjudications subject to the 30-day processing timeframe that it has been able to complete. *Id.* ¶ 34. To illustrate this, in December 2021 and January 2022, respectively, USCIS processed 10,534 and 12,457 CASA and ASAP applications subject to the 30-day requirement. *Id.* In May, June, and July 2022, meanwhile, USCIS processed 31,474, 29,014, and 25,694 applications. *Id.*

Given the limited availability of staff resources to process applications, USCIS has focused its processing efforts largely on reducing its backlog of initial asylum-based EAD applications, starting with the oldest ones. Nolan Decl. ¶ 35. Focusing on the oldest applications has resulted in longer processing times for newer applications but is necessary to achieve consistent processing timeframes across USCIS's entire application caseload. *Id.* ¶¶ 35-36. Longer average processing times do not mean that USCIS is processing fewer applications overall. *Id.* ¶ 36. To the contrary, between March and July 2022, USCIS processed about 85,000 more applications than it had

between October 2021 and February 2022. *Id.* Absent disruptions to its adjudication processes, USCIS expects to resolve most of its backlog of cases by about September 30, 2022. *Id.* ¶ 37.

### D.      USCIS's Efforts to Amend the Code of Federal Regulations Post-Vacatur

The *Federal Register* is the official journal of the United States government. *The Federal Register*, Nat'l Archives & Records Admin., https://www.archives.gov/federal-register/the-federal-register. Published every federal workday by the Office of Federal Register, it provides legal notice of Presidential orders and proclamations, notices of proposed rulemakings, final rules, and other documents required to be published by statute. *Federal Register Office*, Nat'l Archives & Records Admin, https://www.federalregister.gov/agencies/federal-register-office. The Code of Federal Regulations ("CFR") is the official codification of the general and permanent rules that agencies publish in the *Federal Register*. 44 U.S.C. § 1510. Like the *Federal Register*, the CFR is published by the Office of Federal Register, but unlike the *Federal Register*, it is updated annually, rather than on a daily basis. 1 C.F.R. § 8.3; *About the Code of Federal Regulations*, Nat'l Archives & Records Admin., https://www.archives.gov/federal-register/cfr/about.html. Title 8 of the CFR, which contains all immigration regulations, is scheduled to be updated on January 1, 2023. *See About the Code of Federal Regulations*, *supra*. The eCFR, an online version of the CFR, is updated every day. *See What is the eCFR*, Nat'l Archives & Records Admin., https://www.ecfr.gov/reader-aids/understanding-the-ecfr/what-is-the-ecfr.

USCIS does not sign or promulgate rules changing Title 8 of the CFR. Ex. B, Decl. of Samantha Deshommes ¶ 11. That authority rests with the Secretary, who has not delegated it to USCIS. *Id.* USCIS may serve as the originating component of regulatory actions that require the Secretary's signature, such as a final rule, which entails responsibility for drafting and coordinating clearances within USCIS and with departmental components. *Id.* ¶ 12. The final step before USCIS

approves a regulatory action for departmental review is clearance by USCIS's Director. *Id.* A regulatory action that requires the Secretary's signature generally requires clearance by related components, the Office of the General Counsel, and the Office of the Secretary. *Id.* ¶ 13.

If a regulatory action is "significant" within the meaning of Executive Order 12,866, it must also undergo review by the Office of Information and Regulatory Affairs ("OIRA"), a component of the Office of Management and Budget within the Executive Office of the President. Deshommes Decl. ¶ 14. OIRA determines whether a regulatory action is "significant." *Id.* As part of its review, OIRA coordinates review of the regulatory action with other executive agencies and offices within the Executive Office of the President. *Id.* Once OIRA concludes its review of a regulatory action, the Secretary reviews and signs it. *Id.* ¶ 15. The Office of the Federal Register typically publishes a regulatory action within four business days of receiving it. 1 C.F.R. § 17.2(c).

On August 8, 2022, OIRA and the U.S. General Services Administration published the Spring 2022 *Unified Agenda of Regulatory and Deregulatory Actions*, 87 Fed. Reg. 48,236 (Aug. 8, 2022), https://www.reginfo.gov/public/do/eAgendaMain. In that publication, the Department announced that it "plans to rescind" the Rules and issue a final rule in September 2022. *See Spring 2022 Unified Agenda of Regulatory and Deregulatory Actions*, RIN 1615-AC66, https://www .reginfo.gov/public/do/eAgendaViewRule?pubId=202204&RIN=1615-AC66.[1]

On June 7, 2022, USCIS initiated the process of removing the challenged Rules from the CFR. Deshommes Decl. ¶ 20. By July 14, USCIS had drafted a final rule, and began to clear it through its program offices and directorates. *Id.* ¶ 22. On July 27, 2022, USCIS submitted the draft final rule for departmental review. *Id.* ¶¶ 22-23. As noted, the Department is attempting to publish

---

[1]     OIRA and the General Services Administration publish only parts of the Unified Agenda of Regulatory and Deregulatory Action in the Federal Register.

the draft final rule by September 2022. *Id.* ¶ 19. Once the Secretary signs the final rule, USCIS will submit it for publication in the *Federal Register*. *Id.* ¶ 15. USCIS expects the final rule to be published in the *Federal Register* in time for it to be included in the next official publication of Title 8 of the CFR on January 1, 2023. *Id.* ¶ 26.

### E.    USCIS's Efforts to Revise the Form I-765 and Instructions Post-Vacatur

To receive authorization to work in the United States, an applicant for asylum must apply for employment authorization using Form I-765, Application for Employment Authorization, under the category for pending asylum applications. Deshommes Decl. ¶ 27. The challenged Rules, and especially the Broader Asylum EAD Rule, resulted in various changes to Form I-765 and its instructions (collectively "Form I-765"). *Id.*

