**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASYLUMWORKS, *et al.*,<br><br>          Plaintiffs,<br><br>v.<br><br>ALEJANDRO N. MAYORKAS, in his official capacity as the Secretary of Homeland Security, *et al.*,<br><br>          Defendants. | No. 2020-cv-03815-BAH |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE JUDGMENT OR FOR ADDITIONAL INJUNCTIVE RELIEF AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES PURSUANT TO THE EQUAL ACCESS TO JUSTICE ACT**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ...................................................................................................................... 2

I.    The Court Should Grant Plaintiffs' Motion to Enforce the Judgment or for
      Additional Injunctive Relief ................................................................................... 2

      A.    Defendants Must Provide Fair Notice of the Applicable Rules and Comply
            With Them .................................................................................................... 3

            1.    Defendants Continue to Provide Inaccurate Information via the
                  eCFR and the EAD Application's Instructions. ................................... 3

            2.    Defendants Remain Noncompliant with the Thirty-day
                  Adjudication Timeframe. ..................................................................... 8

      B.    Plaintiffs Had and Continue to Have Standing ............................................. 10

      C.    Plaintiffs are Entitled to Enforcement of the Court's Vacatur Order. ............ 13

      D.    Alternatively, Plaintiffs are Entitled to Injunctive Relief ............................... 14

II.   The Court Should Grant Plaintiffs' Motion for Attorneys' Fees and Expenses. ............. 15

      A.    Plaintiffs are Entitled to an Enhanced Fee Rate. ........................................... 15

            1.    Defendants' Bad Faith Justifies a Higher Fee ...................................... 16

            2.    Plaintiffs' Counsel's Specialized Skill set Justifies a Higher Fee
                  Rate .................................................................................................... 20

      B.    Plaintiffs Expended a Reasonable Number of Hours ..................................... 22

CONCLUSION .................................................................................................................. 28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AFL-CIO v. Chao*,
   496 F. Supp. 2d 76 (D.D.C. 2007) ............................................................3, 8, 13

*Am. Hosp. Ass'n v. Sullivan*,
   938 F.2d 216 (D.C. Cir. 1991)................................................................ 18

*Armstrong v. Exec. Off. of President*,
   823 F. Supp. 4 (D.D.C. 1993)................................................................ 6

*Ashraf-Hassan v. Embassy of Fr. in the U.S.*,
   189 F. Supp. 3d 48 (D.D.C. 2016) ....................................................... 23

*Batalla Vidal v. Wolf*,
   501 F. Supp. 3d 117 (E.D.N.Y. 2020)....................................... 17, 18

*Bennett v. Castro*,
   74 F. Supp. 3d 382 (D.D.C. 2014) ...................................................... 24

*Carranza v. INS*,
   277 F.3d 65 (1st Cir. 2002) ................................................................. 21

*Casa de Maryland v. DHS*,
   No. 17-02942 (D. Md. 2017).............................................................. 26

*Casa de Maryland, Inc. v. Wolf*,
   486 F. Supp. 3d 928 (D. Md. 2020) ............................... 4, 6, 12, 22, 23

*Conboy v. U.S. Small Bus. Admin.*,
   992 F.3d 153 (3d Cir. 2021).............................................................. 25

*Cornella v. Schweiker*,
   728 F.2d 978 (8th Cir. 1984) ............................................................. 20

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)........................................................................ 3

*Elec. Priv. Info. Ctr. v. FBI*,
   80 F. Supp. 3d 149 (D.D.C. 2015) ............................................... 26, 27

*Equal Rights Ctr. v. Post Props., Inc.*,
   633 F.3d 1136 (D.C. Cir. 2011)........................................................ 12

*Hightower v. Comm'r of Soc. Sec.*,
   No. 19-13433, 2022 WL 597436 (E.D. Mich. Feb. 28, 2022)............. 26

*Ibrahim v. DHS*,
   912 F.3d 1147 (9th Cir. 2019) .......................................................... 19

*IMAPizza, LLC v. At Pizza Ltd.*,
   No. 17-cv-2327(TJK/GMH), 2021 WL 2410713 (D.D.C. June 8, 2021)............. 26

*Imm. Legal Res. Ctr. v. Wolf*,
  491 F. Supp. 3d 520 (N.D. Cal. 2020)..................................................................... 17

*Johnson v. Sec'y, Dep't of Health & Hum. Servs.*,
  587 F. Supp. 1117 (D.D.C. 1984)............................................................................ 14

*Kiakombua v. Wolf*,
  498 F. Supp. 3d 1 (D.D.C. 2020)........................................................................ 3, 13

*Kooritzky v. Herman*,
  178 F.3d 1315 (D.C. Cir. 1999)............................................................................... 24

*La Clinica De La Raza v. Trump*,
  No. 19-cv-4980, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020) ........................... 17

*Nadarajah v. Holder*,
  569 F.3d 906 (9th Cir. 2009)............................................................................ 21, 22

*Nat. Res. Def. Council, Inc. v. Train*,
  510 F.2d 692 (D.C. Cir. 1974).................................................................................. 6

*Northstar Wireless, LLC v. FCC*,
  38 F.4th 190 (D.C. Cir. 2022).................................................................................. 3

*Nw. Immigrant Rights Project v. USCIS*,
  496 F. Supp. 3d 31 (D.D.C. 2020)
  *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021) ................ 14, 17

*Open Communities Alliance v. Carson*,
  No. 17-2192, 2018 WL 8622230 (D.D.C. June 15, 2018 ............................... 23, 24

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
  512 F. Supp. 3d 966 (N.D. Cal. 2021)................................................................14, 15, 17

*PETA v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015)............................................................................... 11

*Peters v. Nat'l R.R. Passenger Corp.*,
  966 F.2d 1483 (D.C. Cir. 1992)................................................................................. 9

*Pierce v. Underwood*,
  487 U.S. 552 (1988).................................................................................................. 22

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015)........................................................................... 15

*Rodgers v. Lincoln Towing Serv., Inc.*,
  771 F.2d 194 (7th Cir. 1985)................................................................................... 25

*Rodriguez-Hernandez v. Miranda-Velez*,
  132 F.3d 848 (1st Cir. 1998).................................................................................... 23

*Rosario v. USCIS*,
  Case No. 2:15-cv-00813-JLR (W.D. Wash.).......................................................... 8, 9

*Scahill v. Dist. Of Columbia*,
  271 F. Supp. 3d 216 (D.D.C. Sept. 25, 2017)........................................................ 12

*Select Specialty Hosp.-Denver, Inc. v. Becerra*,
    No. 10-1356(BAH), 2021 WL 4262652 (D.D.C. Sept. 20, 2021) .................................. 10, 13

*United States v. Philip Morris USA, Inc.*,
    287 F. Supp. 2d 5 (D.D.C. 2003) ................................................................................... 14

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) ..................................................................................................... 10

*Villa v. Holder*,
    464 F. App'x. 270 (5th Cir. 2012) ................................................................................... 21

*Vo Van Chau v. U.S. Dep't of State*,
    891 F. Supp. 650 (D.D.C. 1995) ..................................................................................... 15

## Statutory Authorities

5 U.S.C. § 706(1) ............................................................................................................... 6

28 U.S.C. § 2412(a)(1) ....................................................................................................... 15

28 U.S.C. § 2412(b) ........................................................................................................... 15

28 U.S.C. § 2412(d)(1)(A) ................................................................................................. 15

## Rules and Regulations

8 C.F.R. § 208.7(a)(1)(iii)(B)–(C) ..................................................................................... 21

8 C.F.R. § 274a.13(a)(1) ...................................................................................................... 4

8 C.F.R. § 274a.13(a)(2) ...................................................................................................... 4

84 Fed. Reg. 62,374 ............................................................................................................. 4

85 Fed. Reg. 38,626 ........................................................................................................... 21

86 Fed. Reg. 27,027 ............................................................................................................. 7