When amending forms, USCIS must comply with the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*, which governs how the government collects information from the public. The Act generally requires federal agencies to obtain approval from OIRA before using identical questions to collect information from 10 or more persons. 44 U.S.C. §§ 3502(3)(A)(i), 3504(a)(1)(B)(i). To initiate OIRA review of a form revision, USCIS submits a revised form to the Department, which then submits the revision to OIRA for review. Deshommes Decl. ¶ 31. Amending a form usually requires USCIS to issue a *Federal Register* notice soliciting public comment on any changes that it proposes to make. *Id.* ¶ 29. USCIS may, however, request emergency processing of a revision to a form without notice and comment from OIRA in select circumstances. *See id.*; 5 C.F.R. § 1320.13. OIRA's review and approval process allows it to review only one form revision at a time for each form submitted. Deshommes Decl. ¶ 32. If a Form I-765 revision package is pending with OIRA, then, USCIS must wait until OIRA has finished review of that package before it can submit another subsequent Form I-765 revision package for review. *Id.*

Following this Court's vacatur order, USCIS began revising Form I-765 on May 10, 2022, and engaged in early coordination with relevant departmental components and OIRA. Deshommes Decl. ¶¶ 33, 35. USCIS signed its portion of an emergency approval request on June 17, 2022. *Id.* ¶ 33. On July 20, 2022, one day after OIRA completed review of another pending revision to a Form I-765 revision (i.e., at the earliest possible date), the Department submitted the revision to OIRA. *Id.* ¶¶ 37-38. OIRA approved the revision on July 26, 2022. *Id.* ¶ 39. While operationalizing the changes to Form I-765 is a complex undertaking spanning many different computer systems, USCIS expects the revised form to be available to the public in early September 2022. *Id.* ¶ 43.

## ARGUMENT

Defendants have undertaken reasonable efforts to effectuate regulatory change in response to the Court's vacatur order consistent with the legal constraints on administrative action, limited resources available to them, and significant application backlog they are experiencing. Plaintiffs are entitled to no additional relief. While Plaintiffs are entitled to an award of attorney's fees, the size of the award that they seek is unreasonable, and this Court should award them no more than $108,265.33 in attorney's fees.[2]

**I.**      **This Court Should Deny Plaintiffs' Motion to Enforce**

Plaintiffs seek three forms of relief—(1) revision of the eCFR to reflect the challenged Rules' vacatur, (2) issuance of the revised Form I-765, and (3) full compliance with the 30-day processing deadline. Defendants are on track to meet each of these goals soon and are undertaking reasonable efforts to do so. At the same time, Defendants cannot simply ignore the restraints that Congress and the President have imposed on the administrative process, or the need to prioritize

---

[2]      Although Plaintiffs style their motion as one for fees and expenses, the only expenses for which they appear to seek an award are paralegal and law clerk time.

relief to those whose applications have been pending the longest. Defendants intend to update the eCFR to reflect the challenged Rules' vacatur in the coming weeks, which would be reflected in the next print edition of Title 8 on January 1, 2023, and make the revised Form I-765 available by September 2022. Plaintiffs may characterize compliance with these congressional and presidential restraints on regulatory action as "bureaucracy," Pls.' Mot. Enforce at 15, but it is simply the price of making regulatory change consistent with the rule of law. Defendants are likewise on track to process most of their backlog of applications that have been pending for over 30 days by the end of September 2022, having markedly improved their rate of adjudication. Although Defendants understand Plaintiffs' frustration with this progress's pace, they are undertaking reasonable efforts considering the significant resource and workload constraints under which they are operating.

Plaintiffs nonetheless demand even more, but they are not entitled to it. "Success on a motion to enforce a judgment gets a plaintiff only the relief to which the plaintiff is entitled under its original action and the judgment entered therein." *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (cleaned up); *accord Select Specialty Hosp.-Denver, Inc. v. Becerra*, Civ. A. No. 10-1356 (BAH), 2021 WL 4262652, at *7 (D.D.C. Sept. 20, 2021). Plaintiffs lack standing to pursue the relief they seek, which in any event lies far beyond the vacatur order's scope. That order did not require or imply that Defendants would do any of what Plaintiffs demand, much less on the schedule by which they demand it. It merely vacated the challenged Rules without imposing any additional, affirmative obligations. Nor do Plaintiffs meet the requirements to obtain an injunction. For all these reasons, this Court should deny Plaintiffs' motion to enforce in full.

### A.    Plaintiffs Lack Standing To Obtain The Relief They Seek

"The Constitution limits [the] judicial Power to Cases and Controversies, and there is no justiciable case or controversy unless the plaintiff has standing." *Am. Fuel & Petrochem. Mfrs. v.*

*EPA*, 937 F.3d 559, 591 (D.C. Cir. 2019) (cleaned up). A plaintiff has standing only if (1) it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) there is "a causal connection between the injury and the conduct complained of," and (3) it is "likely . . . that the injury will be redressed by a favorable decision." *Cierco v. Mnuchin*, 857 F.3d 407, 416 (D.C. Cir. 2017) (citation omitted). "Because standing is not dispensed in gross," a plaintiff separately "must demonstrate standing separately for each form of relief sought." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Dep't of Transp.*, 879 F.3d 339, 346 (D.C. Cir. 2018).

These requirements train judicial power on the actual dispute between the parties to a case, rather than abstract questions untethered to a plaintiff's interests. *See Comm. on Jud. v. McGahn*, 968 F.3d 755, 769 (D.C. Cir. 2020) ("the requirement of standing focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated" (quotation marks omitted)); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1346 (D.C. Cir. 2014) ("Because the exercise of judicial power . . . depends upon the existence of a case or controversy, a federal court may not decide questions that do not affect the rights of parties properly before it." (cleaned up)). Consistent with these principles, a plaintiff cannot rely solely on a third party's injury to show standing—it may vindicate a third party's rights only if it has suffered injury of its own. *See Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004) (plaintiffs only have "standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights" (quotation marks omitted). *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (to sue "on behalf of third parties," a "litigant must have suffered an injury in fact" (quotation marks omitted)); *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 552 (D.C. Cir. 2020) ("a plaintiff must assert and rely on its own alleged injuries, not those of a third party

who is not a plaintiff in the case"). An organization likewise has standing only if "at least one of its members would have standing to sue in his own right." *Am. Fuel*, 937 F.3d at 591-92.

Plaintiffs lack standing to pursue any of the three forms of relief they seek. The individual plaintiffs allege no injuries to themselves, while the organizational plaintiffs allege no injuries to themselves or their members. The only injuries Plaintiffs allege are to third parties who are not before the Court. As such, this Court should deny Plaintiffs' motion to dismiss for lack of standing.