Fed. R. Civ. P. 11(b) .......................................................................................................... 25

Fed. R. Civ. P. 11(b)(2) ...................................................................................................... 25

LCvr 83.15 .......................................................................................................................... 25

Rule of Professional Conduct 3.3. ...................................................................................... 25

## Additional Authorities

Aug. 14, 2020 GAO Decision, *https://www.gao.gov/assets/b-332451.pdf.* ............................... 17

H.R. Rep. No. 1418, 96th Cong., 2d Sess. 11 ..................................................................... 20

September 6, 2022 version of the Instructions, *available at*
    https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf. .............................. 4

In February 2022, this Court granted summary judgment to Plaintiffs and vacated two Department of Homeland Security ("DHS" or "Agency") rules: *Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants*, 85 Fed. Reg. 37,502, *et seq.* (June 22, 2020) ("Timeline Repeal Rule") and *Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532, *et seq.* (June 26, 2020) ("EAD Bar Rule") (collectively, "the Rules"). Order Granting Pls. Mot. for Summ. J. and Mem. Op., Dkts. 41–42. Seven months later, Defendants have yet to fully effectuate the Court's vacatur. In fact, Defendants project that they will not reach full compliance until, at the very earliest, January 2023—almost a full year after this Court's order. But Defendants have not explained why it will take them a year to modify the eCFR to communicate the effect of this Court's vacatur to the public. They still have not accurately corrected the Form and Instructions used for applying for an Employment Authorization Document (EAD).[1] And they have given no reasonable justification as to why they cannot comply with their obligation to process EAD applications within thirty days given the vacatur of the Timeline Repeal Rule, and instead insist that this issue is not the province of this Court. Their arguments do not justify these delays, nor do Defendants cite any efforts to minimize the practical impact of these delays in the interim. To ensure Defendants' compliance with its vacatur order, this Court should grant Plaintiffs' Motion to Enforce Judgment or for Additional Injunctive Relief.

Meanwhile, Defendants concede that Plaintiffs are entitled to attorneys' fees as the prevailing party under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. Despite this

---

[1] On September 7, 2022, Defendants informed the Court that DHS had amended the Form I-765 Application for Employment Authorization (the "Form") and the Instructions related to that Form (the "Instructions"). *See* Defs. Notice of Publication, Dkt. 56. Defendants assert that this action moots that aspect of Plaintiffs' motion to enforce. *Id.* For the reasons discussed below, that action was not sufficient to moot Plaintiffs' claim.

concession, Defendants take issue with the amount that Plaintiffs seek. They assert that the time Plaintiffs' counsel expended in filing (and winning) this lawsuit is purportedly "excessive." They also dispute Plaintiffs' request for enhanced fees based on an unreasonable claim that the Agency's conduct did not constitute bad faith and a meritless challenge to Plaintiffs' invocation of counsel's specialized skills. Finally, Defendants erroneously contend that certain lines of work should be excluded entirely. This Court should reject these meritless arguments and award fees as Plaintiffs have requested.

In all, Defendants ignore the reality that they could have avoided all this litigation by, in the first place, following the law—including *six* prior opinions that found the appointment of former Acting DHS Secretary Chad Wolf to be invalid. Or they could have mitigated the amount of fees requested and obviated the need for the motion to enforce by taking action to comply with this Court's vacatur within a reasonable timeframe. These motions are driven by clearly illegal agency action followed by unreasonable recalcitrance to comply with a judicial order. This Court should not condone either.

## **ARGUMENT**

## I.    **The Court Should Grant Plaintiffs' Motion to Enforce the Judgment or for Additional Injunctive Relief.**

Defendants claim that their sole duty under the vacatur order is to cease enforcing the Rules in individual adjudications. But by that logic, Defendants bear no responsibility for continuing to make inaccurate public statements regarding DHS's regulations and an asylum seeker's corresponding eligibility for work authorization. Defendants also seek absolution from the inevitable confusion that results from these misrepresentations, and they suggest that they are free to continue publicly circulating vestiges of the invalidated Rules, so long as they stop short of actually applying them. This view of vacatur would significantly undermine both this Court's

order and the public's ability to rely on the government's own notices and directives as to current policy and procedures. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("[T]he Government should turn square corners in dealing with the people.") (internal quotation marks and citation omitted).

### A.    Defendants Must Provide Fair Notice of the Applicable Rules and Comply With Them.

A vacatur order requires an agency to take an unlawful rule "off the books," *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 57 (D.D.C. 2020), and give the public fair notice of the rules that are in effect as a result of the vacatur, *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 216 (D.C. Cir. 2022). Moreover, the agency must abide by *all* those rules. *See AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 83 (D.D.C. 2007). As applied to this case, these principles require Defendants to comply with the vacatur of both the Timeline Repeal Rule and the EAD Bar Rule.

### 1.    Defendants Continue to Provide Inaccurate Information via the eCFR and the EAD Application's Instructions.

Defendants' compliance with the vacatur order requires fair notice to the public of the rules that are in effect, not just assurances that the agency will not enforce the invalidated rules. "[A] party has fair notice when, by reviewing the regulations and other public statements issued by the agency, it can identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Northstar Wireless*, 38 F.4th at 216 (internal quotation marks and citations omitted). Defendants have violated this obligation in at least two respects.

First, until September 6, 2022, Defendants continued to promote obsolete versions of the United States Citizenship and Immigration Services ("USCIS") EAD Form and Instructions. The September 6 revision of the Form and Instructions was a step toward compliance, but it is insufficient to "moot" that aspect of Plaintiffs' motion to enforce as Defendants assert. The version of the Instructions that DHS published earlier this month continues to reinforce the notion that

"USCIS may, in its discretion, deny your application if you have been arrested and/or convicted of any crime."[2]  As the Court in *Casa de Maryland* explained, the EAD Bar Rule "eliminate[d] automatic EAD authorization where the asylum applicant met preexisting criteria; [under the EAD Bar] such EAD applications may be denied at the discretion of the agency." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 939 (D. Md. 2020).

Plaintiffs acknowledge that the Agency may generally deny EADs in an exercise of discretion under 8 U.S.C. § 1158(d)(2), but the regulations that existed prior to the Rules at issue in this case specifically excluded discretionary denials of EADs in asylum cases.  *Compare* 8 C.F.R. § 274a.13(a)(1) (referring to non-asylum seeking EAD applicants and describing the approval of such applications as being "within the discretion of USCIS"), *with* 8 C.F.R. § 274a.13(a)(2) (referring to asylum-seeking EAD applicants without describing the approval of such applications as being subject to USCIS's discretion).  DHS highlighted this carve-out as one of the issues the now-vacated Rules were designed to address.  In its Notice of Proposed Rulemaking for the now-vacated Rules, "DHS proposed further changes [to the regulations] to prevent asylum applicants who have committed certain crimes from obtaining a (c)(8) EAD, and *to make the decision to grant (c)(8) employment authorization to asylum applicants discretionary.*" Notice of Proposed Rulemaking, "Asylum Application, Interview, and Employment Authorization for Applicants," 84 Fed. Reg. 62,374 (Nov. 14, 2019) (emphasis added).  Defendants have not provided any justification for their ongoing insistence that the Agency may issue discretionary denials of asylum-based EADs under the regulatory regime restored by this Court's vacatur.  The

---

[2]    *See* September 6, 2022 version of the Instructions at p. 21, *available at* https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf.

modifications to the Form and Instructions are thus insufficient to bring the Agency into compliance with this Court's vacatur.[3]