### 1.    *Plaintiffs fail to show personal injury to compel revision of the CFR*

Plaintiffs fail to demonstrate the personal injury necessary to compel Defendants to revise the CFR. They speculate only that it "makes legal research potentially confusing, and in some cases impossible, for the general public, especially for those who do not have lawyers." Pls.' Mot Enforce at 10. Even crediting this wholly speculative claim, it is doubtful whether mere confusion is a sufficiently concrete and particularized injury for standing purposes. *See N.E. Power Gens. Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) ("It would be a strange thing indeed if uncertainty were a sufficiently certain harm to constitute an injury in fact."); *Viola v. FDIC*, Civ. A. No. 18-2351 (JEB), 2019 WL 2492786, at *3 (D.D.C. Jun. 14, 2019) ("uncertainty alone is insufficient to show injury."). But this Court need not resolve that issue, as Plaintiffs do not claim to be confused themselves as to whether the challenged Rules are still in effect. They plainly know the challenged Rules are vacated, having secured the vacatur. Nor do the organizational plaintiffs claim that their members are confused as to whether the challenged Rules are in force. That is no surprise—they presumably have already informed their members who are seeking asylum-based EADs about the rules that currently govern such applications.[3] Without any injury of their own,

---

[3]    Indeed, it seems unlikely that the organizational plaintiffs could possibly even learn that their members are unaware that the challenged Rules have been vacated without, in the very process of doing so, informing them of the vacatur, instantly remedying any injury.

Plaintiffs lack standing to compel Defendants to revise the CFR on the general public's behalf. *See Kowalski*, 543 U.S. at 131; *Powers*, 499 U.S. at 410-11; *N.Y. Stock Exch.*, 962 F.3d at 552.

   2.    *Plaintiffs fail to show injury to compel revision of Form I-765*

Plaintiffs likewise fail to demonstrate the personal injury necessary to compel Defendants to revise Form I-765. They allege only that the current version Form I-765 elicits information that is no longer relevant post-vacatur, and that its instructions contain outdated "restrictions derived from" the Broader Asylum EAD Rule. Pls.' Mot. Enforce at 12. But they do not claim that the form itself or instructions cause them harm, such as because Defendants are relying on information that is no longer relevant, or enforcing restrictions that no longer apply, to adjudicate their or their clients' applications.[4] To the contrary, Defendants have publicly affirmed that they are no longer enforcing the challenged Rules. *See USCIS Stops Applying Certain EAD Provisions for Asylum Applicants*, *supra*. This representation is entitled to the presumption of truth, *see Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016), and Plaintiffs do not dispute it. They instead argue that Form I-765 may deceive or dissuade persons from applying for asylum-based EADs, but they naturally do not claim to have been deceived or dissuaded themselves (or that their members have been) as they know the challenged Rules are vacated. Because they once again invoke speculative injuries to third parties rather than any injuries to themselves, they lack standing to challenge Form I-765.[5] *See Kowalski*, 543 U.S. at 131; *Powers*, 499 U.S. at 410-11; *N.Y. Stock Exch.*, 962 F.3d at 552.

---

[4]    Plaintiffs note that the instructions direct payment of an $85 fee, but concede that USCIS's website expressly advises applicants that this fee is no longer required, and do not claim that Defendants have ever accepted payment of this fee since the vacatur order. Pl.'s Mot. at 13.

[5]    Plaintiffs also demand that Defendants update their website, but do not specify what change they want Defendants to make. *See AT&T Corp. v. FCC*, 970 F.3d 344, 351 (D.C. Cir. 2020) ("a litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones

3.      *Plaintiffs fail to show personal injury to compel Defendants to process applications within 30 days*

Finally, Plaintiffs fail to demonstrate the personal injury necessary to compel Defendants to process applications within 30 days. They do not claim that Defendants have failed to adjudicate their own (or their clients') applications within 30 days. Instead, they vaguely assert only that they "are aware of" applications by unnamed third parties that have been pending for over 30 days. Pls.' Mot. Enforce at 17. Once again, absent any injury of their own, Plaintiffs lack standing to compel Defendants to process applications within 30 days on behalf of third parties not before the Court.

\*      \*      \*

For these reasons, Plaintiffs lack standing to seek the relief they demand.

**B.      The Vacatur Order Did Not Entitle Plaintiffs to the Relief They Seek**

Plaintiffs' motion to enforce also fails on the merits, because the vacatur order imposed no additional, affirmative obligations on Defendants that can form the basis of Plaintiffs' motion. By its plain terms, the vacatur order did nothing more than simply vacate the challenged Rules. ECF No. 41. It did not order Defendants to revise the CFR or Form I-765, nor did it naturally imply any such obligations. *Id.* All that the vacatur order required of Defendants was to stop enforcing the challenged Rules, which Defendants did immediately upon the order's issuance. *See* Nolan Decl. ¶ 11; *USCIS Stops Applying Certain EAD Provisions for Asylum Applicants*, *supra*. As explained, Defendants are doing their best to process applications timely consistent with workload and resource constraints operating on them. The vacatur order surely did not require the impossible.

Even if the vacatur order had imposed or implied an obligation to revise the CFR and Form I-765, it did not suggest that Defendants would do so on a particular timeframe—much less

---

arguments." (cleaned up)). To the extent they seek to compel Defendants to post revised versions of the Form I-765 on their website, they lack standing to do so, for the reasons given above.

before they satisfied the requirements of Executive Order 12,866 and the Paperwork Reduction Act and integrated the new form with its computer systems. Nor did it suggest that Defendants would begin to process applications within 30 days before it had finished clearing out its substantial backlog of applications that have been pending for even longer, a backlog created in large measure as a result of the challenged Rules' vacatur. Given the limited resources available to Defendants, they cannot currently process new applications within 30 days without neglecting applications that have been pending longer, Nolan Decl. ¶¶ 35-37, an unfair and inequitable result. *See Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) ("We have noted before the importance of competing priorities in assessing the reasonableness of an administrative delay," and "refused to grant relief, even though all the other factors . . . favored it, where a judicial order putting the petitioner at the head of the queue [would] simply move[] all others back one space and produce no net gain" (cleaned up)); *Nibbler v. USCIS*, Civ. A. No. 20-3207 (BAH), 2020 WL 7360215, at *7 (D.D.C. Dec. 15, 2020) (applying this principle in context of EAD application to reject unreasonable delay claim). Denying Plaintiffs' motion to enforce notably would not leave Defendants unaccountable as to their compliance with the 30-day processing requirement, as Defendants remain subject to ongoing judicial supervision on the same issue in *Rosario*. For all of these reasons, this Court should deny Plaintiffs' motion to enforce.