Second, even if it were true that revisions to the Form and Instruction mooted Plaintiffs' claims as to those issues, DHS's communication to the public of the applicable regulatory standards remains insufficient. At this late date, Defendants have still not completed the steps necessary to remove the vacated Rules from the online Code of Federal Regulations website (the "eCFR"). Defendants tout the eCFR as "continuously updated," Samantha Deshommes Decl. ¶ 7, Dkt. 54-3; Defs. Resp. at 5, Dkt. 54 (the eCFR is "updated every day"), offering the public a false assurance that the information found there is accurate. Moreover, because Defendants have not updated the eCFR, various websites that post federal regulations and services like Westlaw and LexisNexis continue to point lawyers to the vacated Rules. This foot-dragging represents an ongoing failure to provide the public with fair and reasonable notice of the consequences of the vacatur and the rules now in effect. Defendants do not dispute their obligations to update the eCFR and amend the Form and Instructions. *See* Deepa Acharya Decl. Exhibit N at 1–2, Dkt. 47-1 (email exchange in which defense counsel acknowledged that "the CFR needs to be updated to reflect the regulatory language that existed prior to the effective date of the two vacated C8 EAD rules" and

---

[3] Plaintiffs acknowledge that the Instructions, even before the Rules at issue in this case were proposed, contained substantively identical language relating to the Agency's discretion. *See* Exhibit A, Instructions, May 31, 2018 edition, p. 8. That the Instructions previously invoked Agency discretion on this issue is not dispositive. There was no regulatory justification for that claim of discretionary authority in the earlier version of the Instructions, and one of the reasons that the Agency promulgated the now-vacated Rules was to justify that exercise of discretion. To comply with this Court's vacatur order, Defendants must restore the regulations to the *status quo ante*, and they must accurately communicate that point to the public. Reversion to prior, inaccurate, language that is contrary to the reinstated regulations is insufficient to achieve compliance.

"revising the I-765" is "necessitated by the AsylumWorks vacatur"). They also concede that, to date, they have failed to comply with these obligations. Defs. Resp. at 7–9, Dkt. 54.

Defendants' principal justification for their delay in updating the eCFR is that that these things take time and that the vacatur order did not obligate them to act by a certain deadline. *Id.* at 6–8, 14; Deshommes Decl. ¶ 17, Dkt. 54-3. The Administrative Procedure Act ("APA"), however, obligates an agency to take required actions within a reasonable amount of time. *See* 5 U.S.C. § 706(1) (permitting a reviewing court to compel agency action that is "unreasonably delayed"). As a result of Defendants' failure to update the eCFR within a reasonable time, the Court may set deadlines to compel Defendants' performance. *See Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 705 (D.C. Cir. 1974).

Tellingly, Defendants do not offer their view as to what would constitute a reasonable amount of time to update the eCFR. As Judge Paula Xinis observed in *Casa de Maryland v. Wolf*, Case No. 8:20-cv-02118-PX (D. Md.), updating the CFR—and, by extension, the eCFR—"doesn't seem to be that hard." Zak Manfredi Decl. Exhibit C at 9:20, Dkt. 47-2. The *seven months* that have passed since the Court issued its vacatur order provides more than enough time for Defendants to implement the required updates. *See, e.g., Armstrong v. Exec. Off. of President*, 823 F. Supp. 4, 5 (D.D.C. 1993) (refusing to stay contempt order because government "dillydallied, d[id] little and delayed for the past *five* months rather than make serious efforts to comply with this Court's prior orders") (emphasis added).

Instead, Defendants have bemoaned the complexity of implementing the needed corrections. Defendants describe the processes for replacing superseded rules and forms that entail multiple steps involving multiple agencies. Deshommes Decl. ¶¶ 10–17, 28–32, Dkt. 54-3. The processes they describe are cumbersome, antiquated, and unresponsive to the needs of today's

digital world. But even those antiquated processes should not take several months to complete. *See* Pls. Mot. to Enforce J. at 5, Dkt. 47 (noting other circumstances where DHS, when presented with a vacated rule, documented and implemented the vacatur within days). This is particularly so where the Agency's obligation is only to restore the previously existing regulations, rather than issuing new ones. In DHS's own words, "delaying the ministerial act of restoring the regulatory text in the Federal Register is contrary to the public interest because it could lead to confusion, particularly among the regulated public." *Strengthening the H-1B Nonimmigrant Visa Classification Program, Implementation of Vacatur*, 86 Fed. Reg. 27,027 (May 19, 2021) (removing from the CFR a rule that was vacated by a federal district court on December 1, 2020).

Additionally, Defendants were not and are not powerless to take steps to offset the burden on the public during the delay occasioned by these outmoded updating processes. Defendants do not indicate what prevented them from offering, for instance, public engagement conference calls (a frequently used measure for communicating new information to the public), issuing press releases, or improving on the contradictory messaging in their website posts.

Given their conduct to date, Defendants' promise to eventually update the eCFR rings hollow. Defendants cannot avoid accountability for their own delays by pointing to the roles of other federal entities in revising regulations. The time to appeal this Court's order expired on April 7, 2022; the vacatur order issued on February 7, 2022; and Defendants should have known that vacatur was a possibility long before then. But Defendants do not explain:

- Why DHS waited four months after this Court's decision to make an initial announcement about its "plans to rescind" the vacated Rules in June 2022, Deshommes Decl. ¶ 19, Dkt. 54-3;

- Why USCIS did not "kick[] off the rulemaking project to implement the vacatur" until June 7, 2022, four months after the Court's order, *id.* ¶ 20;

- Why around May 10, 2022, USCIS "commenced drafting a revised Form I-765," *id.* ¶ 33, instead of availing itself of the already drafted and finalized language contained in the edition of the Form that had been in effect immediately before the edition reflecting the invalidated Rules; and

- Why USCIS amended the Form and Instructions in September 2022, only after the filing of Plaintiffs' motion to enforce the judgment.

In view of these unexplained delays and Defendants' non-responsiveness to Plaintiffs' requests for prompt compliance, *see* Acharya Decl. Exhibits K–O, Dkt. 47-1, the Court should set imminent deadlines for Defendants to update the eCFR and complete the correction of the Form Instructions.

## 2.    Defendants Remain Noncompliant with the Thirty-day Adjudication Timeframe.

Defendants must adjudicate initial (c)(8) EAD applications within thirty days. They are required to do so because vacatur "reinstate[s] the prior regulatory regime," *AFL-CIO*, 496 F. Supp. 2d at 85, which mandated the thirty-day timeline. Defendants acknowledge that the vacatur order obligates Defendants to abide by this timeline, yet they admit they are not complying with it. *See* Defs. Resp. at 5–6, Dkt. 54.

Instead, Defendants argue that they "cannot currently process new applications within thirty days without neglecting applications that have been pending longer." *Id.* at 15.[4] This "inequitable result," as Defendants call it, is a fallacy. Moreover, "inequity" is of Defendants' own creation, and they alone bear the burden of resolving it. Despite this Court's vacatur, Defendants have allowed a massive backlog of initial EAD applications pending more than 121 days to develop—applications USCIS has said should take on average *twelve minutes* to process. *See Rosario v. USCIS*, Case No. 2:15-cv-00813-JLR (W.D. Wash.), Dkt. 191-1. Indeed, by the

---

[4]  As a practical matter, Defendants could quickly reduce the backlog of unadjudicated initial EAD applications by issuing interim EADs pending final adjudication. Such a measure would not resolve the backlog, but it would reduce the harm to applicants pending adjudication.

time this Court—the seventh to find Wolf's appointment invalid—vacated the Rules, Defendants had let that backlog "swell[]" to 8,138 applications. Defs. Resp. at 5, Dkt. 54. In reality, a backlog remains because Defendants have not kept pace with adjudications. Plaintiffs do not ask for Defendants to process newer applications before older ones. Rather, Plaintiffs simply ask the Court to enforce its order by requiring Defendants to process all applications within the thirty-day timeline.