### C.    Plaintiffs Are Not Entitled To An Injunction

Perhaps recognizing the futility of seeking to compel enforcement of an order that does not provide the relief they seek, Plaintiffs also ask for an injunction. But they identify no law requiring Defendants to revise the CFR or Form I-765 at all, much less to do so immediately. To the extent they claim that the vacatur order itself imposed such a duty, they are mistaken, as explained. Nor is this case an appropriate forum for Plaintiffs' demand that Defendants follow the processing plan

established in *Rosario*. Pls.' Mot. Enforce at 17. If they take issue with Defendants' compliance with the *Rosario* plan, the appropriate way to raise such a challenge is to intervene in *Rosario*, not through a collateral attack in a different case raising different claims before a different court.

Regardless, Plaintiffs fail to establish the requirements for an injunction—(1) irreparable injury, (2) inadequacy of legal remedies, (3) a favorable balance of hardships, and (4) that an injunction would not disserve the public. *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs fail to show irreparable injury for the same reason that they lack standing—they allege injuries only to third parties who are not before the Court. Requiring Defendants to make the revised Form I-765 immediately available would impose undue hardship on Defendants and disserve the public, meanwhile, given the need to operationalize the changes to Form I-765 across a variety of different computer systems first. Deshommes Decl. ¶ 43. Finally, as explained above, requiring Defendants to immediately begin processing all applications within 30 days would be not only impossible but inequitable, requiring them to neglect applications that have been pending longer. Nolan Decl. ¶¶ 35-37. Plaintiffs thus are not entitled to an injunction.

## II.   Plaintiffs Seek Excessive Attorneys' Fees

The Equal Access to Justice Act ("EAJA") authorizes a court to award attorney's fees and costs to a prevailing party in a civil action against the United States unless the government's position was substantially justified. 28 U.S.C. § 2412(d)(1)(A). A plaintiff "bears the burden of establishing both entitlement to an award of attorney's fees as well as the amount properly due." *Turner v. D.C. Bd. of Elections & Ethics*, 354 F.3d 890, 895 (D.C. Cir. 2004). Defendants agree that Plaintiffs are prevailing parties, and do not argue for purposes of this fee litigation that their position was substantially justified, which would preclude Plaintiffs from recovering any fee award at all. Plaintiffs thus are entitled to an award of reasonable attorney's fees.

But the $762,583.60 in fees that Plaintiffs demand is excessive, reflecting unjustifiably high rates and an unreasonable number of hours. Altogether, this Court should award Plaintiffs no more than $108,265.33. Defendants first explain their objections to the rates and hours underlying Plaintiffs' fee demand, then explain how they calculated their own figure. That said, should the Court decline to fully accept either party's position as to the rates and hours that a fee award should reflect, it need not calculate such an award itself, which could entail the time-intensive work of applying different rates for different years and omitting specific categories of work. Defendants propose that the Court instead direct the parties to calculate a proper award in light the Court's resolution of the parties' areas of disagreement, and submit that figure in a Joint Status Report.

## A.    Plaintiffs Are Entitled To Fees at a Rate No Greater Than $125 Per Hour

The rate at which a court may award attorney's fees under EAJA generally shall not exceed $125 per hour, which the court may adjust to account for an increase in the cost of living. 28 U.S.C. § 2412(d)(2)(A). A court may award reasonable attorney's fees at prevailing market rates only if a special factor justifies a higher fee, or a party other than the United States would be liable for such fees under the common law. *Id.* § 2412(b), (d)(2)(A).

Plaintiffs argue that they are entitled to fees at prevailing market rates, rather than the EAJA default rate, because (1) Defendants acted in bad faith and (2) their attorneys' Spanish-language skills and immigration law expertise are special factors warranting enhanced fees. None of that is correct. Plaintiffs thus are entitled to fees at a rate of $125 per hour, which this Court should adjust to reflect an increase in the cost of living.[6]

---

[6]    The parties agree that this Court should calculate the appropriate cost of living adjustment for each year in which Plaintiffs' attorneys performed work using the U.S. Court of Appeals for the Ninth Circuit's cost of living adjustment rate chart. *See* Pls. Mot. Fees at 13 n.5; *Statutory Maximum Rates Under the Equal Access to Justice* ("Ninth Circuit Chart"), U.S. Court of Appeals for the Ninth Circuit, https://www.ca9.uscourts.gov/attorneys/statutory-maximum-rates.

### 1. *Defendants did not act in bad faith*

Under the common law, parties typically pay their own attorney's fees. *Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219 (D.C. Cir. 1991). But a "narrow" exception to this rule exists—a party that acts in bad faith may be required to pay the other party's reasonable attorney's fees. *Id.* Bad faith requires that a party "has been the victim of unwarranted, oppressive, or vexatious conduct on the part of his opponent and has been forced to sue to enforce a plain legal right." *Heartland Plymouth Court MI, LLC v. NLRB*, 838 F.3d 16, 27-28 (D.C. Cir. 2016) (quotation marks omitted).

Plaintiffs accuse Defendants of operating in bad faith in three ways—by (1) enacting the challenged Rules in the first place, (2) defending the challenged Rules in this litigation, and (3) attempting to ratify the Timeline Repeal Rule once Secretary Mayorkas entered office. None of these actions were in bad faith. They did not violate any court order or contravene binding appellate authority, and while Defendants' position ultimately did not prevail, it was not so plainly meritless as to constitute bad faith. None of this is to deny that this Court may assess the quality of Defendants' position in calculating an appropriate fee award. But a better way to do so is to decline to find that Defendants' position was substantially justified. The Court should not take the "extraordinary" next step, *Ass'n of Am. Phys. & Surg. v. Clinton*, 187 F.3d 655, 660 (D.C. Cir. 1999), of concluding that Defendants' position was so patently meritless as to constitute bad faith.