Defendants further attempt to justify their failure to process EAD applications within thirty days by invoking the permanent injunction in *Rosario*. In *Rosario*, the U.S. District Court for the Western District of Washington enjoined USCIS from failing to adhere to the thirty-day deadline with respect to a nationwide class of individuals seeking asylum. 365 F. Supp. 3d 1156, 1158 (W.D. Wash. 2018). Because Defendants remain subject to ongoing judicial supervision in *Rosario*, they argue that this Court need not compel their compliance with the thirty-day deadline. But Defendants cannot cite their *Rosario* obligations as proof of their future compliance. As the *Rosario* plaintiffs recently explained in their case, "[A]t present, almost no class members are receiving the benefit of this Court's permanent injunction and Defendants are not taking all reasonable steps to achieve substantial compliance." *Rosario*, No. 2:15-cv-00813-JLR, Dkt. 196 (Pls.' Mot. Civil Contempt and to Enforce Permanent Inj.).

Defendants also contend that the only way for Plaintiffs to challenge Defendants' noncompliance with the thirty-day deadline is to intervene in *Rosario*. Defs. Resp. at 16, Dkt. 54. But Plaintiffs do not ask this Court to interpret or enforce the injunction in *Rosario*; rather, they ask the Court to enforce its own vacatur order and compel Defendants' compliance with the thirty-day deadline as the direct and necessary consequence of this Court's vacatur of the Timeline Repeal Rule. *See Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1487 (D.C. Cir. 1992)

(explaining that the issuing court is the proper court to "interpret and enforce its own order"). Defendants concede that they have not honored this Court's vacatur order and have not adjudicated applications on the required thirty-day timeline. Defs. Resp. at 5, Dkt. 54. Because Defendants have "plainly neglect[ed]" their duty to timely process these applications, this is a "particularly appropriate" case for the Court to exercise its authority to enforce its judgment and direct Defendants to comply with the thirty-day deadline. *See Select Specialty Hosp.-Denver, Inc. v. Becerra*, No. 10-1356 (BAH), 2021 WL 4262652, at *7 (D.D.C. Sept. 20, 2021) (Howell, C.J.) (internal quotation marks and citation omitted).

### B. <u>Plaintiffs Had and Continue to Have Standing.</u>

In addition to these poor excuses for their ongoing failure to comply with this Court's order, Defendants advance meritless arguments relating to Plaintiffs' standing, and they dispute the availability of the remedies that Plaintiffs seek. This Court should reject both contentions.

Defendants' challenge to Plaintiffs' standing fails right out of the gate. Standing is assessed as of the outset of the case. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). Defendants never previously made this argument (not in any motion or in response to Plaintiffs' motion for summary judgment). Instead, Defendants raise this issue for the first time at this post-judgment juncture, asserting that Plaintiffs cannot establish an injury-in-fact.[5] *Compare* Defs. Mot. for Summ. J. and Defs. Resp. to Pls. Mot. for Summ. J., Dkts. 28, 29 (raising no challenge to standing—and no arguments in response to Plaintiffs' assertion of standing—by the summary judgment stage), *with* Defs. Resp., Dkt. 54 (challenging Plaintiffs' standing after the Court granted Plaintiffs' motion for summary judgment and vacated the Rules). As previously explained in their

---

[5]  Defendants do not challenge any other element of Plaintiffs' standing.

summary judgment briefing, Plaintiffs had standing to challenge the Rules upon the commencement of this action. Pls. Mot. for Summ. J. at 14–18, Dkt. 25-1.

Further, the issues presented remain live due to Defendants' failure to comply with the Court's vacatur. Defendants' noncompliance continues to frustrate the missions of the Organizational Plaintiffs, which have had to divert resources (and continue to do so) to address that harm. *See PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). For example, Defendants' persistence in maintaining the outdated eCFR makes the process of applying for employment authorization "convoluted and confusing" for the Organizational Plaintiffs' staff and asylum-seeking clients. Joan Hodges-Wu 2d Decl. ¶ 6, Dkt. 47-4. As a result, the Organizational Plaintiffs have had to "undertake new and extra work" to help staff and clients navigate the EAD application process. *Id.* ¶ 10. This diversion of resources undermines the efficiency of the Organizational Plaintiffs and narrows the ambit of their work.

Additionally, Defendants' failure to timely adjudicate applications has negatively impacted the Organizational Plaintiffs' clients. *Id.* ¶ 13 (attesting that Plaintiff AsylumWorks has "clients who have not gotten adjudicated on [the thirty-day] . . . timeline"); Richard Caldarone Decl. ¶ 18, Dkt. 47-5 (attesting that the "ongoing delays in adjudication of these EADs" has adversely affected Plaintiff Tahirih's clients). These delays harm the Organizational Plaintiffs in multiple ways, including by frustrating their missions and requiring them to expend additional resources. For example, AsylumWorks' mission is to "strengthen communities by empowering asylum seekers to rebuild their lives with dignity and purpose," and employment is one of the organization's three "core" service areas. Joan Hodges-Wu 1st Decl. ¶¶ 9–10, Dkt. 25-5. Delays in adjudicating EAD applications leave asylum seekers in prolonged periods of instability and thereby frustrate AsylumWorks' efforts to advance this mission. Similarly, Tahirih is an organization that provides

holistic services to survivors of violence, and in doing so "provides training and education services to professionals in a position to assist immigrant victims of violence." Adilene Nunez Huang Decl. ¶¶ 3, 5, Dkt. 25-7. The ongoing failure by Defendants to provide consistent and accurate information complicates Tahirih's objective of providing this training and requires diversion of resources to address the confusion that these rules cause. *See* Caldarone Decl. ¶ 18, Dkt. 47-5.

The Organizational Plaintiffs' ongoing harms are "fairly traceable" to Defendants' actions. *See Scahill v. Dist. Of Columbia*, 271 F. Supp. 3d 216, 228–29 (D.D.C. Sept. 25, 2017). By Defendants' own admission, they have not completed the tasks that the vacatur order necessitates. Defs. Resp. at 7–8, Dkt. 54 (conceding that DHS has not completed its review of the updates to the CFR and the DHS Secretary has not signed the final action); *id.* at 5 (confirming that USCIS has not adjudicated all applications that have been pending over thirty days).

Defendants try to diminish Plaintiffs' injuries resulting from the outdated eCFR as "mere confusion" about the applicable rules that can be "instantly" remedied by the organizations' "informing [their clients] . . . of the vacatur." *Id.* at 12, 12 n.3.[6] Not so. In addition to generating confusion, the outdated eCFR blocks access to work authorization for eligible clients, who mistakenly believe they do not qualify based on the vacated Rules. As a result, the Organizational Plaintiffs' staff must devote additional time and resources to help clients navigate the application process. Accordingly, this Court should reject Defendants' claims with respect to standing.

---

[6] Defendants also attempt to diminish the Organizational Plaintiffs' standing by framing them as membership organizations. *See* Defs. Resp. at 12–13, Dkt. 54. But the Organizational Plaintiffs do not claim associational standing, but rather organizational standing. *See Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (distinguishing standing asserted on behalf of an organizational versus standing asserted on behalf of an organization's members).

C.      **Plaintiffs are Entitled to Enforcement of the Court's Vacatur Order.**

To the extent that Defendants challenge Plaintiffs' "standing" to obtain a specific remedy, this Court should treat those arguments as relating not to standing but to the appropriateness of the remedies that Plaintiffs seek and, for the reasons discussed here, should award those remedies. Specifically, Plaintiffs ask this Court to enforce its judgment by ordering Defendants to amend the eCFR, properly correct the EAD Instructions, and timely adjudicate EAD applications.

"A motion to enforce is the usual method for requesting a court to interpret its own judgment and to compel compliance if necessary in light of that interpretation." *Select Specialty*, 2021 WL 4262652, at *7. The Court should reject Defendants' assertions that enforcement of the Court's orders does not require the relief Plaintiffs seek.