### a. The decision to enact the challenged Rules was not in bad faith

First, the challenged Rules' unlawfulness was not so "clear" that the decision to enact them itself amounted to bad faith. *See Sullivan*, 938 F.2d at 220 ("Bad faith in conduct giving rise to the lawsuit may be found where a party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights." (quotation marks

omitted)). Whether the challenged Rules were valid turned on the lawfulness of Wolf's service as Acting Secretary, which itself turned on the proper construction of Delegation No. 106. But at the time that the challenged Rules issued, no Court had yet construed Delegation No. 106, much less the specific versions of it in effect during the relevant period, at least as best Defendants are aware. The absence of any case law foreclosing Defendants' position at the time that the challenged Rules issued weighs firmly against a finding that their issuance constituted bad faith. *See Am. Emps. Ins. Co. v. Am. Sec. Bank, N.A.*, 747 F.2d 1493, 1503 (D.C. Cir. 1984) (no bad faith where "the law on the issue . . . was not settled"); *Select Specialty Hosp.-Denver, Inc. v. Azar*, Civ. A. No. 10-1356 (BAH), 2020 WL 3469685, at *6 (D.D.C. June 25, 2020) (no bad faith where issue "was unsettled"); *GasPlus, LLC v. Dep't of Int.*, 593 F. Supp. 2d 80, 88 (D.D.C. 2009) (fact that a law "had only recently been adopted" and "no precedent existed . . . sap the record of clear and convincing evidence that the government acted in bad faith").

      b.     <u>The decision to defend the challenged Rules was not in bad faith</u>

Second, Defendants' decision to defend the challenged Rules in this litigation was based on an interpretation of Delegation No. 106 and intent that was, at a minimum, colorable. *See* Defs.' Mem. Supp. MSJ at 15-20, ECF No. 28-1; *Ass'n of Am. Phys. & Surg.*, 187 F.3d at 660 (bad faith standard "is stringent and attorneys' fees will be awarded only when extraordinary circumstances or dominating reasons of fairness so demand" (quotation marks omitted)). Indeed, this Court has explained that courts should find bad faith based on pre-litigation conduct only in "limited" circumstances, because otherwise "every time the Government advances a statutory interpretation that a Court ultimately rejects, it is acting in bad faith." *Select Specialty*, 2020 WL 3469685, at *6 (quotation marks omitted); *see also Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 653 (9th Cir. 1988) ("An argument need not be correct to be considered made in good faith." (cleaned up)).

Notably, Defendants did not "inten[d] to confuse or mislead the court," which are "[a]ctions that courts consider to be taken in bad faith typically reflect." *Clark v. Feder, Semo & Bard, P.C.*, 59 F. Supp. 3d 114, 117 (D.D.C. 2014).

The fact that several other district courts have rejected Defendants' position does not alter the picture. As best Defendants are aware, no court has ever held that the government acts in bad faith merely by declining to acquiesce in the reasoning of a district court in an entirely different case involving other parties. This Court should not be the first. The decision to issue and enforce the challenged Rules did not contravene any appellate authority or violate any court order, and the government is generally entitled to defend itself in court. Private litigants may advance arguments that district courts have rejected in cases involving other parties absent the collateral estoppel effect of a final judgment, which does not apply against the government, *United States v. Mendoza*, 464 U.S. 154, 163 (1984), and there is no reason to hold the government to a more stringent standard.

To the contrary, principles of interbranch comity counsel for recognizing the government's unusually compelling need to be able to take positions that other district courts have rejected in cases against other parties, given its unique litigation responsibilities. These entail "a far greater number of cases on a nationwide basis than even the most litigious private entity," many of which raise "legal questions of substantial public importance," including "many constitutional questions [that] can arise only in the context of litigation to which the government is a party." *Mendoza*, 464 U.S. at 160-61. To say the government acts in bad faith by raising arguments that other courts have rejected would be particularly inappropriate given that the Supreme Court has blessed this practice as beneficial to the law's development, by enabling issues to percolate before it finally weighs in.[7]

---

[7]    Although Plaintiffs note that Defendants did not appeal these rulings, this Court should draw no adverse inference about the governments' assessment of its position's merit from that fact. "Unlike a private litigant who generally does not forego an appeal if he believes that he can prevail,

*Id.* at 159 ("Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari" and "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue"); Sup. Ct. R. 10 (review likelier if authority is split).

            c.      <u>The attempt to ratify the Timeline Repeal Rule was not in bad faith</u>

Third, Secretary Mayorkas' attempt to ratify the Timeline Repeal Rule was not in bad faith. It rested on reasonable statutory construction supported by ample case law, including an opinion by a Judge of this Court. *See* Defs.' Mem. at 29-30; *Nw. Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31, 59 (D.D.C. 2020). Indeed, Plaintiffs cited no case law for their own contrary argument. *See* Pls.' Mem. at 36-37, 43. Although the Court found Plaintiffs' position more persuasive, Defendants' position was not so meritless as to be in bad faith. Notably, while several officials purported to ratify both challenged Rules, *see id.* at 31-42, Defendants chose to argue only that Secretary Mayorkas' ratification of the Timeline Repeal Rule was valid, reflecting discernment as to the selection of arguments to press.

            2.      *No special factor warrants enhanced fees*

Nor are the Spanish language skills or immigration law expertise that Plaintiffs' attorneys possess special factors that warrant enhanced fees. If a "special factor" existed whenever "lawyers skilled and experienced enough to try the case are in short supply, it would effectively eliminate the [default $125 per hour] cap." *Pierce v. Underwood*, 487 U.S. 552, 571 (1988). The "'special factors' envisioned by the exception must be such as are not of broad and general application,"

---

the Solicitor General considers a variety of factors, such as the limited resources of the government and the crowded dockets of the courts, before authorizing an appeal." *Mendoza*, 464 U.S. at 161; *see also Milton S. Kronheim Co., Inc. v. District of Columbia*, 91 F.3d 193, 205 (D.C. Cir. 1996) ("The government litigates quantities of suits, often involving issues of public importance, and it may decide not to appeal for policy reasons or due to the constraints of limited resources.").

meaning that "[t]he novelty and difficulty of issues, undesirability of the case, the work and ability

of counsel, and the results obtained, are factors applicable to a broad spectrum of litigation; they

are little more than routine reasons why market rates are what they are." *Id.* (quotation marks

omitted). As explained below, no special factor warranting enhanced fees is present here.