As explained above, Defendants are incorrect that "[a]ll that the vacatur order required of Defendants was to stop enforcing the challenged Rules." Defs. Resp. at 14, Dkt. 54. This argument is refuted by Defendants' own concessions that the vacatur order obligates them to modify the Form, the Instructions, and the eCFR, and to adjudicate EAD applications within thirty days. *Id.* at 5; Acharya Decl. Exhibit N at 1–2, Dkt. 47-1. In addition to preventing Defendants from enforcing the invalidated Rules, the vacatur order requires Defendants to abide by the prior regulatory regime, *see AFL-CIO*, 496 F. Supp. 2d at 85, and give the public fair notice of the rules that currently apply, *see Kiakombua*, 498 F. Supp. 3d at 57.

Ultimately, Defendants do not appear to dispute that Plaintiffs are entitled to the relief they seek, but instead seem to take issue with the timeline on which Plaintiffs want Defendants to act. But Plaintiffs have not asked for implementation on an unreasonable timeline. Plaintiffs first communicated with Defendants about implementation on April 19, 2022, and Plaintiffs initiated numerous subsequent communications. Plaintiffs filed this motion to enforce only after it became apparent that Defendants would not commit to a meaningful timeline for implementation. This

Court should order Defendants to comply with its order to prevent further recalcitrance. *See United States v. Philip Morris USA, Inc.*, 287 F. Supp. 2d 5, 14 (D.D.C. 2003) ("If the rule of law is to be upheld, it is essential that the judiciary takes firm action to vindicate its authority to compel compliance with lawfully issued directives, and to not reward delay and disobedience."); *Johnson v. Sec'y, Dep't of Health & Hum. Servs.*, 587 F. Supp. 1117, 1122 (D.D.C. 1984) ("[T]he egregious conduct of the defendant crystallizes a recurring problem . . . Specifically, government clients who . . . fail to obey orders of United States Courts . . . The conduct of the defendant shows a total lack of regard for human misery and suffering which must be brought to a stop. Poor and disadvantaged people cannot afford the luxury of bureaucratic delay and indifference to human needs.") (emphasis added).

### D.    Alternatively, Plaintiffs are Entitled to Injunctive Relief.

If this Court determines that enforcement of the vacatur order is not the appropriate vehicle for granting the relief that Plaintiffs seek, the Court should grant additional injunctive relief as an alternative remedy. Plaintiffs have satisfied all the elements for an injunction.

First, Plaintiffs have suffered irreparable injury. As the sworn declarations submitted with Plaintiffs' motion establish, Defendants' post-vacatur compliance failures have caused the Organizational Plaintiffs to divert staff resources, undermining their efficiency and narrowing the ambit of their work. *See* Hodges-Wu 2d Decl. ¶¶ 6, 10, 13, Dkt. 47-4; Caldarone Decl. ¶ 18, Dkt. 47-5. Such ongoing harms constitute irreparable injuries. *See Nw. Immigrant Rights Project v. USCIS*, 496 F. Supp. 3d 31, 48–49 (D.D.C. 2020), *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021); *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 975–76 (N.D. Cal. 2021). These harms will continue absent enforcement of the vacatur order or an injunction.

Second, if the Court finds that enforcement of its vacatur order is not appropriate, that supports a conclusion that the remedies available at law are inadequate. Moreover, monetary damages cannot compensate for Plaintiffs' injuries because they are unavailable in APA cases. *See Pangea*, 512 F. Supp. 3d at 976.

Finally, the balance of the equities favors injunctive relief. Defendants have failed to fully comply with the vacatur order over the last seven months. And "[t]he government cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quotation marks omitted). Meanwhile, "the public interest is harmed by the defendants' perpetuating a policy that has been found . . . [to be a] violation of law." *Vo Van Chau v. U.S. Dep't of State*, 891 F. Supp. 650, 657 (D.D.C. 1995).

Thus, Plaintiffs are entitled to injunctive relief in the alternative if this Court is not inclined to grant their motion to enforce by ordering the specific remedies that Plaintiffs seek.

## II.      The Court Should Grant Plaintiffs' Motion for Attorneys' Fees and Expenses.

In opposing Plaintiffs' motion for attorneys' fees, Defendants concede that Plaintiffs are the prevailing party. They do not argue that their position regarding Wolf's authority was substantially justified, nor that special circumstances would make a fee award unjust. 28 U.S.C. § 2412(a)(1), (b), (d)(1)(A). Accordingly, the sole issue for the Court to decide is whether the $762,583.60 in fees requested is reasonable. For the reasons discussed below, the answer is yes.

### A.      Plaintiffs are Entitled to an Enhanced Fee Rate.

Plaintiffs calculated the proposed fee award by multiplying each timekeeper's applicable fee rate by the number of hours expended. At minimum, Defendants agree that Plaintiffs are entitled to attorneys' fees at the statutory default rate, adjusted for the cost of living to $207.78 per

hour. *See* Defs. Resp. at 17, 17 n.6, Dkt. 54.[7,8]  However, two special factors warrant a higher rate: (i) Defendants' bad faith; and (ii) Plaintiffs' counsel's unique expertise.

### 1.    Defendants' Bad Faith Justifies a Higher Fee.

Defendants do not dispute that bad faith can constitute a special factor; rather, they disagree that they acted in bad faith in promulgating and enforcing the Rules and in litigating this case.

The weight of authority against Defendants' position on Wolf's appointment, which largely existed prior to the filing of this lawsuit, was so strong that it is difficult to characterize Defendants' pre-litigation promulgation and enforcement of the Rules as anything other than bad faith.  As this Court previously determined by "credit[ing] the text of the law"—i.e., the Federal Vacancies Reform Act ("FVRA"), the Homeland Security Act ("HSA"), and internal DHS orders governing the agency's line of succession—it is "clear" that neither Kevin McAleenan nor Wolf possessed lawful authority to serve as Acting Secretary of DHS.  Mem. Op. at 15–16, Dkt. 42 (quotation marks omitted).  Thus, the Rules promulgated during Wolf's tenure as Acting Secretary are invalid. *Id.*

Subsequent interpretations (made by the government itself) further confirm that the government acted in bad faith in defending the rules.  Several months before Plaintiffs initiated this action, the Government Accountability Office ("GAO") issued a report opining that

---

[7]  The work in this case occurred over three calendar years from September 2020 to the present. The base fee rate, adjusted for the cost of living, is $207.78/hour for 2020, $217.54/hour for 2021, and $231.49/hour for 2022.  *See* Statutory Maximum Rates Under the Equal Access to Justice, U.S. Court of Appeals for the Ninth Circuit, https://www.ca9.uscourts.gov/attorneys/statutory-maximum-rates.  For ease of calculation, Plaintiffs have opted to use the earliest in time (and thus lowest dollar amount) for the entire time period.

[8]  In a heading, Defendants state: "Plaintiffs Are Entitled To Fees at a Rate No Greater Than $125 Per Hour."  However, in the body of their brief, Defendants clarify that their position is that Plaintiffs are entitled to the default rate "adjust[ed] to reflect an increase in the cost of living." Defs. Resp. at 17, Dkt. 54.

McAleenan took office as Acting Secretary in violation of "the express terms of the existing designation," so his "subsequent amendments to the order of succession . . . were invalid," and Wolf thus became Acting Secretary "by reference to an invalid order of succession."  Aug. 14, 2020 GAO Decision.[9]  Additionally, by the time this Court concluded that Wolf's appointment was invalid, six other judges—including another judge in the U.S. District Court for the District of Columbia—had already reached this same conclusion.  *See* Mem. Op. at 2, Dkt. 42.[10]  In one of these cases, *Casa de Maryland*, the court issued a preliminary injunction prohibiting USCIS from applying the Timeline Repeal Rule and certain aspects of the EAD Bar Rule—the exact rules that Plaintiffs later challenged in this action.  486 F. Supp. 3d at 935.[11]  Defendants' decision to keep pursuing litigation in the face of such mounting evidence of illegality demonstrates bad faith.