> a. Plaintiffs are not entitled to enhanced fees due to their attorneys'
> <u>Spanish language skills</u>

Plaintiffs argue that they are entitled to enhanced fees because their attorneys spoke with

them in Spanish. But foreign language knowledge merits enhanced fees only if "such qualifications

. . . can be obtained only at rates in excess of the [$125 per hour] cap." *Pierce*, 487 U.S. at 572.

Plaintiffs make no attempt to show that qualified Spanish-speaking attorneys in or around the

District of Columbia are unavailable at EAJA default rates. *See Am. Wrecking Corp. v. Sec'y of

Lab.*, 364 F.3d 321, 329 (D.C. Cir. 2004) (plaintiff bears burden to demonstrate a special factor).

Even if Plaintiffs could not find competent Spanish-speaking counsel at EAJA default rates, they

make no effort to show that they could obtain such attorneys only at prevailing market rates. And

even if Plaintiffs could obtain such attorneys only at market rates, they are entitled to market-rate

fees only for work that actually required speaking Spanish, not for all hours their attorneys billed.

> b. Plaintiffs are not entitled to enhanced fees due to their attorneys'
> <u>legal expertise</u>

Plaintiffs also seek enhanced fees on the ground that their attorneys are experts in "a niche

area of law." Pls.' Mot. Fees at 11. But this is a bog-standard administrative law case, the bread

and butter of this District's bar. *See Select Milk Prods., Inc. v. Johanns*, 400 F.3d 939, 951 (D.C.

Cir. 2005) ("nothing in the text or legislative history of EAJA suggests that Congress intended to

make all lawyers practicing administrative law in technical fields eligible for a fee enhancement"

(quotation marks omitted)); *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 969 (D.C. Cir. 2004)

("garden-variety administrative law matter that large Washington law firms handle routinely" do not merit enhances fees). Plaintiffs raised paradigmatic administrative law claims under the APA, Federal Vacancies Reform Act, Homeland Security Act, and Appointments Clause. Am. Compl. ¶¶ 335-90.[8] This is the District of Columbia—it teems with lawyers who litigate claims like these.

Plaintiffs argue that they are entitled to enhanced fees because their attorneys are experts in immigration law. But expertise warrants enhanced fees only if it "requir[es] technical or other education *outside* the field of American law." *In re Sealed Case 00-5116*, 254 F.3d 233, 235 (D.C. Cir. 2001). Expertise gained "solely . . . through practice in a specific area" does not count. *Select Milk Producers*, 400 F.3d at 950-51; *compare Pierce*, 487 U.S. at 572 (patent knowledge, which requires technical knowledge that most attorneys lack, merits enhanced fees), *with Truckers United for Safety v. Mead*, 329 F.3d 891, 895 (D.C. Cir. 2003) (knowledge of energy, communications, railroads, firearms, or election law does not merit enhanced fees).[9] Plaintiffs' counsel gained their knowledge of immigration law through the practice of law, not specialized non-legal training.[10] The very concept of non-legal expertise in immigration law, after all, is a contradiction in terms.

---

[8] While Appointments Clause claims arise under the Constitution rather than statute, they are generally considered to be part of the body of administrative law. *See* Jerry Mashaw et al., *Administrative Law: The American Public Law System* 203-96 (7th ed. 2014). Regardless of how one characterizes them, Appointments Clause claims require no special expertise to raise, and are typically litigated by generalists. *See In re Grand Jury Investigation*, 315 F. Supp. 3d 602 (D.D.C 2018); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012); *In re Sealed Case*, 838 F.2d 476 (D.C. Cir. 1988); *In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987).

[9] For these reasons, the Ninth Circuit cases Plaintiffs cite for the idea that immigration law expertise can merit enhanced fees squarely conflict with D.C. Circuit law. The one case Plaintiffs cite from this District that relied on Ninth Circuit authority predated more recent, contrary D.C. Circuit authority. *See Nat'l Ass'n of Mfrs. v. Dep't of Lab.*, 962 F. Supp. 191 (D.D.C. 1997).

[10] All of the above holds equally true if one characterizes the counsels' experience as being in asylum law in particular, rather than immigration law in general.

Regardless, this case did not require immigration law expertise, only a general ability to understand the relevant legal rules any competent generalist could provide. While the challenged Rules governed the asylum process, Plaintiffs' claims turned on general interpretive principles that are not specific to immigration law. Even if this case required immigration law expertise, Plaintiffs fail to show that they could obtain such expertise only at prevailing market rates, not at EAJA rates.[11] Finally, even if Plaintiffs could obtain such expertise only at market rates, they are entitled to market-rate fees only for work that actually required—and was in fact performed by attorneys who actually possess—such expertise, not for all hours billed by any of their attorneys.

### 3.    *Plaintiffs billed an excessive number of hours*

A court "should exclude from this initial fee calculation hours that were not reasonably expended." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). "Cases may be overstaffed," and a "prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id.* According to Plaintiffs, fourteen attorneys, two law clerks, and a paralegal billed time on this case. Pls.' Mot. Fees at 14-15. Given this overstaffing, it is unsurprising that Plaintiffs' counsel billed excessive hours for their work.

Recognizing that the Court has limited time and resources to devote to parsing individual entries of Plaintiffs' fee petition on a line-by -line basis, an excruciatingly tedious task, Defendants raise five categorical challenges to the hours that Plaintiffs bill. First, this Court should award fees for no more than 92.4 hours of work performed prior to the complaint's filing. Second, the Court

---

[11]    The notion that Plaintiffs cannot find attorneys with asylum law expertise at EAJA default rates is belied by the fact that many asylum-seekers arrive in this country with little money. *See Quintero v. Garland*, 998 F.3d 612, 633 (4th Cir. 2021) ("[m]any asylum seekers flee their home countries with little other than the clothes on their backs" (cleaned up)); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 (9th Cir. 2020) ("most asylum seekers cannot afford" to retain "legal counsel").

should award no fees for time that counsel spent recruiting plaintiffs for the case or preparing retainer agreements, or for work that predates any attorney/client relationship. Third, the Court should award fees for no more than 225 hours of work relating to Plaintiffs' summary judgment briefing. Fourth, the Court should award no fees for work relating to Plaintiffs' motion to enforce. Should the Court grant that motion, it should award fees for no more than 50 hours of work relating to it. Fifth, the Court should award fees for no more than 50 hours of work relating to Plaintiffs' motion for attorney's fees, and further reduce that amount in proportion to the percentage of fees sought that the Court actually grants.