Remarkably, Defendants insist that their promulgation and enforcement of the Rules, as well as their defense against this litigation, was not in bad faith because Defendants "did not violate any court order or contravene binding appellate authority."  Defs. Resp. at 18, Dkt. 54.  But Defendants offer no authority in support of their position that a party acts in bad faith only in these two circumstances.  In fact, the case law contemplates that a far broader range of conduct may

---

[9]  *Available at https://www.gao.gov/assets/b-332451.pdf.*

[10]  Citing *Pangea*, 512 F. Supp. 3d 966; *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117 (E.D.N.Y. 2020); *Nw. Imm. Rights*, 496 F. Supp. 3d 31; *Imm. Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Casa de Md.,* 486 F. Supp. 3d 928; *La Clinica De La Raza v. Trump*, No. 19-cv-4980, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020).

[11]  Defendants ignore *Casa de Maryland* in arguing that Plaintiffs cite no authority to show that Defendants acted in bad faith in defending the Timeline Repeal Rule.  Defs. Resp. at 21, Dkt. 54.  Further, the Court need look no further than its own vacatur order to reject Defendants' argument that *Nw. Imm. Rights* provided "ample" support for their defense of the Timeline Repeal Rule in this case.  *See* Mem. Op. at 16 n.7, Dkt. 42 (distinguishing *Nw. Imm. Rights* on the basis that, since that case, Defendants had "abandoned any . . . theory that earlier ratifications, or other purported actions, by either [Peter] Gaynor or Wolf may salvage the validity of the Timeline Repeal Rule and EAD Bar Rule").

constitute bad faith. *See Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219 (D.C. Cir. 1991) (explaining that a party acts in bad faith whenever, "confronted with a clear statutory or judicially-imposed duty," the party acts so contrary to that duty that the injured party must "undertake otherwise unnecessary litigation to vindicate plain legal rights"). Here, Defendants' promulgation of the Rules was contrary to clear statutes and internal DHS orders. Defendants' defense against this litigation was likewise contrary to this clear statutory text as well as the opinion of the GAO and six other district courts.

Defendants argue that they were not bound by other district courts' opinions, and thus could not have acted in bad faith. While it is true that the government can defend itself against similar legal challenges in multiple districts without acting in bad faith, the particular circumstances of Defendants' conduct in this case call for a different conclusion.

First, Defendants proceeded in bad faith by offering the presiding court "no reason to depart from the reasoned holding of these other decisions." Mem. Op. at 2, Dkt. 42. In each of the prior six cases, either or both DHS and USCIS were named as defendants. And the District of Maryland's opinion in *Casa de Maryland* addressed the same issues as to the same set of Rules. Moreover, although one district court's decision is not binding on another, every district court to adjudicate the issue came to the exact same conclusion. Judge James Donato, the fifth judge to find Wolf's appointment to be invalid, confronted the government's attempts to argue the contrary: "You are asking a fifth judge now to take another look at it, as if nothing has happened." Case no. 3:20-cv-09253-JD, 1/7/21 Hr'g Tr. At 6–8, Dkt. 67.

Second, DHS declined to appeal the decision in this case or any of the six that preceded it. As Judge Donato stated:

> The government did not appeal the *Batalla* order. I mean, if you all think it's so wrong, why aren't you returning to the Second Circuit to get this fixed? We don't

do sideways appeals. You don't go to another District Court and just keep peddling the same bucket of fish until somebody buys it. We don't do that. You go to the Court of Appeals if you think someone at the District Court level, a trial court level has made a fundamental error. And you didn't do that.

. . .

I actually think it's quite questionable, both on a professional-conduct level and on a Rule 11 level, that the government keeps trotting out the same tired arguments that have been definitively rejected, factually and legally.

Case no. 3:20-cv-09253-JD, 1/7/21 Hr'g Tr. At 6–8, Dkt. 67.

Plaintiffs do not contend that the government can never defend a case against a contrary law or finding in different courts. Rather, Defendants' utter failure to engage with the cases that have held against them—either by filing an appeal or putting forth arguments that respond to those cases—illustrates their bad faith.

And even absent the six prior cases and the GAO's report, Defendants' attempts to circumvent the FVRA and HSA on multiple occasions prior to this litigation support a finding of bad faith and warrant an enhanced fee rate. *See* Pls. Mot. for Summ. J. at 2–5, Dkt. 25-1 (explaining the series of illegitimate actions, including attempted ratifications, that led to Wolf's elevation to Acting Secretary).

As Plaintiffs discussed in detail in their briefing on summary judgment, the multiple ratification attempts taken by DHS—particularly when taken with knowledge that they would be insufficient to rectify the deficiencies identified by myriad courts and the GAO—constitute separate evidence of bad faith. *See, e.g.*, *Ibrahim v. DHS*, 912 F.3d 1147, 1184–85 (9th Cir. 2019) (explaining that a district court is required to "consider whether the government's position as a whole was in good faith").

### 2.    Plaintiffs' Counsel's Specialized Skill set Justifies a Higher Fee Rate.

If this Court agrees with Plaintiffs on the bad-faith argument, that is sufficient to justify an enhanced fee award. But there is another separate and independent basis: Plaintiffs' counsel possessed special expertise that was needed to litigate this case. That expertise flowed from "overlapping federal court and immigration-specific skills that . . . are exceedingly rare." Jeffrey Dubner Decl. ¶ 12, Dkt. 48-6 ("[F]ew federal court litigators have expansive knowledge of immigration law and its ever-changing regulatory scheme. That intersection becomes even more rarified when it involves questions under the FVRA, HSA, and Appointments Clause. In-depth knowledge in all three of these arenas would have been critical in this case."). In addition, Spanish-language fluency was necessary to explain this case to many of the Individual Plaintiffs, to build trust, and to cultivate a constructive working relationship. See Pls. Mot. for Fees at 10–11, Dkt. 48. Defendants' efforts to discount this expertise are not persuasive.

Defendants claim that Plaintiffs could find (i) other Spanish-speaking attorneys, and (ii) other attorneys with administrative and immigration law expertise, in the District of Columbia at the default EAJA rate. Defs. Resp. at 22–24, Dkt. 54. However, it is the *combination* of counsel's Spanish-language skills and their expertise in administrative law, immigration law, and federal court litigation that render counsel's skill set difficult to find, let alone at default EAJA rates.[12]

---

[12]    Shamefully, Defendants suggest that asylum seekers like the Individual Plaintiffs can recover fees only at EAJA default rates because such clients often have "little money" and thus "cannot afford" to retain counsel. Defs. Resp. at 24 n.11, Dkt. 54. But the EAJA's legislative history reflects that it was designed to incentivize well-compensated lawyers to accept cases on behalf of indigent clients. H.R. REP. No. 1418, 96th Cong., 2d Sess. 11, *reprinted in* 1980 U. S. Code Cong. & Ad. News 4984, 4984 (explaining that the purpose of the EAJA is to ensure that individuals are not deterred in challenging unreasonable governmental action "because of the expense involved in securing vindication of their rights"). Restricting recovery to EAJA default rates merely due to plaintiffs' lack of finances would disincentivize expert counsel from representing indigent plaintiffs, thereby "effectively reducing access to the judiciary for indigent individuals. Such a result surely does not further the goals of the EAJA." *Cornella v. Schweiker*, 728 F.2d 978, 986–87 (8th Cir. 1984).

Defendants also contend that this case was a "bog-standard administrative law case, the bread and butter of this District's bar," and that it "did not require immigration law expertise." *Id.* at 23–24.   That contention is belied by the record.  Bringing this case demanded sophisticated knowledge of the EAD application process for asylum seekers, the impact of the Rules on that process, and the statutes and orders governing DHS's line of succession.  Indeed, the EAD Bar Rule imposed no fewer than a dozen changes to work authorization eligibility.  *See* Mem. Op. & Order Denying Defs. Mot. to Stay at 2–4, 4 n.3, Dkt. 22.  As one example, understanding at least one of those provisions—the bar based on exposure to the criminal justice system—required knowledge of still other statutes and regulations, and the ability to assess the potential immigration consequences of certain criminal charges.  *See* 85 Fed. Reg. 38,626 at 38,550 (codified at 8 C.F.R. § 208.7(a)(1)(iii)(B)–(C)) (discussing interplay between Rule at issue in this case and separate rule changing criminal bars to asylum).