a. <u>Plaintiffs billed excessive hours prior to filing the complaint</u>

Plaintiffs billed 631.6 hours, or nearly 14 workweeks, for work predating and pertaining to their complaint's filing, a facially unreasonable sum. The complaint, which raised six claims for relief, was 99 pages long, consisting mostly of unnecessarily detailed background information that went far beyond what a valid complaint must set forth. *See* Fed. R. Civ. P. 8(a) (a complaint requires "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for the relief sought"). The *CASA* complaint, in contrast, which "presented the same issue as to the *same Rules*" as this case, Pls.' Mot. Fees at 6 (emphasis in original), was only 61 pages long, Ex. C—no exercise in brevity, but not nearly as overwritten as Plaintiffs' complaint.

The number of hours that Plaintiffs billed for pre-complaint work is all the more excessive given that they had five cases' worth of materials involving the same or substantially similar issues from which to draw in drafting their complaint. Plaintiffs do not hide that they availed themselves of this trove of resources—for example, their fee petition reflects numerous entries amounting to over 20 hours, for reviewing the *CASA* complaint and briefing and communicating with *CASA*

25

counsel. ECF Nos. 48-1 at 5, 48-2 at 11-12. The fact that Plaintiffs built their complaint on a foundation of work already done by other attorneys naturally bears on the reasonableness of the number of hours they billed for pre-complaint work. Plaintiffs did not start fresh on the issues that this case raised. Having themselves emphasized the number of courts to have considered these issues, Plaintiffs cannot now ask the Court to ignore that they were walking well-trodden ground.

This Court thus should limit the number of pre-complaint hours for which Plaintiffs may receive fees. Their fee award should reflect the (1) number of hours it would have been reasonable to bill for a 61-page complaint, the length of the *CASA* complaint; (2) unopposed 13-page motion to proceed under pseudonyms; (3) four supporting declarations, amounting to nine pages in total excluding exhibit tabs, boilerplate 28 U.S.C. § 1746 attestations and certificates of translation; and (4) one-page proposed order. That collectively amounts to 84 pages. A reasonable number of hours to bill for this work would be 1.1 hours per page, or 92.4 hours altogether. *See Elec. Priv. Info. Ctr. v. FBI*, 80 F. Supp. 3d 149, 158 (D.D.C. 2015) (Kollar-Kotelly, J.) (reducing attorney's fees requested to 9.5 hours for "comprehensive" 9-page complaint, a rate of 1.055 hours per page). While Plaintiffs' complaint was more involved than the "straightforward" complaint in *Electronic Privacy Information Center, id.*, its complexity is adequately reflected in the far greater number of Plaintiffs hours billed for it, not to mention the materials from five prior cases challenging Wolf's service available to Plaintiffs.

  b. Plaintiffs cannot recover fees for time that their attorneys spent recruiting them for this case or preparing retainer agreements, or for <u>work predating any attorney-client relationship</u>

Plaintiffs also seeks fees for 206.2 hours that their attorneys spent recruiting them for this case, preparing retainer agreements, or performing work predating any attorney-client relationship. But such work is not compensable under EAJA, as it was not done within the scope of any attorney-

client relationship. Under EAJA, "fees must be for a professional who has in fact acted in an attorney-client relationship with the fee claimant." *Kooritzky v. Herman*, 178 F.3d 1315, 1324 (D.C. Cir. 1999). The efforts that an attorney makes to recruit a client precedes the creation, and thus necessarily cannot fall within the scope, of an attorney-client relationship. *See ACLU of Ga. v. Barnes*, 168 F.3d 423, 435 (11th Cir. 1999) ("time spent procuring potential plaintiffs is obviously not expended on the litigation because until the attorney has a client, there is no case to litigate"); *Salazar v. District of Columbia*, 991 F. Supp. 2d 39, 62 (D.D.C. 2014) (different statute allows fees only for work done "in the course of providing legal services"); *Ford v. Karpathoes, Inc.*, Civ. A. No. 14-0824, 2015 WL 736809, at *10 (D. Md. Feb. 19, 2015) ("plaintiff is not entitled to bill . . . the time his attorneys spent preparing his retainer agreement").

Three additional considerations buttress this conclusion. First, EAJA vests the right to recover fees in prevailing parties themselves, not in their attorneys. *See Astrue v. Ratliff*, 560 U.S. 586, 591 (2010). Work that an attorney performs before the client is even in the picture is not fairly attributable to that client. Second, EAJA's waiver of sovereign immunity is "construed strictly in favor of the sovereign and not enlarged beyond what the language requires." *Haselwander v. McHugh*, 797 F.3d 1, 2 (D.C. Cir. 2015) (quotation marks omitted). Any ambiguity as to whether EAJA permits recovery for time that an attorney spent recruiting plaintiffs thus must be resolved against fee recovery. Third, "[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley*, 461 U.S. at 434. If attorneys do not bill their clients for time spent recruiting them or work done outside the scope of the attorney-client relationship, EAJA does not allow fee recovery for such time either.

Plaintiffs' fee petition shows that their attorneys made the decision to bring this litigation, and began to work on it, long before entering into any attorney-client relationships with Plaintiffs.

As they prepared to challenge the Rules, they simultaneously labored to find and recruit plaintiffs with standing to challenge the Rules. Plaintiffs' fee petition is replete with entries reflecting these efforts, such as for "Reviewing Ideal Plaintiff Chart," "Researching potential plaintiffs," "Plaintiff search process, and evaluating available plaintiffs," "Plain and prepare for outreach with immigration services organizations re: impact of EAD rules and potential plaintiffs," "Emails to immigration services organizations re: potential plaintiffs," "plaintiff search – blurb for staff" and "EAD litigation plaintiff search." Pls.' Fee Petition With Highlights, Ex. D at 20-21, 31, 42. Entries reflecting work of this nature are highlighted in blue in Exhibit D. While it is not unusual for an organization to seek out plaintiffs with standing to challenge a particular policy, such work does not fall within the scope of any attorney-client relationship, and thus is not compensable under EAJA. At a minimum, this Court should not award Plaintiffs any fees for this time.