Courts have routinely remarked on the overall complexity of immigration law.  *See Carranza v. INS*, 277 F.3d 65, 68 (1st Cir. 2002) (noting the difficulty of "attempting to distill some semblance of clarity from the Byzantine realm of immigration law"); *Villa v. Holder*, 464 F. App'x. 270, 272 (5th Cir. 2012) (describing the "immigration law of the United States" as "inexcusably complicated"); *Nadarajah v. Holder*, 569 F.3d 906, 913 (9th Cir. 2009) (addressing the complexity in the EAJA context).  *Nadarajah*, which Plaintiffs cited in their opening brief, but Defendants have not directly addressed,[13] was fundamentally a habeas case; yet the Ninth Circuit found that counsel's specialized knowledge in immigration law warranted an enhanced fee award.

---

[13]  Defendants argue that Ninth Circuit cases holding that expertise in niche areas of immigration law merits an enhanced fee "squarely conflict with D.C. Circuit law."  Defs. Resp. at 23 n.9, Dkt. 54.  But tellingly, Defendants fail to cite to any D.C. Circuit cases holding that immigration law expertise does not merit an enhancement.

*Nadarajah*, 569 F.3d at 913–14.  This case required an equal measure of specialized knowledge, implicating a particularly complicated niche in administrative and immigration law.

*Nadarajah* also directly undercuts Defendants' argument that "expertise warrants enhanced fees only if it requires technical or other education *outside* the field of American law." Defs. Resp. at 23, Dkt. 54 (internal quotation marks and brackets omitted, emphasis in original). In fact, expertise warrants enhanced fees so long as it requires "more than established principles of law with which the majority of attorneys are familiar."  *Nadarajah*, 569 F.3d at 914 (enhancing fee based on counsel's expertise in "statutory and constitutional immigration law"); *see also Pierce v. Underwood*, 487 U.S. 552, 572 (1988) (explaining that enhanced fees are warranted for "attorneys having some distinctive knowledge or specialized skill needful for the litigation in question," such as an "identifiable practice specialty," as "opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation").   Here, counsel employed their combined expertise in administrative and immigration law—two distinct practice specialties that were both necessary for this case and that are rare to find in combination.  This expertise—in conjunction with counsel's Spanish-language skills—warrants an enhanced fee rate.

**B.     Plaintiffs Expended a Reasonable Number of Hours.**

Defendants' arguments that Plaintiffs seek to recover for excessive hours lack merit.

First, Defendants attack the number of individuals who worked on Plaintiffs' case, without acknowledging that not all of them worked continuously throughout the matter and without citing any authority indicating that the raw number of timekeepers is meaningful in the reasonableness analysis.   The team's size here correlates with the case's complexity, the high stakes in the proceedings, and the large number of clients (eighteen Individual Plaintiffs and three nonprofit organizations).   Recruiting multiple individual plaintiffs and organizations was essential to the successful litigation of this case.   Indeed, the court in *Casa de Maryland* refused to enjoin certain

provisions of the EAD Rule because the organizations in that case failed to identify members impacted by those provisions. *See* 486 F. Supp. 3d at 948–49.

To the extent that Defendants suggest that the team's size led to a duplication of efforts, they fail to point to any examples. Further, "[t]ime spent by two [or more] attorneys on the same general task is not . . . *per se* duplicative. Careful preparation often requires collaboration and rehearsal . . . ." *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998). And in any event, Plaintiffs made significant reductions to their time entries to account for potential duplication of effort or excess time, significantly reducing billing for work related to crafting the first two counts and the APA background section of the complaint (because Plaintiffs did not seek summary judgment on these two counts, which asserted APA violations)—as well as omitting entirely work performed by certain team members (including all time for counsel from Organizational Plaintiff Tahirih). Acharya Decl. ¶¶ 10-11, Dkt. 47-1; Keren Zwick Decl. ¶¶ 26, 29, Dkt. 48-2; Annie Daher Decl. ¶ 7, Dkt. 48-4; Wendy Wylegala Decl. ¶ 9, Dkt. 48-5. Counsel's declarations provide the Court sufficient support to reject Defendants' concerns about excessive or duplicative billing. *Open Communities Alliance v. Carson*, No. 17-2192, 2018 WL 8622230, at *6 (D.D.C. June 15, 2018) (Howell, C.J.) (finding that "defendants' concerns about excessive or duplicative billing are fully addressed by the 'exercise of billing judgment' noted in the plaintiffs' declaration") (citing *Ashraf-Hassan v. Embassy of Fr. in the U.S.*, 189 F. Supp. 3d 48, 58 (D.D.C. 2016) (holding the hours billed were reasonable where "in an effort to reduce the fee amount, Plaintiff's counsel regularly no charged duplicative or unnecessary time . . . .")).

Second, Defendants contend that Plaintiffs cannot recover for any time that their attorneys spent recruiting them, preparing retainer agreements, or performing work predating the attorney-client relationships. Defs. Resp. at 26, Dkt. 54. But as this Court has held, recovery for pre-

23

attorney-client relationship work such as "client recruitment" and drafting "retainer agreements" is "not barred by any binding precedent, nor is it unreasonable," particularly where, as here, plaintiffs are represented by several co-counsel organizations in a complex suit challenging agency action. *Open Communities*, 2018 WL 8622230 at *4 (internal quotation marks and citations omitted) (permitting full recovery for pre-attorney-client relationship work such as client recruitment and drafting retainer agreements).[14]

Third, Defendants insist that the 631.6 hours billed "for work predating and pertaining to their complaint's filing" is a "facially unreasonable sum." Defs. Resp. at 25, Dkt. 54. But as this Court has instructed, a "general complaint that the numbers of hours spent on different phases of this litigation was facially unreasonable" is "unpersuasive." *Open Communities*, 2018 WL 8622230, at *6. Indeed, given the "similar billings that other courts have found reasonable," along with the complexity of this case, this objection should be rejected. *Id.* (citing *Bennett v. Castro*, 74 F. Supp. 3d 382, 403 (D.D.C. 2014) (finding reasonable 576 hours spent on "preliminary work")).

Fourth, Defendants assert that Plaintiffs' counsel should have billed fewer hours "given that they had five cases' worth of materials involving the same or substantially similar issues from which to draw." Defs. Resp. at 25, Dkt. 54.[15] Precedent does not erase counsel's obligation to

---

[14]    Defendants rely on *Kooritzky v. Herman*, 178 F.3d 1315, 1324 (D.C. Cir. 1999), for the proposition that "fees must be for a professional who has in fact acted in an attorney-client relationship with the fee claimant." But *Kooritzky* merely confirms that EAJA fees cannot be recovered unless an attorney-client relationship is eventually created. *Kooritzky* does not preclude recovery for work performed before the attorney-client relationship, so long as such a relationship was ultimately established.