More fundamentally, these entries cast real doubt on how much of the work that Plaintiffs' counsel performed prior to filing the complaint actually fell within the scope of any attorney-client relationship. Counsels' efforts to recruit plaintiffs for this case continued through and even beyond the date the complaint was filed. Plaintiffs should demonstrate when each of them entered into an attorney-client relationship with their attorneys and withdraw any and all demands for fees as to work done outside the scope of an existing attorney-client relationship. Should Plaintiffs fail to do so, this Court should award them no fees for any work done prior the complaint's filing.

c.    Plaintiffs billed excessive hours for summary judgment briefing

Plaintiffs billed 315.53 hours for work relating to their summary judgment briefing, as the yellow-highlighted entries in Exhibit D show. Their summary judgment motion, reply, statements of undisputed material fact, and supporting declarations amount to 191 pages in total. ECF Nos. 25, 32. In drafting these documents, moreover, Plaintiffs had the benefit of five prior decisions and

reams of briefing addressing identical or similar issues from which to draw. Once again, Plaintiffs cannot selectively emphasize the number of courts to have considered the same issues to argue for enhanced fees, only to play this figure down as to the reasonableness of the hours their attorneys billed. Applying a rate of 1.1 hours per page yields a product of 210.1 hours, more than five workweeks, a reasonable figure given the volume of case law and briefing available to Plaintiffs.

d.      Plaintiffs are not entitled to fees for their motion to enforce

Plaintiffs seek $74,277.40 in fees for 157.3 hours of work pertaining to their motion to enforce. Pls.' Mot. Fees at 14 n.6; Ex. D. These entries are highlighted in green in Exhibit D. Because this Court should deny that motion in full, it should also deny Plaintiffs fees for any work pertaining to it. Even if the Court were to grant that motion, the fees Plaintiffs seek for it are excessive. The motion and supporting declarations amount to 45 pages in total. Plaintiffs are entitled to no more than 1.1 hours per page, or 49.5 hours, which Defendants round to 50 hours. Should the Court grant the motion in part and deny it in part, it should award fees in an amount proportionate to the degree of relief it provides.

e.      Plaintiffs billed excessive hours for their motion for attorney's fees

Plaintiffs billed 93.9 hours for work relating to their motion for attorney's fees, as the red-highlighted entries in Exhibit D show. Their motion and supporting declarations amount to 56 pages in total. ECF No. 48. Applying a rate of 1.1 hours per page yields a product of 61.6 hours. This Court should further reduce that amount by a fraction equal to the amount of fees that it awards (not counting this reduction) over the amount of fees Plaintiffs seek. *See Hensley*, 461 U.S. at 434 (court properly reduces fees based on "results obtained"). For example, had Plaintiffs sought $1 million in fees, including $10,000 for work relating to their motion for attorney's fees, and the

Court awarded them $500,000, it should then further reduce by half the amount of fees it awards for work relating to their motion for attorney's fees, and subtract an additional $5,000.

### 4. This Court should award no more than $108,265.33 in fees

For all these reasons, this Court should award Plaintiffs no more than $108,265.33 in fees. Defendants calculate this figure as follows. For the year 2020, Plaintiffs are entitled to fees for 92.4 hours of work, as the only work their attorneys performed that year predated or related to the complaint's filing. They are entitled to $207.78 per hour for this work, Ninth Circuit Chart, *supra*, or $19,198.88. For the year 2021, Plaintiffs are entitled to fees for 366.4 hours of work—the hours in their fee petition minus hours spent recruiting plaintiffs and working on their summary judgment briefing, plus 210.1 hours reflecting a reasonable amount of time to spend on summary judgment briefing. They are entitled to $217.54 per hour for this work, Ninth Circuit Chart, *supra*, or $79,706.66. For the year 2022, Plaintiffs are entitled to fees for 92.3 hours of work—the hours in their fee petition minus hours spent on their motions to enforce and for attorney's fees, plus 61.6 hours reflecting a reasonable amount of time to spend on their motion for attorney's fees. They are entitled to $231.49 per hour for this work, Ninth Circuit Chart, *supra*, or $21,366.53. Adding these figures for 2020, 2021, and 2022 yields a subtotal of $120,272.07.

A final reduction is warranted to account for the degree of success that Plaintiffs achieved on their motion for attorney's fees. Plaintiffs sought $762,583.60 in fees. An award of $120,272.07 is just under 15.8% of the fees they sought, warranting an 84.2% reduction in the fees to which they are entitled for hours they spent on their motion for attorney's fees. As noted above, Plaintiffs are entitled to fees for 61.6 hours on their motion to enforce. Because Plaintiffs performed all this work in 2022, that yields a product of $14,259.79. 84.2% of that amount is $12,006.74. Subtracting that amount from the $120,272.07 subtotal yields a difference of $108,265.33.

## CONCLUSION

This Court should deny Plaintiffs' motion to enforce and deny Plaintiffs' motion for attorney's fees and expenses in part.

Dated: August 23, 2022

Respectfully submitted,

MATTHEW M. GRAVES
D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/ Bradley G. Silverman
BRADLEY G. SILVERMAN
D.C. Bar #1531664
Assistant United States Attorney
601 D Street NW
Washington, DC 20530
(202) 252-2675

*Attorneys for the United States*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ASYLUMWORKS et al.,

*Plaintiffs*,

v.

ALEJANDRO MAYORKAS,
Secretary of Homeland Security, et al.,

*Defendants*.

Civil Action No. 20-3815 (BAH)

## [PROPOSED] ORDER

UPON CONSIDERATION of Plaintiffs' Motions to Enforce Judgment and for Attorney's Fees and Expenses, the memoranda submitted in support thereof and opposition thereto, and the entire record herein, it is hereby

ORDERED that Plaintiffs' Motion to Enforce Judgment is DENIED; and it is further

ORDERED that Plaintiffs' Motion to for Attorneys' Fees and Costs is GRANTED IN PART and DENIED IN PART; and it is further

ORDERED that Plaintiffs are awarded $108,265.33 in attorney's fees.

SO ORDERED.

_____

Dated

_____
BERYL A. HOWELL
Chief United States District Court Judge