[15]    Defendants present the Court with a false dichotomy, asserting that because Plaintiffs argue that the six prior opinions put Defendants on notice of the futility of their position for the purposes of a bad faith determination, Plaintiffs have somehow limited their fee recovery to fees for a cut-

exercise independent thought and adapt prior arguments to the specific facts of the case at hand. *See, e.g.*, *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 158 (3d Cir. 2021) (imposing sanctions for "copy-and-paste" litigation, which "reflect[s] a dereliction of duty"); *Rodgers v. Lincoln Towing Serv., Inc.*, 771 F.2d 194, 204 n.6 (7th Cir. 1985) (explaining that the use of "boilerplate allegations" "evince[s] counsel's carelessness in drafting and filing" and "illustrate[s] the appropriateness of . . . assessing sanctions under Fed. R. Civ. P. 11"); Fed. R. Civ. P. 11(b)(2) (stating that every time an attorney files a document, he or she certifies that the arguments contained therein "to the best of the person's knowledge, . . . formed after an inquiry reasonable under the circumstances . . . are warranted by existing law . . ."). This very Court's rules demand thorough research and attention to relevant precedent. LCvR 83.15 (incorporating Rule of Professional Conduct ("Rule") 3.3(a)(3)); Rule 3.3 Cmt. ("A lawyer . . . must recognize the existence of pertinent legal authorities. Furthermore, as stated in subparagraph (a)(3), an advocate has a duty to disclose directly adverse authority . . . . The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case."). Defendants have not shown why they are entitled to reduce the hours billed because Plaintiffs' counsel, instead of merely recycling briefing in prior cases, performed additional research and drafting in a thoughtful, comprehensive manner.

Fifth, Defendants assert that fee recovery for the complaint, motion for summary judgment, motion to enforce the judgment, and motion for attorneys' fees must be capped at 1.1 hours per page. However, "[t]here is not, and should not be, a simple formula of pages of review per hour

---

and-paste job. The filing of a complaint and other briefing requires more than blind reliance on other attorneys' work. *See* Fed. R. Civ. P. 11(b). So, while the six prior opinions confirmed the clear invalidity of Wolf's tenure, this case law did not give Plaintiffs' counsel license to cut corners.

or pages of a brief per hour that dictates the reasonableness of hours claimed." *Hightower v. Comm'r of Soc. Sec.*, No. 19-13433, 2022 WL 597436, at *3 (E.D. Mich. Feb. 28, 2022). "[T]he value of Plaintiff[s'] counsel's services was in his review of the record, research, and brief writing to obtain the result, not the . . . pages of briefing authored." *Id.* And it makes little sense to restrict recovery to 1.1 hours per page, as it often takes *more time* to write concisely. *See IMAPizza, LLC v. At Pizza Ltd.*, No. 17-cv-2327 (TJK/GMH), 2021 WL 2410713, at *21 (D.D.C. June 8, 2021), *report & recommendation adopted by* 2021 WL 3168132 (D.D.C. July 27, 2021) ("[F]ewer words generally means more time and thus fewer pages does not necessarily mean counsel spent less time briefing that issue.") (internal quotation marks omitted).

Defendants suggest that *Elec. Priv. Info. Ctr. v. FBI*, 80 F. Supp. 3d 149, 158 (D.D.C. 2015) ("*EPIC*") created a *per se* rule that any greater ratio than 1.1 hours per page is unreasonable. *EPIC*, however, created no such rule. Rather, the *EPIC* court awarded a fee for 9.5 hours of work—rather than the requested 18.4 hours—for a nine-page complaint based on the facts of that case. 80 F. Supp. 3d at 158. The *EPIC* court reduced the number of hours upon finding that the complaint was highly similar to the complaints that EPIC frequently filed, and upon finding that there were "inefficiencies and redundancies" in preparing and filing that complaint. *Id.* By contrast, nothing about the complaint that Plaintiffs filed was routine or duplicative of other works.[16] Defendants point to no inefficiencies or redundancies in Plaintiffs' billing entries that would warrant a reduction in their hours. And as stated above, Plaintiffs have already reduced

---

[16] Defendants attempt to direct the Court's attention to a 61-page complaint that "'presented the same issue as to the *same Rules*' in this case," Defs. Resp. at 25, Dkt. 54, but instead they have annexed a complaint relating to the Deferred Action for Childhood Arrivals program, *Casa de Maryland v. DHS,* No. 17-02942 (D. Md. 2017), Dkt. 54-4.

their billing entries to account for duplication of or excess efforts on their own initiative. *See supra* p. 23. A different approach than the one used in *EPIC* is, therefore, warranted.

Sixth, and finally, Defendants ask the Court to decline to award any fees for Plaintiffs' motion to enforce the judgment, under the theory that the Court should deny that motion. Defs. Resp. at 29, Dkt. 54. For the reasons stated in the motion and this reply, the Court should grant Plaintiffs' motion to enforce the judgment. Defendants' unjustified resistance to compliance with the vacatur order (evidenced by both Defendants' inadequate response to Plaintiffs' direct outreach prior to filing the motion to enforce and in Defendants' opposition to that motion) underscores the reason why fees should be awarded for Plaintiffs' enforcement motion. *See* Acharya Decl. Exhibits K–O, Dkt. 47-1 (documenting attempts to communicate regarding Defendants' post-vacatur obligations). Defendants' failure to revise the Form and Instructions until after Plaintiffs filed their motion to enforce the judgment likewise emphasizes why the motion was necessary. And the fact that Defendants have now made some revisions to the Form and Instructions— partially addressing one of the remedies sought in the enforcement motion—renders Plaintiffs the prevailing party at least as to that issue.

The hours claimed in this case are commensurate not just with the complexity of the case, but also with the gravity of the proceeding. The stakes in this case were particularly high for the Individual Plaintiffs. A defeat—and the corresponding lack of access to work authorization, potentially for the duration of their asylum proceedings—would have caused devastating results such as struggles to find stable housing, compromised access to medical care, and barriers to financially supporting themselves and their families. It is thus no surprise that counsel took care to thoroughly research and brief the issues in this case—and the results speak for themselves, as

Plaintiffs prevailed on all fronts.  Accordingly, the Court should find that the number of hours for which Plaintiffs seek to recover fees is reasonable.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs request that the Court grant their motion to enforce or for additional injunctive relief and (i) declare that Defendants have failed to comply with the Court's vacatur order; (ii) direct Defendants to amend the eCFR within seven days to accurately reflect vacatur of the Rules at issue; (iii) direct Defendants to revise the EAD Application's Instructions within fifteen days; and (iv) order Defendants to adopt EAD processing procedures to ensure compliance with the mandatory processing times that were restored by the vacatur of the Rules by processing all new cases within thirty days and by adjudicating the backlog within fifteen days.

Further, Plaintiffs request that the Court grant their motion for attorneys' fees and expenses pursuant to the EAJA and award Plaintiffs a total amount of $762,583.60.

Dated: September 20, 2022

Respectfully submitted,

By:  */s/ Deepa Acharya*

Keren Zwick (D.D.C. Bar. No. IL0055)
Mark Fleming*
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Ave., Suite 600
Chicago, IL 60604
312-660-1370
kzwick@heartlandalliance.org
mfleming@heartlandalliance.org

Richard Caldarone***
TAHIRIH JUSTICE CENTER
6400 Arlington Blvd., Suite 400
Falls Church, VA 22042
571-282-6161
richardc@tahirih.org

Annie Dutton
CENTER FOR GENDER & REFUGEE
STUDIES
200 McAllister St.
San Francisco, CA 94102
415-565-4877
duttonanne@uchastings.edu

*\* Certification to practice pursuant to
LCvR 83.2(g) to be submitted*

*\*\* Counsel for Individual Plaintiffs only*

*\*\*\* Counsel for Tahirih Justice Center
only*

Deepa Acharya (D.C. Bar No. 996412)
Carl Spilly (D.C. Bar No. 230830)
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
1300 I St. NW, Suite 900
Washington, DC 20005
202-538-8000
deepaacharya@quinnemanuel.com
carlspilly@quinnemanuel.com

Melissa Crow (D.C. Bar No. 453487)
CENTER FOR GENDER & REFUGEE STUDIES
1121 14th St. NW, Suite 200
Washington, DC 20005
202-355-4471
crowmelissa@uchastings.edu

Wendy Wylegala**
KIDS IN NEED OF DEFENSE
252 West 37th Street, Floor 15
New York, NY 10018
646-970-2913
wwylegala@supportkind.org

*Counsel for Plaintiffs*

29